to his bedroom, and verbally gave them permission to take his computer from his bedroom.  The detectives did not search any of the rooms or take any other items.

Looking at the totality of the circumstances, the defendant's verbal consent was voluntary.  The defendant was calm and cooperative throughout the time the detectives were at the residence.  He was in his home, he was not in handcuffs, and as he concedes in his affidavit, he was told he was not under arrest. *See United States v. Mitchell*, 966 F.2d 92, 99 (2d Cir. 1992) (noting that interrogation in the familiar surroundings of one's own home is generally not deemed custodial).  In fact, the defendant admits that the request to go to the police station for an interview "was phrased as a request, not an order."  The defendant also has prior dealings with law enforcement and is no newcomer to the law. *See Calvente*, 722 F.2d at 1023 (consent voluntary where 40-year-old defendant was calm, conversation with police was conversational in tone, and defendant had prior convictions and was "thus no newcomer to the law").

Finally, when the defendant was taken back to the police station, he initialed and signed a "Consent to Search" form, memorializing his prior consent to have the detectives examine his computer.  Morgan Decl. Ex. A-4. The form expressly disclosed that he had the right to refuse consent, and he initialed the form indicating he read and understood that right.  He also initialed the form to indicate his consent was being given freely and voluntarily without coercion.  Accordingly, his motion to suppress the computer evidence should be denied.

### 2.    The defendant's version of events is not credible.

The defendant and his mother provide different version of events.  The defendant argues that the Waterbury detectives' version of events should be discredited, claiming their version does not make sense.  *See* Def.'s Mem. at 9-12.  To the contrary, the detectives' version of events makes complete sense.

15

For example, the defendant argues that it does not make sense that Mr. Eastman would consent to a search given his past history with law enforcement. *See* Def.'s Mem. at 9.  However, as the Second Circuit and other courts in this circuit have repeatedly observed, "[d]espite the obvious irony, it is apparent that suspects can, and often do, voluntarily consent to a search even when it must be clear to them that incriminating evidence will be disclosed." *United States v. Price*, 599 F.2d 494, 503 (2d Cir. 1979); *see United States v. Villegas*, 928 F.2d 512, 518 (2d Cir. 1991) (quoting the same); *United States v. Moreno*, No. 08-CR-605, 2009 WL 454548, at *7 (E.D.N.Y. Feb. 24, 2009) (same); *United States v. Yepes-Quintero*, No. 86 CR 672, 1987 WL 8114, at *2 (E.D.N.Y. Mar. 6, 1987) (same).  Although an individual's consent to a search primarily benefits law enforcement, it "may result in considerably less inconvenience for the subject of the search." *Schneckloth*, 412 U.S. at 228. Granting consent in such circumstances is not necessarily self-defeating, because a defendant may still disclaim ownership of what is uncovered in the search. *See Price*, 599 F.2d at 497.  Thus, it is entirely reasonable for the defendant to have provided his consent to take and search his computer.

The defendant also suggests that it does not make sense that the Waterbury detectives did not get a warrant first, reflecting poor judgment. *See* Def.'s Mem. at 9. However, Detective Morgan believed the better course of action was to try and speak with Eastman first because he felt he needed additional information to support an application for a search warrant.  It is entirely reasonable for law enforcement to try and obtain a defendant's consent to search without having a warrant in hand.  In fact, courts have repeatedly recognized that this procedure, often called a "knock and talk" strategy, is a legitimate law enforcement option. *See United States v. Chambers*, 395 F.3d 563, 568 n. 2 (6th Cir. 2005) ("Courts generally have upheld [the 'knock and talk'] investigative procedure as a legitimate effort to obtain a suspect's consent to search.");

*United States v. Jones*, 239 F.3d 716, 720 (5th Cir. 2001) ("Federal courts have recognized the 'knock and talk' strategy as a reasonable investigative tool when officers seek to gain an occupant's consent to search or when officers reasonably suspect criminal activity."); *United States v. Hardeman*, 36 F. Supp. 2d 770, 777 (E.D. Mich. 1999) (noting that the "knock and talk" is "generally upheld as a legitimate method of investigation, designed to obtain a suspect's consent to search").

The defendant further suggests that there must be something wrong with the detective's version of events because Detective Morgan did not include Mrs. Eastman's presence and reaction in his report.  *See* Def.'s Mem. at 9.  Again, this argument is unconvincing.  As Detective Morgan's declaration makes clear, Mrs. Eastman's presence was almost non-existent. She came out for a brief moment when the defendant told her to go back into her room.  Later, the defendant spoke to her again when he informed her that he was going with the officers to the police station.  The detectives never entered her room and she never told the detectives to leave. Since the only item the detectives took from the home was the defendant's computer from his own bedroom with his consent, there was no need to mention her in the report.

Finally, the defendant suggests that the time and location written on the Consent to Search form are suspicious because it was signed at the Waterbury police station and was not signed at the home.  *See* Def.'s Mem. at 10, 11. There is nothing suspicious about the form.  As Detective Morgan explains in his declaration, the defendant gave a verbal consent at his residence, which was later memorialized in the written consent at the station.  There is no requirement that consent must be in written form.  *See Buettner-Janusch*, 646 F.2d at 764 ("[I]t is well settled that consent may be inferred from an individual's words, gestures, or conduct.").

17

If any version of events should be discredited, it is the version offered by the defendant and his mother.  If the detectives had performed a warrantless search of the home, then it makes no sense that they would have left the other laptop computer behind.  It also makes no sense they would take the defendant's cell phones, only to return them to him after his interview without examining them.  This alone casts doubt on the defendant's version of events.

The fact is the detectives did not take the laptop because the defendant was being cooperative and stated the laptop was not his.  He stated his computer was in the bedroom.  The defendant was calm and cooperative.  If the events at the home were as contentious as the defendant contends, then it would only make sense for the detectives to take the other laptop and keep the cell phones for further examination, which they did not.  The only plausible explanation is that the defendant voluntary agreed to turn over his computer.

The defendant next argues that even if he did give consent, his mother's refusal to consent to a search negates whatever consent the defendant gave.  *See* Def.'s Mem. at 10-11. Again, the defendant's argument presumes there was a search of the residence in the first place, which the detectives flatly deny, and as just discussed, does not even make sense.  In addition, at no time did Mrs. Eastman tell the detectives to leave.  And the detectives were under no obligation to ask for her consent. *See United States v. Lopez*, 547 F.3d 397, 400 (2d Cir. 2008) (holding that if one co-tenant consents to a search, officers have "no duty to ask [the other co-tenant] if he consented to the search, no matter how easy or convenient it might have been to do so.").

Moreover, Mrs. Eastman's authority to consent or refuse consent to a search only relates to property or area she had common authority over, a substantial interest in, or permission to access. *See United States v. Davis*, 967 F.2d 84, 87 (2d Cir. 1992) ("[A] third-party consent to a

search will validate the search if two prongs are present: first, the third party had access to the area searched, and, second, either: (a) common authority over the area; or (b) a substantial interest in the area; or (c) permission to gain access").  With respect to a container, a co-inhabitant's consent (and implicitly a refusal to consent) "may not be effective consent to a search of a closed object inside the home." *United States v. Karo*, 468 U.S. 705, 725 (1984); *see United States v. Block*, 590 F.2d 535 (4th Cir. 1978) (mother had no authority to consent to search of footlocker in son's room); *United States v. Robinson*, 999 F. Supp. 155, 162–63 (D. Mass. 1998) (mother had authority to consent to search of adult son's bedroom for items open to view but not a closed vinyl bag in the room or the pockets of a pair of pants in the room).

In this case, the computer belonged to the defendant, not his mother, and it was in his bedroom, not the common area.  She does not claim that she had access to it or otherwise used it. Accordingly, even if she could refuse consent to search the common areas of the home, she did not have the authority to consent, and therefore refuse consent, to a search the defendant's bedroom or his computer.  *See United States v. Griswold*, No. 09-CR-6174, 2011 WL 7473466, at *4 (W.D.N.Y. June 2, 2011) (holding that while defendant's mother had the right to retrieve the laptop from the defendant's bedroom and deliver it to the officers, the mother did not have authority to consent to search the laptop itself, which "is akin to a closed container").

Finally, it bears noting that although the defendant's mother states she filed a complaint with the Waterbury Police Department, she did so in August 2013—over nine months after the supposed warrantless search of her residence and the seizure of the defendant's computer.  If the events of that day occurred as they now contend, they offer no explanation why they waited so long to file a complaint.  This delay further undermines their version of events.

3.      **Handwriting analysis confirms the defendant signed the consent to search form.**

In his motion to suppress, the defendant claims that the initials and signature on the Consent to Search form are not his, suggesting they were forged.  However, the government's forensic document examiner, Ms. DiMartino, compared the signature and initials on the original Consent to Search form (as opposed to a photocopy) to several other original documents that the government asserts bear the defendant's signature and initials, including a Waiver of Extradition, which he signed before a judge in Norfolk, Virginia on May 15, 2013, and his Uniform Arrest Report, his booking card, and a questionnaire, all of which he signed on May 29, 2013 after he was brought back to Waterbury.  Ex. C. After performing a comparative and microscopic handwriting examination, she determined that the writer of John Eastman's signature on the Consent to Search form is the same as the writer of John Eastman's signature on the other original documents she examined.  Ex. C.

Although the defendant's handwriting expert, John Reznikoff, reaches a different conclusion, his report should be given little weight, if any.  First, unlike Ms. DiMartino, the defense expert has not examined any original documents, only photocopies.  As he readily admits, "photocopies provide a sub-par example of handwriting . . . . Lost for examination are pen speed, pressure, rhythm, as well as a number of other factors."  Def.'s Mot. Ex. A at 4.

In addition, the majority of documents that Mr. Reznikoff uses as the defendant's known signatures are documents the defendant signed in 2015, after he was arrested and had a motive to manipulate or alter his signature.  Significantly, of the four known signatures he examined that pre-date the disputed documents, none of them remotely resemble the defendant's 2015 signatures, further supporting the government's belief that the defendant altered his signature after his arrest.  The defense expert offers no explanation for this discrepancy.  In addition, the

defense fails to describe the conditions under which the defendant provided his handwriting exemplars, whether he was supervised and given instructions, or whether he was simply left alone and allowed to take all the time in the world to carefully manipulate his signature.

Finally, the defense expert has not examined many of the other documents the government's witness has examined.  For example, as discussed, Ms. DiMartino examined an original Waiver of Extradition form, which the government submits the defendant signed before a judge in Norfolk, Virginia, an original Uniform Arrest Report, an original booking card, and an original questionnaire, all of which were signed in May 2013.  *See* Exs. D, E, F, G.

In addition, there are numerous other non-original documents containing the defendant's signatures and initials, including various forms the defendant signed in 2011 with the State Probation Office (*see* Ex. H), a fingerprint card the defendant signed in 1997 (*see* Ex. I), and other forms he signed and initialed while he was being held in Virginia in May 2013 (*see* Ex. J). Although the government's forensic examiner was unable to perform an electrostratic analysis on these non-original documents due to the poor quality, the Court can view the defendant's signature and initials on these documents for itself and see that they are strikingly similar to the initials and signatures on the disputed Consent to Search form. *See, e.g.*, *United States v. Marshall*, No. 3:10-CR-14-JCH, 2011 WL 2842497, at *6 (D. Conn. July 14, 2011) ("The law does not require 'a questioned document examiner to vouch for the similarity of handwriting,' but instead, allows the jury to determine for itself whether the same person's handwriting appears on two documents" (quoting *United States v. Alvarez–Farfan*, 338 F.3d 1043, 1045 (9th Cir. 2003)).

A-128

Below is a comparison of the signatures and initials on the various documents:

| Signature and Initials | Source |
|---|---|
|  | Consent to Search (Morgan. Decl. Ex. A-4) |
|  | Waiver of Extradition (Ex. D) |
|  | Uniform Arrest Report (Ex. E) |
|  | Booking Card (Ex. F) |
|  | Questionnaire (Ex. G) |
|  | 2011 Probation Forms (Ex. H) |

22

| | |
|---|---|
| SIGNATURE OF ACCUSED<br>X<br>P.D. ID NO.<br>17886     P.D. CASE N<br>910- | 1997 Fingerprint Card<br>(Ex. I) |
| explanation and acknowledges with his/her initials next to each service.<br><br>Grievance Procedures<br>Recreation<br>Visitation | Norfolk Sheriff's Office forms<br>(Ex. J) |

The government submits that the initials and signatures are all remarkably similar. Thus, to believe the defendant's signature on the Consent to Search form is forged would require this Court to also believe that the defendant's signature on the waiver of extradition form witnessed by a judge in Virginia was also forged, his signature on other forms from the Norfolk Sherriff's office were forged, the signature on the 2011 probation forms was forged, his signature on a 1997 fingerprint card was also forged, and his signature on the Uniform Arrest Report, Booking Card, and Questionnaire in 2013 were forged. Such a vast conspiracy to forge his signature on multiple documents witnessed by multiple people in multiple jurisdictions over a span of 20 years defies credulity.

> **4.     Suppression is not warranted because the Federal law enforcement who forensically examined a mirror image of the defendant's computer acted in good faith reliance on a federal search warrant.**

Even if the Court finds that the Waterbury detectives did not have consent to take and search the defendant's computer, or that they otherwise violated the defendant's Fourth Amendment rights, suppression of the computer evidence is not warranted here because federal

law enforcement agents obtained a separate warrant to forensically examine a mirror image of the defendant's computer and acted in good faith reliance on that warrant.

In *United States v. Leon*, 468 U.S. 897, 920 (1984), the Supreme Court held that the exclusionary rule does not require the suppression of evidence seized by law enforcement officers in good faith pursuant to a warrant. *See also United States v. Falso*, 544 F.3d 110, 125 (2d Cir. 2008) (quoting *Leon*, 468 U.S. at 922) ("The exclusionary rule barring illegally obtained evidence from the courtroom does not apply to evidence seized 'in objectively reasonable reliance on' a warrant issued by a detached and neutral magistrate judge, even where the warrant is subsequently deemed invalid."). The good faith exception applies even when the affidavit in support of a warrant includes information obtained from prior unconstitutional conduct. *See United States v. Thomas*, 757 F.2d 1359, 1368 (2d Cir. 1985) (finding *Leon* good faith rule applicable where affidavit supporting the warrant contained evidence obtained in violation of the Fourth Amendment); *United States v. McClain*, 444 F.3d 556, 564–566 (6th Cir. 2005) (finding that "the *Leon* good faith exception should apply despite an earlier Fourth Amendment violation"); *United States v. Fletcher*, 91 F.3d 48, 51–52 (8th Cir. 1996) (finding that the *Leon* good faith exception was applicable to a subsequent warrant authorizing search of luggage when the initial detention of the luggage was a Fourth Amendment violation).

There are four circumstances in which the good-faith exception does not apply: (1) the issuing judge relied on an affidavit that the affiant knew was false or would have known was false had he or she not acted in "reckless disregard of the truth"; (2) the "magistrate wholly abandoned his judicial role"; (3) the "affidavit [is] so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; or (4) the warrant is "so facially deficient . . . that the executing officers cannot reasonably presume it to be valid." *Leon*, 468

24

U.S. at 923.  None of these circumstances are present here: there is no evidence that the Agent Haimila, who signed the federal warrant application, deliberately misled the magistrate, that the magistrate abdicated her duty, that the warrant application lacked probable cause, or that the warrant was facially deficient.

Although Agent Hamilia's affidavit in support of the warrant does describe evidence that the Waterbury police obtained from the forensic examination of the defendant's computer and his statements, she makes clear in her attached declaration that when she applied for the federal warrant to search the defendant's computer, she had no knowledge that the defendant was contesting the validity of his consent to search, his waiver of rights, or his voluntary statement. Ex. B.  The agent read through all of the documents she received from Waterbury and talked to Detective Morgan on numerous occasions, and there was nothing to suggest anything improper. Therefore, the Court should find that the federal agents acted in good faith when they obtained the federal warrant and forensically examined a mirror image of the defendant's computer. *See United States v. DeProspero*, 472 F. App'x 42, 43-44 (2d Cir. 2012) (finding agents acted in good faith because "[e]ven if we assume that the review of the electronic media by the state law enforcement officers was improper, the evidence was nonetheless admissible because the federal law enforcement agents relied in good faith on a facially valid federal search warrant").

**B.      The Court Should Deny the Motion to Suppress Eastman's Statements**

The Court should also deny the defendant's motion to suppress the statements in the Voluntary Statement form.  First, any discussion that took place in the defendant's home, during which he told the Waterbury detectives about his computer in his bedroom, was not the subject of a custodial interrogation.  *See Mitchell*, 966 F.2d at 99 (noting that interrogation in one's own home is generally not deemed custodial).  The defendant invited the detectives into the home, he was not in handcuffs, and he was calm and cooperative throughout the short time period the

25

detectives were in the home.  Indeed, the defendant concedes he was told he was not under arrest and the detectives' request for him to go to the station "was phrased as a request, not an order."

Second, at the station, the defendant was still not in handcuffs.[6]  Nonetheless, the defendant was advised of and waived his rights two times, once when he signed the Advisement of Rights form and then again when he signed the Voluntary Statement Rights form.  Morgan Decl. Exs. A-1 and A-2.  In his Voluntary Statement, the defendant again acknowledged that he was advised of his rights and agreed to waive them.  Morgan Decl. Ex. A-3.  All three forms were signed by both the defendant in the presence of Detectives Morgan and Terni.  In addition, a supervisor, Lieutenant Fox observed and notarized the defendant's signature on the Voluntary Statement.

Although the defendant claims that he did not sign the forms, the government's forensic document examiner, Ms. DiMartino, examined the originals of these three forms and compared the signatures and initials on the forms to the other original documents mentioned previously, and she determined that the writer of John Eastman's signature and initials on these forms is the same as the writer of John Eastman's signature and initials on the other documents.  Although the defense expert reaches a different conclusion, his report should be given little to no weight for the same reasons discussed above, primarily that he has not examined original documents, he relies primarily on known signatures that post-date the defendant's arrest (except for a couple of documents where the pre-arrest signatures do not resemble his post-arrest signatures), and he has not examined a variety of other documents containing initials and signatures that are remarkably

---

[6] In his memorandum, the defendant argues that because Detective Morgan's report states that the defendant "was allowed to leave" after the interview, the suggestion is he must not have been allowed to leave earlier.  *See* Def.'s Mem. at 5.  However, as Detective Morgan explains, his choice of words, "was not meant to indicate that Eastman was not allowed to leave at any point before then.  Rather, I simply meant that I was not placing him under arrest following the interview." Morgan Decl. ¶ 26.

similar to the disputed signatures on the three forms.  Below is a comparison of the various signatures:

| Signature and Initials | Source |
| --- | --- |
|  | Advisement of Rights (Morgan. Decl. Ex. A-1) |
|  | Voluntary Statement Rights (Morgan. Decl. Ex. A-2) |
|  | Voluntary Statement (Morgan. Decl. Ex. A-3) |

| | |
|---|---|
| Signature of Person giving voluntary st | |
| gnature of Person giving voluntary statement<br>uthority designated to transport me to the | Waiver of Extradition<br>(Ex. D) |
| ACCUSED<br>John Eastman<br>IATURE OF ACCUSED | Uniform Arrest Report<br>(Ex. E) |
| ict family or counsel. | Booking Card<br>(Ex. F) |
| | Questionnaire<br>(Ex. G) |
| understand and agree to the above terms | 2011 Probation Forms<br>(Ex. H) |

| | |
|---|---|
| SIGNATURE OF ACCUSED<br>X<br>P.D. ID NO.<br>17886   P.D. CASE N<br>910- | 1997 Fingerprint Card<br>(Ex. I) |
| explanation and acknowledges with his/her initials next to each service.<br>Grievance Procedures<br>Recreation<br>Visitation | Norfolk Sheriff's Office forms<br>(Ex. J) |

Finally, it is not plausible that the detectives manufactured the facts in the Voluntary Statement out of thin air, especially in light of the fact that the forensic examination corroborated most of the statements, and Detective Morgan would not have known of those facts until he completed the examination. In his affidavit, the defendant states that he read (but did not sign) the typed statement that Detective Morgan gave him and believes it is the same one that is in dispute. At that time, Detective Morgan had not yet begun to forensically examine the defendant's computer. The only Skype account he was aware of at that point was "harry.styles888" which was mentioned in the Vermont complaint. Detective Morgan had not yet discovered the other Skype accounts on the computer or the videos of the individual singers and band members, which the defendant played so the minors he was talking to would think they are talking to the real singers. In addition, Detective Morgan had no way of knowing which websites the defendant frequented. He found this evidence on the computer after the interview. Yet the typed statement included statements that the defendant used multiple screen names on Skype that were names of One Direction band members and that the defendant would play You Tube videos of the singers to trick the minors he was chatting with. The statement also indicated

the defendant visited pornography websites such as Motherless.com, which is one of the websites Agent Haimila noticed in her review of the defendant's web browsing history.  Haimila Decl. ¶ 6.  Detective Morgan could not have determined these facts until he performed the forensic examination.  Thus, the only plausible explanation for these statements being in the Voluntary Statement form is that the defendant did, in fact, provide these statements to the detectives.

Accordingly, the defendant's motion to suppress his statements should be denied.

## CONCLUSION

For the foregoing reasons, the Government respectfully requests that the Court deny the defendant's motion to suppress.

Respectfully submitted,

DEIRDRE M. DALY
UNITED STATES ATTORNEY

/s/  Neeraj N. Patel
NEERAJ N. PATEL
ASSISTANT UNITED STATES ATTORNEY
Federal Bar No. phv04499
157 Church Street, 25th Floor
New Haven, CT  06510
Tel.:   (203) 821-3700
Fax:   (203) 773-5376
Email: neeraj.patel@usdoj.gov

A-137

# EXHIBIT

# A

A-138

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | Criminal No.  3:16-CR-006(MPS) |
| v. | : | |
| | : | |
| JOHN EASTMAN | : | March 25, 2016 |

**DECLARATION OF PETER MORGAN
IN SUPPORT OF GOVERNMENT'S OPPOSITION TO
DEFENDANT'S MOTION TO SUPPRESS EVIDENCE**

I, Peter Morgan, a Detective with the Waterbury, Connecticut Police Department,

pursuant to 28 U.S.C. § 1746, declare as follows:

1.       I am a Detective with the Waterbury Police Department.  I make this declaration

in support of the Government's Memorandum in Opposition to Defendant's Motion to Suppress

Evidence in the above captioned case.

2.       I have been a member of the Waterbury Police Department since 1995.  I started

as a police officer and became a detective in 2004.  I am currently assigned to the Criminal

Investigations Bureau and work in the Computer Crimes Unit.  I am also a computer forensic

examiner.

**The Pre-Interview Investigation**

3.       On or about October 25, 2012, the Waterbury Police Department received a

complaint and investigative reports from Trooper Eric Jollymore of the Vermont State Police,

which I then reviewed.  Trooper Jollymore's reports indicated that on or about September 13,

2012, the mother of an 11-year old girl in Vermont called the Vermont State Police to report an

incident that occurred when her daughter and two of her friends were using Skype during a

sleepover the weekend before.  Trooper Jollymore then spoke with the 11-year old girl, who

Case 17-3893, Document 37-3, 07/24/2018, 2351754, Page19 of 95

indicated that she and her friends were using the Skype program to speak with people over the internet, including individual on Skype using the username "Harry.Styles888."  Harry Styles is a member of the musical group "One Direction" that is popular with teenagers.  The girl reported to Trooper Jollymore that during the Skype conversation, "Harry.Styles888" requested that they activate their web cam so that he could see them.  The girl further reported that she told "Harry.Styles888" that they were 13 years old, and "Harry.Styles888" informed them that he was 18 years old.  The girl reported that after she activated her web cam, "Harry.Styles888" asked them if they could pose in the sexual position called "Doggy Style" in front of the web cam for him.  The girls stated that they did not perform the act, and the conversation ended shortly after this.

4.      Through a court order, Trooper Jollymore obtained from Skype the subscriber information associated with the screen name "Harry.Styles888." Skype reported that the "Harry.Styles888" account was activated on July 27, 2012 from a computer using internet protocol address 76.23.191.201 (the "Suspect IP Address"), which Trooper Jollymore subsequently determined was assigned to Comcast Cable to a subscriber in Waterbury, Connecticut.  At that point, Trooper Jollymore referred the matter to the Waterbury Police Department for further investigation.  The case was then assigned to me.

5.      On or about November 1, 2012, I applied for and obtained an ex parte order from a Connecticut Superior Court Judge in Waterbury requiring Comcast to disclose subscriber information for the Suspect IP Address.  I then sent the order to Comcast.

6.      On or about November 8, 2012, Comcast reported that on July 27, 2012, which was the date and time the "Harry.Styles888" account was activated on Skype, the Suspect IP

Address had been assigned to the account of John Eastman ("Eastman") of ███████ ███, Waterbury, Connecticut ("Eastman's Residence").

**Events at Eastman's Residence on November 10, 2012**

7.       On or about Saturday, November 10, 2012, I was working a weekend rotation at the Waterbury Police Department.  Detective David Terni of the Waterbury Police Department was also working that weekend.  I know that Detective Terni has been a detective with the Waterbury Police Department for several years.

8.       That evening, I asked Detective Terni to accompany me to Eastman's Residence to try and locate and speak with Eastman about the incident in Trooper Jollymore's report.  I did not obtain a search warrant at the time because I felt I needed additional information to support an application for a search warrant to seize computer related items.  I believed the better course of action was to try and speak with Eastman first.

9.       Detective Terni agreed to accompany me and we drove together to Eastman's Residence.  Although I do not recall the exact time we left the Waterbury Police station, I do recall it was dark outside and was sometime between approximately 6:00 p.m. and 6:30 p.m.

10.       Upon arrival at Eastman's Residence, I knocked on the door.  Eastman answered the door, and I identified myself and Detective Terni to Eastman.  Although we were dressed in plain clothes, I showed Eastman my police shield and stated I was with the Computer Crimes Unit of the Waterbury Police Department.  I recall that Detective Terni was wearing his police shield around his neck and was visible.

11.       Eastman invited us inside the apartment.  Once inside, I informed Eastman that he was not under arrest and that I was conducting an investigation regarding his internet activity.  Eastman stated he wished to cooperate.  Eastman sat down on the couch in the living room.

Eastman was never placed in handcuffs during the time Detective Terni and I were in his residence.

12.     While I was explaining the nature of my investigation, Eastman's mother came out  from a bedroom and asked what was happening.  I told her we were from the police department and explained we were investigating Eastman's internet activity.  At the same time I was talking to Eastman's mother, Eastman told his mother to go back inside her room and that everything was okay.  Eastman's mother then went inside her room and closed the door.  Neither Detective Terni nor I entered her bedroom.

13.     I observed a laptop computer in plain view and I asked Eastman about the laptop. Eastman stated he did not use that laptop.  Eastman stated he had a desktop computer in his bedroom that he uses, and Eastman then showed us his bedroom.  Detective Terni and I followed Eastman to his bedroom.  In the bedroom I observed the desktop computer, along with a webcam and a reclining chair.  I asked Eastman if we could take the desktop to the police station to be examined for further investigation.  Eastman verbally consented for us to take the computer.  I then unplugged the desktop computer and disconnected it from the monitor.  I did not ask to take the other laptop computer because Eastman indicated he did not use that computer.  At that point, after seeing the desktop computer and the webcam, along with a reclining chair positioned in front of it, if Eastman had not provided his consent to take the computer, I would have immediately had officers remain outside the apartment while I applied for a search and seizure warrant.

14.     I also asked Eastman if he would be willing to come to the Waterbury Police Department to speak with Detective Terni and I about the case.  Eastman agreed to come to the station to speak with us.

4

15.     Prior to leaving, Eastman used the bathroom.  Eastman closed the door as he was

using the bathroom.  Also, before leaving, Eastman knocked on the door to his mother's

bedroom to let her know where he was going.  Eastman's mother inquired as to whether her son

was under arrest and I responded no.

16.     We then left the apartment and proceeded to the car.  Eastman sat in the back seat

of our car, and we drove Eastman to the Waterbury Police station.  Eastman was not in handcuffs

during the drive.

17.     I believe the amount of time Detective Terni and I spent in at Eastman's

Residence was less than half an hour.  At no time did we enter the kitchen or any other room in

the apartment, except for the living room and Eastman's bedroom.  We did not conduct a search

of the apartment and the only item we took from the apartment was the desktop computer, which

Eastman verbally agreed to let us take.  Eastman never asked us to leave the apartment and never

asked for a search warrant.  Eastman's mother also never asked us to leave the apartment, never

asked for a search warrant, and never informed us we could not take the computer from

Eastman's bedroom.  Eastman was never placed in handcuffs and he was calm and cooperative

throughout the period we were at his residence.

**Eastman's Voluntary Statement at the Police Station**

18.     After we arrived at the Waterbury Police Station, we proceeded to the second

floor to interview Eastman.  I sat at a desk in an open area next to a computer.  Eastman sat next

to me.  Detective Terni was across from us.  Eastman was not in handcuffs during the interview.

There is no video recording of the interview because prior to 2014, the Waterbury Police

Department was not equipped with video recording devices to record interviews.

5

19.     Before I asked Eastman any questions, I provided Eastman with an "Advisement of Rights" form.  A copy of the form is attached hereto as Exhibit A-1.  I read out loud each of the Constitutional rights contained on the form.  Eastman initialed each of the rights contained on the form and agreed to waive those rights.  Eastman then signed the form.  I also signed the form and noted the date and time, which was November 10, 2012 at 6:55 p.m.

20.     After I advised Eastman of his rights, I interviewed Eastman and he described his use of Skype to interact with minors.  After the interview, I opened a computer program on my computer that allows me to type his statement into a "Voluntary Statement" form.  The way the computer program operates is that upon opening the program and entering preliminary case details, the program first generates a "Voluntary Statement Rights Form" which, like the "Advisement of Rights" form discussed above, lists an individual's Constitutional rights.  I provided the form to Eastman and had him read the form to himself.  Eastman placed his initials next to each right and then signed the form agreeing that he understood and wished to waive those rights.  I also signed the form and noted the date and time, which was November 10, 2012 at 7:32 p.m.  A copy of the form is attached hereto as Exhibit A-2.

21.     I then finished typing Eastman's statements from the interview into the "Voluntary Statement" form, printed the form, and then handed it to Eastman.  I asked Eastman to read portions of the statement out loud to make sure he could read the form.  After reviewing the statements on the form, Eastman asked me to make a change to one of his statements.  Although I do not recall specifically what he asked me to change, I made the change he requested, reprinted the form, and provided it to Eastman.

22.     I am aware the internal procedures at the Waterbury Police Department require me to take the following steps before the individual making the statement signs the Voluntary

6

Statement form: once the individual has read the statement and is satisfied with its contents, a supervisor is called into the room to notarize the individual's signature.  Another officer is also present to witness the signature. The supervisor administers an oath to the individual as set out on the bottom form, observes the individual initial each page in two places, and then observes as the individual signs all pages of the statement.  Then supervisor then signs his own name notarizing the individual's signature.  Finally, the third officer signs as a witness.

23.     In accordance with those procedures, I called Lieutenant William Fox to come up and notarize and observe while Eastman signed the Voluntary Statement.    Lieutenant Fox has since been promoted and is currently a Captain at the Waterbury Police Department.  Lieutenant Fox was present when Eastman initialed and signed the Voluntary Statement on each page. Lieutenant Fox then signed the form on each page.  Finally, Detective Terni signed the form on each page as a witness.  A copy of the signed form is attached hereto as Exhibit A-3.

24.     I also asked Eastman to sign a Consent to Search form to memorialize the verbal consent he previously gave us to search his desktop computer.  Eastman signed the form.  I also signed the form and noted the date and time, which was November 10, 2012 at 7:40 p.m.  A copy of the form is attached hereto as Exhibit A-4.

25.     As I indicated above, Detective Terni was present with me and Eastman the entire time.  Eastman was never placed in handcuffs and he was calm and cooperative throughout the interview.

26.     We did not arrest Eastman following the interview.  Before arresting and charging him, I wanted to perform a forensic examination of Eastman's computer to see if evidence from

the computer corroborated his statements.  In my report I indicated that following the interview

Eastman "was allowed" to leave the station.  My choice of words, however, was not meant to

indicate that Eastman was not allowed to leave at any point before then.  Rather, I simply meant

that I was not placing him under arrest following the interview.

27.     Detective Terni and I drove Eastman back to his residence.  Eastman sat in the

back seat of the car and he was not placed in handcuffs during the drive. Upon arrival at his

residence, Eastman got out of the car.  Detective Terni and I did not get out of the car.  We then

drove away.

28.     To this day, I am not aware of Eastman ever making a request to have his

computer returned to him.


I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge and belief.

Executed on March ___, 2016
Waterbury, Connecticut

Detective Peter Morgan
Waterbury Police Department

A-146

# EXHIBIT

# A-1

## ADVISEMENT OF RIGHTS

The Constitution requires that I advise you of your rights:

1. You have the right to remain silent. If you talk to any police officer, anything you say can and will be used against you in court.

2. You have the right to consult with an attorney before you are questioned, and you may have him/her with you during questioning.

3. If you cannot afford a lawyer, one will be appointed for you, if you wish, before any questioning.

4. If you wish to answer questions, you can stop answering at any time.

5. You may stop answering at any time if you wish to talk to an attorney, and you may have him/her with you during any questioning.

6. If you are a juvenile (under age 16), a parent or guardian must be present during any admission, confession or statement (written or oral).

Do you understand these rights?   Yes / No

Do you wish to give up these rights and answer my questions?   Yes / No

Signature: _____

Date: _____   Time: _____

Officer's Signature: _____   ID# _____

A-148

# EXHIBIT

# A-2

A-149

Waterbury Police Department
Waterbury, Connecticut
Standard Form Number P-07
Revised 10/20/08

# Waterbury Police Department
## Voluntary Statement Rights Form

**Case Number:** <u>2012-066882</u>

The Constitution requires that I inform you of your rights:

You have the right to remain silent. If you talk to any police officer, anything you say can and will be used against you in court. ( )

You have a right to consult with a lawyer before you are questioned, and may have him/her with you during questioning. ( )

If you can not afford a lawyer, one will be appointed for you, if you wish, before any questioning. ( )

If you wish to answer questions, you have the right to stop answering at any time. ( )

You may stop answering at any time if you wish to talk to a lawyer, and may have him/her with you during any further questioning. ( )

If you are a juvenile (under 16), a parent or guardian must be present during any admission, confession, or statement, written or oral. ( )

## WAIVER

Do you understand these rights?  Yes ( )  No ( )
Are you willing to waive (give up) these rights and answer my questions?  Yes ( )  No ( )

_____   _____   _____   _____
Officer Signature & ID Number        Signature              Date             Time

La Constitucion de los Estados Unidos requiere que se le informe de sus derechos:

Tiene derecho de permanecer en silencio. Si le habla a cualquier oficial de la policia, cualquier cosa que le diga puede ser usado en corte en su contra. ( )

Tiene derecho de consultar con un abogado antes de ser interrogado y a que el abogado este presente durante el interrogatorio. ( )

Si no tiene dinero para pagar un abogado, la corte le proveera uno, si asi lo desca, antes de cualquir interrogatorio. ( )

Si  desea contestar preguntas, tiene derecho de dejar de contestar las preguntas en cualquier momento.( )

Si desea hablar con un abogado, puede dejar de contestar a las preguntas en cuelquier momento, y el abogado puede permanecer con usted durante el resto del interrogatorio. ( )

Si usted es un menor, (menor de 16 años) uno de sus padres o un guardian tiene que estar presente durante alguna admision, confesion, o declaracion, escrita o oral, que usted haga. ( )

## RENUNCIA DE DERECHOS

Entiende estos derechos? Si ( ) No ( )
Esta dispuesto a renunciar estos derechos y contestar mis preguntas? Si ( ) No ( )

_____   _____   _____   _____
Officer Signature & ID Number        Signatura              Fecha          Hora del Dia

# EXHIBIT

# A-3

Waterbury Police Department
Waterbury, Connecticut
Standard Form Number P-06
Revised 09/06

# Waterbury Police Department
## Voluntary Statement

Start Date: 11/10/2012 Time: 07:34 PM

CASE No.# : 2012-066882

PLACE STATEMENT TAKEN: 255 East Main St. Waterbury, CT

I, the undersigned, John  Eastman  of ▮▮▮▮▮▮▮▮▮▮▮▮ Waterbury, CT, Tel.# ▮▮▮▮▮▮, being 45 years of age, born in New Haven, CT on ▮▮▮/1967, do hereby make the following statement to Peter Morgan, having first been identified as  a Waterbury Police Detective.

John Eastman of ▮▮▮▮▮▮▮▮▮ D.O.B. ▮▮/67, am giving this statement under my own free will. I can read and write English, and have completed ten years of schooling and have a GED. Det. Morgan has advised me of my Constitutional Rights and I signed and initialed a card and form agreeing to waive those Rights and speak to him and to give this statement. I have not been threatened to give this statement, nor have I been promised anything in return for it. I know the contents of this statement can be used in court.

   I live with my mother at our apartment and have my own bedroom in the apartment. I have an HP desktop computer in my bedroom that I use to go onto the Internet. I have had this computer for about 5 months, and it has been in my bedroom the entire time. I also have a web cam hooked up to the computer that I use to chat with people on the Internet. I had a laptop computer before that, but it stopped working and I threw it out and bought the one I have now.

   I use the Internet to chat with girls on different web sites. I use the program Skype to chat with girls because you can use the web cam to video chat and see them while chatting. I am sexually  attracted to very petite girls. I like girls that are 14 years old and have started to develop. Because of this, I made a couple of screen names on Skype that were the names of members of the singing group One Direction. I used their names because I know the names would attract teenage girls to contact me. One of the screen names I used is "harry.styles888". I also have an email address "stylesharry446@gmail.com". I log on to Skype with the screen name and just wait for girls to contact me. When a girl contacts me, I start chatting with them. If they want to see me on the web cam, I will have a You Tube video of the singer from some old video footage ready to play and then point my web cam at the computer screen so the girl thinks that she is talking to the real singer. I will then try talking to the girl in a sexual manner to see if she will talk back. I will ask if the girl will pose in the sexual position doggy style with their ass facing the camera. I ask them to do this because I think it is the best pose to see a girl. My hope is that the girl will show me herself on camera and then pose in a sexual manner, or perform some kind of sex act for me to see. I know that I have chatted with some girls that were between like 12 and 15 years old, we chatted about sex and they posed in a sexual

The facts herein contained are true and correct, and knowing that any false statement is subject to prosecution under the penalties of Connecticut State Statute 53a-157b, I have given the above statement of my own free will without threat or promise.

Signed _____
Signature of Person giving voluntary statement

Witness: Det _____ #570

Supervisor _____ 11-10-12
Subscribed and Sworn to before me                        Date

Finished Date: 11102012 Time: 08:43 PM

Page 1 of 2

COPY

A-152

**Waterbury Police Department**
**Waterbury, Connecticut**
**Standard Form Number P-06**
**Revised 09/06**

## Waterbury Police Department
## Voluntary Statement

Start Date: <u>11/10/2012</u> Time: <u>07:34 PM</u>                    CASE No.# : <u>2012-066882</u>

manner or performed a sex act so I could watch on the web cam. Anytime that I can get the girls to perform any sex acts, I will masturbate until I ejaculate.

While we were discussing the investigation, Det. Morgan informed me about a couple of girls from Vermont that had complained to their parents about me asking them to pose doggy style on Skype. I do not remember these girls because I talk to so many girls and these girls did not pose for me.

I also go to other porn sites called Motherless.com and Jailbait.

Today, detectives came to my house and told me about an investigation into what I had been doing on Skype with young girls. I wanted to fully cooperate, so I agreed to go to the Detective Bureau to speak about it and give this statement. I also signed a Consent to Search form allowing Det. Morgan to take the desktop computer from my bedroom and do a forensic examination on it to look for the information from my Skype chats.

This statement is the truth.

---

The facts herein contained are true and correct, and knowing that any false statement is subject to prosecution under the penalties of Connecticut State Statute 53a-157b, I have given the above statement of my own free will without threat or promise.

Signed _____
                                  Signature of Person giving voluntary statement

Witness: Det _____ #570    Supervisor _____  11-10-12
                                                          Subscribed and Sworn to before me          Date

Finished Date: 11102012 Time: 08:43 PM

Page 2 of 2

COPY

A-153

# EXHIBIT

# A-4

Waterbury Police Department
Waterbury, Connecticut
Standard Form Number P-20
Revised 04/08

# Waterbury Police Department
## Consent to Search Form

**CASE NUMBER:** _12-66882_        **TYPE OF INCIDENT:** _Offense Against Child_

The Waterbury Police Department requests your permission to search/obtain _HP desktop_
_Computer_
_which is located at: _157 Congress Ave. 3rd Floor Wtby, CT_

*Under existing circumstances, the law requires that the Waterbury Police Department either make the search on authority of a Search Warrant or, in the absence of a Search Warrant, that the Waterbury Police Department conduct the search with your voluntary consent. The Waterbury Police Department wants to inform you that you have the right to require that no search be conducted without a search warrant, but you may also waive that right, if you so desire, by giving the Waterbury Police Department your permission to conduct the search. In the event that items of evidence are collected, said items may be subject to forensic analysis.*

*I have read and understood the above disclosure:* _____ (initial of person giving consent)

**Do you freely and voluntarily give permission to the Waterbury Police Department to** search/obtain: _HP desktop computer_ ,
**which is located at:** _157 Congress Ave. 3rd Floor Wtby, CT_ ?

☒ Yes   ☐ No   _____ (initial of person)

**Have any promises been made to you, or have you been pressured or coerced to consent to this search?**

☐ Yes   ☒ No   _____ (initial of person)

Signature of Person Giving Consent: _____

Printed Name of Person Giving Consent: _John T. Eastman_

DATE: _11/10/12_  TIME: _7:42 pm_  LOCATION: _255 E Main St Wtby_

WITNESSES OR OFFICERS: _____  PARENT/LEGAL GUARDIAN:

A-155

# EXHIBIT

# B

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | Criminal No.  3:16-CR-006(MPS) |
| v. | : | |
| | : | |
| JOHN EASTMAN | : | March 28, 2016 |

**DECLARATION OF ALLISON M. HAIMILA
IN SUPPORT OF GOVERNMENT'S OPPOSITION TO
DEFENDANT'S MOTION TO SUPPRESS EVIDENCE**

I, Allison M. Haimila, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I am a Special Agent with the Department of Homeland Security, Homeland

Security Investigations ("HSI"), assigned to the Resident Agent in Charge in the District of

Connecticut.  I have been so employed for approximately since 2009.  I have received training in

the area of child pornography (as defined in 18 U.S.C. § 2256) and child exploitation, and have,

as part of my daily duties as an HSI agent, investigated violations relating to child exploitation

and child pornography, including violations pertaining to possession, distribution, receipt and

production of child pornography, in violation of 18 U.S.C. §§ 2251, 2252, and 2252A, and

enticement of minors, in violation of 18 U.S.C. § 2422.  I have also participated in the execution

of search and arrest warrants, which involved child exploitation and/or child pornography

offenses.  As a federal agent, I am authorized to investigate violations of the laws of the United

States and to execute warrants issued under the authority of the United States.

2.      In February 2014, I was informed about a state case involving defendant John

Eastman that was being investigated by the Waterbury Police Department.  I was asked to see if

the facts of the case supported federal charges.  I contacted Detective Peter Morgan of the

Waterbury Police Department and talked to him about the facts of the case.  I also obtained and

1

A-157

reviewed copies of Detective Morgan's reports and the results of his forensic examination of the defendant's computers.

3.      Based on my training and experience and my review of Detective Morgan's forensic examination, as well as the statements that I understood Mr. Eastman provided to Detective Morgan on November 10, 2012, I applied for and obtained federal search warrants on or about May 12, 2014 for several of the email accounts associated with the Skype accounts found on Mr. Eastman's computer.  I executed those warrants shortly thereafter.

4.      Based on my investigation and my training and experience, I believed that several photos and a video that Detective Morgan found on Mr. Eastman's computer were taken during Skype video conversations calls and depicted child pornography of at least five different victims.

5.       On February 12, 2015, I applied for and obtained a federal criminal complaint charging John Eastman with the enticement and possession of child pornography.  Mr. Eastman was arrested on the complaint and had his initial appearance in federal court on February 20, 2015.

6.      After Mr. Eastman's federal arrest, I continued my investigation to try and identify the minors depicted in the photos.  Subsequently, on July 28, 2015, I applied for and obtained a search warrant to forensically examine a mirror image of Mr. Eastman's computer.  In the affidavit in support of the warrant application, I stated that I was aware that computer forensic examiners at HSI had access to additional computer forensic analysis tools to examine the computer.  Computer forensic examiners at HSI executed the warrant, performed additional computer forensics on the computer image, and in addition to recovering the evidence that Detective Morgan had recovered, HSI examiners also recovered Skype chat messages between the Skype accounts on Mr. Eastman's computer and dozens of individuals who I believe are

2

minors.  Several of the chats correspond to the date and time some of the still images depicting child pornography were taken using the Skype Video Snapshot function.  In addition, the internet browsing history recovered from the computer indicate the computer user visited the website Motherless.com.

7.     Through Facebook and other social media applications, law enforcement was able to identity two of the minors: one resides in Seattle and was 16 years old at the time of the offense, and the other resides in Florida and was approximately 12 years old at the time of the offense.

8.     At the time I applied for the federal search warrants described above, and until he filed his motion to suppress, I was unaware that Mr. Eastman was contesting the validity of his consent to search, the waiver of rights, or his voluntary statement.  I had read through all of the documents I received from Detective Morgan and I talked to Detective Morgan on numerous occasions.  Based on the information provided to me, I had no reason to believe that Mr. Eastman had not provided consent to search his computer or that he had not voluntarily made the statements contained in the Voluntary Sworn Statement.  In addition, it was my understanding that Mr. Eastman had never requested to have his computer returned to him.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on March ___28___, 2016
Hartford, Connecticut

Special Agent Allison M. Haimila
Department of Homeland Security
Homeland Security Investigations

3

# EXHIBIT

# C

 **Homeland Security**

**U.S. Department of Homeland Security**
U.S. Immigration and Customs Enforcement
Homeland Security Investigations
Forensic Laboratory

March 22, 2016

**Laboratory Report**
HSI-FL 16-00768
Page 1 of 2

Special Agent Allison Haimila
U.S. Immigration and Customs Enforcement
450 Main Street
Suite 522
Hartford, CT  06103
860-244-0570

**REF:**     HC07QS14HC0010

**EXHIBIT(S):**

1.1     Original Waterbury Police Department Advisement of Rights card dated 11-10-12 with questioned signature in the name of John Eastman

1.2     Original Waterbury Police Department Voluntary Statement Rights Form/Waiver dated 11-10-12 with questioned signature in the name of John Eastman

1.3     Original Waterbury Police Department Consent to Search Form dated 11-10-12 with questioned signature in the name of John Eastman

1.4     Original Uniform Arrest Report dated 5-29-13 containing known signature of John Eastman

1.5     Original Waterbury Police Department Booking Card dated 5-29-13 containing known witnessed signature of John Eastman

1.6     Original Waterbury Police Department Completed Questionnaire dated 5-29-13 containing known witnessed signature of John Eastman

1.7     Original Commonwealth of Virginia/City of Norfolk Waiver of Extradition Proceedings dated 5-15-13 containing known signature of John Eastman

1.8     Original Waterbury Police Department two page Voluntary Statement dated 11-10-12 with two questioned signatures (a/b) in the name of John Eastman

1.9     Copy of Connecticut DMV Change of Address Card for Operator's License dated 4-20-11 containing known signature of John Eastman (provided by defense)

1.10    Copy of Sears Salescheck dated 5-25-10 containing known signature and known initials of John Eastman (provided by defense)

1.11    Copy of Court Support Services Division Electronic Monitoring Agreement containing known signature of John Eastman (provided by defense)

1.12    Copy of State of Connecticut Superior Court Copy of Computer Access Agreement dated 1-28-11 containing known signature of John Eastman (provided by defense)

1.13    Copy of CSSD/Adult Probation Waterbury Terms and Conditions of GPS Monitoring dated 1-28-13 containing known signature of John Eastman (provided by defense)

1.14    Copy of Connecticut Judicial Branch Firearm Acknowledgment Form dated 1-28-11 containing known signature and known initials of John Eastman (provided by defense)

1.15    Copy of Court Ordered Special Conditions form dated 1-28-11 containing known signature of John Eastman (provided by defense)

1.16    Copy of  Uniform Arrest Report fingerprint card # 0864446 dated 11-19-97 containing known signature of John Eastman (provided by defense)



A-161

March 22, 2016

**Laboratory Report**
HSI-FL 16-00768
Page 2 of 2

1.17     Copy of Uniform Arrest Report 0040692 dated 12-29-99 containing known signature of John
         Eastman (provided by defense)

1.18     Digitized image of Connecticut DMV Identification Card issued 4-20-11 with known signature of
         John Eastman

**FINDING(S):**

A comparative and microscopic handwriting examination resulted in the following findings:

The writer of the original known signatures on Exhibits 1.4 through 1.7 prepared the original questioned
signatures on Exhibits 1.1, 1.2, 1.3 and 1.8 a/b.  This finding is based upon the significant agreement of
corresponding individualizing handwriting characteristics and stroke execution within the questioned and known
writing.  No characteristics of unnaturalness were observed in either the questioned or known Eastman
signatures. The Exhibit 1.18 known signature was not used in the comparative process due to its poor quality.

The Exhibits 1.9 through 1.17 known signatures provided by the defense were not used in the examination
process since the signatures are poor quality photocopies with insufficient resolution and clarity resulting in
some characteristics and components in the writing not being observable.  The electrostatic reprographic process
has obscured detail in the signatures which precluded a thorough examination of the writing features.

**REMARK(S):**

The standard operational procedures and methodology followed by this examiner are accepted within the
scientific community and are best practices in forensic document examination.

For Homeland Security Investigations, the Forensic Laboratory requires that Project Code 0E6 for Forensic
Examination be entered into Case Management by the assigned case agent.

If in-person testimony in support of the above findings is required, the laboratory should receive at least a ten
day notice along with a subpoena.

The above referenced evidence was received in the laboratory on March 4, 2016 and will be returned by official
courier.

Conclusions, opinions, and interpretations contained in the finding(s) section of this report are based upon the
examination(s) of the evidence conducted by the undersigned examiner as specified.

Joan A. DiMartino
Forensic Document Examiner





**Department of Homeland Security**
U.S. Immigration and Customs Enforcement
*Homeland Security Investigations*
*Forensic Laboratory (HSI-FL)*

**STATEMENT OF QUALIFICATIONS**

# Joan A. DiMartino

<u>**Professional Experience**</u>

**U.S. Department of Homeland Security (DHS)**
**U.S. Immigration and Customs Enforcement (ICE)**
**Homeland Security Investigations**
**Forensic Laboratory (HSI-FL)**

*The HSI-FL has been accredited by the American Society of Crime Laboratory Directors Laboratory Accreditation Board (ASCLD/LAB) since 2001.*

Senior Forensic Document Examiner, January 2003 to present

Qualified as an expert in forensic document examination by knowledge, training and skill with over thirty years of experience.  Conduct examinations of domestic and international travel and identification documents to determine authenticity and reveal alterations.  Examinations include but are not limited to microscopic, instrumental and comparative analysis of handwriting, typewriting, printing processes and stamp impressions. Preparation of formal results of findings. Presentation of testimony in criminal and administrative proceedings as an accepted expert witness in the field of document examination.

Responsible for the oversight of casework to include verification reviews.  Serve as a mentor for apprentice examiners; prepare apprentice examiners for Daubert hearings; coordination of moot court hearings for apprentice examiners; provide on the job training regarding casework examinations and testimony; participate in expert panels for question and answer training sessions; provide instruction and training to law enforcement personnel and other officials encompassing various components of questioned document examination.

<u>**TESTIMONY**</u>

Qualified as an expert witness over two hundred times in U.S. Federal Criminal District Court in California, Maryland, Virginia, Pennsylvania, Illinois, Florida, New York and Texas; Criminal

and Civil Circuit and District courts in the twenty-four jurisdictions in the state of Maryland; Also, U.S. Immigration Courts in Maryland, New York, New Jersey, California, Ohio, Virginia, Pennsylvania, Colorado, Nevada, Texas, California, Illinois; Grand Jury and Deposition Testimonies.

**Maryland State Police**
**Forensic Services Division**

Document Examiner-Expert, January 2001 to January 2003

Conducted examinations pertaining to criminal and administrative investigations on cases from investigators in the twenty-four jurisdictions in Maryland as well as the Maryland Attorney General's Office, the Governor's Office, Maryland Insurance Administration, Maryland Physician and Nursing Boards, Maryland Department of Corrections as well as other Maryland governmental agencies.  Examinations included but not limited to handwriting, typewriting, alterations, tear mark comparisons, seal impressions and production methods of documents on cases ranging from Fraud to Homicides. Exemplar collection when necessary. Preparation of formal reports and testimony as an expert witness in state/local district and circuit courts throughout Maryland as well as testimony in federal court.

Provided annual training in the various components of questioned document examination and evidence recovery to MSP investigators and crime scene technicians at the Maryland State Police Training Academy.

**Baltimore County Police Department**
**Forensic Services Division**

Administrative Evidence Coordinator, January 1980 to May 1984
Questioned Document Examiner, May 1984 to January 2001

*BCPD Questioned Document Unit accredited by the American Society of Crime Laboratory Directors Laboratory Accreditation Board (ASCLD/LAB) in 1999*

Until service retirement as the sole Forensic Document Examiner for BCPD, examined evidence from criminal investigations as well as administrative investigations for Baltimore County and Baltimore City Police Departments and other adjacent jurisdictions in Maryland.  Also performed examinations on evidence submitted by investigators from Federal Bureau of Investigation, U.S. Coast Guard, U.S. Drug Enforcement Agency, U.S. Immigration and Naturalization Service and U.S. Department of Agriculture.  Examinations were conducted to determine the manner in which a document was prepared, by whom it was or was not executed, and if changes had occurred since its initial production.  Formal results of findings were prepared.  Presented expert witness testimony in Maryland State criminal and civil trials in multiple jurisdictions and Federal District Court.

Personally collected handwriting exemplars from prisoners charged with major case crimes such as Homicides, Armed Robberies, Identity Theft for the purpose of comparison to questioned handwritten evidence.

As the evidence coordinator for the BCPD Forensic Services Division (formerly the BCPD Crime Laboratory), entered and completed a full-time 3500 hour training program sponsored by the Maryland State Police Crime Laboratory under the tutelage of three questioned document examiners. The curriculum included reading and research assignments, theories, concepts and practices in the scientific community, theoretical and practical problems, instruction on specialized instrumentation, photography, photocopiers and non-original evidence, microscopy, printing processes, mechanical impressions, paper, inks, watermarks, alterations, obliterations, security paper, exemplar collection, legal rulings pertaining to evidence, check writers, restoration of indented impressions, charred and fluid damaged documents, report writing, proficiency and competency testing, mock trial participation, demonstrative exhibit preparation and handwriting/hand printing and signature examination. After successfully completing the apprenticeship, received Certification of Competency from the Maryland State Police to perform document examinations for the Baltimore County Police Department autonomously.

## Specialized Training

"Forensic Examination of Biometrically Captured e-Signatures" Workshop, Mid-Atlantic Association of Forensic Scientists Annual Meeting, Cambridge, MD (May 2015)

Sabic Corporation polycarbonate card training, McLean, VA (May 2015)

PPG Teslin training, McLean, VA (May 2015)

U.S. Department of State U.S. e-passport Security Briefing, McLean VA (October 2014)

Ghostwriter Automated Signature Technology, McLean VA (September 2014)

3M AssureTec training, McLean, VA (April 2014)

KURZ Kinegram, McLean, VA (March 2014)

Kubtec  Radiology System Training, McLean VA (October 2013)

Keyence Digital Microscope Training, McLean VA (August 2013)

Measurement Science and Standards in Forensic Handwriting Analysis Conference, Gaithersburg MD (June 2013)

Spectral Imaging Workshop, McLean VA (April 2013)

Damilac Autopen Systems Manufacturing Facility, Rockville MD (April 2012)

"Paper Fundamentals for Forensic Document Examiners" Workshop, McLean VA (March 2012)

Datacard Group Passport and Identity Card training, McLean, VA (February 2012)

Safran/Morpho Polycarbonate Cards training, McLean, VA (November 2011)

Kubtec X-Ray training, McLean VA (October 2009)

Video Spectral Comparator 6000 Training, Foster and Freeman, McLean VA (September 2009)

"Information Management Institute Security Printing", Information Management Institute, Baltimore, MD (September 2009)

 "Printing Process Identification and Image Analysis for Forensic Document Examiners", Rochester Institute of Technology, Rochester NY (June 2009)

Appleton Paper Mill Seminar, Roaring Spring, PA (April 2009)

 Banknote Corporation of America Seminar, producer of security documents, Browns Summit, NC (April, 2008)

Kinegram Technology, Kurz, McLean, VA (March 2007)

Scrambled Indicia Technology, presented by Graphic Security Systems Corporation (GSSC), in McLean VA (May 2006)

Securink Technology, presented by Tom Jay of SICPA, McLean, VA (May 2006)

"Laser Engraving", Muhlbauer, Inc., McLean VA (August 2006)

U.S. Visa, Optical I-551 Card training, FDL Operations, McLean, VA (December 2005)

Tour of Primary and Secondary Inspections at Washington Dulles International Airport, Dulles, VA (August 2005).

Observation of Asylum applicant interviews, U.S. Citizenship and Immigration Services, Arlington, VA (August 2005)

Axalto (Schlumberger) Smart Card Training Owings, Mills MD (December 2003)

Tour of U.S. Bureau of Engraving and Printing, Washington, D.C., (December 2003)

A-166

Teslin Visa and Permanent Resident Card Training, FDL Operations, McLean, VA (September 2003)

"MeadWestvaco Paper Knowledge" Field Seminar presented by MeadWestvaco Corporation at USSS, Washington, DC (May 2003)

"Handwriting Examination Workshop" sponsored by Mid-Atlantic Association of Forensic Scientists, Annapolis MD (May 2003)

"Preservation of Charred Documents", Federal Bureau of Investigation, McLean, VA (April 2003)

Immigration and Naturalization Service Document Familiarization Program, McLean VA (January-March 2003)

"Adobe Photoshop for Questioned Document Examiners", Imaging Forensics, Hershey PA (October 2001)

"Method Validation Workshop", American Society of Questioned Document Examiners, Des Moines, IA (August 2001)

"Signature Comparison Workshop", American Society of Questioned Document Examiners, Des Moines, IA (August 2001)

Credit Card Technology Conference, Visa U.S.A., Hunt Valley MD (July 2000)

Fraud Investigation Course, Metropolitan Police Institute, Miami-Dade County, FL (July 2000)

2nd Annual Symposium on the Forensic Examination of Questioned Documents, New York State Police/FBI, Albany, NY (June 1999)

"Identification of Printing Processes for Document Examiners Workshop", Mid-Atlantic Association of Forensic Scientists, Rockville, MD (May 1998)

"Fluorescent Light Sources, Light Theory and Fluorescent Photography Workshop", SPEX Industries, Washington D. C. (April 1996)

"Fluorescent Light Sources, Light Theory and Fluorescent Photography Workshop", SPEX Industries, Washington D. C. (April 1996)

"Canon Fax Workshop", American Society of Questioned Document Examiners, Lake Buena Vista FL (August 1991)

"Expert Witness Workshop", American Society of Questioned Document Examiners, Lake Buena Vista FL (August 1991)

"Canon Facsimile Workshop", American Society of Questioned Document Examiners, Aurora, CO (August 1988)

"F.B.I. Questioned Document Course", Federal Bureau of Investigation, Quantico, VA (June 1986)

"U.S. Secret Service Questioned Document Course" presented by U.S.S.S. instructors at Federal Law Enforcement Training Center, Glynco, GA (June 1985)

Advanced Latent Fingerprint Processing, FBI, Prince George's County Police Department Training Academy (November 1984)

"Collection and Preservation of Physical Evidence", Federal Bureau of Investigation, Quantico, VA (October 1983)

## Presentations and Instruction

Presentation entitled "Hand printing Identification: A Study: Reliable or Not?"  (interim research results on individualization of hand printing) Cambridge, MD (May 2015)

Presentation of Details of Hand printing Research Project  Addressing the Reliability of Methodology and Hand printing's Individualizing Potential  McLean, VA  (July 2014)

Provided a Handwriting Familiarization course to Homeland Security Investigations Operations Officers and Special Agents, McLean Va.  (March 2012)

Presentation entitled "Handwriting in the 21st Century" (controversy concerning teaching of cursive writing in U.S. schools)   Ellicott City, MD (May 2012)

Provided Fraud Prevention Training on Travel and Identity Documents to Maryland Motor Vehicle Administration Document Assessors, Hanover MD (October 2004)

Provided a Handwriting Familiarization course to U.S. Citizenship and Immigration Services Asylum Officers and Adjudicators, McLean VA (October 2003)

Poster presentation entitled "Close, But No Cigar"(convicted life-without-parole multiple murderer fabricated court and prison release papers so he could walk out of prison, fortunately, he did not succeed) at American Society of Questioned Document Examiners Annual Conference in San Diego, CA (August 2002)

Participant on five member panel of forensic experts for Forensic Science Seminar involving technical support presentations to command level law enforcement personnel in Maryland, Johns Hopkins University, Columbia, MD (September 1999)

Presentation entitled "Homicide- Life on the Streets of Baltimore...County" (Homicide investigations involving questioned document evidence) at American Society of Questioned Document Examiners Annual Conference in Washington, D.C. (August 1996)

Presentation entitled "The Caller" co-presented with Baltimore County Homicide Detective (case study involving handwritten note left on decedent's body) at International Association for Identification, Chesapeake Bay Division Bi-Annual Conference in Martinsburg, WVA (November 1995)

Presentation entitled "Commit the Crime and Cross the Line" (identity theft involving multiple jurisdictions prior to federal and state laws being enacted) at International Association for Identification  Annual Conference in Mesa, AZ (July 1994)

While at Baltimore County Police Department, provided monthly training regarding questioned document examination and exemplar collection to investigators and prosecutors in a document familiarization course at Baltimore County Police Academy (1994 to 1998)

## Professional Affiliations

International Association for Identification, 1984 to present

Mid-Atlantic Association of Forensic Scientists, 1985 to present

American Society for Testing and Materials (ASTM, International), 2004 to December 2015

The Society for Imaging Science and Technology, 2010 to present

## Research

Ongoing documented research regarding the individualization of hand printed characters

## Proficiency Testing

Have successfully completed semiannual proficiency testing in the forensic disciplines of Questioned Documents and Handwriting Examination, Collaborative Testing Services, Sterling, VA, 1986 to present.

A-169

# EXHIBIT

# D

A-170

# WAIVER OF EXTRADITION PROCEEDINGS

Commonwealth of Virginia / City of Norfolk

VA. CODE ANN. § 19.2-114

☒ General District Court #5
☐ Juvenile and Domestic Relations District Court

CASE NO. _____

I, the undersigned Accused, have been arrested within the Commonwealth of Virginia, and stand charged with the commission of a crime committed in the state of _____

**Connecticut**
DEMANDING STATE

The nature of the charge against me is as follows:

Fugitive from justice from Waterbury, Connecticut

On the charge of Poss of child pornography (1st), Use computer to engage a minor in a sexual act, Misrepresentation of age to entice minor, Promote minor for obscene performance, Employ minor in obscene performance, Risk of injury to minor

I certify that I was brought this day before this Court, and that the Judge of this Court fully explained my rights concerning the issuance and service of the process of extradition, my right to be represented by a lawyer in extradition proceedings, and my right to petition for a writ of habeas corpus as provided by law.

Having been informed of the nature of the charge against me, and of my rights in extradition proceedings, I nevertheless waive my rights to issuance and service of process of extradition, and all other process or proceedings incidental to extradition, and I voluntarily consent to be extradited and transported from the Commonwealth of Virginia to the demanding state, there to answer the charges against me. I voluntarily submit myself to the custody of the authority designated to transport me to the demanding state.

Seen:

_____
WAIVED
(attorney for accused)

_____
ACCUSED
John Eastman

5/5/13
DATE

Subscribed and sworn to before me this day.

_____
JUDGE

FORM DC-375 7/92 (114-6-010 5/96)

---

WAIVER OF EXTRADITION PROCEEDINGS

Connecticut

V.

John Eastman
ACCUSED

A-171

# EXHIBIT

# E

A-172

**UNIFORM ARREST REPORT** JD-CR-21(1)

FOR SPBI USE ONLY

NAME OF ACCUSED (LAST, FIRST MIDDLE)
EASTMAN, JOHN

SPBI USE ONLY

UAR: 8481320

NO. STREET CITY STATE AND ZIP
VIRGINIA BEACH, VA 23454

COMPANION U.A.R. NO.

| SEX M | RACE W | HISP. ☐ YES | DATE OF BIRTH ▮-1967 | PLACE OF BIRTH CT | SS#. ▮5221 | HT. 600 | WT. 200 | HAIR BRO | EYES HAZ | DOCKET NO. |

PHYSICAL CHARACTERISTICS (SMT)

PHYSICAL DISABILITIES | RIGHT OR LEFT HANDED LEFT | TEETH GOOD/FINE

EMPLOYER | OCCUPATION UNEMPLOYED

MARITAL STATUS SINGLE | NUMBER OF CHILDREN 0 | EDUCATION 12TH

NATIONALITY UNITED STATES | SKIN COMPLEXION FAI

ACCOMPLICES | PLACE ARRESTED 255 EAST MAIN ST

PHOTO AVAILABLE __X__ YES ____ NO | NAME AND ADDRESS OF RELATIVE OR PERSON TO BE NOTIFIED IN CASE OF EMERGENCY

PALM PRINTS AVAILABLE __X__ YES ____ NO

ALIAS/MAIDEN NAME | ALIEN REG. NO. | OPERATOR'S LICENSE NO. (MV) ▮ | STATE CT | DATE AND TIME ARRESTED 05-29-2013 2000

____ SURETY  __X__ DETAINED | AMOUNT OF BOND 200000 | ____ CASH ____ OTHER | COMMERCIAL/HAZ. MAT. ____ CDL ____ CV ____ HM. | TOWN OF ARREST 151 | TOWN OF OFFENSE 151

ARRESTING OFFICER MILLS | SHIELD NO. 407 | SIGNATURE OF ACCUSED X _[signature]_ | SIGNED - OFFICIAL TAKING PRINTS HARDA719

DEPARTMENT OR TROOP/ORI CT0015100 | MOT. VEH. ____ REG. # _____ | P.D. ID NO. 000429252 | P.D. CASE NO. 2012-00066882 | NOTE AMP.

REMARKS | F.V. ____ ALC. ____ NAR. ____ | COURT DATE 5-30-13 | S.P.B.I. NO.

| G.A. NO. GA-04 | DATE FINGERPRINTED 05-29-2013 | F.B.I. NO.

CHARGE(S) AND STATUTE NO. | DATE OF OFFENSE

```
53A-196A EMPLOYING MINOR IN OB (
53A-196B PROMOTING A MINOR IN
53A-90a COMPUTER USE TO ENTICE        8/25/12-
53A-196D POSSESSING CHILD PORN                  11/6/12
53-21 INJURY/RISK OF INJURY/IM (
53a-90b MISREP AGE TO ENTICE MIN
```

A-173

# EXHIBIT

# F

Case 3:16-cr-00006-MPS   Document 46-6   Filed 03/28/16   Page 2 of 2

# Booking Card

## EASTMAN, JOHN






**Print Date/Time:** 05/29/2013 20:35
**Login ID:** STRUB476

Waterbury Police Department
**ORI Number:** CT0015100



| | | |
|---|---|---|
| **Charge:** | | 53A-90b |
| State | 00026 | Misrepresentation of Age Entice/Minor |
| | | ~~NONLISTED CHARGES~~ |

| | | | | | |
|---|---|---|---|---|---|
| **Offense/Charge Date:** | 05/29/2013 20:23 | **Warrant Number:** | | **Court Date/Time:** | |
| **Case Tracking ORI:** | CT0015100 | **Case Tracking #:** | 2012-00066882 | **Docket Number:** | |
| **Bond/Bail Set Type:** | Bond | **Bond/Bail Set Date:** | 05/29/2013 20:31 | **Bond/Bail Set Amt:** | $200000.00 - Inclusive/ |
| **Bond Posted By:** | | **Bond Post Date:** | | **Bond Post Amt:** | |
| **Severest:** | No | | | | |

**Release Date/Time:**            **Released By:**
**Release Reason:**               **Released to ORI:**
**Released To:**

I will have opportunity to contact family or counsel.

**Inmate Signature:**

**Booking Officer(s):**   #                          #   476

**Reviewed By:**   #

05/29/2013        2056
Date/Time

A-175

# EXHIBIT

# G

A-176



# Completed Questionnaire

| | |
|---|---|
| **Print Date/Time:** 05/29/2013 20:32 | **Waterbury Police Department** |
| **Login ID:** HARDW719 | **ORI Number:** CT0015100 |
| **Inmate:** EASTMAN, JOHN | **Booking #:** 2013-00003453 |

### Questionnaire: Waterbury Police Department

| | | | |
|---|---|---|---|
| **Arrest Datetime:** 05/29/2013 20:00 | | **Given By:** 719 - Hardwick 05/29/2013 20:31 | |
| **Arresting Officers** | **Agency** | **Brought In By** | **Agency** |
| 407 - Mills | CT0015100 | | CT0015100 |

| Question # | Question | Response | Response Value |
|---|---|---|---|
| 1 | Was the Subject Booked at Court? | No | 0 |
| 2 | Do You Want to Kill Yourself? | No | 0 |
| 3 | Been treated for psychological disorder? Describe | No | 0 |
| 4 | Recently suffered any personal losses? (Family Death) | No | 0 |
| 5 | Do you have a history of suicide attempts? | No | 0 |
| 6 | Are you presently using narcotics of any type? | No | 0 |
| 7 | Any apparent depression? | No | 0 |
| 8 | Any sadness or tearfulness? | No | 0 |
| 10 | Any sense of despair? | No | 0 |
| 11 | Any severe psychiatric disorder? | No | 0 |
| 12 | Any signs of hallucinations? | No | 0 |
| 13 | Presently on medicine, drugs or liquor? | No | 0 |
| 14 | Medications with Inmate? | No | 0 |
| 15 | Family member or friend contacted? | No | 0 |

**Completed Questionnaire Value:** 0

**High Risks**
___ Assaultive
___ Other
___ Suicidal Risk

**Special Conditions**
___ Body Fluid Watch
___ Handicap/Retarded
___ Juvenile
___ Medical
___ Other
___ Protective Custody

Officer: _____ 476          Date: 5/29/31

Inmate: _____          Date: 5/29/31

A-177

# EXHIBIT

# H



**G4S**

Group 4 Securicor

*Eastman*

## Electronic Monitoring Agreement

You have been ordered to cooperate with a period of electronic monitoring. A unit will be attached to your ankle to monitor your cooperation with your curfew. For the equipment to function accurately, specific conditions must be present where the home unit is installed. You may also be ordered to carry a MTD tracking device.

1. The home should have a static free telephone line that does not have call waiting, caller ID, caller ID block, call forwarding, three-way calling, or conference calling.

2. Modems, fax machines, and answering machines may interfere with monitoring and therefore cannot share the same phone line/number as the home unit.

3. Once installed, the telephone service, home unit, and ankle unit are not to be tampered with or moved and you are required to remain inside your home during curfew hours.

4. The area around the home unit should be kept clear and free from pictures, mirrors, metal signs, etc.

5. Any telephone line installed by the state or installer is to be used only for monitoring.

6. An electronic monitoring installer must be allowed into the home (juveniles must have an adult present) and must have access to telephone lines and electric power.

7. The phone must be allowed to ring twice before answering.

8. The phone must not be used for 10 minutes after the monitored person enters the home.

9. All equipment will be returned to the supervising officer or installer at the end of the monitoring period.

10. The transmitter cannot be immersed under water however, showers are permitted.

11. If you are ordered to carry an MTD tracking device the following will also apply:

    a. You will place the MTD in the powered-up charging stand for a minimum of ten (10) hours a day and at all times while at home.

    b. You will carry/wear the MTD at all times. You will keep the MTD within 50 feet of you at all times. Leaving the MTD behind at home, work, or other places will be grounds for violation.

    c. You understand that all movement will be tracked and stored as official record.

    d. You will follow all established home, work, etc. rules. Deviation from your schedule and/or approved travel routes is a violation.

    e. You will respond immediately to all messages sent to your MTD.

Failure to comply with any of the above conditions may result in further sanctions including a return to court. If the equipment is misused, damaged, or not returned, fees of up to $2000.00 may be assessed. The supervising officer will be notified immediately of any problems regarding monitoring.

I/We understand and agree to the above terms:

_____          1/28/11
Participant or Legal Guardian Signature          Date

_____
Print Participant and Legal Guardian First and Last Name

_____          _____
Juvenile Participant Signature          Date

_____          1/28/11
Supervising Officer Signature          Date

MC- 002 Rev A  EM Agreement

**A-179**

**COMPUTER ACCESS AGREEMENT**
JD-CR-143 Rev. 1-07
C.G.S. § 53a-30(a)(17) & (b)

STATE OF CONNECTICUT
SUPERIOR COURT
COURT SUPPORT SERVICES DIVISION
www.jud.ct.gov



| NAME OF PROBATIONER **JOHN EASTMAN** | PERIOD OF PROBATION **5 MONTHS** | DATE **7/8/11** | CMIS NO. **CA00002355052** |
|---|---|---|---|
| G.A. NO./JUDICIAL DISTRICT AT **G.A. 4 WATERBURY** | NAME OF PROBATION OFFICER | | DOCKET NO. **U04W-CR07-0363143-S** |

## I AGREE TO THE FOLLOWING CONDITIONS: *(Probation Officer must check all conditions that apply)*

☒ 1. I will give a written explanation to my Probation Officer of the purpose for owning or using a computer(s), and any necessity for using the computer(s) to access the Internet or an e-mail system.

☒ 2. I will notify my Probation Officer in writing of any changes to the original written explanation for my use of the computer(s).

☒ 3. I will use only the computer(s) that I am authorized to use by my Probation Officer.

☒ 4. I will not enter or participate in any bulletin boards, instant messaging or chat rooms of any type.

☒ 5. I will not use any web-based e-mail program which provides any ability to remain anonymous.

☒ 6. I will, upon the request of my Probation Officer, keep a log of all use of the Internet and the e-mail system.

☒ 7. I will not access any site that contains sexually explicit or sexually stimulating material and any other site that my Probation Officer has instructed me not to access.

☒ 8. I will not possess any sexually explicit or sexually stimulating material in any manner on disk, in computer hard drive, or any other electronic storage medium that can hold this type of material.

☒ 9. I will not use any encryption software or devices without the permission of my Probation Officer. I will give my Probation Officer any and all passwords used on my authorized computer(s).

☒ 10. I will not avoid the creation of, or alter or destroy records of my computer use without my probation officer's approval. This includes, but is not limited to, deleting or removing browser history data regardless of its age, the possession of software or items designed to alter or erase computer media, defeat forensic software or block monitoring software. This also includes a prohibition against restoring a computer to a previous state or reinstallation of operating systems.

☒ 11. I understand that I am responsible for all material and information on my computer, on any computer I have been authorized to use by my Probation Officer, and for the contents of any electronic storage medium under my control.

☒ 12. I agree at the outset of my probation to permit examination of my computer and related equipment to determine what hardware and software exists to provide a basis for comparison to any different hardware or software found in the future.

☒ 13. I agree to have installed and pay for all software programs my Probation Officer requires to monitor the use of my authorized computer(s) for compliance with this Agreement and the conditions of my probation.

☒ 14. I agree and voluntarily consent to having my computer examined and/or searched at any time, announced or unannounced, by Probation or its agent to verify compliance with the special conditions of my probation.

☒ 15. I acknowledge that, if the monitoring or examination of my computer(s) or related equipment in the future reveals that the computer(s) or related equipment has been used in any manner that constitutes a violation of the conditions of my probation, Probation has the authority to confiscate the computer or related equipment. I further acknowledge that, in the event of such a confiscation, all data on the computer or related equipment may be copied and (1) if the data found constitutes a violation of the terms of my probation, the data will be deleted before the computer or related equipment is returned to me, and (2) if the data found constitutes evidence of a crime, the evidence will be given to an appropriate law enforcement agency.

☒ 16. I will supply written documentation of all use and billing records that relate to my computer when requested by my Probation Officer.

☒ 17. I will provide Probation or its agent with a list of all equipment used in conjunction with my authorized computer(s), including backup systems and disks and any equipment added.

☒ 18. I will use the Internet according to the schedule approved by my Probation Officer.

☒ 19. I have read, and will comply with and abide by, the Software Payment, Ownership and Indemnification Agreement attached hereto.

☒ 20. Other:

*I have read, and the Probation Officer has reviewed with me, the above checked conditions. I understand them, ~~was~~ provided a copy of them, and will abide by them.*

| SIGNED *(Probationer)* | WITNESSED BY *(Probation Officer)* | DATE 7/28/11 |
|---|---|---|

DISTRIBUTION:  ORIGINAL - Probation Officer          COPY - Probationer

A-180

Terms and Conditions of Global Positioning System (GPS) Monitoring

Offender's Name: _John Eastman_                    Agency Number: _____

1.   I understand that I will be monitored by a non-removable ankle bracelet (device). I will be required to wear the device 24 hours a day, 7 days a week. I understand that my location will be monitored by this device.

2.   I will charge the device for a continuous 120 minutes every day without unplugging the device for the entire cycle using the charger provided to me. I am financially responsible for care taking of the charging unit and ankle bracelet and will be careful not to damage either piece of equipment.

3.   I am responsible for electrical service to my residence and will ensure it is continuously maintained during my time wearing the device.

4.   I authorize any probation official or law enforcement officer to enter my residence at any time.

5.   I understand that any attempt to remove the device, failure to charge it every day, or attempt to interfere with its ability to transmit information is considered a violation subject to investigation and considered a violation of my terms of probation.

6.   Damage or theft of the device or charger may result in prosecution and would be a violation of the terms of my probation.

7.   I understand that I must comply with the daily schedule given to me. I understand that my schedule will be verified by phone calls and unscheduled visits at any time.

8.   I understand that I must remain at my residence **at all times** unless given written approval by my supervising officer. Residence is defined as the dwelling I live in, not including the front porch, yard, garage, or any other area outside the front, back or side door of the dwelling.

9.   I understand that should I fail to arrive at a designated location within the prescribed time or leave my designated location at an invalid time, such an action may be deemed a violation of the terms of my probation.

10.  I understand that I will not enter areas that are defined as exclusion zones (i.e. work place or residence of my instant offense) as documented by my supervising officer.

11.  I will respond immediately to all calls and messages as they relate to my GPS Monitoring and failure to do so would be a violation of my terms of release.

12.  I will let my supervising officer know of any changes to telephone, working, or other contact information immediately. I will also keep the supervising officer apprised of all people living in the same residence as me.

I UNDERSTAND AND AGREE TO ABIDE BY THE ABOVE TERMS AND CONDITIONS ASN I FURTHER UNDERSTAND THAT EVEN IF I REFUSE TO SIGN THIS FORM THESE RULES ARE STILL IN EFFECT. I hereby certify that these terms and conditions have been read and explained to me, and that I fully understand these terms and conditions.

_John Eastman_                          _____      _1/28/11_
OFFENDER'S NAME                     SIGNATURE               DATE

_Nicole Grelle_                          _____      _1/28/11_
OFFICER'S NAME                      SIGNATURE               DATE

**FIREARM ACKNOWLEDGMENT**
JD-AP-137 New 10-06
C.G.S. § 29-33, 29-36f, 29-36k,
53a-30, 53a-217, 53a-217c

**CONNECTICUT JUDICIAL BRANCH**
**COURT SUPPORT SERVICES DIVISION**
**ADULT PROBATION**
*www.jud.ct.gov*

### INSTRUCTIONS

*1. Complete all information requested and have the person initial where provided.*
*2. If the person is 16 or 17 years of age a legal guardian should initial and sign where applicable.*
*3. If the person refuses to sign or to provide information, check appropriate box provided at bottom of form.*
*4. Place original in Probation file and give a copy to person under probation supervision.*

| NAME *(Person under probation supervision)* | ADDRESS |
|---|---|
| John Coorman | |

I, the person named above, acknowledge and understand that I am currently under a period of probation supervision, and in accordance with a specific Court order and/or Connecticut General Statutes Section 29-33, 29-36f, 29-36k, 53a-30, 53a-217, and/or 53a-217c, **I am ineligible to possess a firearm as a condition of my probation.**

*("X" one of the following and initial where provided:)*

☐ **1.**   I am currently in possession of the firearm(s) described below and will either legally transfer ownership or surrender the firearm(s) to the State Police not later than the end of business on *(date)* _____
(two (2) business days) and will provide the probation officer with verification of the transaction within three (3) business days of the transaction.

*(Initial)* _____

**Description of weapon(s):**

The weapon(s) described above is/are the only weapon(s) that I possess.   *(Initial)* _____

☐ **2.**   I have possessed one or more firearms in the past but do not currently possess any firearms. I will provide my probation officer with a transfer of ownership form or receipt of surrender or a copy of a firearm statement not later than the end of business on *(date)* _____ (three (3) business days).

*(Initial)* _____

☒ **3.**   I do not possess, and have never possessed a firearm.   *(Initial)* _____

I have discussed and reviewed this information with my probation officer and I agree that the information shown above is accurate and true. I understand that I am not to possess any firearms while I am under probation supervision. I also understand that if I am found to be in possession of a firearm I may be found to be in violation of my probation supervision.

SIGNED:   X _____
*(Person under Probation Supervision and/or guardian)*                          1/28/11
_____ *(Date)*

WITNESSED: _____
*(Probation Officer - sign and print name)*                          1/28/11 *(Date)*

WITNESSED: _____
*(Probation Officer - sign and print name)*                          _____ *(Date)*

*(If the person under probation refused to sign or provide information, sign the "witnessed" section above and check the appropriate box below.)*

☐ Person under probation supervision refused to complete/sign this form but verbally provided the information shown above.
☐ Person under probation supervision refused to provide any firearms information.

**DISTRIBUTION:**   ORIGINAL - File     COPY - Person Under Probation Supervision

**CLIENT: JOHN EASTMAN**
**DOB: 10/2/67**
**CA00002355052**


## COURT ORDERED SPECIAL CONDITIONS


1. If convicted of a violation of General Statutes Section 53-21 (a)(2), 53a-70, 53a-70a, 53a-70b,53a-71, 53a-72a, or 53a-72b, immediately notify your supervision officer whenever you change your residence address.
2. No contact with the two victims
3. Substance abuse evaluation and treatment


_____     |1/28/11
Client Signature                     Date Signed

_____     1/28/11
Probation Officer Signature          Date Signed

A-183

# EXHIBIT

# I



EASTMAN   JOHN

NO., STREET, CITY AND STATE                    Wallingford, CT

16-cr-00006-MPS   Document 46-9   Filed 03/28/16   Page 2 of 2

COMPANION U.A.R. NO.

| SEX | RACE | DATE OF BIRTH | PLACE OF BIRTH | SOCIAL SECURITY NO. | HT. | WT. | HAIR | EYES | DOCKET NO. |
|---|---|---|---|---|---|---|---|---|---|
| M | W | -67 | New Haven | -5221 | 6' | 165 | bro | Haz | 07- 184526 |

ALIAS/MAIDEN NAME          ALIEN REG. NO.     OPERATOR'S LICENSE NO.     STATE     DATE AND TIME ARRESTED
11-19-97     1517

☒ SURETY   ☐ DETAINED   AMOUNT OF BOND $10,000.   ☐ CASH   ☐ OTHER   COMMERCIAL/HAZ. MAT. ☐ CDL ☐ CV ☐ HM   TOWN OF ARREST North Haven   TOWN OF OFFENSE North Haven

CHARGE(S) AND STATUTE NO.
Attempted Sexual Assault 4th, 53a-73a 73a 35 49
Risk of Injury To Minor, 53a-21

F.V. ALC. NAR.   COURT DATE 12-04-97   S.P.B.I. NO. 439381
G.A. NO. 7   DATE FINGERPRINTED 11-19-97   F.B.I. NO.

ARRESTING OFFICER Detective Hotton   SHIELD NO. 527   SIGNATURE OF ACCUSED X   SIGNED - OFFICIAL TAKING PRINTS

DEPARTMENT OR TROOP/ORI   CT 0010100   P.D. I.D. NO. 17886   P.D. CASE NO. 910-8023   NOTE AMP.

**UNIFORM ARREST REPORT** JD-CR-21 Rev. 11-95   FOR SPBI USE ONLY   SPBI CARD 929945

A-185

# EXHIBIT

# J

A-186

# Norfolk Sheriff's Office

## Room and Board Policy

Date: 5/14/13

Inmate Name: Eastman, John

CJIS#: 1993371

The following will be charged to your inmate canteen account:

$2.00 per day will be charged to inmate's canteen account daily. Inmates from federal jurisdiction and inmates in the NSO Electronic Monitoring Program will be exempt from room and board.

I have been informed of the above policies.

_____
Inmate Signature / Date

_____
Deputy Signature / Date / J#

The above inmate refused or was unable to sign this statement. I have informed the inmate of this policy.

_____
Deputy Signature / Date / J#

CF# 011
07/19/10

A-187

Case 3:16-cr-00006-MPS   Document 46-10   Filed 03/28/16   Page 3 of 8

| User: EPENA | NORFOLK SHERIFF'S OFFICE | 05/17/2013 08:16:23 |
|---|---|---|

**Booking #:** 2013005611     **Inmate:** EASTMAN, JOHN - WM ████ 1967

**Classification Officer:** Pena, Evelyn          **Date/Time** 05/17/2013 08:16:05

| Q. # | Question | Answer Notes |
|---|---|---|
| 1 | Is this an initial Classification? | Y |
| 2 | Current Offense Assaultive Felony | N |
| 5 | Prior Assaultive Felony Conviction | Y |
| 6 | Escape History (secure) | N |
| 8 | Known Past/Present Inst. Behavior Problems | N |

**Classification:**     CUSC

_Signature of Classification Officer_

_Signature of Inmate_

jclass

Page 1

A-188

## Prison Rape Elimination Act (PREA)

The Norfolk Sheriff's Office maintains a zero tolerance for sexual assault, abuse or rape. Anyone sexually assaulting another person should know criminal investigation will be conducted. Anyone criminally charged and convicted under Virginia Law could receive an additional prison sentence and be required to register as a sexual predator upon their release.

Anyone committing such an act will also be subject to administrative charges under the Inmate Rules of Conduct, as outlined in the disciplinary section of the inmate handbook.

Everyone should consider that unprotected sex increases your risk of HIV infection, along with exposing you to other sexually transmitted diseases. If you have difficulty controlling your actions, you should notify a staff member immediately so you can be referred to a social worker.

If you are sexually assaulted you should REPORT THE ATTACK TO A STAFF MEMBER IMMEDIATELY! Do not shower, brush, your teeth, use the toilet or change your clothes. The longer you wait to report the attack the more power you give to the perpetrator and the more difficult it is to obtain the evidence necessary to support your criminal complaint.

If you are assaulted or witness an assault, but you are unwilling to report it directly to a staff member, then you can always fill out an inmate communication form requesting to see the Chaplain, Classification Staff or Medical Staff. However, this method of reporting delays the initiation of an investigation and may make it more difficult to prove your complaint or allegation.

Sexual assault affects everyone, either directly or through the experience of those we care about. It can affect any male or female of any age, race, ethnic group, socioeconomic status, sexual orientation, or disability.

No other inmate or staff member ever has the right to ask you for a sexual favor or to have sex with you!!

## Inmate Needs Assessment

**Health**

| | | | | | | |
|---|---|---|---|---|---|---|
| 1 | Limited physical; capacity, acute illness; needs hospitalization or outpatient treatment | 2 | Mild disability or illness; outpatient treatment required; non-strenuous work | 3 | No problems that limit housing or work assignments. | 3 Code |

**Emotional Stability**

| | | | | | | |
|---|---|---|---|---|---|---|
| 1 | Severe impairment; danger to self, others; needs hospital environment | 2 | Moderate impairment requires monitoring individual or group therapy. | 3 | Emotionally stable; no indications of mental illness. | 3 Code |

**Education**

| | | | | | | |
|---|---|---|---|---|---|---|
| 1 | 5th grade or below reading Math skills; needs remedial or Special education classes | 2 | No high school diploma; needs adult education or GED program | 3 | High school diploma, GED, or equivalent | 3 Code |

**Vocational Skills**

| | | | | | | |
|---|---|---|---|---|---|---|
| 1 | No discernible skill; needs Training | 2 | Limited skills; ability to hold semi-skilled Position; needs training | 3 | Possesses marketable skill or trade | 2 Code |

**Substance Abuse**

| | | | | | | |
|---|---|---|---|---|---|---|
| 1 | Frequent abuse resulting In social, economic or legal Problems; needs treatment | 2 | Occasional abuse causing disruption of functioning | 3 | No disruption of functioning or legal difficulties | 3 Code |

**Mental Ability**

| | | | | | | |
|---|---|---|---|---|---|---|
| 1 | Serious disability Limiting ability to function; Needs sheltered living, Work situations | 2 | Mild disability limited educational vocational potential | 3 | No discernible disability | 3 Code |

Inmate Name _Eastman, John_                     Date _5/17/13_

CJIS# _199337/_ Housing Unit _2M25_   Inmate Signature _[signature]_   _5/17/13_

Classification Specialist: _[signature]_                     Date _5/17/13_

A-189

## Norfolk Sheriff's Office Classification Orientation Form

**Inmate Grievance Procedures**

In order to provide prompt, fair decisions and actions in response to inmate grievances (complaints), the Norfolk Sheriff's Office (NSO) has adopted Policy and Procedures regarding alleged grievances. Refer to the Norfolk City Jail Resident Handbook; consult with the Inmate Classification Specialist or Grievance Coordinator.

Any inmate who desires to make a written grievance (complaint) may obtain an Inmate Standard or Emergency Grievance Form from the floor supervisor. The following issues are considered grievable, utilizing the Emergency Grievance Process, CF#38.

1. Serious / Irreparable Harm or Risk of Injury
2. Missed Prescribed Medications
3. Missed Meals Due to No Fault of the Inmate

Any inmate needing assistance in understanding or completing the form may request assistance from the Grievance Coordinator, Inmates Classification Specialist or the floor supervisor.

A set of abbreviated guidelines is provided in the Norfolk City Jail Resident Handbook to assist each inmate.

**The following issues are grievable as recognized by the Norfolk Sheriff's Office:**

1. The interpretation and application of Norfolk Sheriff's Office Policy and Procedures, institutional rules and regulations for residents
2. Actions of employees and other inmates, including denial of access to the grievance process
3. Any reprisal against an inmate by staff for filing a grievance or appeal under the inmate Grievance Procedure for participation in an Inmate Grievance Proceeding.
4. Life, health and safety violations
5. Alleged violations of inmate's civil or constitutional rights
6. Any alleged criminal or prohibited act by an employer to include unjust and selective enforcement of Norfolk Sheriff's Office rules, regulations and disciplinary procedures

**The following are not grievable issues as recognized by the Norfolk Sheriff's Office:**

1. State and federal court regulations
2. Parole Board decisions
3. Adjustment Committee decisions
4. Norfolk Sheriff's Office Inmate programs
5. Any matter that is determined beyond the control of the Norfolk Sheriff's Office

**Resident Orientation:**

Medically Cleared:  ___YES___   ___NO___

**Federal Inmate**  ___YES___   ___NO___

The inmate understands explanation and acknowledges with his/her initials next to each service.

Communication Forms ☐            Grievance Procedures ☐

Medical Policies and Fees ☐        Recreation ☐

Therapeutic Programs ☐            Visitation ☐

Resident Handbook ☐

Federal Inmates will be charged for all medical services thirty (30) days from incarceration date in our facility. Medical charges are in accordance to the Inmate Handbook.

**Norfolk Sheriff's Office Classification Orientation Form Cont'd**

A-190

| User: JEPARKE | **NORFOLK SHERIFF'S OFFICE** | 05/14/2013 22:43:12 |
|---|---|---|

## Print Screening
## Inmate Suicide Screening Report

**Booking #:** 2013005611     **Inmate:** EASTMAN, JOHN          **Race:** W     **Sex:** M     **DOB:** ▓▓▓ 1967

**Screening Officer:**   (J1422) PARKER, JEREMY  MR.          **Date/Time** 05/14/2013 22:43:07

| Q. # | Question | Answer | Notes |
|---|---|---|---|
| 1 | Is the current charge/detainer of the highest severity violent offense? | N | |
| 2 | Is Inmate a suicide risk? | | |
| 3 | Is the inmate a suicide risk? | N | |
| 4 | Medical risk requires special medical treatment or observation | N | |
| 5 | Severe substance abuse withdrawal symptoms | N | |
| 6 | Severe Mental Health concerns; Mentally ill/bizarre behavior; Mental subject | N | |
| 7 | Any reason to be separated due to a group/individual incarcerated in NCJ | N | |
| 8 | History of aggressive assaultive behavior; Discipline problem; Threat to safety | N | |
| 10 | MALES - (Alert of violent history)   SECTION 1 | | |
| | FEMALES - (Alert or violent history)  3M6 | | |
| 11 | MALES - (Mental health/Suicide precautions)  2P | | |
| | FEMALES - (Mental health/Suicide precautions)  3R01 - 04 | | |
| 12 | MALES - (Medical)  SECTION 1 OR 2P | | |
| | FEMALES - (Medical)  3M1 OR 3M2 | | |
| 13 | MALES - (Violent)  2M25 INTAKE HOUSING | | |
| | FEMALES - (Violent)  3M6 | | |
| 14 | MALES - (Non-violent history)  2M24 INTAKE HOUSING | N | |
| | FEMALES - (Non-violent history  3M3 - 3M5 | | |

X _____

*Signature of Inmate*

## INMATE VIOLATION REPORT

Date: 5-22-13   Time: 0915

Inmate Name: Eastman, John   Housing: LSI   CIIS #: 1919371

Log # 13-1377

Violation Code: 221   Intentionally destroying any property

DESCRIPTION OF OFFENSE AND/OR DAMAGE TO PROPERTY

Inmate had strips of a torn sheet wrapped around his laundry bag

Reporting Staff: Dep Seward   J-number: 1221
Post Supervisor: Dep Sottord   J-number: 1237

### TEAM COMMANDER OR DIVISION SUPERVISOR'S ACTIONS

5 days Cell Restriction

No gym, no canteen, no visits

Team Commander or
Division Supervisor's Signature: CM W   J-number: 746
Violation issued to inmate by: CM Meager   J-number: 746
Does inmate wish to appeal this violation report?  ☐ Yes  ☐ No   Int. ___
Inmate signature: ___   Date: 5-22-13

### ADJUSTMENT COMMITTEE ACTION REPORT

Date: ___   Time: ___

_I, ___ have been informed of the charge(s) against me and my right to appeal to the Adjustment Committee. I do not wish to accept the disposition of the Deputy in charge and have received a copy of the violation report ___ (inmate int.). You are advised that you may employ an attorney (at your own expense) of your choice to represent you at your committee hearing. If you want to hire an attorney, the hearing will be delayed not to exceed four working days. You are advised if you do not wish to employ an attorney, you may have the assistance of any volunteer advisor of your choice. You are advised that you may offer the testimony of voluntary witnesses, including other inmates. You are advised that you may request that the reporting Deputy be present at the hearing._

A.  I do/do not desire to employ an attorney ___ (inmate int.)
B.  Attorney contacted Name: ___   Date: ___   Time: ___
C.  Volunteer advisor Name: ___
D.  Witnesses: 1. ___   2. ___   Date: ___   Time: ___
E.  I do/do not desire to call the reporting Deputy ___ (Int.)
Deputy in charge: ___   Date: ___   Time: ___

CF-002 Revised (08/2010)   White – Classification   Yellow – Cancan   Pink – Floor   Green – Inmate

## CASE HEARD BY ADJUSTMENT COMMITTEE

Date: ___   Time: ___

BOARD MEMBERS: CHAIRPERSON: ___
MEMBER: ___

Inmate Present:  ☐ yes  ☐ no   Witness Present:  ☐ yes  ☐ no
Inmate Offered plea agreement  ☐ yes  ☐ no   Deputy Present:  ☐ yes  ☐ no

Findings and Action: ___

I have been informed of my right to request that the Sheriff review this decision.
Review requested:  ☐ yes  ☐ no   Inmate signature: ___
Letter to Sheriff due: ___   Inmate init: ___

### SHERIFF'S REVIEW

Reviewed by Sheriff / Designee: ___   Date: ___

Comments: ___

Sheriff / Designee ___

### LOSS OF PRIVILEGES

Term of Suspension: 5 DAYS

Privileges taken: No gym, no canteen, no visits

Start Date: 5-22-13   Reinstatement Date: 5-27-13
Authorized by: CM Meager   Date: 5-22-13

A-192

## NSO BOOKING DEPARTMENT INTAKE

| BOOKING NUMBER: 504745 | LAST NAME: Eastman | | FIRST NAME: John | | RACE: W | SEX: M |
|---|---|---|---|---|---|---|
| ICE ALERT: Y /(N) | OFFENSE CODE: 19.2-99 | | NUMBER OF MISDEMENORS: | NUMBER OF FELONIES: O | COURT: CSD | |
| HOLDS: Connecticut | BOND TYPE: No Bond | | BOND AMOUNT: | BONDING COMPANY: | | |
| TIME SEARCHED: 1910 | TIME COMMITTAL SIGNED: 1916 | BOOK START TIME: 2222 | BOOK END TIME: 2302 | TIME BAILED: | TIME TO JAIL: 0053 | |
| BOOKING DEPUTY: Parker | | J# 1422 | FINGER PRINT DEPUTY: Parker | J# 1422 | SEARCH DEPUTY: Tinba | J# 1464 |
| MILITARY: Y (N) | BRANCH: | SEX OFFENDER REGISTRATION: Y / N | DNA: Y /(N) | JAIL INMATE: Y (N) | | WEEKENDER: Y (N) |
| INFORMER CHECK: (Y) N | HOLDING CELL: H6 | SSN: ███-██-5221 | DATE OF BIRTH: ██-██-67 | TRN# 1993371 | | |

### NSO ARREST ONLY (I.E. COURTS, JAIL INMATES, TRANSPORTATION)

| ARREST DATE: | ARREST TIME: | ARREST LOCATION: |
|---|---|---|
| ARRESTING OFFICER: | | J# |

### PRISONER QUESTIONS

| | YES | NO |
|---|---|---|
| 1. Do you need **MEDICAL ATTENTION**? | ☐ YES | ☑ NO |
| 2. Have you recently been in a **MOTOR VEHICLE ACCIDENT / CAR CRASH**? | ☐ YES | ☑ NO |
| 3. Have you recently been the victim of a **VIOLENT ASSAULT**? | ☐ YES | ☑ NO |
| 4. Have you recently suffered any **MAJOR FALLS**? | ☐ YES | ☑ NO |
| 5. Have you had any other **SERIOUS INJURIES** within the past 5 days? | ☐ YES | ☑ NO |
| 6. Have you been in the **HOSPITAL** within the past 5 days? | ☐ YES | ☑ NO |
| 7. Any problems that you believe are **LIFE THREATENING**? | ☐ YES | ☑ NO |
| 8. Have you recently been Diagnosed or Treated for any **DISEASES**? | ☐ YES | ☑ NO |
| 9. Have you **TAKEN ANY DRUGS** within the last 24 hours? (Not including regular dosing of properly prescribed medications?) | ☐ YES | ☑ NO |
| 10. Are you presently having thoughts of **SUICIDE**? | ☐ YES | ☑ NO |
| 11. Are you having or have you had any **CHEST PAINS**? | ☐ YES | ☑ NO |

Note any medical condition the prisoner states:

PRISONER SIGNATURE: X _(signature)_

### DEPUTY QUESTIONS

| | YES | NO |
|---|---|---|
| 12. Has the prisoner been placed in a **POSITIONAL ASPHYXIA POSITION**? | ☐ YES | ☑ NO |
| 13. Does the prisoner **APPEAR INTOXICATED**? | ☐ YES | ☑ NO |
| 14. Does the prisoner have any known **ENEMIES**? | ☐ YES | ☑ NO |

DEPUTY SIGNATURE _(signature)_     DATE:     TIME:

**F "YES" WAS ANSWERED TO ANY OF THE QUESTIONS ABOVE. CONTACT MEDICAL ASSITANT**

A-193

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | Criminal No.  3:16-CR-006(MPS) |
| v. | : | |
| | : | |
| JOHN EASTMAN | : | May 6, 2016 |

**STIPULATION REGARDING EVIDENCE**
**RELATED TO DEFENDANT'S MOTION TO SUPPRESS**

The United States of America (the "Government") and the defendant, John Eastman, through their undersigned counsel, hereby stipulate as follows:

WHEREAS on January 7, 2016, a federal grand jury sitting in New Haven returned an indictment charging the defendant with one count of coercion and enticement of a minor, in violation of 18 U.S.C. § 2422(b), and one count of possession of child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B).

WHEREAS on January 22, 2016, the defendant filed a Motion to Suppress Physical Evidence and Statements in which he seeks to suppress evidence the Government obtained from his computer and statements the defendant made to members of the Waterbury Police Department. The defendant argues, among other things, that he did not sign and/or initial the following documents which appear to bear the signature "John Eastman" or "John T. Eastman" and the initials "JE": (i) Waterbury Police Department Advisement of Rights form (ii) Waterbury Police Department Voluntary Statement Rights form (iii) Waterbury Police Department Voluntary Statement form, and (iv) Waterbury Police Department Consent to Search form (collectively, the "Disputed Documents").  The defendant retained the services of a handwriting expert, John Reznikoff, who examined photocopies of the Disputed Documents and compared

1

A-194

the signatures and initials on those forms to signatures and initials on other documents provided by the defendant. Mr. Reznikoff prepared a report, attached to the defendant's Motion to Suppress, in which he opined to a strong degree of professional certainty that the signatures and initials on the copies of the Disputed Documents do not share authorship with the signatures and initials on the other documents provided by the defendant.

WHEREAS the Government has custody of the original Disputed Documents, as opposed to photocopies, along with the following other original documents from the defendant's case that appear to bear the signature "John Eastman" or "John T. Eastman" and the initials "JE": (i) Uniform Arrest Report, (ii) Waterbury Police Department Booking Card, (iii) Waterbury Police Department Completed Questionnaire, and (iv) Commonwealth of Virginia/City of Norfolk Waiver of Extradition Proceedings form (collectively, the "Arrest Documents" and together with the original Disputed Documents, the "Original Documents").

WHEREAS on March 28, 2016, the Government filed a memorandum in opposition to the defendant's motion to suppress and attached a report from Joan DiMartino, who is a forensic document examiner employed by the United States Department of Homeland Security. According to her report, Ms. DiMartino examined the Original Documents as well as photocopies of other documents that appear to bear the signature "John Eastman" or "John T. Eastman" and the initials "JE."  Ms. DiMartino found that the writer of the original signatures on the Arrest Documents prepared the original signatures on the Disputed Documents.

WHEREAS the Court has scheduled a suppression hearing for May 31, 2016.

WHEREAS the defendant's expert, Mr. Reznikoff, did not examine the Original Documents prior to preparing his report but only examined photocopies of the Disputed Documents and other documents supplied by the defendant.

A-195

WHEREAS the parties wish to provide Mr. Reznikoff with an equal opportunity to examine the Original Documents prior to the suppression hearing using examination tools at his place of business.  His examination tools cannot be transported to the Government's offices.  Mr. Reznikoff estimates he will need access to the Original Documents for approximately two hours.

NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED, subject to Court approval, that

1.      On a date mutually agreeable to both parties, but no later than May 20, 2016, a Government law enforcement agent shall deliver and transfer chain of custody of the Original Documents to the defendant's designated handwriting expert, John Reznikoff, at 49 Richmondville Avenue, Westport, CT 06880, for examination.

2.      Once delivered, Mr. Reznikoff shall be responsible to maintain and document the chain of custody of the Original Documents until the Original Documents are returned to the Government law enforcement agent.

3.      If any of the Original Documents must be altered or consumed for purposes of Mr. Reznikoff's examination, Mr. Reznikoff will notify counsel for the defendant, who in turn, shall notify counsel for the Government, prior to the examination for an opportunity to be heard on the matter.

4.      The defendant waives the right to object in any court proceeding to the admissibility of the Original Documents, as well as to any testimony concerning the Original Documents, based on the break in the chain of custody and control of the Original Documents by the Government, and/or any alteration or destruction of the Original Documents, from the time the Government delivers custody of the Original Documents to Mr. Reznikoff until the time Mr. Reznikoff returns the Original Documents to the Government.

Case 17-3893, Document 37-3, 07/24/2018, 2351754, Page76 of 95

A-196

5.      Counsel for the defendant shall provide a copy of this Stipulation to Mr.

Reznikoff prior to the date the Government delivers the Original Documents to Mr. Reznikoff.


DATED:  May 6, 2016


For the United States of America:

DEIRDRE M. DALY
UNITED STATES ATTORNEY


NEERAJ N. PATEL
ASSISTANT U.S. ATTORNEY
Federal Bar No. phv04499
157 Church Street, 25th Floor
New Haven, CT  06510
Tel.:   (203) 821-3700
Fax:    (203) 773-5376
Email: neeraj.patel@usdoj.gov

For the Defendant, John Eastman:

OFFICE OF THE FEDERAL DEFENDER


KELLY M. BARRETT
ASSISTANT FEDERAL DEFENDER
Bar No. ct27410
265 Church Street, Suite 702
New Haven, CT  06510
Tel.:   (203) 498-4200
Fax:    (203) 498-4207
Email: Kelly_barrett@fd.org


APPROVED and SO ORDERED this _____ day of May, 2016 at Hartford, Connecticut.


_____
HON. MICHAEL P. SHEA
UNITED STATES DISTRICT JUDGE


4

A-197

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | Criminal No.  3:16-CR-006(MPS) |
| v. | : | |
| | : | |
| JOHN EASTMAN | : | May 6, 2016 |

**STIPULATION REGARDING EVIDENCE**
**RELATED TO DEFENDANT'S MOTION TO SUPPRESS**

The United States of America (the "Government") and the defendant, John Eastman, through their undersigned counsel, hereby stipulate as follows:

WHEREAS on January 7, 2016, a federal grand jury sitting in New Haven returned an indictment charging the defendant with one count of coercion and enticement of a minor, in violation of 18 U.S.C. § 2422(b), and one count of possession of child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B).

WHEREAS on January 22, 2016, the defendant filed a Motion to Suppress Physical Evidence and Statements in which he seeks to suppress evidence the Government obtained from his computer and statements the defendant made to members of the Waterbury Police Department. The defendant argues, among other things, that he did not sign and/or initial the following documents which appear to bear the signature "John Eastman" or "John T. Eastman" and the initials "JE": (i) Waterbury Police Department Advisement of Rights form (ii) Waterbury Police Department Voluntary Statement Rights form (iii) Waterbury Police Department Voluntary Statement form, and (iv) Waterbury Police Department Consent to Search form (collectively, the "Disputed Documents").  The defendant retained the services of a handwriting expert, John Reznikoff, who examined photocopies of the Disputed Documents and compared

1

Case 17-3893, Document 37-3, 07/24/2018, 2351754, Page78 of 95

A-198

Case 3:16-cr-00006-MPS   Document 49   Filed 05/06/16   Page 2 of 5
Case 3:16-cr-00006-MPS   Document 48   Filed 05/06/16   Page 2 of 5

the signatures and initials on those forms to signatures and initials on other documents provided by the defendant. Mr. Reznikoff prepared a report, attached to the defendant's Motion to Suppress, in which he opined to a strong degree of professional certainty that the signatures and initials on the copies of the Disputed Documents do not share authorship with the signatures and initials on the other documents provided by the defendant.

WHEREAS the Government has custody of the original Disputed Documents, as opposed to photocopies, along with the following other original documents from the defendant's case that appear to bear the signature "John Eastman" or "John T. Eastman" and the initials "JE": (i) Uniform Arrest Report, (ii) Waterbury Police Department Booking Card, (iii) Waterbury Police Department Completed Questionnaire, and (iv) Commonwealth of Virginia/City of Norfolk Waiver of Extradition Proceedings form (collectively, the "Arrest Documents" and together with the original Disputed Documents, the "Original Documents").

WHEREAS on March 28, 2016, the Government filed a memorandum in opposition to the defendant's motion to suppress and attached a report from Joan DiMartino, who is a forensic document examiner employed by the United States Department of Homeland Security. According to her report, Ms. DiMartino examined the Original Documents as well as photocopies of other documents that appear to bear the signature "John Eastman" or "John T. Eastman" and the initials "JE." Ms. DiMartino found that the writer of the original signatures on the Arrest Documents prepared the original signatures on the Disputed Documents.

WHEREAS the Court has scheduled a suppression hearing for May 31, 2016.

WHEREAS the defendant's expert, Mr. Reznikoff, did not examine the Original Documents prior to preparing his report but only examined photocopies of the Disputed Documents and other documents supplied by the defendant.

2

Case 17-3893, Document 37-3, 07/24/2018, 2351754, Page79 of 95

A-199

Case 3:16-cr-00006-MPS   Document 49   Filed 05/06/16   Page 3 of 5
Case 3:16-cr-00006-MPS   Document 48   Filed 05/06/16   Page 3 of 5

WHEREAS the parties wish to provide Mr. Reznikoff with an equal opportunity to examine the Original Documents prior to the suppression hearing using examination tools at his place of business. His examination tools cannot be transported to the Government's offices. Mr. Reznikoff estimates he will need access to the Original Documents for approximately two hours.

NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED, subject to Court approval, that

1.       On a date mutually agreeable to both parties, but no later than May 20, 2016, a Government law enforcement agent shall deliver and transfer chain of custody of the Original Documents to the defendant's designated handwriting expert, John Reznikoff, at 49 Richmondville Avenue, Westport, CT 06880, for examination.

2.       Once delivered, Mr. Reznikoff shall be responsible to maintain and document the chain of custody of the Original Documents until the Original Documents are returned to the Government law enforcement agent.

3.       If any of the Original Documents must be altered or consumed for purposes of Mr. Reznikoff's examination, Mr. Reznikoff will notify counsel for the defendant, who in turn, shall notify counsel for the Government, prior to the examination for an opportunity to be heard on the matter.

4.       The defendant waives the right to object in any court proceeding to the admissibility of the Original Documents, as well as to any testimony concerning the Original Documents, based on the break in the chain of custody and control of the Original Documents by the Government, and/or any alteration or destruction of the Original Documents, from the time the Government delivers custody of the Original Documents to Mr. Reznikoff until the time Mr. Reznikoff returns the Original Documents to the Government.

Case 17-3893, Document 37-3, 07/24/2018, 2351754, Page80 of 95

A-200

Case 3:16-cr-00006-MPS   Document 49   Filed 05/06/16   Page 4 of 5
Case 3:16-cr-00006-MPS   Document 48   Filed 05/06/16   Page 4 of 5

5.    Counsel for the defendant shall provide a copy of this Stipulation to Mr. Reznikoff prior to the date the Government delivers the Original Documents to Mr. Reznikoff.

DATED:  May 6, 2016

For the United States of America:                For the Defendant, John Eastman:

DEIRDRE M. DALY                                  OFFICE OF THE FEDERAL DEFENDER
UNITED STATES ATTORNEY

NEERAJ N. PATEL                                  KELLY M. BARRETT
ASSISTANT U.S. ATTORNEY                          ASSISTANT FEDERAL DEFENDER
Federal Bar No. phv04499                         Bar No. ct27410
157 Church Street, 25th Floor                    265 Church Street, Suite 702
New Haven, CT  06510                             New Haven, CT  06510
Tel.:   (203) 821-3700                           Tel.:   (203) 498-4200
Fax:    (203) 773-5376                           Fax:    (203) 498-4207
Email: neeraj.patel@usdoj.gov                    Email: Kelly_barrett@fd.org

APPROVED and SO ORDERED this 6th day of May, 2016 at Hartford, Connecticut.

/s/ MICHAEL P. SHEA

HON. MICHAEL P. SHEA
UNITED STATES DISTRICT JUDGE

4

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA                    :

            vs.                          :     CRIMINAL NO. 3:16CR006(MPS)

JOHN EASTMAN                                :     May 17, 2016

**MR. EASTMAN'S REPLY TO GOVERNMENT'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS**

      Mr. Eastman limits his brief reply memorandum to three main points in light of the fact that the bulk of the disputed issues are factual in nature and will be more effectively addressed at the evidentiary hearing and/or in connection with post-hearing briefing.  In doing so, he does not waive or abandon any of the arguments previously raised in the principal memorandum.  <u>First</u>, the government errs as a matter of law in arguing that the Waterbury detectives' entrance into the Eastman home does not constitute a search. It is black letter law that it is a search for which either a warrant or a valid exception is required. <u>Second</u>, if the Court finds that the government has not met its burden of proof regarding the validity of the search and seizure at issue, and therefore the Waterbury detectives' version of events does not apply, the "good faith exception" does not apply.  <u>Third</u>, the government handwriting expert's opinion demonstrates the variability of handwriting analysis and the problems of relying upon different universes of samples covering expansive periods of time.

     **1.**    **The Waterbury detectives' entrance into the Eastman home constitutes a "search" in and of itself for which a warrant or a valid exception to the warrant requirement is needed.**

      Much attention has been paid by both parties to the question whether the Waterbury detectives had valid consent to search the computer seized from the Eastman home.  There is, however, another

1

issue regarding whether the Waterbury detectives had the authority to enter the Eastman home in the first instance.  In its memorandum, at page 14, the government states that "law enforcement did not conduct a search of [the Eastman] residence."  This statement is an incorrect statement of the law.  At the moment the Waterbury detectives entered the Eastman home, they were conducting a search.  See, e.g., Miller v. United States, 357 U.S. 301 (1958) (police entry into home began when they broke down the door of apartment in multi-unit building); Johnson v. United States, 333 U.S. 10 (1948) (search began when police entered "living quarters – hotel room of defendant).  The question becomes whether they had the authority to do so.  This question is the key to Mr. Eastman's motion to suppress.  It is more important than the handwriting issue on the consent forms, which even according to the Waterbury detectives' version of events, were not signed until almost two hours after they initially entered the Eastman home, because even assuming for the sake of argument that Mr. Eastman signed the consent form for the computer, there is no consent form for the home.  Putting aside for the moment the question whether the Waterbury detectives had authority to seize and search the computer, before they seized the computer, they entered the Eastman home without a warrant.  And, if their entry into the home was illegal, so is everything that followed.

It is a clear violation of the Fourth Amendment for police to enter a home without a warrant or one of the narrow exceptions to the warrant requirement.  Not only is the entry into the home considered a search, but in addition, it is considered to be presumptively unreasonable.  It is "a cardinal principle that searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable . . . subject only to a few specifically established and well-delineated exceptions."  Mincey v. Arizona, 437 U.S. 385, 390 (1978) (internal citations and quotation marks omitted); see also Coolidge v. New Hampshire, 403 U.S. 443, 474 (1971) ("a search

or seizure carried out on a suspect's premises without a warrant is *per se* unreasonable, unless the police can show that it falls within one of a carefully defined set of exceptions").

Adequate consent would, theoretically, be an acceptable exception to the warrant requirement if the Waterbury detectives had obtained it, however, they did not do so in this case. It is undisputed that there is no written consent, so the only arguable form of consent is oral consent. Mr. Eastman denies giving consent. Such refusal is consistent with his history and characteristics. Mr. Eastman has a history of refusing to deal with law enforcement. For example, in 2007, he was charged with refusing to be fingerprinted because he refused to be fingerprinted in connection with another pending charge. See Exhibit E (refusal to be fingerprinted documents). The question of consent will no doubt be explored further at the evidentiary hearing scheduled for May 31, 2016.

The government argues that the Eastman version of events is not credible. Mrs. Eastman is both the lease-holder of the apartment and the owner of the seized computer. She was present at the time of the search and seizure. Notwithstanding differences in the factual depictions between the Eastman version of events and the Waterbury detectives' version of events, it is undisputed that Mrs. Eastman was at home and present at the time of the search. It is hard to imagine why the Waterbury detectives would exclude altogether the lease-holder of the searched apartment and owner of the seized computer from the police report. On the other hand, it is entirely reasonable and expected that Mrs. Eastman did not file a complaint with the Waterbury Police until August 2013. This is because Mr. Eastman was not even arrested until May of 2013. It was not until he went to court and was given

3

a lawyer in July 2013 that the issue of a consent to search form was even raised.  Prior to that, neither

Mr. nor Mrs. Eastman would have known anything about a consent form.  Mrs. Eastman then

complained as soon as practicable thereafter, asserting that neither she nor her son had consented.

The Waterbury detectives' illegal entry into the Eastman home did not dissipate enough to avoid

tainting the resulting seizure of the computer and supposed statements of Mr. Eastman.  In United

States v. Snype, the Second Circuit stated:

> When a consent to search follows an illegal entry, this circuit requires the
> government to show more than the voluntariness of the consent; it must also
> demonstrate that "the taint of the initial entry has been dissipated" in order
> to admit evidence seized following the illegal entry.  United States v. Oguns,
> 921 F.2d 442, 447 (2d Cir. 1990) (internal quotation marks omitted).
> Oguns's identification of taint and voluntariness as distinct inquiries in
> evaluating the validity of certain consents derives from two Supreme Court
> decisions:  Wong Sun v. United States, which held that evidence seized after
> an illegal search must be suppressed unless the government shows that it, in
> fact, resulted from "an intervening independent act of free will" sufficient
> "to purge the primary taint of the unlawful invasion," 371 U.S. 471, 486, 83
> S. Ct. 407, 9 L.Ed.2d 441 (1963); and Brown v. Illinois, which held that,
> where an inculpatory statement follows an unlawful arrest, a finding of
> voluntariness under the Fifth Amendment (based on Miranda warnings)
> does not obviate the need to make a separate Fourth Amendment
> determination as to whether the statement was "'sufficiently an act of free
> will to purge the primary taint.'"  422 U.S. 590, 602, 95 S. Ct. 2254, 45
> L.Ed.2d 416 (1975) (quoting Wong Sun, id.).

441 F.3d 119, 132 (2d Cir. 2006).

The Supreme Court has prescribed three factors for determining whether the taint from a

Fourth Amendment violation has dissipated:  (1) the time between the Fourth Amendment violation

and the acquisition of evidence, (2) the presence of intervening circumstances, and (3) the flagrancy

of the official misconduct.  Brown v. Illinois, 422 U.S. 590, 603–04 (1975).  Here, all three factors

point to the need to apply the Exclusionary Rule.  The time between the illegal entry into the home

and the seizure of the computer was quite brief – "less than half an hour," according to the

4

government's response at page 5.  There were essentially no intervening circumstances – no change of venue, no substantive conversation between police and Mr. Eastman, and no opportunity for Mr. Eastman to speak to counsel or communicate with anyone outside the apartment – much less use the bathroom unsupervised.  Finally, the egregiousness of the violation cannot be overstated.  According to Mr. Eastman's affidavit, police simply barged into his home, disregarded his rights and his invocation of those rights, handcuffed him, humiliated him by forcing him to use a bathroom with an open door, and then hauled him off to the police station.

**2.    The "good faith" doctrine does not apply here.**

The government argues that even if the Waterbury detectives unlawfully searched the Eastman home and unlawfully searched and seized their computer, the error was harmless, because a different, federal law enforcement officer later submitted a search warrant affidavit based on the illegally obtained evidence without knowing of the illegality.  This cannot be correct, because if it was, it would allow a government body to, in effect, "launder" its bad searches through an alternative government body.

The government cites three cases for the proposition that the use of tainted information can be excused under the Good Faith exception.  None are on point, because all three cases stand for the proposition that reliance on evidence later judged to have been obtained illegally, *but the illegality of which had not been obvious to the officer who violated the law in the first place*, should not fatally taint any downstream use of that evidence whatsoever.  Here, there *is no inadvertence*.  If this Court rules that the government has not met its burden, the evidence thereby obtained is tainted in a manner that cannot be explained by mere inadvertence.

5

In <u>United States v. Thomas</u>, 757 F.2d 1359, 1368 (2d Cir. 1985), the Circuit did indeed find that the <u>Leon</u> good faith rule was applicable where an affidavit supporting a warrant contained evidence obtained in violation of the Fourth Amendment.   Subsequent to the <u>Thomas</u> decision, however, the Second Circuit later decided <u>United States v. Reilly</u>, 76 F.3d 1271, 1281 (2d Cir. 1996), on reh'g, 91 F.3d 331 (2d Cir. 1996), in which it held that "it is one thing to admit evidence innocently obtained by officers who rely on warrants later found invalid due to a magistrate's error.  It is an entirely different matter when the officers are themselves ultimately responsible for the defects in the warrant."

Key to the distinction between the two cases was that in <u>Thomas</u> "[t]he officer who presented the canine sniff evidence to the magistrate was clearly acting in good faith in doing so.  He did not have any significant reason to believe that what he had done was unconstitutional."  In <u>Reilly</u>, by contrast, the officers deliberately excluded relevant information from their affidavit.  Here, the officer presenting the facts to the magistrate knew (or should have known) that the evidence had not been obtained legally.  <u>Reilly</u> contains an excellent survey of cases where the original evidence was obtained illegally, including one that noted Leon "does not hold that a subsequent warrant validates an earlier illegal search.  Police officers cannot launder their prior unconstitutional behavior by presenting the fruits of it to a magistrate."  <u>State v. Hicks</u>, 707 P.2d 331, 333 (Ariz.Ct.App. 1985) (aff'd on other grounds sub nom. <u>Arizona v. Hicks</u>, 480 U.S. 321 (1987).  That is exactly what the government is trying to do here – launder the unconstitutional behavior of the Waterbury Police through an unwitting cutout.

The government also cited to <u>United States v. McClain</u>, 444 F.3d 556, 564–66 (6th Cir. 2005) for the proposition that "the <u>Leon</u> good faith exception should apply despite an earlier Fourth

Amendment violation."  Again, however, a critical part of the court's analysis was that the violation

in question was a tenuous one that might not have been apparent to the officers:

> The court in [United States v. White, 890 F.2d 1413 (8th Cir. 1989)] refused
> to apply the exclusionary rule because the facts surrounding the initial Fourth
> Amendment violation were 'close enough to the line of validity to make the
> officer's belief in the validity of the warrant objectively reasonable.'…The
> same is true here.  The facts surrounding these officers' warrantless entry into
> the house at 123 Imperial Point were not sufficient to establish probable cause
> to believe a burglary was in progress, but we do not believe that the officers
> were objectively unreasonable in suspecting that criminal activity was
> occurring inside McClain's home.

McClain, 444 F.3d at 566.  Here, there can be no argument that a violation of Mr. Eastman's rights

was an objectively reasonable mistake by officers in a hurry.

Finally, in United States v. Fletcher, 91 F.3d 48, 51–52 (8th Cir. 1996), the court found that

the Leon good faith exception was applicable to a subsequent warrant authorizing search of luggage

when the initial detention of the luggage was a Fourth Amendment violation, but again only because

"an objectively reasonable officer could have believed the search was valid."  Id.  Indeed, the Fletcher

Court stated that "[t]he relevant inquiry is whether the facts surrounding reasonable suspicion are

'close enough to the line of validity' that the police officers were entitled to a belief in the validity of

the warrant and the existence of reasonable suspicion."  Id.

Moreover, the government is overlooking a critical fact from Leon – that case was about

objectively reasonable reliance on a search warrant that was legally insufficient to establish probable

cause because "the information included was fatally stale.  The affidavit, moreover, failed to establish

the informant's credibility."  United States v. Leon, 468 U.S. 897, 904 (1984).  Here, by contrast, the

affidavit contained illegally obtained information.

As Chief Justice Roberts noted in a relatively recent case further developing the good faith

exception, "If the police have been shown to be reckless in maintaining a warrant system, or *to have*

*knowingly made false entries to lay the groundwork for future false arrests*, exclusion would certainly be justified under our cases should such misconduct cause a Fourth Amendment violation." Herring v. United States, 555 U.S. 135 (2009) (emphasis added).

Contained within Leon is an analysis of why suppression is or is not an appropriate remedy for invalid warrants, and Justice White's opinion makes clear there is a distinction between inadvertent failure to establish probable cause, which should not necessarily trigger suppression, and the use of false or misleading information, which should be treated under Franks v. Delaware, 438 U.S. 154, 171 (1978). Franks makes it clear that the proper way to deal with a search warrant affidavit containing false information is to excise the false information and see if what remains still supports a finding of probable cause.

If that were done there, there would be nothing left of the affidavit in question. When reading the affidavit of Agent Haimila, it is clear that Detective Morgan and his report was her sole source for her information, and that she had no personal knowledge whatsoever of the "facts" in the affidavit. The only information in the affidavit related to the seizure and search of the computer – the nature of the visit to the Eastman home, the details of police interaction with Mr. Eastman, and the contents of the purported statement given by him – are all the same as, and no doubt directly derived from, Detective Morgan's version of events. If that cannot stand, then the Haimila affidavit, and thus the federal warrant, also cannot stand.

3. **The government's handwriting expert opinion demonstrates the variability of the science of handwriting analysis.**

The government's handwriting expert does not squarely address the defense handwriting expert opinion, but instead considers an entirely new universe of documents. This is not responsive, and does not illuminate where the real differences of opinion between the two experts lie.

Nonetheless, the issue of the government expert's handwriting analysis is expected to be the subject of testimony at the hearing scheduled for May 31, 2016, at which time the quality of the analysis and evidence behind the expert's opinion can be assessed.

In conclusion, Mr. Eastman respectfully asserts that the moment the Waterbury detectives entered his home on November 10, 2012, a search of the home occurred.  The critical question is whether the Waterbury detectives had valid consent to do so.  A separate question exists regarding whether the Waterbury detectives had valid consent to search the computer.  Although the government conflates the two (the search of the home and the computer), they are actually two separate inquiries. If the Waterbury detectives searched the Eastman home and/or computer without valid consent in the manner alleged, the "good faith" doctrine does not apply.

Respectfully Submitted,

THE DEFENDANT,
JOHN EASTMAN

FEDERAL DEFENDER OFFICE


Date:  May 17, 2016                    /s/ Kelly Barrett_____
                                       Assistant Federal Defender
                                       265 Church Street, 7th FL
                                       New Haven, CT 06510
                                       Phone: (860) 498-4200
                                       Bar No.: ct27410
                                       Email: kelly_barrett@fd.org

A-210

# EXHIBIT E

JD-CR-71 LP REV 7-05

**STATE OF CONNECTICUT**
SUPERIOR COURT

DOB: 10/02/1967

ORIGINAL INFORMATION: YES

COURT DATE: 07/26/2007   AT: GA04 - WATERBURY

DISPOSITION DATE:

DOCKET NO.: CR07-0363143-S

The undersigned Prosecuting Authority of the Superior Court of the State of Connecticut charges that

EASTMAN JOHN

116 CONGRESS AV, WATERBURY, CT 00000

Did commit the offenses recited below:

Count: 1 RISK OF INJURY TO CHILD    Type/Class: F/C  At: WATERBURY
On or About: 07/26/2007    In Violation Of CGS/PA No: 53-21(a)(1)

Count: 2 BREACH OF PEACE 2ND DEG    Type/Class: M/B  At: WATERBURY
On or About: 07/26/2007    In Violation Of CGS/PA No: 53a-181

Count: 3 FLR COMPLY FINGERPRINT REQS    Type/Class: V/  At: WATERBURY
On or About: 07/26/2007    In Violation Of CGS/PA No: 29-17

SEE OTHER SHEETS FOR ADDITIONAL COUNTS    DATE JUL 2 6 2007    SIGNED (PROSECUTING AUTHORITY)

**COURT ACTION**

DEFENDANT ADVISED OF RIGHTS BEFORE PLEA (JUDGE)    DATE JUL 2 6 2007    BOND $50000    SURETY    CASH    ELECTION: COURT   JURY

ATTY.   PUB DEFENDER   GUARDIAN    REDUCTION   APPEAL    ELECTION WITHDRAWN DATE   SEIZED PROPERTY

| COUNT NO. | PLEA DATE | PLEA | PLEA WITHDRAWN DATE | NEW PLEA | VERDICT/FINDING | FINE | JAIL | ADDITIONAL DISPOSITION |
|---|---|---|---|---|---|---|---|---|
| 1 | SEP 13 2007 | | 3 2008 | | GY | | | |
| 2 | SEP 13 2007 | | 3 2008 | | GY | | | |
| 3 | | | | | | | | |

OTHER COURT ACTION    JUDGE Roch

DATE JUL 2 6 2007

**PUBLIC DEFENDER APPOINTED**
**BOND ONLY**

PROBABLE CAUSE FOUND

Mental Health
Conditions on M14
No Contact w Victim
No driving of Bond made

SEP 13 2007

| | DATE | PURPOSE | REASON |
|---|---|---|---|
| 1. | | | |
| 2. | 11-5 | X | |
| 3. | 3-3-08 | X | |
| 4. | | | |
| 5. | | | |
| 6. | | | |
| 7. | | | |
| 8. | | | |
| 9. | | | |
| 10. | | | |

FINE PAID    RECEIPT NO.    MITTIMUS DATE    TRIAL TOWN

PROSECUTOR ON ORIGINAL DISPOSITION   REPORTER ON ORIGINAL DISPOSITION   SIGNED (CLERK)   SIGNED (JUDGE)

SEE REVERSE SIDE

DISC-000133

AUG 23 2007  Motion for Bond review (Atty)

~~slot~~ not acted on  Roc

Cont 9/13/07

OCT 1 5 2007

NOV 0 5 2007

10-25. Δ Rejects offer  Brunette
all offers w/d  Brunette

MAR 0 3 2008

SUBSTANCE ABUSE EVALUATION

Count three                           arms charges
and rights and pleased voluntarily

DO NOT THREATEN, ASSAULT, OR
HARASS
NO CONTACT
DOMESTIC
SUBSTANCE
FIREARMS

2 victims

DNA
PSI warin
Jail Credit from
7/25/07

DISC-000134

**A-213**

| UNIFORM ARREST REPORT JD-CR-21(1) | | FOR SPBI USE ONLY | |
|---|---|---|---|
| NAME OF ACCUSED (LAST, FIRST MIDDLE) <br> EASTMAN, JOHN | SPBI USE ONLY | | UAR: 8431755 |
| NO., STREET, CITY, STATE AND ZIP <br> WATERBURY, CT | | | COMPANION U.A.R. NO. |

| SEX <br> M | RACE <br> W | DATE OF BIRTH | PLACE OF BIRTH <br> CT | SOCIAL SECURITY NO. | HT. <br> 600 | WT. <br> 200 | HAIR <br> BRO | EYES <br> HAZ | DOCKET NO. |
|---|---|---|---|---|---|---|---|---|---|

PHYSICAL CHARACTERISTICS (SMT)

| PHYSICAL DISABILITIES | RIGHT OR LEFT HANDED <br> LEFT | TEETH <br> FINE/GOOD/NO DISCERN |
|---|---|---|
| EMPLOYER   SHOREWOOD PACKAGING <br> 155 S LEONARD ST <br> WATERBURY, CT 06708 | | OCCUPATION <br> FACTORY WORKER |
| MARITAL STATUS <br> SINGLE | NUMBER OF CHILDREN <br> 00 | EDUCATION <br> 12 |
| NATIONALITY <br> UNITED STATES | | SKIN COMPLEXION <br> FAR |
| ACCOMPLICES | | PLACE ARRESTED <br> WATERBURY,CT |

| PHOTO AVAILABLE <br> _X_ YES  ___ NO <br> PALM PRINTS AVAILABLE <br> ___ YES  _X_ NO | NAME AND ADDRESS OF RELATIVE OR PERSON TO BE NOTIFIED IN CASE OF EMERGENCY <br> SHOREWOOD PACKAGING <br> 155 S LEONARD ST <br> WATERBURY, CT 06708 | |

| ALIAS/MAIDEN NAME | ALIEN REG. NO. | OPERATOR'S LICENSE NO. (MV) | STATE | DATE AND TIME ARRESTED <br> 07-26-2007 <br> 0402 |
|---|---|---|---|---|
| ___ SURETY <br> ___ DETAINED   AMOUNT OF BOND <br> 50 000 | ___ CASH <br> ___ OTHER | COMMERCIAL/HAZ. MAT. <br> ___ CDL ___ CV ___ HM | TOWN OF ARREST <br> 151 | TOWN OF OFFENSE <br> 151 |
| ARRESTING OFFICER <br> SHEEHAN, NATHAN | SHIELD NO. <br> 727 | SIGNATURE OF ACCUSED <br> X  Refused | SIGNED – OFFICIAL TAKING PRINTS <br> maia606 |
| DEPARTMENT OR TROOP/ORI <br> CT0015100 | MOT. VEH. ___ <br> REG. # ____ | P.D. ID NO. <br> 000280944 | P.D. CASE NO. <br> 200700062487 | NOTE AMP. |
| REMARKS | | F.V. ALC. NAR. <br> ___ ___ ___ <br> G.A. NO. <br> GA-04 | COURT DATE <br> 7-26-07 <br> DATE FINGERPRINTED <br> 07-26-2007 | S.P.B.I. NO. <br> F.B.I. NO. |

| CHARGE(S) AND STATUTE NO. | DATE OF OFFENSE |
|---|---|
| 53-21 INJURY,RISK OF INJURY (F <br> 53A-181 BREACH OF PEACE 2ND DE <br> 29-17 Refusal to be fingerprintd | 07-26-2007 <br> 07-26-2007 <br> 07-26-2007 |

DISC-000135

Waterbury Police Department
Waterbury, Connecticut
Standard Form Number P-01
Revised 09/06

# Waterbury Police Department
## Incident and Offense Report

07-6248?

1. COMPLAINT NUMBER
07-6258.

| 2. FILE NUMBER | 3.STATUS | 4. OFF. I.D. | 5 DATE OPENED | 6. DATE CLEARED | 7. INCIDENT OR OFFENSE |
|---|---|---|---|---|---|
| | 3 | 606 | 07-26-07 | 07-26-07 | Police Info. |

| 8. MAJ. CD. | 9. NAME OF PLACE, BUSINESS OR FIRM | 10. ADDRESS OF OCCURENCE |
|---|---|---|
| | Police Head Quarters | 255 East Main St |

| 11. LOC. CO. | 12. DAY OF WK. | 13. DATE OF OCCURENCE | 14. TIME | 15. WEATHER | 16. OBJECT OF ATTACK |
|---|---|---|---|---|---|
| | Th | 07-26-07 | 0500 | C | Other |

| 17. WEAP, TOOL, MEANS OF ATTACK OR ENTRY | 18. POINT OF ENTRY | 19. METHOD OF ATTACK |
|---|---|---|
| Other | | Other |

| VICTIM: 20. AGE | 21. SEX | 22. RACE | 23. VICTIM'S NAME | | | 24. VICTIM'S ADDRESS |
|---|---|---|---|---|---|---|
| | | | LAST | FIRST | M | |
| | | | LAST | FIRST | M | |
| | | | LAST | FIRST | M | |

| 25. COMPLAINANT'S NAME | | 26. COMPLAINANTS ADDRESS | 27. PHONE |
|---|---|---|---|
| LAST Maia FIRST Querino | | 255 East Main St. | 574-6920 |

| 28. DESCRIPTION OF PLACE | 29. NATURE OF LARCENY |
|---|---|
| | |

| 30. EST. VALUE OR TYPE OF STOL.PROP | CURRENCY | JEWELRY | FUR/CLOTH. | OFFICE EQUIP. | TV/RADIO | FIREARM | MISC. | TOTAL |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |

| 31. OTHER OFFICERS AT SCENE | 32. WITNESSES: | | | | 33. ADDRESS |
|---|---|---|---|---|---|
| Ofr. Leone | LAST | FIRST | M | | |
| | LAST | FIRST | M | COURT COPY | |
| | LAST | FIRST | M | | |
| | LAST | FIRST | M | | |

| 5. PERSONS ARRESTED - NAME | 36. ADDRESS | 37. CHARGE |
|---|---|---|
| LAST Eastman FIRST John M | █████████████ | 29-12 Refusal to be printed |
| LAST | FIRST | M |
| LAST | FIRST | M |
| LAST | FIRST | M |
| LAST | FIRST | M |
| LAST | FIRST | M |

| OFFICER REPORTING SIGNATURE | 38. POST/BEAT | 40. DATE OF REPORT | 41. COMP. OPER. |
|---|---|---|---|
| Querino Maia #606 | Desk | 07-26-07 | DISC-000136 |

**A-215**

42. NARRATIVE:

**DETAILS OF OFFENSE:**   Describe important information as to why or how the incident occurred; physical evidence;
include serial numbers of property if available; vehicles used if any; any suspects; etc.

On 07-26-07 at 0500hrs. I, Officer Maia, while work-
ing the desk asked a Prisoner, John Eastman DOB
▇▇▇▇, to be printed several times, but Mr. East-
man refused and replied "fuck you I'm not doing
shit." Mr. Eastman continued to refuse being printed.
At this time Mr. Eastman was Put back in his
cell and charged with Refusal to be printed. Ct.
Stat: 29-12.

Officer J. Maia #606

43. FOR FURTHER INVESTIGATION:

DETECTIVE ☐   YOUTH ☐   V&I ☐   OTHER: EXPLAIN ☐

SUBSCRIBED AND SWORN TO
BEFORE ME THIS DATE
44. SUPERVISOR APPROVING:   614

45. DATE   7-26-07

DISC-000137