# 17-3893-cr

# United States Court of Appeals

*for the*

# Second Circuit

UNITED STATES OF AMERICA,

*Appellee,*

– v. –

JOHN EASTMAN,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT (NEW HAVEN)

## JOINT APPENDIX
## Volume 3 of 3 (Pages A-459 to A-723)

SANDRA SLACK GLOVER
NEERAJ N. PATEL
UNITED STATES ATTORNEY'S OFFICE,
    DISTRICT OF CONNECTICUT
*Attorneys for Appellee*
Connecticut Financial Center
157 Church Street, 25th Floor
New Haven, Connecticut 06510
(203) 821-3700

DAVID A. MORAGHAN
SMITH KEEFE MORAGHAN
    & WATERFALL, LLC
*Attorneys for Defendant-Appellant*
257 Main Street, Fl. 2-2
Torrington, Connecticut 06790
(860) 482-7651

i

# TABLE OF CONTENTS

**Page**

Lower Court Docket Entries ..................................... A-1

Complaint, dated February 12, 2015 ........................ A-23

Indictment, filed January 7, 2016 ............................. A-38

Notice of Motion, by Defendant, to Suppress
 Physical Evidence and Statements, dated
 January 22, 2016 .................................................. A-42

Memorandum of Law, by Defendant, in Support of
 Motion, dated January 22, 2016 ........................... A-44

Exhibit A to Memorandum of Law-
 Export Report .................................................... A-61

Exhibit B to Memorandum of Law -
 Affidavit of John Eastman, sworn to
 November 25, 2015 ............................................ A-91

Exhibit C to Memorandum of Law -
 Affidavit of Linda Eastman, sworn to
 November 23, 2015 ............................................ A-95

Exhibit D to Memorandum of Law-
 Incident and Offense Report, dated May 7, 2013 .. A-98

Government's Memorandum of Law, in Opposition
 to Motion, dated March 26, 2018 ........................ A-107

Exhibit A to Memorandum -
 Declaration of Peter Morgan, in Opposition to
 Motion, dated March 25, 2016 ............................ A-137

Exhibit A-1 to Memorandum -
 Advisement of Rights ......................................... A-146

ii

**Page**

Exhibit A-2 to Memorandum -
Voluntary Statement of Rights Form ..................... A-148

Exhibit A-3 to Memorandum -
Voluntary Statement................................................. A-150

Exhibit A-4 to Memorandum -
Consent Search Form.............................................. A-153

Exhibit B to Memorandum -
Declaration of Allison M. Haimila, in Opposition
to Motion, dated March 28, 2016 ......................... A-155

Exhibit C to Memorandum -
(i) Laboratory Report by Special Agent Allison
Haimila, dated March 22, 2016 ............................ A-159

(ii) *Curriculum Vitae* of Joan A. DiMartino........... A-162

Exhibit D to Memorandum -
Waiver of Extradition Proceedings, dated
May 15, 2013 ......................................................... A-169

Exhibit E to Memorandum -
Uniform Arrest Report, dated May 29, 2013 ......... A-171

Exhibit F to Memorandum -
Booking Card.......................................................... A-173

Exhibit G to Memorandum -
Complete Questionnaire of Waterbury Police
5Department .......................................................... A-178

Exhibit H to Memorandum -
Electronic Monitoring Agreement, dated
January 28, 2011 .................................................... A-177

Exhibit I to Memorandum -
Fingerprint Card...................................................... A-183

iii

**Page**

Exhibit J to Memorandum -
Norfolk Sheriff's Office Room and Board Policy . A-185

Stipulation regarding evidence related to
Defendant's Motion to Suppress, dated
May 6, 2016 ........................................................... A-193

So-Ordered Stipulation of the Honorable Michael P.
Shea, dated May 6, 2016 ....................................... A-197

Reply Memorandum of Law, by Defendant, in
Response to the Government's Opposition, dated
May 17, 2016 ........................................................ A-201

Exhibit E to Reply Memorandum -
Refusal to be Fingerprinted Documents ................ A-210

Transcript of Suppressing Hearing held before
Michael P. Shea, dated May 31, 2016 ................... A-216

Defendant's Exhibit List ............................................ A-454

Government's Exhibit List .......................................... A-456

Defendant's Witness List ........................................... A-458

Defendant's Proposed Finding of Facts and
Conclusions of Law, dated June 27, 2016 ............. A-459

Exhibit F to Proposed Finding of Facts and
Conclusions of Law -
Property Record Report and Property Inventory ... A-489

Government's Proposed Finding of Facts and
Conclusions of Law regarding Defendant's
Motion to Suppress Evidence, dated
June 27, 2016 ........................................................ A-494

Ruling on Motion to Suppress of the Honorable
Michael P. Shea, dated August 15, 2016 ............... A-535

iv

|  | Page |
|---|---|
| Plea Agreement, dated March 2, 2017 ...................... | A-561 |
| Transcript of Sentencing Proceedings held before the Honorable Michael P. Shea, dated March 2, 2017........................................................ | A-573 |
| Transcript of Plea Proceedings held before the Honorable Michael P. Shea, dated March 2, 2017........................................................ | A-613 |
| Transcript of Sentencing Proceedings held before the Honorable Michael P. Shea, dated November 29, 2017 .............................................. | A-653 |
| Notice of Appeal, dated December 1, 2017 .............. | A-723 |

A-459

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA        :

             vs.                     :      CRIMINAL NO. 3:16-CR-6 (MPS)

JOHN EASTMAN                :      June 27, 2016

### DEFENDANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

This briefing arises out of the warrantless search and seizure conducted by two Waterbury Police detectives on November 10, 2012 at the Eastman home at 157 Congress Avenue, 3rd floor, Waterbury, Connecticut.  This is an important case, because it implicates the right to be free from unreasonable searches and seizures in our homes, which is the "chief evil" against which the Fourth Amendment is directed.  See United States v. United States District Court, 407 U.S. 297, 313 (1972).

On May 14, 2013, Mr. Eastman was arrested on Connecticut state child pornography and related charges[1] and he has been detained in state custody ever since.  Def. Ex. 40.  On February 12, 2015, by criminal complaint, the federal government charged Mr. Eastman with child pornography and coercion and enticement offenses arising out of the same alleged conduct.  Doc. No. 19. Thereafter, on January 7, 2016, the federal government indicted Mr. Eastman on the same charges. Doc. No. 28.  On January 22, 2016, the defendant, Mr. John Eastman, through undersigned counsel, filed a motion to suppress physical evidence (an HP desktop computer and its contents) and a written statement, both taken by the Waterbury police on November 10, 2012.  Doc. No. 30.  On March 28, 2016, the government filed a memorandum in opposition to the defendant's motion.

_____

[1] These charges included illegal possession of child pornography, 1st degree (53a-196d); enticing a minor by computer (53a-90a(b)(1)); misrepresentation of age to entice a minor (53a-90b); employing a minor in an obscene performance( 53a-196a); promoting a minor in an obscene performance (53a-196b); risk of injury to a child (53-21).

Doc. No. 46.  On May 17, 2016, Mr. Eastman filed a reply.  Doc. No. 50.  That pre-hearing memoranda included affidavits as well as two competing expert reports on handwriting analysis. By agreement, the parties agreed not to present testimony by their respective handwriting experts. Transcript of May 31, 2016 Suppression Hearing (hereinafter, "Tr.") at 2-5.

On May 31, 2016, the Court held an evidentiary hearing, at which three law enforcement witnesses testified on behalf of the government, and one witness testified on behalf of Mr. Eastman. At the conclusion of the hearing, the Court ordered the parties to submit post-hearing briefings in the form of proposed findings of fact and conclusions of law.

This suppression briefing raises six principal issues:  (1) whether the detectives conducted an illegal search of the Eastman home when they entered it on November 10, 2012 without a warrant or whether they had a valid exception to the warrant requirement (e.g., voluntary consent); (2) if there was an illegal search into the Eastman home, whether everything that follows is fruit of the poisonous tree that must be suppressed; (3) whether Mr. Eastman was in custody in his home and subjected to custodial interrogation for which he was not Mirandized; (4) whether as a result he was unable to provide voluntary consent; (5) whether Ms. Eastman, as a third-party leaseholder of the home and owner of the computer, retracted any purported consent; and (6) whether everything that followed at the police station was fruit of the poisonous tree.

**Proposed Findings of Fact**

1) John Eastman was born on October 2, 1967.  Def. Ex. 40.  In the fall of 2012 he was 45 years old.  Id.

2) He has a lengthy criminal history.  Id.  His rap sheet is 37 pages long.  Id.  See also Tr. 60:4-7.

3) In 1998, Mr. Eastman was convicted of Sexual Assault 4 and Risk of Injury of a Minor; in 1999, he was convicted of Harassment in the First Degree; and in 2008, he was convicted of Risk of Injury to a Minor.  Def. Ex. 1 at 7.  In 1999, Mr. Eastman was placed on the Connecticut Sex Offender Registry for 10 years.  Id.  See also Def. Ex. 40.  He also has multiple convictions for public indecency.  Def. Ex. 40.

2

4) In 2003, Mr. Eastman was charged with Assault on a Public Safety Personnel in violation of Conn. Gen. Stat. 53a-167c, however, he ultimately pled guilty to Assault 3d.  Def. Ex. 40.  He has been convicted of Interfering/Resisting Arrest.  Id.  He has been convicted of numerous counts of Disorderly Conduct and/or Breach of Peace.  Id.  He has been convicted of at least three violations of probation.  Def. Ex. 1 at 7; but see Def. Ex. 40 (revealing potentially more than three violations of probation).  Mr. Eastman has also been charged with Failure to Comply with Fingerprint Requests, but that charge was later nolled, when he pled guilty to Risk of Injury of a Child and Breach of Peace in 2008.  See Exhibit E to Defendant's Reply Memorandum.

5) Ms. Linda Eastman is John Eastman's mother.  Tr. 209:8-9.

6) Before 2004, Ms. Eastman had little to no contact with Mr. Eastman.  Tr.: 219:25-220:1.

7) In 2008, Ms. Eastman moved to 157 Congress Avenue, 3rd Floor, Waterbury, Connecticut.  Tr. 209:15-16.

8) Ms. Eastman leased the apartment in her name.  Tr. 209:17-18; Def. Ex. 37.

9) Prior to November 10, 2012, John Eastman moved in with Ms. Eastman.  Tr. 209:21-23.

10) John Eastman's name has never been on the lease.  Tr. 210:1-4.

11) On July 11, 2012, Ms. Linda Eastman purchased an HP Pavilion desktop computer (serial number 088611238022) from Walmart.  Tr. 217:4-9; Def. Ex. 38.  She owns that computer.  Id. She used the computer approximately once per week "to see what was on there."  Tr. 225:25-226:1-3.  Mr. Eastman used the computer and it was kept in his bedroom.  Tr. 225.

12) On September 13, 2012, Vermont State Police Trooper Eric Jollymore spoke with a mother, who complained that her 11 year old daughter had a sleep over with three other girls, ages 11 and 12 at their residence on September 8-9, 2012.  The mother stated that during the party, the girls were using the computer program "Skype" to communicate with people over the internet. Def. Ex. 1 at 2; Tr. 12:22-13:7.

13) The mother further complained that the girls began speaking to an individual with the user name Harry.Styles888 (resembling the name of a singer in the group One Direction), who requested that the girls pose in front of the camera in the sexual position doggie style. Tr. 13:9-22.

14) On October 13, 2012, Trooper Jollymore applied for and was granted a court order to Skype to provide the account activation information for the user name Harry.Styles888. Tr. 14:7-10; Def. Ex. 1 at 2.

15) On October 24, 2012, Trooper Jollymore received the results of the court order from Skype. The information indicated that the "Harry.Styles888" user name was activated on 7/27/12 from IP address 76.23.191.201. Def. Ex. 1 at 2.

16) Trooper Jollymore traced that IP address (and the sexually explicit Skype activity associated with it) to an IP address in Waterbury, Connecticut. Tr. 58, Lines 12-14.

17) On October 25, 2012, Trooper Jollymore contacted the Waterbury Police Department ("WPD") about his investigation. Tr. 57:22-25. He faxed his investigative reports to the WPD for further investigation. Tr. 14:5-7.

18) The WPD assigned the case to Detective Peter Morgan for further investigation. Tr. 57:20-21; 12:18-21.

19) Detective Morgan is assigned to the Computer Crimes Unit, where he investigates all crimes that involve any kind of computers or digital media evidence. Tr. 11:16-19. The majority of the cases to which he is assigned focus on possessing and sharing of child pornography and the online enticement of minors to engage in sexual activity. Tr. 11:22-25.

20) Detective Morgan claims to have specialized training in digital forensics examinations and computer investigations, including an EnCase certification. Tr. 12:3-17.

21) As of the fall of 2012, Detective Morgan had been working at the WPD for 17 years (since 1995) and had been a detective for eight years (since 2004). Tr. 10:17-23.

22) He has worked on all major crimes, including homicides, serious assaults, robberies, and sexual assaults. Tr. 11:8-14.

23) On November 1, 2012, Detective Morgan applied for an *ex parte* court order to Comcast to obtain the subscriber information (IP address, date/time of creation) for the "Harry.Styles888" user account.  Tr. 15:2-6; 58:15-20.

24) The court granted that *ex parte* order.  Tr. 58:21-22.

25) By letter dated November 6, 2012, Comcast responded to the court order.  See Gov't Ex. 17.

26) On Thursday, November 8, 2012, Detective Morgan received the response from Comcast stating that the IP address 76.23.191.201 (which was in turn associated with the "Harry.Styles888" user account) was assigned on July 27, 2012 to John Eastman at 157 Congress Avenue, 3rd Floor, Waterbury, Connecticut 06708.  Tr. 15:8-11; 59:3-10.

27) The Comcast response received by Detective Morgan also stated that the subscriber account was "Active."  Gov't Ex. 17.  The response also indicated that the "Method of Payment" on the account was by "Statement sent to the above address" (the "above address" being John Eastman, 157 Congress Ave Fl 3, Waterbury, CT 06708).  Id.  The active nature of the account, in combination with the current IP history, see Gov't Ex. 17 at 2-3, suggests that the account was up to date and that payment was being made by statements sent to John Eastman at 157 Congress Avenue.  See id.

28) The Comcast response received by Detective Morgan also provided a telephone number (203-527-7591) and two email addresses (leastman9826 and Eastman.john) associated with John Eastman at 157 Congress Avenue, 3d Floor, Waterbury, Connecticut.  Gov't Ex. 17.

29) Upon receiving the response from Comcast, Detective Morgan did not believe that time was of the essence.  Tr. 59:15-16.

30) Yet, in the two-day period following his receipt of the Comcast response, he failed to perform the following due diligence:

   a)  Detective Morgan did not determine John Eastman's date of birth.  Tr. 64:16-18.

   b)  Detective Morgan did not run John Eastman's rap sheet.  Tr. 59:17-19.

   c)  Detective Morgan did not determine that John Eastman was a former registered sex offender and had a variety of prior convictions relevant to the current investigation.  Tr. 60:8-25-61:1-3.

   d)  Detective Morgan did not check the property records for 157 Congress Avenue.  Tr. 62:4-6.

   e)  Detective Morgan did not determine who was the leaseholder for the property at 157 Congress Avenue.  Tr. 62:7-9.

   f)  Detective Morgan did not attempt to call the telephone number listed on the Comcast response to determine if there was a John Eastman at that number.  <u>See</u> Gov't Ex. 17.

   g)  Detective Morgan did not attempt to email the email addresses listed on the Comcast response to determine if those accounts were active.  <u>See</u> Gov't Ex. 17.

   h)  Detective Morgan did not request the billing records for the Comcast account that Comcast had indicated was "Active."  <u>See</u> Gov't Ex. 17.

31) In light of ¶ 29, the failure to perform the steps set forth in ¶ 30(a)-(h) was sloppy police work.

   a)  Detective Morgan claimed that he needed more information to determine whether John Eastman was living in the residence at the time.  Tr. 17:23-24.  Yet, that claim is belied by the fact that the response Detective Morgan received from Comcast on November 8, 2012 stated that the account was "active" and payments were being made by "John Eastman" at 157 Congress Avenue.  <u>See</u> ¶ 27, <u>supra</u>.  Moreover, the steps set forth in ¶ 30(a)-(h) would have further confirmed the same.

32) Based upon the information he knew or should have known by November 8, 2012, Detective Morgan had sufficient information to seek and obtain a search warrant.  <u>See</u>, <u>supra</u> ¶¶ 1-30.

33) Detective Morgan ***chose*** not to apply for a search warrant.  Tr. 61:17.

34) Detective Morgan ***chose*** not to apply for an arrest warrant.  Tr. 61:20.

35) In light of ¶¶ 29-30(a)-(h), Detective Morgan's claim that he did not try to apply for a search warrant, because he "felt he needed additional information" is not credible.  Tr. 62:17-19.  His contention on direct examination that he "felt that a judge may question not doing my own investigative research prior to obtaining a search warrant," Tr. 17:20-21, is belied by the fact that he nevertheless did not do any investigative research.  <u>See supra</u> 29-30(a)-(h).

a) If he felt he needed "additional information" an experienced and seasoned detective (see ¶¶ 19-22) would have performed the steps, or at least the most basic steps, such as running a date of birth and rap sheet, outlined in ¶¶ 30(a)-(h).

b) The fact that Detective Morgan did not state in his police report that he felt he needed more information to apply for a warrant, see Def. Ex. 1, further supports the conclusion that his claim is not credible.  Tr. 62:20-22.

c) Detective Morgan's demeanor and manner on cross-examination regarding the topic of why he did not at least try to obtain a warrant suggest that his claimed justification is not credible.  For example, he stated that he "did not feel that at the time that there was a definite crime" because John Eastman could have been 13 years old, and therefore his chats with 11 and 12 year old girls would have been "age appropriate" talk.  Tr. 64:1-15.  Yet, Detective Morgan did not perform the exceedingly simple step of determining Mr. Eastman's age.  Tr. 64:16-18.  More importantly, even without taking any additional action, he already had information in his possession to suggest that John Eastman was an adult, not a minor, and that therefore the chats were not "age appropriate."  The letter that Detective Morgan received from Comcast, dated November 6, 2012, see Gov't Ex. 17, stated that John Eastman was the responsible party for payment of bills.  A minor would never be listed as the obligor on a utility bill.

d) In addition, Detective Morgan's demeanor and manner of response on cross-examination regarding why he did not try to obtain a search warrant was argumentative, evasive, and defensive.  See, e.g., Tr. 65:1-23.

   i) For example, when asked by defense counsel whether Detective Morgan *now* knows that Linda Eastman is John Eastman's mother, Detective Morgan said he did not know.  Tr. 62:16.  Yet, on direct examination, Detective Morgan claimed to have been aware that John Eastman's mother had filed a complaint against him, suggesting he did know who John Eastman's mother was.  Tr. 56:13.

36) Detective Morgan's claim that he did not run John Eastman's rap sheet between November 8 and November 10, 2012 because he "didn't have a suspect at that time" is not credible.  Tr. 59:17-22.

a) That testimony is contradicted by Detective Terni, who testified that at the time [he] became involved (November 10, 2012 at the WPD prior to going to the Eastman home), Mr. Eastman was already a suspect.  Tr. 161:3-5.

7

A-466

    b) No reasonable police officer, especially one with as much experience as Detective Morgan, would have gone into the home of a suspect without at least trying to run a rap sheet, particularly not knowing whether the individual was a firearm owner.  Tr. 168:11.

    c) Detective Morgan's claim that he did not do so suggests either a lack of candor or extreme sloppiness.

37) Even if Detective Morgan truly believed that he did not have enough information to apply for a search warrant, he nevertheless decided to go to the Eastman home anyway without a warrant to attempt to get the same information to which he would have had access if he had obtained a warrant.  Tr. 66:13-25; 67:1-8.

38) In approaching the Eastman home, Detective Morgan was hoping that Mr. Eastman would be cooperative and speak to Detective Morgan without a lawyer present.  Tr. 69:7-13.

39) Saturday, November 10, 2012 was the Veteran's Day holiday weekend.  Detective Morgan was working "a short-staffed weekend shift."  Detective Morgan decided to go to the Eastman home. Tr. 16:13.

40) He asked Detective David Terni to accompany him for officer safety.  Tr. 72:4.

41) At least from the moment that Detective Terni became involved in the case onward, he and Detective Morgan considered Mr. Eastman to be a suspect.  Tr. 161:3-5.

42) Detective Terni is junior to Detective Morgan.  Tr. 73:5.

43) Detectives Morgan and Terni did not have a search warrant for the Eastman home at 157 Congress Avenue, 3rd Floor, Waterbury, CT on November 10, 2012.  Tr. 17:15 -18:9; 61: 13-24.

44) Detectives Morgan and Terni went to the Eastman home between 6:00 and 6:15 p.m.  Tr. 71:12-13.

45) It was dark.  Tr. 71:15.

46) Detectives Morgan and Terni were armed with firearms.  Tr. 73:11-12.

47) Their firearms were visible.  Tr. 73:13-14.

48) Detectives Morgan and Terni were visibly wearing police badges.  Tr. 74: 1-2.

49) Detectives Morgan and Terni were carrying handcuffs, which are part of the standard police uniform.  Tr. 161:25 – 162:1-4.

8

50) Detective Morgan's testimony that neither he nor Detective Terni were carrying handcuffs is not credible.  Tr. 73:17-25.

    a)  It is contradicted by Detective Terni's testimony.  Tr. 161:25 – 162:1-4.

    b)  It defies logic and common sense.  No (on-duty) police officer in his right mind, let alone a seasoned officer such as Detective Morgan would go anywhere, let alone the home of a potential suspect, without carrying his handcuffs with him.  Even if Detective Morgan had no reason to think anyone in the Eastman home was dangerous, anything could happen either in the home or on his way to and from the home.  What would he have done if he needed to restrain someone either in the Eastman home or upon passing an emergency scene along the way?

    c)  In the affidavit submitted at Exhibit A of the Government's Memorandum in Response to Defendant's Motion to Suppress, Detective Morgan states that he never placed Mr. Eastman in handcuffs, but he does not state that he did not have his handcuffs on him when he went to the Eastman home.  Gov't Memorandum, Ex. A at ¶ 11.

    d)  When asked on direct examination whether he placed Mr. Eastman in handcuffs, Detective Morgan testified "No . . . because he wasn't under arrest."  Tr. 22:11-15.  If, in fact, he did not have handcuffs on him at all, it would have been natural to offer up the additional explanation, "Oh, and I did not even have my cuffs on me at the time."  But he did not say that.

    e)  It is a point that a police officer would be unlikely to forget or misremember and therefore suggests a willful attempt to deceive as opposed to a memory failure.

51) Detective Morgan's apparent willful lack of credibility on a point - that itself is not particularly important but is related to a very important point - suggests that the Court should treat his testimony as a whole with caution and skepticism, and when confronted with conflicted evidence on any particular point, the Court should not find in favor of Detective Morgan.  See, supra ¶¶ 48- 50; see also ¶¶ 35(a)-(d)-36.

52) Detectives Morgan and Terni identified themselves as police officers when Mr. Eastman answered the door.  Tr. 74:23-25.

53) Their ID badges and guns were visible.  Tr. 73:13-14; 136:20-23.

54) It is undisputed that Mr. Eastman did not provide written consent for Detectives Morgan and Terni to enter the home.  Tr. 106:11.

55) Mr. Eastman did not provide oral consent for Detectives Morgan and Terni to enter the home. The detectives did not ask for permission to enter the home, nor did Mr. Eastman invite them in. Defendant's Memorandum of Law in Support of Motion to Suppress, Ex. B (John Eastman Affidavit) ¶ 4.  They stepped inside and Mr. Eastman backed away.  He did not physically oppose them.  Id.

   a) Detective Terni does not recall the words exchanged between the detectives and Mr. Eastman. Tr. 164:3-12.  Therefore, the Court should not credit any testimony by Detective Terni to the contrary on direct examination.  Detective Terni's failure to recollect on this point and others more generally is supported by other known facts:

      i)   Detective Terni's entire involvement with the Eastman case began and ended on November 10, 2012.  Tr. 158:20-23.

      ii)  Since November 10, 2012, Detective Terni has definitely investigated more than 50 cases and possibly more than 100 other cases.  Tr. 156:1-4.

      iii) Detective Terni did not take notes of what occurred on November 10, 2012.  Tr. 157:1.

      iv)  Detective Terni never read Detective Morgan's Police Report (Def. Ex. 1).  Tr. 158:10-11.

      v)   Although he was reluctant to admit it, Detective Terni admitted that he could not recall all of the details of what happened on November 10, 2012, such as whether or not he searched Mr. Eastman prior to putting him in the police vehicle.  Tr. 156:18-23.  He also could not recall whether or not Detective Morgan brought a written consent form to the Eastman home.  Tr. 163:15.

      vi)  Although Detective Terni testified that he reviewed "paperwork" about what transpired on November 10, 2012, see Tr. 157:4, the "paperwork" was limited to the voluntary statement form, the rights card, and the consent form.  Tr. 157:11-25.  The "paperwork" did not include notes or the police report, see above, and both Detective Terni and Detective Morgan testified that there was no verbatim record taken of what

10

was actually said or done at the Eastman home.  Tr. 165:5; Tr. 91:16 (Q: Did you have any documents from the Eastman home on November 10, 2012?  A:  No.).

b) It is undisputed that Detectives Morgan and Terni did not discuss informed consent with Mr. Eastman prior to entering the home.  Tr. 75:15-18.

c) It is undisputed that neither the Detectives nor Mr. Eastman ever uttered the word "consent."  Tr. 75: 19-21.

d) Detective Morgan's testimony that Mr. Eastman "allowed" the Detectives to come in and/or that Detective Morgan asked to come in and Mr. Eastman said, "Yes, okay," is not credible either due to lack of memory and/or due to lack of candor or sloppiness.  Tr. 75: 1-25.

    (1) Lack of Memory

        (a) Detective Morgan did not keep any notes during the Eastman investigation.  Tr. 91:23.   This is another example of sloppy police work.

            (i) Captain William Fox testified that field notes play an important role in criminal investigations and that "most officers take field notes."  Tr. 200:10-14.

            (ii) Captain Fox is a training officer, supervisor, shift commander, graduate of the FBI academy, and recipient of numerous commendations for his work.  Tr. 199:1-23.[2]

            (iii)Detective Terni testified that in an investigation lasting six months, "of course" an officer should take field notes, so as to remember important details about the investigation.  Tr. 170:13-23.

            (iv)Detective Morgan agreed that the decision not to keep notes was not necessarily keeping with best police practices but rather was in keeping with **his own** police practices. [emphasis added] Tr. 92:4-10.

_____

[2] See also
http://www.wtbypd.org.dnnmax.com/Divisions/Operations/Patrol/ShiftCommanders/tabid/134/Default.aspx

(b) It is undisputed that there are no contemporaneous documents (or recordings) memorializing what occurred in the Eastman home.  Tr. 92:18; 91:14-16.

(c) It is undisputed that Detective Morgan's police report is dated May 7, 2013, more than six months after November 10, 2012.  Tr. 90:17-25.

(d) Detective Morgan relied on his memory in typing up the section of the police report pertaining to the time spent at the Eastman home.  Tr. 91:10.

(e) Even though Detective Morgan knew the issue of whether Mr. Eastman consented to the Detectives entering the home was important, the police report does not quote the words used by Detective Morgan or Mr. Eastman.  Its description concerning the issue of consent is vague.  Def. Ex. 1.

(f) Since November 10, 2012, Detective Morgan investigated over 50 cases.  Tr. 93:5.

(2) Lack of Candor or Sloppiness

(a) Detective Morgan was dishonest about the fact that both he and Detective Terni carried handcuffs as part of their standard police uniform on November 10, 2012.  See supra, ¶¶ 48-50.

(b) Detective Morgan's police report contains numerous material omissions, most notably of which are all the aspects of the investigation that were less helpful to law enforcement, e.g., the presence of Ms. Eastman in the home, the fact that Detective Morgan did not believe he had enough information to get a search warrant, the time the detectives went to the Eastman home, the time and place where the written consent form were signed, the fact that Detective Terni patted down or searched Mr. Eastman, the fact that Detective Morgan called Mr. Eastman's former probation officer, and the fact that Mr. Eastman used the bathroom while the Detectives were at his home.  Tr. 97:1-25-99:1-25.

(c) Detective Morgan's demeanor and manner of answering questions on cross-examination regarding his note-taking policy, the omissions from his police report, and the presence and importance of Ms. Eastman was argumentative, evasive and defensive, thus further suggesting a lack of candor or extreme sloppiness.  For example, when asked "You know the issue of whether Mrs. Eastman was present in the home is important, correct?", Detective Morgan

12

answered "No" even though he acknowledged that the presence of a third-party in the home could invalidate consent.  Tr. 97:8-16.

(d) Detective Morgan's testimony about not knowing that Mr. Eastman was ultimately arrested in May 2013 is not credible in light of the fact that it was Detective Morgan who sought the arrest warrant and then closed the case in May 2013 with Mr. Eastman's arrest.  Tr. 117:17-25; 118:1-8.

(e) Detective Morgan was dishonest about his entering of the computer into evidence.  He testified that he entered the computer into evidence on November 10, 2012, Tr. 121:8-22, however, the Property Record Report and Property Inventory demonstrate that the computer was not logged into evidence until May 10, 2013.  See Exhibit F (attached hereto).[3]

(f) In addition, Detective Morgan failed to give Mr. or Ms. Eastman a property receipt for the computer that was seized.  Tr. 118:23.

    (i)  It is undisputed that the computer was evidence.  Tr. 119:1.

    (ii) The failure to provide a receipt was both sloppy and against police procedure.  Tr. 119:2-13.  Def. Ex. 39-1.

(g) The fact that Detective Morgan relied on oral consent (rather than written consent) is in itself evidence of sloppy and/or dishonest work.

    (i)  Captain Fox testified that WPD officers are taught to use the standard written consent form whenever possible.  Tr. 202:2-4.

    (ii) The purpose of using the standard written consent form is to protect everybody, meaning the officers and the suspect.  Tr. 202:5-8.

    (iii) Captain Fox testified that if officers can get written consent, that is better than oral consent.  Tr. 202:9-12.

_____

[3] The Property Record was not disclosed to the defense in the discovery received prior to the May 31, 2016 hearing.  Following Detective Morgan's testimony, defense counsel specifically requested the Property Form, and it was provided by the government to the defense on June 13, 2016.

(iv) The written consent form advises suspects that they have a right to refuse consent.  Tr. 175:14-16.

(v) Detective Morgan did not advise Mr. Eastman that he had a right to refuse consent.  Tr. 103:11.

(vi) In light of the above, the fact that Detective Morgan did not even bring a written consent form with him is evidence of bad faith and/or extreme sloppiness.  Tr. 29:7; Tr. 163:24.

(h) Numerous other examples of Detective Morgan's sloppiness have already been cited.  See, supra ¶¶ 30, 35, 36, 49, 50, 54(d)(1)(i).

56) The written consent to search form was not signed until 7:40 at the WPD.  The form states that the property was located at 157 Congress Avenue, but at the time it was executed, that was not an accurate statement.  Tr. 102.

a) The police report, Def. Ex. 1, does not state that the written consent was signed at 7:40 at the WPD.  In fact, it is misleading in that it is written in such a way as to suggest it was signed at the Eastman residence.  Tr. 99:5-11.

b) The fact that the consent form itself states the location of the property was Congress Avenue, when in fact it was the WPD, and the fact that the police report is misleading, both suggest that Detective Morgan's testimony regarding oral consent is not credible.

57) If the Court indeed finds the above suggested findings of fact, it is not necessary to proceed any further.

58) Once inside the Eastman home, Detective Morgan told Mr. Eastman that he was investigating sex chats from Vermont and asked questions about the same.  Tr. 77:20-22.

59) At that point, even Detective Morgan agrees, and thus it is undisputed, that Mr. Eastman was considered a suspect, and in fact was the only suspect.  Tr. 161:5.[4]

_____

[4] Mr. Eastman urges the Court to find that he was actually considered a suspect earlier, at least as of the point in time when Detective Terni became involved in the case.  Tr. 161:3-5.

60) The detectives put handcuffs on Mr. Eastman, and had him sit on the couch in the living room. Tr. 214:22-23.

   a)  Ms. Eastman had a clear line of sight from where she was standing, because Mr. Eastman is a large man, so he was sitting on the edge of the couch far enough forward where Ms. Eastman could see his hands behind his back.  Tr. 233:22-23.  She was able to see him through the open sliding doors.  Tr. 231.

61) As Mr. Eastman sat on the couch, Detective Terni remained with him, standing to the side of him.  Tr. 214:24-25.

62) Neither Detective Morgan nor Detective Terni advised Mr. Eastman of his <u>Miranda</u> rights.  Tr. 104:2.

63) They did not tell him he had a right to a lawyer.  Tr. 104:5.

64) They did not tell him he had a right to remain silent.  Tr. 104:8.

65) They did not tell him that anything he said could be used against him.  Tr. 104:11.

66) In fact, they did not even have an Advice of Rights card with them at the time.  Tr. 104:14.

67) They did not tell him he had a right to leave.  Tr. 104.

68) Detective Morgan conducted a protective sweep of the home.  Given that officer safety is paramount, Tr. 78:21, and given that Detective Morgan did not ask whether anybody else was in the home at the time he entered, Tr. 75:14, it is not credible that he would not have conducted a protective sweep.  In addition, as discussed below, Mrs. Eastman observed Detective Morgan checking her bedroom and conducting a protective sweep of other areas of the home.

69) Detective Morgan knocked on the bedroom door of Ms. Linda Eastman, and she answered the bedroom door in her pajamas.  Tr. 213:10-15.

70) Ms. Eastman did not consent to the Detectives searching her home.  Tr. 79:25.

71) Ms. Eastman questioned who he was and what he was doing in her home.  Tr. 213:23-24; Tr. 80:4-6.  Ms. Eastman did not and would not have allowed the police to enter her home without a warrant and did not allow them to take the computer without a warrant.  Tr. 217.

72) Detective Morgan exited the bedroom, and Ms. Eastman observed him opening up drawers and going through them.  Tr. 214:16-18.

73) It is undisputed that Detective Morgan did not advise Mr. Eastman that he could refuse consent to take the computer.  Tr. 103:11.

74) Mr. Eastman did not orally consent to Detective Morgan taking the HP Pavilion Desktop computer.  Defendant's Memorandum of Law in Support of Motion to Suppress, Ex. B (John Eastman Affidavit) ¶ 11.

a) Detective Terni's testimony regarding the seizure of the computer is not credible, because he did not recall what was said between Detective Morgan and Mr. Eastman, and he did not take notes, so he did not know what was said.  Tr. 164:15- 165:5.

b) Detective Morgan's testimony regarding the seizure of the computer is not credible for the reasons already discussed above (failing to discuss Ms. Eastman in the police report, wrongly stating that he did not have handcuffs with him, making other material omissions in the police report, etc).

c) Moreover, Detective Morgan's testimony regarding the seizure of the computer is not credible because no reasonable police officer would have permitted a suspect to lead the detective around his own house unrestrained.  Mr. Eastman was a suspect at this time.  Tr. 81:18-25; 82:1-7.

d) Detective Morgan's testimony regarding the seizure of the computer is not credible for the additional reason that he wrongly testified that he never went into the kitchen at the Eastman home, when in fact he did go into the kitchen.  Tr. 80:14-16; 215:3.

e) In fact, it is impossible to get to either Mr. or Ms. Eastman's bedrooms without going through the kitchen.  Tr. 215:3-4.  That is because in November 2012, there were furniture, including a heavy antique Victrola and boxes completely blocking the door between the living room and the bedroom on the living room side.  Tr. 228:18-25.  See also Def. Exs. 18-21.  In addition, the door between the living room and John Eastman's bedroom was also blocked on the bedroom side with furniture, a computer table and the computer itself.  See Def. Exs. 13-17 (depicting the computer stand where the computer was located, and furniture blocking the door from inside Mr. Eastman's bedroom).  Thus, the only way for Detective Morgan to have accessed Mr. Eastman's bedroom to seize the computer was to go through the kitchen and into the other bedroom door from the hallway.  See Def. Ex. 21.

16

75) Ms. Eastman did not orally consent to Detective Morgan taking the HP Pavilion Desktop computer.  Tr. 215:21.

76) While the detectives were in his home, Mr. Eastman requested permission to use the bathroom.  Tr. 81:1.

77) When Mr. Eastman requested the use of the bathroom, the handcuffs were removed but he was told he would have to keep the door partially open so one of the detectives could observe him, which he did.  Tr. 216:1-5.

78) Mr. Eastman was then placed back in handcuffs, see supra, had his person searched by Detective Terni, see Tr. 84:12-22, and was transported by the detectives to the Waterbury Police Department, along with the HP computer.  Defendant's Memorandum of Law in Support of Motion to Suppress, Ex. B (John Eastman Affidavit) ¶ 12.  No reasonable officer would have transported Mr. Eastman, now a criminal suspect, in the backseat of an unmarked police vehicle without a screen, and although we can argue over semantics (prisoner versus suspect), the WPD policy suggests that such a practice would be impermissible.  Def. Ex. 39-2.

79) Detectives Morgan and Terni did not advise Mr. Eastman that he had the right to refuse the search of his person and that they had no authority to pat him down if he did not agree.  Tr. 85:1-5.

80) At the police station, Mr. Eastman was read a copy of a police report from Vermont, which he denied.  He also asked for the return of his computer.  Defendant's Memorandum of Law in Support of Motion to Suppress, Ex. B (John Eastman Affidavit) ¶ 13.

81) At that point, he was threatened by Detective Morgan with detention over the long holiday weekend if he refused to cooperate.  Id. ¶ 14.  Detective Morgan called Mr. Eastman's prior probation officer, another fact omitted from the police report, to intimidate Mr. Eastman.

82) Mr. Eastman, feeling that he was under arrest instead of being a party to a consensual interview, asked what charges were being made against him and requested a lawyer.  Id. ¶ 15.

17

83) Detective Morgan ignored the question and request, instead typing up and printing the "voluntary statement." Mr. Eastman did not agree with or admit to the statements on the form. ¶ Id. 16.

84) Mr. Eastman did not sign the "Advisement of Rights" form. Def. Ex. 22 (Expert Report of John Reznikoff) at 4.

85) Mr. Eastman did not sign the "Consent to Search" form for the HP computer. Def. Ex. 22 (Expert Report of John Reznikoff) at 4.

86) Mr. Eastman did not sign the "Voluntary Statement Rights Form." Def. Ex. 22 (Expert Report of John Reznikoff) at 4.

87) Mr. Eastman did not sign the "Voluntary Statement." Def. Ex. 22 (Expert Report of John Reznikoff) at 4.

88) As between the defense expert, John Reznikoff, and the prosecution expert, Joan DiMartino, the Court should find that the opinions are even, and therefore because the government has the burden of proof, in favor of the defense.

    a) Mr. Reznikoff is highly qualified and has served as an expert in many cases in favor of the government. Def. Ex. 22. ████████████████████████ ████████████████████████ Thus, the government cannot critique Mr. Reznikoff's experience, skills, or expertise with any credibility.

    b) Mr. Reznikoff uses the standard tools of the trade, including a Video Spectral Comparator.

    c) Mr. Reznikoff considered 14 known samples of Mr. Eastman's handwriting, of which all were originals, and of which four arose long before any litigation in this case (K1, K12, K13, and K14). Def. Ex. 22.

    d) Ms. DiMartino made a significant mistake in her report. She states that Exhibits 1.9 through 1.17 known signatures were provided by the defense, which is false. Exhibits 1.11 through 1.17 were provided by the government.

    e) Ms. DiMartino's report effectively "talks over" Mr. Reznikoff's report, in that Ms. DiMartino reviewed a set of known samples to which Mr. Reznikoff did not have access at

18

the time he performed his examination (government documents to which the government had access).  Accordingly, those samples were not part of Mr. Reznikoff's report.

f)  Conversely, Ms. DiMartino did not review or opine on the set of known samples that Mr. Reznikoff considered.

g)  Thus, each expert's conclusion is like a ship passing the other in the night, and neither addresses the other's findings and conclusions.

h)  Both experts considered different sets of documents spanning over 15 years.

i)  Handwriting can change over time depending on circumstances, including depending upon stressors and whether someone is handcuffed or not at the time.

j)  Considering all of the above, the Court should find that the expert findings are at best unclear and thus the government cannot meet its burden of proof.

k)

89) Detective Terni did not actually witness Mr. Eastman sign the "advice of rights" form.  Tr. 179:23-25.

90) Detective Terni did not recall witnessing Mr. Eastman sign the "statement of rights" form.  Tr. 180:24-25.

91) Detective Terni did not witness Mr. Eastman sign the written "consent to search" form.  Tr. 172:14; 173:19.

92) Detective Terni was sitting 15 feet away from Detective Morgan and Mr. Eastman at the police station and therefore could not have accurately heard and/or witnessed the contents of the Voluntary Statement form.  Tr. 180:2.

93) There is no video-recording of the encounter with Mr. Eastman at the police station, and no contemporaneous notes or other recordings of what transpired.  Tr. 110:25; Tr. 111:3.

94) Detective Morgan's testimony regarding Mr. Eastman's signature on all four questioned documents is not credible for the reasons already discussed above.  In addition, it is not credible that he would have released Mr. Eastman from custody if, in fact, Mr. Eastman had signed the documents and given a full confession to such serious crimes.  Tr. 184:20-22; 185:2-11.

Case 17-3893, Document 39, 07/24/2018, 2351759, Page25 of 270

95) Detective Morgan and Detective Terni gave contradicting testimony about the mechanics of how Mr. Eastman's alleged statement was taken.  According to Detective Morgan, Mr. Eastman did not give a word-for-word statement, but rather, Detective Morgan generated the words in the written statement and then showed them to Mr. Eastman.  Tr. 112:24-25; Tr. 113:1-2.  According to Detective Terni, the words taken down in the Voluntary Statement were "basically a verbatim transcription of what Mr. Eastman was telling Detective Morgan."  Tr. 183:6; 184:13; 184:19.  This is a major difference that undercuts the credibility of both Detective Morgan and Detective Terni.

96) Mr. Eastman did not make the statement in the Voluntary Statement.  Those words are Detective Morgan's words.  Tr. 113:2; Defendant's Memorandum of Law in Support of Motion to Suppress, Ex. B (John Eastman Affidavit) ¶ 16.

97) Captain Fox had no independent recollection of the events of November 10, 2012 and no independent recollection of witnessing the Voluntary Statement form.  Tr. 196:11-12.

98) In spite of having supposedly obtained a full confession, the physical evidence at issue in the case, forensic evidence from Comcast verified by the detectives' visit to the Eastman home, and confirming Mr. Eastman's sex offender status with his former probation officer, Detective Morgan decided to let Mr. Eastman leave without seeking to charge him with any crime and without seeking to detain him even on a temporary basis.  One or both of the detectives drove him home.  The Court should find that Detective Morgan's position is not credible.

   a) Detective Morgan's testimony that Mr. Eastman did not "necessarily" give what amounts to a full confession is not credible, and again, is suggestive of an overall lack of candor.  Tr. 114:17.  The statement speaks for itself.  Def. Ex. 5 (e.g., "I have chatted with some girls who were like between 12 and 15 years old.  We chatted about sex and they posed in a sexual manner or performed a sex act so I could watch them on the web cam.").

   b) Detective Morgan's testimony that "there was nothing that linked [Mr. Eastman] to the conversations with the girls in Vermont" is not credible and blatantly wrong.  See, supra, 26-

20

28 (delineating information received from Skype and Comcast linking Mr. Eastman to the conversations with the girls in Vermont).

c) Detective Morgan's testimony that "he had no evidence of what he was saying was accurate" is similarly not credible and blatantly wrong for the same reasons. Moreover, it has never been the standard that an officer must have all of the information in any given case in order to detain a suspect.

99) Detective Morgan did not write a report of the night's activities for over six months. Tr. 127:20.

100) Mr. Eastman was arrested on May 14, 2013. He has been detained in custody ever since.

101) Detective Morgan did not properly log the HP Pavilion computer into evidence until May 10, 2013 – over six months after it was seized. Exhibit F, attached. The Court – and all of us – are left to wonder where exactly the computer was for those six months, and what exactly took Detective Morgan so long.

## **Proposed Conclusions of Law**

A. The government bears the burden of proof. "On a motion to suppress, the defendant bears the initial burden of establishing that a government official acting without a warrant subjected him to a search or seizure. . . . Once the defendant has met this burden, the burden then shifts to the government to demonstrate by a preponderance of the evidence . . . that the search or seizure did not violate the Fourth Amendment." United States v. Herron, 18 F. Supp.3d 214, 221 (E.D.N.Y. 2014) (citations omitted). There is no dispute that the police seized a computer from Mr. Eastman's home and subjected it to a search. Nor is there any dispute that no warrant was issued for the seizure or the search. The government therefore has the burden of proving that its actions were legal. United States v. Vasquez, 638 F.2d 507, 524 (2d Cir. 1980) (citing cases).

B. The detectives' entrance into the Eastman home and seizure of the computer is *per se* unreasonable unless the government can prove otherwise. "[I]t is a cardinal principle that searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions." Mincey v. Arizona, 437 U.S. 385, 390 (1978) (internal

21

Case 17-3893, Document 39, 07/24/2018, 2351759, Page27 of 270

citations and quotation marks omitted); see also Coolidge v. New Hampshire, 403 U.S. 443, 474 (1971) ("a search or seizure carried out on a suspect's premises without a warrant is per se unreasonable, unless the police can show that it falls within one of a carefully defined set of exceptions").

C. The government cannot prove that Mr. Eastman provided voluntary consent for the detectives to enter the home. "The government has the burden of proving, by a preponderance of the evidence, that a consent to search was voluntary." United States v. Isiofia, 370 F.3d 226, 230 (2d Cir. 2004). In seeking to admit evidence obtained during a warrantless search on the basis of consent, the Government must demonstrate by a preponderance that such consent was (1) provided (2) voluntary (3) by someone with actual or apparent authority over the premises. The Government must further demonstrate (4) that the consent remained effective (i.e., was not retracted) at the time the evidence was seized, and (5) was not countermanded by a co-inhabitant's express refusal to consent. In holding the Government to its burden, it should be remembered that the right to be free from warrantless searches is "fundamental" and "cannot be eroded simply because the government seeks to take the path of least resistance by obtaining consent from an individual whose interest in the premises searched is obviously vague and attenuated." United States v. Gonzalez Athehorta, 729 F. Supp. 248, 258 (E.D.N.Y. 1990).

D. Because the government cannot prove that Mr. Eastman provided voluntary consent to enter the home, the detectives' entrance into the home is an unlawful search. United States v. Isiofia, 370 F.3d 226, 230 (2d Cir. 2004) ("The government has the burden of proving, by a preponderance of the evidence, that a consent to search was voluntary."). Absent valid, voluntary consent, at the moment the Waterbury detectives entered the Eastman home, they were conducting a search. See, e.g., Miller v. United States, 357 U.S. 301 (1958) (police entry into home began when they broke down the door of apartment in multi-unit building); Johnson v. United States, 333 U.S. 10 (1948) (search began when police entered "living quarters – hotel room of defendant).

E. Accordingly, everything that follows, including the seizure of the computer and purported statements, must be suppressed as fruit of the poisonous tree. "[T]he exclusionary sanction applies to any 'fruits' of a constitutional violation - whether such evidence be tangible,

physical material actually seized in an illegal search, items observed or words overheard in the course of the unlawful activity, or confessions or statements of the accused obtained during an illegal arrest and detention.'"  United States v. Crews, 445 U.S. 463, 470 (1980) (internal citations omitted).  This is true even if Mr. Eastman had later signed the written consent forms and other questioned documents, which he did not, because the taint of illegality had not dissipated by that time.

F.   The government cannot prove that Ms. Eastman consented to the search of her home (and by extension that she did not negate any alleged consent given by Mr. Eastman).  Even if Mr. Eastman consented to the detectives entering the home, that consent was negated by Ms. Eastman's retracting of that purported consent when she questioned the detectives' presence in her home.  An individual who possesses actual or apparent authority may withdraw his or her consent at any time prior to or during the search.  See Walter v. United States, 447 U.S. 649, 656 (1980) ("When an official search is properly authorized – whether by consent or by the issuance of a valid warrant – the scope of the search is limited by the terms of its authorization.");  United States v. Moran Vargas, 376 F.3d 112, 116 (2d Cir. 2004) (noting that an individual has a "constitutional right to revoke or limit the scope of a search to which he has consented").  See Georgia v. Randolph, 547 U.S. at 103, 120 (2006) ("[A] warrantless search of a shared dwelling for evidence over the express refusal of consent by a physically present resident cannot be justified as reasonable as to him on the basis of consent given to the police by another resident.").

G.   Mr. Eastman was in custody at his home, and was subjected to custodial interrogation for which he was not Mirandized.  United States v. Faux, 94 F. Supp. 3d 258, 273-75 (2015) (Underhill, J.).  The test for determining "custody" is an objective inquiry that asks:  (1) "whether a reasonable person would have thought [she] was free to leave" the police encounter; and (2) if not, "whether [her] freedom of action has been curtailed to a degree associated with formal arrest."  Id.  Both elements are required, but the second is the "ultimate inquiry" of the custody analysis.  Id.  An individual's beliefs about his status and the officers' perceptions of the same do not bear on the analysis.  Id.  Relevant factors include:  (1) "the interrogation's duration"; (2) "its location (e.g., at the suspect's home, in public, in a police station, or at the border)"; (3) "whether the suspect volunteered for the

23

interview"; (4) "whether the officers used restraints"; (5) "whether weapons were present and especially whether they were drawn"; and (6) "whether officers told the suspect [she] was free to leave or under suspicion." Id. at 274. Judge Underhill's analysis in Faux is instructive here:

> An interrogation that occurs in an individual's home uniquely affects the custody analysis. The home is "the most constitutionally protected place on earth"; thus, the right to terminate the interrogation and be "free to leave" is "hollow" if the one place that the individual cannot retreat to, or exclude law enforcement from, is her home. *United States v. Craighead,* 539 F.3d 1073, 1082-83 (9th Cir.2008). Nevertheless, being questioned in a private, constitutionally-protected place is viewed as a far cry from the typical custodial setting—the police station or the back of a cruiser. *See id.* Absent a formal arrest, courts rarely conclude that a suspect interrogated in her own home is "in custody." *See, e.g., United States v. Badmus,* 325 F.3d 133, 139 (2d Cir.2003); *United States v. Mitchell,* 966 F.2d 92, 99 (2d Cir.1992); *Falso,* 293 Fed.Appx. at 839; *United States v. Schaefer,* 859 F.Supp.2d 397, 411-12 (E.D.N.Y.2012), *aff'd,* 519 Fed.Appx. 71 (2d Cir.2013); *United States v. Bershchansky,* 958 F.Supp.2d 354, 382-83 (E.D.N.Y.2013); *United States v. Groezinger,* 625 F.Supp.2d 145, 158 (S.D.N.Y.2009).

> Under certain circumstances, however, the home may be transformed into a custodial setting. *See, e.g., Orozco v. Texas,* 394 U.S. 324, 325, 89 S. Ct. 1095, 22 L.Ed.2d 311 (1969) (defendant in custody where four officers entered his bedroom at 4:00 a.m. and questioned him without providing warnings) *Newton,* 369 F.3d at 676-77 (defendant in custody where questioned at home in handcuffs); *United States v. Ortiz,* 943 F. Supp.2d 447, 455-56 (S.D.N.Y.2013) (defendant in custody where officers threatened to arrest everyone in apartment unless information was provided); *Craighead,* 539 F.3d at 1084-89 (defendant in custody where questioned in closed-door room, in police-dominated home, with armed law enforcement blocking exit).

> All factors should be weighed and no one factor is dispositive, but certain circumstances tend to make an individual reasonably feel that she is "completely at the mercy of the police" and, thus, significantly impact the custody analysis. *Newton,* 369 F.3d at 675 (citing *Berkemer,* 468 U.S. at 440, 104 S. Ct. 3138); *United States v. Griffin,* 922 F.2d 1343, 1354-55 (8th Cir.1990) ("Questioning which occurs in the suspect's own home may

24

provide a margin of comfort, but . . . the setting of the interrogation is not so important to the inquiry as the question of police domination of that setting."). Handcuffs, "a hallmark of a formal arrest," are strongly suggestive of custody where the individual lacks reason to believe that she will be handcuffed only for the duration of a search. *See Newton,* 369 F.3d at 676-77. Drawn weapons, raised voices and verbal threats likewise are indicia of custody. *See id.* Restricting the individual's movements in her home may also indicate custody if the individual is not informed that the rationale for doing so is officer safety and/or preservation of evidence. *See Craighead,* 539 F.3d at 1085-86; *Griffin,* 922 F.2d at 1354. Isolating the individual from her family or others who might provide emotional support points toward custody as well. *See id.; United States v. Montalvo,* No. 11-CR-00366-RJA-JJM, 2014 WL 3894374, at *6 (W.D.N.Y. Apr. 16, 2014), *report and recommendation adopted,* No. 11-CR-366-A, 2014 WL 3894383 (W.D.N.Y. Aug. 8, 2014); *United States v. Revels,* 510 F.3d 1269, 1276 (10th Cir. 2007); *United States v. Mittel-Carey,* 493 F.3d 36, 40 (1st Cir. 2007); *cf. United States v. Pollaro,* 733 F. Supp.2d 364, 371 (E.D.N.Y.2010) (defendant not in custody where he and his wife were permitted to go about their morning routine and were not kept apart during interrogation). Finally, the mere fact that the individual's home is overrun with law enforcement officials may also bear on custody, particularly where the individual would not reasonably comprehend why so many officers were present. *Compare, e.g., Craighead,* 539 F.3d at 1085-86 (presence of eight law enforcement officers from three different agencies in defendant's home increased custodial nature of interview), *with Newton,* 369 F.3d at 675 (six officers not surprising where defendant was parolee used to answering questions and knew some of the officers).

Conversely, informing the individual from the outset that she is not required to answer questions, that she is not under arrest or suspicion, and/or that she is free to leave or will be after the search are mitigating statements that carry significant weight in the custody analysis. *See Bershchansky,* 958 F. Supp.2d at 382-83; *Groezinger,* 625 F. Supp.2d at 158; *United States v. Pattee,* No. 12-CR-6183-PFG, 2013 WL 6579066, at *3 (W.D.N.Y. Dec. 13, 2013); *United States v. Lifshitz,* No. 03 CR. 572(LAP), 2004 WL 2072468, at *6-7 (S.D.N.Y. Sept. 15, 2004). The individual's decision to voluntarily permit law enforcement into her home and willingness to engage in conversation also weigh against a finding of custody. *See id.; Badmus,* 325 F.3d at 139.

Id. at 274-75.

Similarly, here, two officers entered the Eastman home at a relatively late hour in the
darkness on a Saturday of a holiday weekend. Mr. Eastman believed they were armed, and
they were armed. Mr. Eastman was placed in handcuffs and was kept on the couch in the
living room, separated from his mother, who was kept in the other part of the house in the
kitchen and hallway area leading to the bedrooms. Mr. Eastman was questioned about his
internet and Skype activities in the context of a specific investigation into the Vermont sex
chats for which he was not only considered a suspect at the time, but was in fact, the only
suspect at the time. Finally, Mr. Eastman was never told that he was free to leave; that he
could refuse consent; that he could refuse to talk to the officers; and that the officers had no
authority to be there if he terminated the interaction. Accordingly, under the totality of the
circumstances here, a reasonable person in Mr. Eastman's situation would have understood
his freedom of action to be curtailed to a degree associated with formal arrest. Because Mr.
Eastman did not receive Miranda warnings, any statements alleged to have been made
during that encounter and all that follow must be suppressed. See id. at 276-77.

H.  Because Mr. Eastman did not consent to the detectives entering the home, the detectives'
    seizure and search of the computer was fruit of the poisonous tree. In other words, the
    detectives' illegal entry into the Eastman home did not dissipate enough to avoid tainting the
    resulting seizure of the computer and supposed statements of Mr. Eastman. In United States
    v. Snype, the Second Circuit stated:

> When a consent to search follows an illegal entry, this circuit requires the
> government to show more than the voluntariness of the consent; it must also
> demonstrate that "the taint of the initial entry has been dissipated" in order
> to admit evidence seized following the illegal entry. United States v. Oguns,
> 921 F.2d 442, 447 (2d Cir. 1990) (internal quotation marks omitted).
> Oguns's identification of taint and voluntariness as distinct inquiries in
> evaluating the validity of certain consents derives from two Supreme Court
> decisions: Wong Sun v. United States, which held that evidence seized after
> an illegal search must be suppressed unless the government shows that it, in

26

> fact, resulted from "an intervening independent act of free will" sufficient
> "to purge the primary taint of the unlawful invasion," 371 U.S. 471, 486, 83
> S. Ct. 407, 9 L.Ed.2d 441 (1963); and Brown v. Illinois, which held that,
> where an inculpatory statement follows an unlawful arrest, a finding of
> voluntariness under the Fifth Amendment (based on Miranda warnings)
> does not obviate the need to make a separate Fourth Amendment
> determination as to whether the statement was "'sufficiently an act of free
> will to purge the primary taint.'"  422 U.S. 590, 602, 95 S. Ct. 2254, 45
> L.Ed.2d 416 (1975) (quoting Wong Sun, id.).

441 F.3d 119, 132 (2d Cir. 2006).

The Supreme Court has prescribed three factors for determining whether the taint from a Fourth Amendment violation has dissipated:  (1) the time between the Fourth Amendment violation and the acquisition of evidence, (2) the presence of intervening circumstances, and (3) the flagrancy of the official misconduct.  Brown v. Illinois, 422 U.S. 590, 603–04 (1975).  Here, all three factors point to the need to apply the Exclusionary Rule.  The time between the illegal entry into the home and the seizure of the computer was quite brief – less than half an hour according to the detectives' own time line.  There were essentially no intervening circumstances – no change of venue, no substantive conversation between police and Mr. Eastman, and no opportunity for Mr. Eastman to speak to counsel or communicate with anyone outside the apartment – much less use the bathroom unsupervised.  Finally, the egregiousness of the violation cannot be overstated.

I.   The government has not met its burden of showing that Mr. Eastman signed any of the questioned documents.  The party proffering the evidence bears the burden of proving "a rational basis for concluding that an exhibit is what it is claimed to be." United States v. Hon, 904 F.2d 803, 809 (2d Cir.1990).  The Court does not even need to reach this issue, however, because everything that happened at the police station is fruit of the poisonous tree that must be suppressed.

J.   In the alternative, because Mr. Eastman was in custody in his home, see supra G, any purported consent he gave regarding the computer was not voluntary and thus not valid.  See supra C.

K.   The "good faith" doctrine does not apply here.  The burden is on the government to demonstrate the objective reasonableness of the officers' good faith reliance on an

27

invalidated warrant. United States v. Jacobson, 4 F. Supp.3d 515, 522 (E.D.N.Y. 2014) (citing United States v. Clark, 638 F.3d 89, 100 (2d Cir. 2011)).  "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." Id. (citing Herring v. United States, 555 U.S. 135, 140 (2009)). There is a distinction between inadvertent mistakes and willful conduct, and in the case of the latter, the good faith doctrine does not apply. See Defendant's Reply Memorandum at 5-8.  To apply it would permit state actors to launder their egregious unconstitutional behavior through the federal government in order to resurrect what would have otherwise been a dead claim. State v. Hicks, 707 P.2d 331, 333 (Ariz.Ct.App. 1985) (aff'd on other grounds sub nom. Arizona v. Hicks, 480 U.S. 321 (1987).  This simply cannot be permitted, and the case law does not justify such a practice in a situation like this. See United States v. Thomas, 757 F.2d 1359, 1368 (2d Cir. 1985); see also United States v. Reilly, 76 F.3d 1271, 1281 (2d Cir. 1996), on reh'g, 91 F.3d 331 (2d Cir. 1996) (holding that "it is one thing to admit evidence innocently obtained by officers who rely on warrants later found invalid due to a magistrate's error.  It is an entirely different matter when the officers are themselves ultimately responsible for the defects in the warrant.").

This case has been pending for over three years.  It began as a case in the State court system. Mr. Eastman raised the issue of the illegal search and seizure with his first lawyer in the state system and each after that.  He went through three different lawyers.  Not one of them hired an expert, conducted any investigation, or filed any motions.  The reason why? Because they were continually told the case was "going federal."  Meanwhile, Mr. Eastman sat in pre-trial detention while effectively nothing was being done on the case.  By the time the federal government charged Mr. Eastman nearly two years later, it knew or should have known that there was a claimed issue with regard to an illegal search and seizure, and if they did not, the only reason is because the state process was stymied by the federal government's involvement.  Neither the letter nor the spirit of the good faith doctrine applies.

28

## <u>Conclusion</u>

It is undisputed that the police did not have a warrant to search the Eastman home or to search the computer in question.  It is undisputed that at the time they entered the home they did not have written consent to enter the home or to take the computer.  The only way the search of the home and resulting interrogation of Mr. Eastman and search and seizure of the computer could have been lawful is if Mr. Eastman provided voluntary consent that was not retracted by Ms. Eastman.  In order for that to have happened, the Court must believe the detectives' version of events, which hinges on a series of decisions and behaviors by Mr. Eastman that require complete cooperation.  Mr. Eastman has a long history of refusing to cooperate with law enforcement – from assaults on safety personnel to resisting arrest to violations of probation to refusing to be fingerprinted to firing lawyer upon lawyer.  There is simply no way that on the one day of his life that he encountered Detective Peter Morgan, John Eastman decided to change the entire essence of who he is in favor of being absolutely and totally submissive to the Waterbury police.  And then, having done so, it is equally unbelievable that the police just let him walk out of the door and run free for seven months.  It just did not happen.  There are many, many defendants who do cooperate on all different levels with law enforcement.  John Eastman is just not one of them.

For the reasons discussed in the Defendant's briefing, exhibits, and testimony evidenced at the May 31 hearing as analyzed above, Mr. Eastman respectfully requests that the Court suppress the HP Pavilion computer, its contents, and all purported statements.

Respectfully Submitted,

THE DEFENDANT,
John Eastman

FEDERAL DEFENDER OFFICE

Date: June 27, 2016                     /s/ Kelly Barrett
                                        Assistant Federal Defender
                                        265 Church Street, 7th FL
                                        New Haven, CT 06510
                                        Phone: (860) 498-4200
                                        Bar No.: ct27410
                                        Email: kelly_barrett@fd.org

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 27, 2016, a copy of the foregoing Proposed Findings of Fact and Conclusions of Law was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ Kelly Barrett
Kelly Barrett

30

A-489

# EXHIBIT F

A-490

Waterbury Police Department
Waterbury, Connecticut
Standard Form Number P-09
Revised 09/06

**Waterbury Police Department**
Property Record Report

I I 3 (Lg. M. E.)
Comp (In Bulk)

CN # 2012-066882

[X] EVIDENCE  [ ] FOUND  [ ] INVESTIGATION  [ ] SAFE KEEPING    COMPANION CN # _____

[ ] M/V FATALITY    [ ] FORENSIC    [ ] MISSING PERSON    [X] OTHER

(NOTE: IF MORE THAN ONE PERSON IS ARRESTED, PLACE INITIALS IN FRONT OF THE ITEMS TO IDENTIFY WHO THE PROPERTY WAS SEIZED FROM.)

| PROPERTY SEIZED: (DESCRIBE TYPE, COLOR, ETC.) | SERIAL NUMBER | NCIC CHECK |
|---|---|---|
| 1. CD containing computer forensic examination results | | - |
| 2. Rights Card signed John Eastman | | - |
| 3. WPD Voluntary Statement Rights Form signed John Eastman | | - |
| 4. Consent to Search Form signed John Eastman | | - |
| 5. IP address information from Comcast Cable | | - |
| 6. HP Pavilion model p2 desktop computer | 3CR22116SQ | - |

12-66882

Case Number:2012-00066882
Description:HP Pavilion Model p2 desktop
Tag Number:77616
Received Datetime:5/10/2013
Storage Location:1A1

Case Number:2012-00066882
Description:CD/RightsCard/Vol Statemnt/Consent/IP info
Tag Number:77615
Received Datetime:5/10/2013
Storage Location:1I3

| IF CASH MONEY WAS SEIZED, ENTER TOTAL AMOUNT HERE → | $0.00 | TYPE OF INCIDENT: **Crimes Against Children** |
|---|---|---|

CHECK ONE → [X] COMPLAINANT    [ ] VICTIM    [ ] PROPERTY OWNER    [ ] DEPT. STORE    [ ] UNKNOWN
NAME: Trooper  Jollymore                                D.O.B _____
ADDRESS: _____  CITY: Bradford                STATE: VT
IF FOUND PROPERTY, WAS ATTEMPT MADE TO CONTACT OWNER:   YES _X_ NO ____   ( NOTIFIED: YES _X_ NO ____ )
NAME, ADDRESS, DOB OF ARRESTED:                                              CHARGES

WILL WARRANTS BE SOUGHT:    YES [X]    NO [ ]        UNDER INVESTIGATION [ ]
SUSPECT(S) NAME AND D.O.B.(S): Eastman, John

| FOUND OR RECOVERED FROM: 255 East Main St., Waterbury, CT | DATE & TIME: 11/10/12 - 1855 |
|---|---|
| INVESTIGATING OFFICER(S): Morgan, P | ID# 522 |
| SUBMITTING OFFICER: Morgan, P | ID# 522 |
| DESK OFFICER RECEIVING PROPERTY: | ID# |
| PROPERTY OFFICER RECEIVING PROPERTY: _____ 5-10-13 | ID# 442 |

PROPERTY RELEASE AUTHORIZATION

FORENSIC: _____ ID# _____   DETECTIVE BUREAU: _____ ID# _____   PROPERTY OFFICER: _____ ID# _____

A-491

## MOTOR VEHICLE TOW/STORAGE INFORMATION

TOW COMPANY: _____  STORED AT: _____

SPECIAL INSTRUCTIONS: _____
(IF OTHER THAN TOW COMPANY LOCATION)
(HOLD FOR PRINTS, PHOTOGRAPHS, SEARCH WARRANT, MECHANICAL INSPECTION, DETECTIVES, ETC.)

### DO NOT WRITE BELOW/ PROPERTY ROOM USE ONLY

### PROPERTY REMOVED FROM PROPERTY ROOM

| REMOVAL DATE AND TIME | REMOVAL PURPOSE | ITEM #'S | OFFICER AND ID # REMOVING ITEMS | SIGNATURE | PROPERTY OFF. & ID# RELEASING ITEMS | SIGNATURE |
|---|---|---|---|---|---|---|
| 1. 5/6/15 13:00 | Comp. Copies | 1. | Mongnet 32 | | R Batista 1492 | |
| 2. 7/9/15 15:00 | Comp. Copies | 6. | Mongnet 32 | | C Reas | |
| 3. | | | | | | |
| 4. | | | | | | |
| 5. | | | | | | |
| 6 | | | | | | |
| 7. | | | | | | |
| 8. | | | | | | |
| 9. | | | | | | |

### PROPERTY RETURNED TO PROPERTY ROOM

| RETURN DATE AND TIME | ITEM #'S | OFFICER AND ID # RETURNING ITEMS | SIGNATURE | PROPERTY OFF. & ID# RECEIVING ITEMS | SIGNATURE |
|---|---|---|---|---|---|
| 1. 7-10-15 11:50 | 1,6 | Pat by #32 | | C Greloy | C N 594 |
| 2. | | | | | |
| 3. | | | | | |
| 4. | | | | | |
| 5. | | | | | |
| 6. | | | | | |
| 7. | | | | | |
| 8. | | | | | |
| 9. | | | | | |

I ACKNOWLEDGE RECEIPT OF THE ITEM(S) LISTED BELOW AND RELIEVE THE WATERBURY POLICE DEPT. OF RESPONSIBILITY FOR SAID ITEM(S).

| ITEM NUMBER(S) | OWNER/AGENT SIGNATURE | RELEASED BY (PRINT NAME) | DATE RELEASED |
|---|---|---|---|
| #'s 2, 3, 4 | SA M H #31 #750V | C Greloy 594 | 3-1-16 |

### FINAL DISPOSITION / COURT ORDER

| RTO | ASSET | PART-B | STATE POLICE | STATE EXAMINER | DESTROYED |
|---|---|---|---|---|---|
| | | | | | |

IF OTHER – EXPLAIN: ___TOT Dep of Homeland Security___

**INVENTORY OF PROPERTY SEIZED**
**WITHOUT A SEARCH WARRANT**

FOR P.D. USE ONLY
WARRANT APPLIED FOR
TO COURT

- [ ] To Court
- [ ] Destroy - No Value
- [ ] Case Pending
- [ ] Return to Owner
- [ ] Prisoner's
- [ ] Juvenile

Part A

Part B

Juvenile

Instructions

Asset Forfeiture

12-66882

460 Grand St.

12-66882

Name, address and telephone number of defendant/subject(s)

1. Eastman, John
   157 Congress Ave. 3rd Wtby, CT

2.

3.

Name, address and telephone number of complainant/witness(es)

Jollimore - Trooper

Bradford, VT

Type of incident

Possession of Child Pornography

Waterbury    11/10/12

Stolen   [X] Evidence   [ ] Lost/found   [ ] Investigation

The following property was seized, in connection with a criminal/delinquency case. (Describe quantity, type, color, serial number, etc.)

1. CD containing computer forensic examination results
2. Rights Card signed John Eastman
3. WPD Voluntary Statement Rights form Signed John Eastman
4. Consent to search form signed John Eastman
5. IP address information from Comcast Cable
6. HP Pavilion model p2 desktop computer S/N 3CR22116SQ
7.
8.
9.
10.
11.
12.

If cash money was seized, enter total amount here

Total amount of cash $

Signed   Det. ____ #522 Detective   Badge number 8522   Date 5/10/13   Department Waterbury PD

**Property Room Use Only**

A-493

DEPARTMENT OF HOMELAND SECURITY

**CUSTODY RECEIPT for**
**SEIZED PROPERTY and EVIDENCE**

No. 6389087

Handbook 5200-09

| 1. FPF No. | 2. Incident No. |
|---|---|
| 3. Investigative Case No. | 4. Enforce No. |
| 5. Prior Detention? Yes ☐ No ☐ If yes, DHS 6051D No. | 6. Date Seized (mm/dd/yyyy) / / | 7. Time Seized (Use 24 Hrs) | 8. FDIN/Misc. |

| 9. Seized From: Name: | 10. Entry No. | 11. Seal or Other ID Nos. |
|---|---|---|
| Address: | 12. Remarks: | |
| Telephone No. ( )          Ext: | | |

13. Send Correspondence to:

**14. PROPERTY** ( By Line Item) Attach DHS Form 58 if conveyance

| a. Line Item No. | b. Description | c. Packages Number | Type | d. Measurements Qty. | UM | e. Est. Dom. Value |
|---|---|---|---|---|---|---|
| | | | | | | $ |
| | | | | | | $ |
| | | | | | | $ |
| | | | | | | $ |
| | | | | | | $ |
| | | | | | | $ |

| 15. Seizing Officer | | |
|---|---|---|
| **x** | | |
| Print Name | Signature | Date |

**16. ACCEPTANCE / CHAIN OF CUSTODY**

| a. Line Item No. | b. Description | c. Print Name/Title/Organization | d. Signature | e. Date |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

DHS Form 6051A Continuation Sheet Attached? Yes ☐ No ☐
DHS retains original
Previous editions are obsolete

DHS Form 6051C (08/09)

A-494

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA          :
                                  :   Criminal No.  3:16-CR-006(MPS)
          v.                      :
                                  :
JOHN EASTMAN                      :   June 27, 2016

**GOVERNMENT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**
**REGARDING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE**

## TABLE OF CONTENTS

I.      PROCEDURAL BACKGROUND..................................................................3

II.     PROPOSED FINDINGS OF FACT .........................................................4

        A.      Background of the Investigation...................................................4

        B.      The Detectives' Entry into the Defendant's Residence ...........................................7

        C.      Events Inside the Defendant's Residence ...........................................10

        D.      The Defendant's Voluntary Statement at the Police Station .................................17

        E.      The Parties' Handwriting Experts...........................................................22

III.    PROPOSED CONCLUSIONS OF LAW ........................................................26

        A.      Law enforcement did not violate the defendant's Fourth Amendment
                rights when they entered the defendant's apartment...............................................26

        B.      Law enforcement did not violate the defendant's Fourth Amendment
                rights when they took the defendant's computer. ...................................................31

        C.      The defendant's written consent at the police station authorized the
                detectives to search the computer. ..........................................................34

        D.      Law enforcement would have inevitably obtained the computer evidence,
                and therefore, suppression is not warranted............................................36

        E.      Law enforcement did not violate the defendant's Fifth Amendment rights
                when they interviewed him.......................................................38

        CONCLUSION...........................................................................41

A-496

The Government respectfully submits the following proposed findings of fact and conclusions of law in connection with the defendant's motion to suppress evidence and the suppression hearing that was held on May 31, 2016.

## I.   PROCEDURAL BACKGROUND

On January 7, 2016, a federal grand jury returned a two-count indictment charging the defendant with one count of coercion and enticement of a minor, in violation of 18 U.S.C. § 2422(b), and one count of possession of child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B).  (*See* Indictment [Doc. # 28].)[1]  The indictment alleges that between June and November 2012, the defendant engaged in video chats with minors over the internet using online video chatting services such as Skype, and that during these video chats, he enticed the minors to engage in sexually explicit conduct, which he then recorded and/or photographed and then saved on his computer.  (*Id*. ¶¶ 2, 5.)   The indictment further alleges that in order to deceive and entice the minors, the defendant posed as famous singers and musicians that are popular to teenagers. (*Id*. ¶ 2.)

On January 22, 2016, the defendant filed a motion to suppress a computer that detectives from the Waterbury Police Department obtained from the defendant's residence on the evening of November 10, 2012, and the results of any subsequent forensic examination of that computer. (*See* Def.'s Mot. to Suppress [Doc. # 30] and Mem. of Law [Doc. # 31].)  The defendant also seeks to suppress statements he allegedly made to the detectives at the police station later that evening.  (*See* Def.'s Mot. to Suppress and Mem. of Law.)

---

[1] The case docket entries are cited as "Doc. # ___."  The transcript of the May 31, 2016 suppression hearing [Doc. # 52] is cited as "Tr. ___." Exhibits admitted into evidence at the suppression hearing are cited as "Gov't Ex. ___" and "Def. Ex. ___."

The Court held a suppression hearing on May 31, 2016.  (Doc. # 51; Tr. 1.)  The Government presented the following three witnesses, all members of the Waterbury Police Department:  Detective Peter Morgan, Detective David Terni, and Acting Captain William Fox.  (*See* Gov't's Marked Witness List [Doc. # 56]; Tr. 9, 133, 190.)  The defendant presented just one witness, Linda Eastman, who is the defendant's mother.  (*See* Def.'s Marked Witness List [Doc. # 55]; Tr. 208).  The defendant did not testify at the suppression hearing but submitted an affidavit.  (Def. Ex. 7.)

At the conclusion of the hearing, the Court directed the parties to submit proposed findings of fact and conclusions of law.  (Tr. 237.)

II.     **PROPOSED FINDINGS OF FACT**

A.     <u>**Background of the Investigation**</u>

1.     The investigation of this case began in the fall of 2012.  (Tr. 12; Def. Ex. 1 at DISC-000029.)  Detective Peter Morgan of the Waterbury Police Department in Waterbury, Connecticut, was the lead detective assigned to the case.  (Tr. 57.)  Detective Morgan has been a member of the Waterbury Police Department since 1995, and he has been a detective for 12 years, since 2004.  (Tr. 11.)  He is currently assigned to the Computer Crimes Unit, and the majority of cases he investigates involve child pornography and the online sexual enticement of minors.  (Tr. 11.)  He has received hundreds of hours of training to investigate those types of cases, and he is also a certified computer forensic examiner.  (Tr. 12; Def. Ex. 1 at DISC-000031.)

2.     On October 25, 2012, Detective Morgan received a complaint from a trooper with the Vermont State Police that an individual with the user name Harry.Styles888 had

4

communicated with three female minors in Vermont via Skype.[2] (Tr. 13; Def. Ex. 1 at DISC-000029.)  The minors believed they were speaking with Harry Styles, who is a well-known performer with the singing group One Direction. (Tr. 13-14 Def. Ex. 1 at DISC-000029.)  The individual turned on his webcam, and the minors could see a still photo of Harry Styles on their screen.  (Tr. 13; Def. Ex. 1 at DISC-000029.)   At one point, the individual asked the minors to pose in front of the camera in a sexual position.  (Tr. 13; Def. Ex. 1 at DISC-000029.)  The minors did not comply and terminated the conversation.  (Tr. 13; Def. Ex. 1 at DISC-000029.)  The trooper initiated an investigation and received information from Skype that the Harry.Styles888 account on Skype was created from an internet protocol address[3] that he subsequently determined belonged to Comcast Cable ("Comcast') and was assigned to someone in Waterbury, Connecticut.  (Tr. 14; Def. Ex. 1 at DISC-000029.)

      3.      Detective Morgan reviewed the trooper's investigative reports and then obtained an *ex parte* order from a Connecticut Superior Court Judge in Waterbury requiring Comcast to disclose the subscriber information associated with the internet protocol address disclosed by Skype.  (Tr. 15; Def. Ex. 1 at DISC-000029.)   Comcast responded via letter dated November 8,

---

[2] "Skype is a voiceover Internet protocol program through which individuals can communicate with each other via webcam (video), microphone (audio), and/or instant messaging, by way of the Internet." *United States v. Naim*, No. 13-cr-660 NGG, 2015 WL 3440253, at *3 (E.D.N.Y. May 20, 2015); *see Ramirez v. Buyauskas*, No. CIV.A. 11-6411, 2012 WL 606746, at *22 (E.D. Pa. Feb. 24, 2012) ("Skype is a computer program that allows users to communicate over the Internet by instant message, video chat, and voice chat.") *amended*, 2012 WL 699458 (E.D. Pa. Mar. 2, 2012).

[3] Internet protocol addresses, also called IP addresses, "are numbers that are automatically assigned when a person signs onto the internet via an 'ISP' (Internet Service Provider). Thus when a person uses an internet service provider to access the internet, that person is assigned an IP address unique to the 'session' in which he is signed on to the internet." *United States v. Hair*, 178 F. App'x 879, 883 n.4 (11th Cir. 2006); *see United States v. Bershchansky*, 788 F.3d 102, 105 n.2 (2d Cir. 2015) ("[a]n internet protocol ('IP') address is a numerical label consisting of four numbers, separated by periods. Every computer that communicates with an internet network is assigned a unique IP address").

A-499

2012, reporting that the internet protocol address was assigned to the account of John Eastman at

████████████████████, Waterbury, Connecticut.  (Tr. 15-16; Gov't Ex. 17; Def. Ex. 1

at DISC-000029.)

      4.     On the evening of Saturday, November 10, 2012, two days after receiving the

response from Comcast, Detective Morgan was working a weekend rotation at the Waterbury

Police Department.  (Tr. 16.)  Detective David Terni was the only other detective working at the

Waterbury Police Department that evening.  (Tr. 17, 133-35.)

      5.     Detective Terni has been a member of the Waterbury Police Department for

nineteen years, and he has been a detective for the last nine years.  (Tr. 133.)

      6.     Detective Morgan asked Detective Terni to accompany him to the defendant's

residence to try and speak with the defendant about the complaint from the Vermont State Police.

(Tr. 16-17, 135-36.)

      7.     Detective Morgan did not obtain a search warrant prior to going to the

residence.  (Tr. 17.)  Detective Morgan testified that he felt he did not have enough probable

cause for a warrant and believed a judge may question him for not conducting addition

investigation before obtaining a warrant.  (Tr. 17, 68.)  Detective Morgan was unsure if John

Eastman was necessarily living at the residence, if someone else was in that residence using the

internet account, or if there was an open wireless network where someone else was using the

account.  (Tr. 17-18.)  In addition, Detective Morgan testified that in his years of experience,

trying to talk to people first, without a search warrant, yields more cooperation. (Tr. 18.)

Detective Morgan referred to this strategy as a widely used law enforcement tactic known as

"knock and talk" and he has employed this tactic on numerous occasions.  (Tr. 18, 125.)  In his

experience, suspects often voluntarily agree to let him examine their computers.  (Tr. 18.)

A-500

8.      That evening, sometime between 6:00pm and 6:15pm, Detectives Morgan and

Terni drove in an unmarked police vehicle to [Redacted] Avenue.  (Tr. 17, 19, 135-36; Def.

Ex. 7 ¶ 2 (noting the time was approximately 6:00pm.).)  They were armed, but only because

they were required to be armed while on duty.  (Tr. 19, 161-62.)  Otherwise, the detectives were

dressed in plain clothes.  (Tr. 19, 136-37.)

**B.      The Detectives' Entry into the Defendant's Residence**

9.      The defendant lived on the third floor of [Redacted] Avenue with his mother,

Linda Eastman.  (Tr. 209, 221.)  Although the lease is in Mrs. Eastman's name, the defendant

has resided there for a few years.  (Tr. 210, 222.)  The defendant had his own bedroom and his

mother had her own bedroom.  (Tr. 221.)  The defendant also had the authority to allow third

parties such as Comcast to provide services to the apartment even though his name was not on

the lease—a fact that Mrs. Eastman readily admitted in her testimony. (Tr. 221-22.)

10.     When the detectives arrived at [Redacted] Avenue, they walked up to the third

floor and knocked on the door.  (Tr. 19-20, 136-37.)  A man who identified himself as John

Eastman answered the door.  (Tr. 20, 136-37.)  Detective Morgan identified himself and

displayed his badge to the defendant.  (Tr. 20, 136, 174.)  Detective Morgan also introduced

Detective Terni, whose badge was visible as he wore it around his neck.  (Tr. 20, 136, 174.)

11.     Detective Morgan informed the defendant that they were investigating a case

involving his residence and asked if the detectives could come inside to speak to the defendant.

(Tr. 20-21, 137, 177)  The defendant consented and invited them to enter the apartment.  (Tr. 21,

137, 163-64, 186.)

12.     Detective Morgan testified that he believed the defendant had the authority to let

the detectives into the apartment.  At that moment, the detectives were unaware that anyone else

was inside or living in the apartment.  (Tr. 21, 168; *see* Tr. 137 (Detective Terni testified that no

7

one else came to the door when they knocked.).)  The defendant's mother, who the detectives

later learned was in the apartment, was in her bedroom, asleep, with the door closed, when the

detectives first arrived.  (Tr. 223-225.)  Nothing in the record indicates that the defendant told the

detectives when they first arrived that anyone else was inside or resided in the apartment.  While

the detectives did not attempt to determine whose name was on the lease prior to driving to the

residence, Detective Morgan had received information from Comcast indicating that John

Eastman was the subscriber for the internet service at that address (Tr. 21; 61-62; Gov't Ex. 17.)

13.     In the defendant's affidavit to the Court, he admits the detectives identified

themselves as police officers, but he claims that they did not display identification or provide

their names.  (Def. Ex. 7 ¶ 3.)  The defendant further claims the detectives did not ask to enter

the apartment and he did not invite them in.  (*Id.* ¶ 4.)  Rather, the defendant claims that when he

opened the door, the detectives stepped inside forcing the defendant to stumble backwards.  (*Id.*)

14.     Because the defendant did not testify and could not be cross-examined, the

assertions in his affidavit should be given little to no weight.  *See, e.g, United States v. Rivera*, 89

F. Supp. 3d 376, 389 (E.D.N.Y. 2015) ("the court declines to give significant weight to

[defendant's] affirmations.  Because Mr. Garrett exercised his right not to testify, his testimony

by affirmation was not subject to cross-examination"); *United States v. Medina*, 19 F. Supp. 3d

518, 535 n. 13 (S.D.N.Y.2014) (giving less weight to defendant's affidavit because "[a]s a

general matter, credible testimony at a hearing is entitled to more weight than an affidavit,

because testimony has been subjected to cross-examination") (collecting cases); *DiMattina v.

United States*, 949 F. Supp. 2d 387, 410–11 (E.D.N.Y. 2013) ( "DiMattina has chosen not to

testify in his own defense. That is his constitutional right. Yet, he cannot use that right as shield

to protect him from potential criminal liability while concomitantly wielding his affidavits as a

sword to cast doubt on testimony found credible by the court as fact-finder. Without the threat of cross-examination, DiMattina's affidavits are viewed as self-serving and given little weight"); *United States v. Munoz*, 987 F. Supp. 2d 438, 440 (S.D.N.Y. 2013) ("The Court considers [the defendant's] affidavits, but affords them less weight than credible testimony offered at the hearing"); *United States v. Abu Ghayth*, 945 F. Supp. 2d 511, 518 (S.D.N.Y. 2013) ("The Court credits the agents' testimony and gives diminished weight to the [defendant's] affidavit, which was not supported by other evidence or subject to cross examination"); *United States v. Al–Marri*, 230 F.Supp.2d 535, 539 (S.D.N.Y. 2002) ( "[t]his Court follows the lead of other federal courts in valuing the weight of live witnesses' testimony over the contents of a defendant's affidavit, and gives lesser consideration to [defendant's] version of the facts"); *United States v. Juliano*, No. 99-cr-1197 (AGS), 2000 WL 1206745, at *3 (S.D.N.Y. Aug. 24, 2000) ("[T]he Court finds that, because defendant did not testify at the hearing and was not subject to cross-examination, the Court is unable to form an opinion as to his credibility or as to the truthfulness of his allegation. . . . Consequently, the Court concludes that defendant's conclusory statement that he "did not consent" carries little weight"); *United States v. Frank*, 8 F. Supp. 2d 284, 291 (S.D.N.Y. 1998) (crediting officers hearing testimony and giving "little weight" to defendant's affidavit because the affidavit was not subject to cross examination and the testifying witnesses were credible); *see also United States v. Rodriguez*, 368 F. App'x 178, 180 (2d Cir. 2010) ("Although defendant submitted an affidavit . . . it was not clearly erroneous for the District Court to credit the officers' testimony over defendant's affidavit").

15.    The defendant did not present any other witness to corroborate his statement about the detectives' entry into the apartment.  The only witness to testify on his behalf was the defendant's mother.  However, she was in her bedroom, asleep, with the door closed, when the

detectives first arrived.  (Tr. 223-225.)  She did not observe the detectives enter the apartment.
(Tr. 223.)  She had no firsthand knowledge if the detectives identified themselves or displayed
their badges to the defendant.  (Tr. 224.)  She had no firsthand knowledge if the detectives asked
the defendant for permission to enter the apartment, and she had no firsthand knowledge if the
defendant gave the detectives permission to enter the apartment.  (Tr. 224-225.)

16.     Accordingly, the Court should credit the detectives' testimony and find that the
detectives identified themselves to the defendant and displayed their badges.  The Court should
further find that the detectives requested permission to enter the apartment before entering, and
that the defendant consented to their entry into the apartment.

**C.     Events Inside the Defendant's Residence**

17.     Once inside the apartment, the defendant sat on a couch in the front living room
while the detectives stood in front of him.  (Tr. 22, 137-38.)  Detective Morgan informed the
defendant about the investigation and began asking the defendant some questions.  (Tr. 22-23,
138, 177-78; *see* Def. Ex. 7 ¶ 5.)  Although the detectives did not inform the defendant of his
*Miranda* rights at that point (Tr. 104, 178), the detectives did not consider him to be in custody
(Tr. 130, 178) and the detectives told the defendant he was not under arrest—a fact that the
defendant himself admits in his affidavit.  (Tr. 22; Def. Ex. 7 ¶ 6; *see also* Tr. 216 (testimony of
Linda Eastman stating the officers told her that the defendant was not going to be arrested).)  The
defendant was calm and cooperative while they were in the apartment.  (Tr. 22, 27, 30, 127; *see*
Tr. 139 (Detective Terni described the defendant as being "very cooperative[,] [v]ery cordial,
[and] "polite.").)

18.     The detectives did not place the defendant in handcuffs at any point.  (Tr. 22, 26,
30, 138, 154-55, 166.)  Nor did they conduct a protective sweep of the apartment.  (Tr. 78-79, 81-
82, 167.)  The detectives did not feel they were in any danger.  (Tr. 83-84, 126-27, 168.)  The

detectives were unaware he had a criminal history. (Tr. 83.)  Although the detectives had

different recollections as to whether or not they were carrying handcuffs on them at the time, the

detectives were definite in their testimony that they did not place the defendant in handcuffs.

(Tr. 22, 26, 30, 73, 138, 166.)  The detectives did not feel handcuffs or a protective sweep were

necessary because he was not in custody or under arrest and because he was very cooperative.

(Tr. 26-27.)  Detective Terni testified, "[the defendant's] demeanor was very pleasant and

cooperative and he gave us no indication that he was going to be violent in any way. We weren't

there for a violent crime. So we weren't concerned with doing a protective sweep of the house."

(Tr. 168.)  Detective Morgan similarly testified, "[t]here was absolutely no reason for that. I

didn't feel a protective sweep was necessary in any way."  (Tr. 127.)  Detective Morgan has

often times talked to individuals in their homes about a case without placing them in handcuffs

or conducting a protective sweep.  (Tr. 127.)  As the Court observed during the hearing,

Detective Morgan has a large physical build.  (*See* Tr. 214 (testimony of Linda Eastman

describing Detective Morgan as "tall" and "big.").)

19.     During Detective Morgan's conversation with the defendant, the defendant stated

he used the Harry Styles user name to speak to people via the Skype program (Tr. 24, 30.)

Detective Morgan asked the defendant if he would be willing to come to the police station to

provide a statement.  (Tr. 24, 139; Def. Ex. 7 ¶ 5.)  The defendant agreed to go with the

detectives to the station for an interview.  (Tr. 24-25, 139; Def. Ex. 7 ¶¶ 5-6.)  The defendant

concedes "the request to go to the station was phrased as a request, not an order." (Def. Ex. 7 ¶

6.)

20.     As Detective Morgan was speaking with the defendant in the living room, the

defendant's mother came into the room.  (Tr. 23, 138-39.)  Detective Morgan proceeded to

11

A-505

identify himself and explain why he was there, but before he could say much, the defendant cut him off. (Tr. 23, 138-39.) The defendant told his mother everything was all right and to go back in her room. (Tr. 23, 138-39.) She then walked away. (Tr. 23-24, 138-39.)

21.     Detective Morgan continued to speak with the defendant. During the conversation, Detective Morgan asked the defendant about computers in the residence. (Tr. 24-25, 139.) Detective Morgan noticed a laptop computer in the living room, but the defendant stated he did not use that laptop. (Tr. 25; *see* Tr. 226 (testimony of Linda Eastman stating there was a laptop in the living room).) The defendant stated the computer he used was in his bedroom. (Tr. 25, 139.) Detective Morgan asked if he could see the computer, at which point the defendant led the detectives into his bedroom. (Tr. 25-2, 139.) The detectives observed a desktop computer, which the defendant identified as the computer he used. (Tr. 25-26, 139.) Detective Morgan did not have a consent to search form with him, but he asked the defendant if the defendant would agree to let the detective take the computer back to the police station, and the defendant verbally agreed. (Tr. 25-26, 28-29, 139, 164-65, 187.)

22.     Detective Morgan testified that based on the defendant's statements, he believed the defendant had the authority to let him take the computer. (Tr. 25-26, 29.) If the defendant had not consented to take the computer, Detective Morgan testified he would have secured the apartment if necessary and obtained a search warrant to seize the computer. (Tr. 30.) While Detective Morgan had stated earlier in his testimony that he did not believe he had enough probable cause for a search warrant before he entered the apartment, he stated the defendant had now admitted that he had been using the Harry Styles username to speak with people over Skype. (Tr. 30.)

12

A-506

23.     The detectives did not take anything else from the residence aside from the one

computer.  (Tr. 28, 226 (testimony of Linda Eastman stating the detectives only took one

computer and nothing else).)  They left the other computers in the apartment.  (Tr. 28, 226.)

They did not enter the mother's bedroom or search through any drawers or cabinets. (Tr. 24, 28,

79, 154.)  Detective Morgan did not recall entering the kitchen, but he testified he walked

through a hallway to get to the bedroom. (Tr. 28, 80.)  In looking at the floor plan, this hallway

was likely the kitchen.  (Def. Ex. 21.)  Similarly, Detective Terni did not recall entering the

kitchen, although he stated he may have a one point (Tr. 154.)  However, both detectives denied

going through drawers or cabinets or searching the kitchen.  (Tr. 24, 28, 79, 154.)

24.     The detectives and the defendant then departed the residence.  (Tr. 26-27, 139-

40.)  Prior to leaving the residence, the defendant used the bathroom.  (Tr. 26-27, 140.)  The

detectives also informed Mrs. Eastman that they were going to the police station with the

defendant, and they also told her that the defendant was not under arrest.  (Tr. 27, 140, 216

(testimony of Linda Eastman confirming the same).  The detectives and the defendant then left

the apartment to go to the Waterbury Police Station.  (Tr. 27, 30-32, 140.)

25.     The period of time that the detectives were in the apartment did not last more than

15 or 20 minutes.  (Tr. 30.)   During the entire time, the defendant was calm and cooperative.

(Tr. 19, 27, 139.)

26.     In the defendant's affidavit to the Court, he makes a number of claims which the

Court should not credit.  He states that when he observed Detective Morgan in his bedroom

disconnecting the computer, he informed the detective he had no right to conduct a search and

not to touch it.  (Def. Ex. 7 ¶ 11.)  There is no testimony his mother heard her son make such a

statement.  The defendant further states the detectives took four cell phones, even though his

13

mother testified the detectives did not take anything except the computer. (Def. Ex. 7 ¶ 18; Tr. 226.)

27.     The defendant also claims that Detective Morgan entered the kitchen and began looking through counter drawers and into the pantry area.  (Tr. 231; Def. Ex. 7 ¶ 8.)  At the same time, however he claims he was sitting on a couch, which his mother confirmed was on the right side of the floor plan in the front living room in front of a window. (Tr. 231; Def. Ex. 7 ¶ 7; Def. Ex. 21.)  In looking at the floor plan of the apartment, it appears unlikely that the defendant would have been able to see the kitchen and most of the pantry area from that vantage point. (*See* Def. Ex. 21.)  He also claims Detective Morgan entered his mother's bedroom (Def. Ex. 7 ¶¶ 8-9), which he would not have been able to see from his location. (*See* Def. Ex. 21.)

28.     As discussed above, because the defendant did not testify and could not be cross-examined, and because his statements uncorroborated, the defendant's claims should be given little to no weight.  (*See* case law, *supra* ¶ 20.)

29.     At the suppression hearing, Mrs. Eastman claimed that earlier that evening, while she was asleep in her bedroom, Detective Morgan banged on her door, opened her door, and stood inside for a few minutes.  (Tr. 213-14.)  She claimed that after he exited her bedroom, she observed him opening drawers and looking through stuff.  (Tr. 213.)  She claimed that she then went and stood in the doorway between the kitchen and the living room, where she saw the defendant sitting on a couch across the way, past the living room, at the far end of the other front living room next to the window, with handcuffs behind his back. (Tr. 214, 231-33; Def. Ex. 21.) She claimed she observed him handcuffed later when he passed by her to use the bathroom.  (Tr. 235.)

14

A-508

30.     The Court should not credit her testimony either.  Seeing her son in jail has been tough for her, and she wants him to come home as soon as possible. (Tr. 219.)  There are also inconsistencies between her testimony and the statements in her affidavit.  For example, in her affidavit, she states that after seeing her son in the living room, she sat down at the kitchen table. (Def. Ex. 8 ¶ 4.)  However, at the hearing, she testified that after seeing her son sitting in the living room, she went to her bedroom and stood "in the doorway between [her] room and the bathroom." (Tr. 234-35.)  She testified she did not go anywhere else while the police were in the apartment. (Tr. 234.)  In addition, the Court should find it hard to believe she was able to observe the defendant wearing handcuffs in the living room, considering there was quite a distance between them and the handcuffs were purportedly behind his back.  (Tr. 214, 231-33; Def. Ex. 21.)

31.     The defendant's mother also testified the detectives did not ask for her permission to take the computer. (Tr. 215.)  She testified that she owned the desktop computer that was in her son's bedroom, claiming she was the one who purchased it.  (Tr. 217.)  She recognized a receipt for the purchase of the computer, although the receipt itself does not list her name or otherwise indicate who purchased the computer. (Tr. 217; Def. Ex. 38.)

32.     Notwithstanding her statements, in the defendant's affidavit, he twice refers to the computer as "my computer."  (Def. Ex. 7 ¶ 17.)  He does not refer to the computer as his mother's computer.  (*Id.*)  In addition, Mrs. Eastman agreed that computer was the one he used and "[f]or the most part, that [computer] was his computer for his use in his bedroom."  (Tr. 225-26.)  She only used that computer "[m]aybe once a week.  Just to see what was on there."  (Tr. 226.)  She had two other computers in the apartment that were for her use: one in her bedroom and one in the living room.  (Tr. 226.)

15

33.     Mrs. Eastman further testified the detectives never asked for her permission to enter the apartment or take the computer.  (Tr. 215.)  In her testimony and in her affidavit, Mrs. Eastman states she asked the detectives why they were in her apartment and what they were looking for, and she claims she was never shown a warrant.  (Tr. 214; Def. Ex. 8 ¶¶ 2, 8.)  She also testified she would not have allowed the police to enter her apartment or take the computer without a warrant. (Tr. 217.)

34.     However, there is no testimony that Mrs. Eastman ever told the detectives she owned the computer.  There is no testimony she ever expressly objected and told them not to take the computer.  There is no testimony she expressly objected to them being in the apartment nor is there any testimony she ever asked them to show her a warrant. And there is no testimony she ever expressly asked the detectives to leave the apartment.

35.     Similarly, nothing in the record indicates that Mrs. Eastman or the defendant ever informed the detectives of the fact that only her name was on the lease.  (Tr. 165.)

36.     After weighing the evidence, the Court should find that the defendant verbally agreed to let the detectives enter the apartment and to take the computer from his bedroom.  (Tr. 25-26, 28-29, 136-37.)  The Court should also find that neither the defendant nor Mrs. Eastman told the detectives she was the owner of the computer or that she was the only person named on the lease.  The Court should further find that neither the defendant nor Mrs. Eastman expressly objected to the detectives being in the apartment, neither of them asked the detectives to leave the apartment (Tr. 28.), neither of them asked to see a warrant (Tr. 28.), and neither of them told the detectives they could not take the computer (Tr. 29.)  In addition, the Court should find that the detectives did not take anything else from the residence.  (Tr. 28, 226.)

16

### D.        The Defendant's Voluntary Statement at the Police Station

37.        After leaving the apartment, the detectives drove the defendant to the Waterbury

Police Station.  (Tr. 30-32, 139-40, 142.)  They did not place the defendant in handcuffs during

the drive.  (Tr. 31, 85, 154-55.)  They did a pat down before he entered the car and did not locate

any weapons.  (Tr. 31.)  Police department policy did not require them to place him in handcuffs

as he was not a prisoner or under arrest.  (Tr. 84-87, 167, 202.)

38.        After they arrived at the police station, they proceeded into an area known as the

Detective Bureau. (Tr. 31-32, 142.)  The Detective Bureau as a large room, about the size of the

courtroom where the suppression hearing was conducted, with numerous desks and other rooms

within.  (Tr. 3, 142-43.)  Detective Morgan sat at a desk with a computer, and the defendant sat

next to him.  (Tr. 32-33, 143.)  Detective Terni sat at a desk behind Detective Morgan, but he

was facing across from the front of the defendant and the computer screen.  (Tr. 33, 143.)

39.        The defendant was not placed in handcuffs while he was at the police station. (Tr.

34, 154-55.)

40.        Detective Morgan then began interrogating the defendant.  (Tr. 34.)  Before

asking any questions, Detective Morgan provided the defendant with an "Advisement of Rights"

card, which lists what is commonly referred to as a person's *Miranda* rights (Tr. 34, 144-45;

Gov't Ex. 1.)  Detective Morgan first read each of the rights out loud to the defendant, after

which he provided the card to the defendant and had him read the rights to himself.  (Tr. 34.)

Detective Morgan had the defendant read the first right out loud as well so he could be sure the

defendant could read and understand English.  (Tr. 35, 145.)  The defendant then initialed each

of the rights and signed the card, indicating he understood and was agreeing to waive those

rights.  (T. 34-35; Gov't Ex. 1.)   Detective Morgan observed the defendant sign and initial the

card, and then Detective Morgan signed the form and noted the date and time, which was November 10, 2012 at 6:55 p.m.  (Tr. 35-37.)  Detective Terni did not sign the card, but he testified he could hear Detective Morgan read the rights to the defendant and he observed the defendant signing the form, although he could not see the words on the form itself from where he was sitting.  (Tr. 144, 148, 179-80.)

41.     Detective Morgan then questioned the defendant about his use of Skype to speak to other individuals.  (Tr. 37, 145-46.)  This conversation lasted about 37 minutes.  (Tr. 40.)  At that point, Detective Morgan asked the defendant if he was willing to provide a written statement, and the defendant agreed.  (Tr. 37-38.)

42.     Detective Morgan started a computer program in order to type the defendant's statement into a "Voluntary Statement" form, but he first provided the defendant with a "Voluntary Statement Rights Form" which is another form that lists an individual's *Miranda* rights.  (Tr. 38; Gov't Ex. 2.)  Detective Morgan had the defendant read the form to himself. (Tr. 39-40.)[4]  The defendant placed his initials next to several (but not all) of the rights and then signed the form agreeing that he understood and wished to waive those rights.  (Tr. 39-40; Gov't Ex. 2.)  Detective Morgan observed the defendant sign and initial the form, and then Detective Morgan signed the form and noted the date and time, which November 10, 2012 at 7:32 p.m. (Tr. 39-40; Gov't Ex. 2.)  Detective Terni did not sign the form, but he testified he could hear Detective Morgan discussing the form with the defendant and he observed the defendant signing the form, although he could not see the words on the form itself from where he was sitting.  (Tr.

---

[4] Detective Terni testified that Detective Morgan verbally advised the defendant of the rights (Tr. 146, 180), although he later stated he could not recall the details about this particular form. (Tr. 180.)  He stated the events took place four years ago and he does not recall all of the "details" of what transpired. (Tr. 156.)

147-48.)  After signing the "Voluntary Statement Rights Form," Detective Morgan began to type

up a "Voluntary Statement" based on the information the defendant provided.  (Tr. 41.)

43.      During this conversation, Detective Morgan had the defendant sign a "Consent to

Search" form to memorialize the verbal consent he previously gave to search his computer.  (Tr.

41, 43-47, 147-48; Gov't Ex. 3.)   The defendant signed and initialed the form.  (Tr. 43-47; Gov't

Ex. 4.)  Detective Morgan observed the defendant sign and initial the form, and then Detective

Morgan signed the form and noted the date and time, which was November 10, 2012 at 7:40

p.m..  (Tr. 43-47; Gov't Ex. 3.)   Detective Terni did not sign the form, but he testified he could

hear Detective Morgan discuss the form and he observed the defendant signing the form,

although he could not see what the words on the from where he was sitting.  (Tr. 147-48, 173.)

44.      The form indicates that the computer is located at ███Redacted███ Avenue, which is

the defendant's residence.  (Tr. 45; Gov't Ex. 4.)  At the time the form was signed, however, the

computer was already physically at the Waterbury Police Station.  (Tr. 45.)  Detective Morgan

testified that he wrote the defendant's address on the form, but he was not trying mislead anyone

by listing the defendant's address rather than the police station as the location of the computer.

(Tr. 45-46.)  Rather, Detective Morgan wanted it to be known where the computer was taken

from originally.  (Tr. 45-46.)

45.      After the defendant signed the Consent to Search form, Detective Morgan

finished typing up the "Voluntary Statement" based on the information that the defendant

providing.  (Tr. 48, 148-49.)  Detective Morgan printed the "Voluntary Statement" form and

gave it to the defendant to read and review.  (Tr. 48, 149.)  The defendant reviewed it and

requested a change.  (Tr. 48, 188-89.)  Detective Morgan made the requested change, reprinted

the form, and provided it to the defendant.  (Tr. 48-49; Gov't Ex. 4.)

19

46.     The "Voluntary Statement" states that Detective Morgan advised the defendant of his constitutional rights and that he signed and initialed a card and form agreeing to waive those rights.  (Tr. 49; Gov't Ex. 4 at 1).  The referenced card and form are the "Advisement of Rights Card" and the "Voluntary Statement Rights Form" that the defendant signed earlier.  (Tr. 49; Gov't Exs. 1, 2.)  The "Voluntary Statement" then described in detail the defendant's alleged use of Skype to entice minors to engage in sexually explicit conduct.  (Gov't Ex. 4).  Finally, the "Voluntary Statement" states that the defendant signed a consent to search form allowing Detective Morgan to take the desktop computer from his bedroom and conduct a forensic examination. (Tr. 49-50; Gov't Ex. 4 at 2).

47.     At that point, Detective Morgan called for a supervisor to observe and notarize the defendant's signature.  (Tr. 50, 149.)  Lieutenant William Fox then came up to notarize the statement.  (Tr. 51-52, 149.)

48.     Lieutenant Fox, who is now an Acting Captain in the Patrol Division, has been a member of the Waterbury Police Department since 1995.  (Tr. 190.)  In November 2012, he was a Lieutenant in the Patrol Division.  (Tr. 191.)  Part of his responsibilities includes notarizing statements made on the Voluntary Statement form.  (Tr. 193.)  He has had to notarize the form on approximately 40 to 50 occasions.  (Tr. 193.)

49.     After Lieutenant Fox came up, he administered an oath to the defendant.  (Tr. 51, 193, 197.)  He asked the defendant if the statement was his statement and if it was the truth and the defendant indicated it was.  (Tr. 52, 193-94, 197-98.)  He then asked the defendant if anyone coerced or forced him to make the statement (Tr. 193-94, 198.)

50.     Lieutenant Fox then asked the defendant initial the beginning and end of the statement on each of the two pages, and the defendant did so.  (Tr. 52-53, 149, 194, 198; Gov't

Ex. 4.)  Detective Morgan, Detective Terni, and Lieutenant Fox all observed the defendant places

his initials on the statement.  (Tr. 52-53, 151-52.)

53.     Lieutenant Fox then asked the defendant to sign the bottom of each page.  (Tr. 53-

54, 198.)  The defendant signed the bottom of each page.  (Tr. 53-54; Gov't Ex. 4.)  Detective

Morgan, Detective Terni, and Lieutenant Fox all observed the defendant sign the statement.  (Tr.

53-54, 151-52.)

52.     After the defendant signed the statement, Lieutenant Fox signed the statement as a

supervisor and Detective Terni signed the statement as a witness.  (Tr. 54, 149-50, 196-97; Gov't

Ex. 4)  Detective Morgan and Detective Terni both observed Lieutenant Fox sign the statement,

and Detective Morgan and Lieutenant Fox both observed Detective Terni sign the statement.

(Tr. 54, 151-52.)

53.     Although Lieutenant Fox could not recall notarizing the Voluntary Statement for

this particular defendant, Lieutenant Fox confirmed his signature on this statement and indicated

he has only notarized a statement for Detectives Morgan and Terni on one occasion.  (Tr. 195,

197.)  He indicated that the process described above is the one he follows every time and he has

never deviated from the process.  (Tr. 194, 197.)  He has never signed a blank Voluntary

Statement form, and he has never notarized a form that had been already signed by an individual

without having observed that person sign it. (Tr. 194, 198.)

54.     After the statement was signed, Detective Morgan and Detective Terni drove the

defendant back to his residence.  (Tr. 54-56, 153.)  The defendant was not arrested at that time.

(Tr. 55-56.)  Detective Morgan testified he first needed to perform a forensic examination of the

defendant's computer to obtain evidence to confirm that the information in his statement was

accurate and to link the defendant to the minors in Vermont.  (Tr. 55, 116-17.)

55.     After they arrived at the residence, the defendant exited the car and the detectives left. (Tr. 56, 155.)

56.     In the defendant's affidavit to the Court, he denies making any statement to the detectives and claims he was handcuffed.  (Def. Ex. 7 ¶¶ 13, 15, 16.)  He claims he did not sign or initial the "Advisement of Rights," the "Voluntary Statement of Rights," the "Consent to Search," or the "Voluntary Statement" (collectively, the "Questioned Documents").  (Def. Ex. 7 ¶ 19.)  The defendant's mother was not present at the police station and did not witness anything that happened there.  (Tr. 210.)

57.     As before, because the defendant did not testify and could not be cross-examined, and because his mother cannot corroborate his claims about what happened at the police station, the Court should give those claims little to no weight.  (*See* case law, *supra* ¶ 20.)

### E.     The Parties' Handwriting Experts

58.     To support the defendant's claim that he did not sign the Questioned Documents, the defendant submitted a report by John Reznikoff, who purports to be an expert in questioned documents and handwriting.  (Def. Ex. 22 at 5.)  In his report, Mr. Reznikoff claims to have examined photocopies of the Questioned Documents.  (Def. Ex. 22 at 3.)  He then compared the signatures on those photocopies to signatures on photocopies and originals of fourteen other documents that he states represent the defendant's known signatures.  (Def. Ex. 22 at 3.)  He concluded that the signatures and initials on the Questioned Documents do not share authorship with the fourteen other documents. (Def. Ex. 22 at 3.)

59.     After preparing the report, Mr. Reznikoff was given the opportunity to review the originals of the Questioned Documents that bear the original ink signatures, as opposed to

photocopies.  (*See* Stipulation Regarding Evidence Related to Defendant's Motion to Suppress [Doc. 49].)  Mr. Reznikoff did not supplement his report after reviewing the original documents.

60.     Mr. Reznikoff did not testify at the hearing and was not subject to cross-examination.[5]

61.     The Court should give little weight to Mr. Reznikoff's report and conclusions. First, he did not testify, and his methodology and qualifications could not be explored.  There is no testimony as to how he examined the documents or for how long, whether he used any special equipment, or whether he simply eyeballed the documents for five seconds.  The Court has no way of understanding the methodology and procedures he used, whether they are reliable and generally accepted, and whether they would satisfy *Daubert*.

62.     Second, his report is not based on a review of the originals of the Questioned Documents, only photocopies.  As he readily admits, "photocopies provide a sub-par example of handwriting . . . . Lost for examination are pen speed, pressure, rhythm, as well as a number of other factors."  (Def. Ex. 22 at 3-4.)  In addition, because Mr. Reznikoff did not prepare a supplemental report after reviewing the originals, the Court does not know if his examination of the originals confirmed or changed his conclusions.

63.     Third, of the fourteen documents that Mr. Reznikoff examined that he claims represent the defendant's known signatures, all but four are documents the defendant appears to have signed after he was arrested and had a motive to manipulate or alter his signature. (Def. Ex. 22 at 3 (stating Exhibits K1, K12 to K14 attached to his report predate the defendant's arrest).) Almost all of them appear to have been signed on one of two days: either February 23, 2015 or

---

[5] At the start of the hearing, the parties agreed that their respective handwriting experts would not testify but that their reports would be admitted as full exhibits. (Tr. 3-5.)   The parties reserved their rights to contest the weight that the Court should attribute to the reports.  (Tr. 3-5.)

A-517

March 19, 2015.  (Def. Ex. 22, Exhibits K2 to K8, K11).  Significantly, of the four known signatures he examined that pre-date the disputed documents, none of them remotely resemble the defendant's 2015 signatures, further supporting the view that the defendant may have altered his signature after his arrest.  Mr. Reznikoff's report offers no explanation for this discrepancy.

64.     In addition, there was no testimony or evidence describing the conditions under which the defendant signed these documents bearing his known signatures and handwriting exemplars, whether he was supervised and given instructions, or whether he was simply left alone and allowed to take all the time in the world to carefully manipulate his signature.

65.     Fourth, there are numerous other documents in evidence containing the defendant's signatures and initials, including a Waiver of Extradition form that he signed before a judge in Norfolk, Virginia, various forms the defendant signed in 2011 with the State Probation Office, a fingerprint card the defendant signed in 1997, and other forms he signed and initialed while he was being held in Virginia in May 2013.  (Gov't Exs. 5 to 15.)  Mr. Reznikoff did not factor these documents into his report.

66.     The Court should find that the defendant's signature and initials on these documents are strikingly similar to the initials and signatures on the Questions Documents. *See, e.g.*, *United States v. Marshall*, No. 3:10-CR-14-JCH, 2011 WL 2842497, at *6 (D. Conn. July 14, 2011) ("The law does not require 'a questioned document examiner to vouch for the similarity of handwriting,' but instead, allows the jury to determine for itself whether the same person's handwriting appears on two documents" (quoting *United States v. Alvarez–Farfan*, 338 F.3d 1043, 1045 (9th Cir. 2003)).

67.     The Government submitted a report by its own forensic document examiner, Joan DiMartino, to refute the conclusions in Mr. Reznikoff's report.  (Gov't Ex. 16.) She is employed

24

by the United Stated Department of Homeland Security.  (Gov't Ex. 16 at 1.)  She compared the
originals of the Questioned Documents to other original documents that bear the defendant's
signatures and initials, including the Waiver of Extradition signed before a judge in Virginia on
May 15, 2013, and a Uniform Arrest Report, a Booking Card, and a Questionnaire, all of which
the defendant signed on May 29, 2013 after he was brought back to Waterbury and which are
signed by officers other than Detectives Morgan and Terni. (Gov't Exs. 5-8, 16 at 1-2.)  After
performing a comparative and microscopic handwriting examination, she determined that the
writer of John Eastman's signature on the Questioned Documents is the same as the writer of
John Eastman's signature on the other documents she examined.

     68.     Ms. DiMartino did not testify and therefore, like Mr. Reznikoff, her methodology
and qualifications could not be explored.  Nonetheless, her findings call Mr. Reznikoff's
conclusions into question.

     69.     In light of these shortcomings in Mr. Reznikoff's analysis and conclusions, the
Court's own review of the various exhibits bearing the defendant's signatures, and the
conclusions of Ms. DiMartino, the Court should not credit Mr. Reznikoff's conclusions.  To find
otherwise, the Court would have to believe that the defendant's signature on the waiver of
extradition form witnessed by a judge in Virginia was also forged, his signature on other forms
from the Norfolk Sherriff's office were forged, the signature on the 2011 probation forms was
forged, his signature on a 1997 fingerprint card was also forged, and his signature on the
Uniform Arrest Report, Booking Card, and Questionnaire in 2013 were forged.  Such a vast
conspiracy to forge his signature on multiple documents witnessed by multiple people in
multiple jurisdictions over a span of 20 years defies credulity.

     70.     Thus, the Court should find that the defendant signed the Questioned Documents.

**III.    PROPOSED CONCLUSIONS OF LAW**

> **A.    Law enforcement did not violate the defendant's Fourth Amendment rights when they entered the defendant's apartment.**

1.    The Waterbury Police detectives did not violate the defendant's Fourth Amendment rights when they entered the apartment because the defendant voluntarily consented to their entry.

2.    "The Fourth Amendment generally prohibits the warrantless entry of a person's home, whether to make an arrest or to search for specific objects." *Illinois v. Rodriguez*, 497 U.S. 177, 181.  "The prohibition does not apply, however, to situations in which voluntary consent has been obtained, either from the individual whose property is searched . . . or from a third party who possesses common authority over the premises." *Id.* (internal citations omitted); *see United States v. Elliott*, 50 F.3d 180, 185 (2d Cir. 1995) (a warrantless search or seizure without probable cause does not violate the Fourth Amendment if "the authorities have obtained the voluntary consent of a person authorized to grant such consent"); *Moore v. Andreno*, 505 F.3d 203, 208 (2d Cir. 2007) ("Such consent may be given by a third party").

3.    A third party has authority to consent to a search "'if two prongs are present: first, the third party had access to the area searched, and, second, either: (a) common authority over the area; or (b) a substantial interest in the area; or (c) permission to gain access.'" *United States v. McGee*, 564 F.3d 136, 139-40 (2d Cir. 2009) (quoting *United States v. Davis*, 967 F.2d 84, 87 (2d Cir. 1992)).  Additionally, "even if a third party lacks actual authority to consent to a search of a particular area, he still may have apparent authority to consent to the search." *Andreno*, 505 F.3d at 209.  A third party has apparent authority when "the facts available to the officer[s] at the moment. . .  warrant a man of reasonable caution in the belief that the consenting

party had authority over the premises." *Rodriguez*, 497 U.S. at 188 (internal quotation marks omitted).

4.      If two people with common authority over a property are present and one consents to a search, but the other objects, the search is unreasonable as to the objecting co-inhabitant.  *See Georgia v. Randolph*, 547 U.S. 103, 120 (2006) ("a warrantless search of a shared dwelling for evidence over the express refusal of consent by a physically present resident cannot be justified as reasonable as to him on the basis of consent given to the police by another resident").

5.      However, the objecting co-inhabitant party must affirmatively make an objection. *See Randolph*, 547 U.S. at 120 (noting that there must be an "*express* refusal of consent" (emphasis added)); *United States v. Lopez*, 547 F.3d 397, 399 (2d Cir. 2008) (noting there must be an "*express objection*" (emphasis is original)).

6.      Law enforcement officers "are under no affirmative obligation to request consent from a potentially objecting co-occupant before acting on permission they received from another occupant." *Id.* at 400 (citing *Randolph*, 547 U.S. at 122).  If one co-tenant consents to a search, officers have "no duty to ask [the other co-tenant] if he consented to the search, no matter how easy or convenient it might have been to do so." *Lopez*, 547 F.3d at 400.  Rather, the onus is on the co-occupant to affirmatively object to the search.  *See id.* ("[t]he onus was on Lopez to object to the search").

7.      Even if a co-occupant expressly objects to a search, "any further search would be unreasonable *as to the objecting co-occupant*." *Id.* at 397 (citing *Randolph*, 547 U.S. at 121-122) (emphasis added).  In *Randolph*, the Supreme Court held that "a physically present co-occupant's stated refusal to permit entry prevails, rendering the warrantless search unreasonable

27

and invalid *as to him*" (emphasis added)).  *Id.* at 106.  Significantly, the Supreme Court did not

hold that the search would be invalid as to anyone else in the apartment, including the person

who consented.  *See id.* at 120 n.8 (stating it was not deciding such an issue).

8.      In determining whether or not a person has expressed his or her consent, courts

have held that consent "need not be expressed in any particular form[.]" *United States v.

Deutsch*, 987 F.2d 878, 883 (2d Cir. 1993). "[I]t is well settled that consent may be inferred from

an individual's words, gestures, or conduct. Thus a search may be lawful even if the person

giving consent does not recite the talismanic phrase: 'You have my permission to search.'"

*United States v. Buettner-Janusch*, 646 F.2d 759, 764 (2d Cir. 1981).

9.      Moreover, in determining whether consent is voluntary, courts look to the totality

of circumstances. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973); *United States v.

Wilson*, 11 F.3d 346, 351 (2d Cir. 1993). A number of factors are relevant to the voluntariness of

a consent to search, including age, education, background, physical and mental condition, the

setting in which the consent is obtained, and the defendant's prior interactions with law

enforcement. *See Schneckloth*, 412 U.S. at 226; *United States v. Calvente*, 722 F.2d 1019, 1023

(2d Cir. 1983) (consent voluntary where 40-year-old defendant was calm, conversation with

police was conversational in tone, and defendant had prior convictions and was "thus no

newcomer to the law").

10.     Significantly, a defendant's knowledge of the right to refuse consent is not a

requirement to a finding of voluntariness.  *See Schneckloth*, 412 U.S. at 231-33; *United States v.

Drayton*, 536 U.S. 194, 206 (2002) ("The [Supreme] Court has rejected in specific terms the

suggestion that police officers must always inform citizens of their right to refuse when seeking

permission to conduct a warrantless consent search").

11.     In this case, there is no Fourth Amendment violation because the detectives asked for permission to enter the apartment and the defendant verbally agreed.  The defendant had the actual authority to allow them to enter the apartment.  Even though the defendant's name was not on the lease, he had been living in the apartment for a few years and had his own bedroom.  He also had the authority to allow third party utilities, such as Comcast, to provide services to the apartment in his name.  The defendant had access to the apartment and had common authority over the apartment.  Therefore, the defendant had the actual authority to allow the detectives to enter the apartment.  *See McGee*, 564 F.3d at 139–40 (a third party has authority if he has access to the area searched, and either: (a) common authority over the area; or (b) a substantial interest in the area; or (c) permission to gain access).

12.     Even if the Court were to find that the defendant lacked the actual authority to allow the detectives inside, the record demonstrates that the detectives reasonably believed the defendant had the authority to let them in.  Although the detectives did not perform a property records search to see who owned or leased the apartment, they had the information from Comcast indicating that the defendant subscribed to internet service at that address.  When the detectives asked if they could come inside, the defendant agreed.   At the time, the defendant did not inform them that someone else was inside the apartment, let alone that the lease to the apartment was in his mother's name.  Under these circumstances, the defendant had the apparent authority to allow the detectives into the apartment.  *See Rodriguez*, 497 U.S. at 188 (warrantless entry based upon the consent of a third party is valid when, at the time of entry, the facts available to the officers would cause them to reasonably believe the party had authority over the premises).

13.     In addition, looking at the totality of the circumstances, the defendant's verbal consent was voluntary.  The defendant invited the detectives into his apartment, and later showed the detectives to his bedroom.  The defendant was calm and cooperative throughout the time the detectives were at the residence.  He was in his home, he was not in handcuffs, and as he concedes in his affidavit, he was told he was not under arrest. *See United States v. Cardona*, 545 F. App'x 76, 80 (2d Cir. 2013) (finding that wife's consent was voluntary where wife was fluent in English, had the authority to consent, was at all times calm and cooperative, and was told she was not in any trouble); *see also United States v. Newton*, 369 F.3d 659, 669 (2d Cir. 2004) ("absent an arrest, interrogation in the familiar surroundings of one's own home is generally not deemed custodial"); *United States v. Mitchell*, 966 F.2d 92, 99 (2d Cir. 1992) (noting that interrogation in the familiar surroundings of one's own home is generally not deemed custodial). In fact, the defendant admits that the request to go to the police station for an interview "was phrased as a request, not an order."  The defendant also has prior dealings with law enforcement and is no newcomer to the law.  *See Calvente*, 722 F.2d at 1023 (consent voluntary where 40-year-old defendant was calm, conversation with police was conversational in tone, and defendant had prior convictions and was "thus no newcomer to the law").  That the detectives did not expressly inform the defendant that he could refuse consent does not impact the voluntariness of his consent.  *See Schneckloth*, 412 U.S. at 231-33 (a defendant's knowledge of the right to refuse consent is not a requirement to a finding of voluntariness); *Drayton*, 536 U.S. 194, 206 (2002) ("The [Supreme] Court has rejected in specific terms the suggestion that police officers must always inform citizens of their right to refuse when seeking permission to conduct a warrantless consent search").

14.      The fact that the officers did not ask Mrs. Eastman, as the tenant whose name was on the lease, for consent to enter the apartment does not change the analysis.  As discussed, the law allows a third party with actual or apparent authority to consent, which the defendant had in this case.  In addition, the detectives were under no obligation to ask for Mrs. Eastman's consent once they had the defendant's consent.  *See Lopez*, 547 F.3d at 400.  Rather, the onus was on Mrs. Eastman to expressly object to their entry or tell them to leave.  *See id*.  As discussed, there is no testimony that she did so.  While she asked Detective Morgan what he was doing and looking for and while she testified they never asked for her permission, she never testified she expressly objected to their presence or asked them to leave.

15.      Even if she had objected, the search would have only been unreasonable as to her, not as to the defendant.  *See Randolph*, 547 U.S. at 106; *Lopez*, 547 F.3d at 397.

16.      Accordingly, because the defendant verbally consented to the detectives entering the apartment, and because he had the actual and apparent authority to give that consent, the detectives did not violate the defendant's Fourth Amendment rights when they entered the apartment.

### B.      Law enforcement did not violate the defendant's Fourth Amendment rights when they took the defendant's computer.

17.      For substantially similar reasons, the Waterbury Police detectives did not violate the defendant's Fourth Amendment rights when they took the computer from his bedroom because, again, the defendant voluntarily consented to let them take the computer.

18.      First, the defendant had the actual authority to allow them to take the computer because he had access to the computer and he had common authority over the computer. *See McGee*, 564 F.3d at 139–40 (a third party has authority if he has access to the area searched, and either: (a) common authority over the area; or (b) a substantial interest in the area; or (c)

31

permission to gain access).  Even though Mrs. Eastman purchased the computer and claims she

is the owner, the defendant was the primary user of the computer.  As she testified, "[f]or the

most part, that [computer] was his computer for his use in his bedroom."  (Tr. 226.)  She only

used that computer "[m]aybe once a week.  Just to see what was on there."  (Tr. 226.)  She had

two other computers in the apartment that were for her use: one in her bedroom and one in the

living room.  (Tr. 226.)  Even the defendant, to this day, continues to refer to the computer as

"my computer."  (Def. Ex. 7 ¶ 17.)  He does not refer to the computer as his mother's computer.

(*Id.*)

19.     Second, even if the Court were to find that the defendant lacked the actual

authority to allow the detectives to take the computer, the record demonstrates that the detectives

reasonably believed the defendant had the authority to let them in.  At the time, the defendant

identified the computer as the computer he uses, and the computer was located in his bedroom.

Detectives had no reason to believe she owned, or even used, the computer.  Neither the

defendant nor Mrs. Eastman informed the detectives that she was purportedly the true owner of

the computer.  Under these circumstances, the defendant had the apparent authority to allow the

detectives to take the computer.  *See Rodriguez*, 497 U.S. at 188 (warrantless entry based upon

the consent of a third party is valid when, at the time of entry, the facts available to the officers

would cause them to reasonably believe the party had authority over the premises).

20.     Moreover, the detectives were under no obligation to ask for Mrs. Eastman's

consent once they had the defendant's consent.  *See Lopez*, 547 F.3d at 400.  If she had an

objection or was refusing consent, the onus was on her to expressly object and tell the detectives

they could not take the computer.  *See id.*  There is no evidence that she did so.  Even if she had

32

A-526

objected, the seizure would have only been unreasonable as to her, not as to the defendant. *See Randolph*, 547 U.S. at 106; *Lopez*, 547 F.3d at 397.

21.     Finally, in looking at the totality of the circumstances, the defendant's verbal consent was voluntary.  As discussed earlier, the defendant invited the detectives into his apartment, and later showed the detectives to his bedroom.  The defendant was calm and cooperative throughout the time the detectives were at the residence.  He was in his home, he was not in handcuffs, and as he concedes in his affidavit, he was told he was not under arrest. The request to go to the police station for an interview "was phrased as a request, not an order." The defendant also has prior dealings with law enforcement and is no newcomer to the law.

22.     Further demonstrating the voluntariness of his consent, when the defendant was at police station, he initialed and signed a "Consent to Search" form, memorializing his prior consent to have the detectives examine his computer.  The form expressly disclosed that he had the right to refuse consent, and he initialed the form indicating he read and understood that right. He also initialed the form to indicate his consent was being given freely and voluntarily without coercion.

23.     Accordingly, because the defendant verbally consented to letting the detectives take the computer, and because he had the actual and apparent authority to give that consent, the detectives did not violate the defendant's Fourth Amendment rights when they took the computer.

C.      **The defendant's written consent at the police station authorized the detectives to search the computer.**

24.      Even if the Court were to conclude that the defendant did not give verbal consent for the detectives to enter the apartment and take the computer, the defendant's written consent later at the police station permitted the detectives to maintain and forensically examine the computer.

25.      When consent to search is preceded by an unlawful seizure, the evidence obtained from the search does not warrant suppression if the Government shows both that the consent was voluntary and that "'the taint of the initial [seizure] has been dissipated.'"  *United States v. Snype*, 441 F.3d 119, 132 (2d Cir. 2006) (quoting *United States v. Oguns*, 921 F.2d 442, 447 (2d Cir. 1990)).  Courts consider four factors to determine whether the taint has been dissipated:  "(1) the giving of *Miranda* warnings, (2) the temporal proximity of the illegal entry and the alleged consent, (3) the presence of intervening circumstances, and (4) the purpose and flagrancy of the official misconduct." *Id.* (citing *Kaupp v. Texas*, 538 U.S. 626, 633 (2003)).

26.      Applying this standard here, suppression is not warranted.

27.      First, Detective Morgan advised the defendant of his *Miranda* rights, not once, but twice, before the defendant signed the consent to search form.  The first time, the defendant read the rights out loud, and then provided the rights card to the defendant to read to himself. Detective Morgan even had the defendant read the first right out loud so he could be sure the defendant could read them.  The defendant initialed each right and signed the card.  Before signing the consent form, the detective provided the defendant with another form listing his *Miranda* rights.  Again, the defendant signed the form acknowledging he understood them.

28.      Second, in terms of temporal proximity, almost an hour passed from when the detectives left the apartment and when the defendant signed the consent to search form.

"[I]ntervening event, even within a brief time, can sometimes sever the causal connection between an illegal entry and a subsequent consent to search, thereby permitting a court to conclude that the consent fairly reflects an act of free will." *Snype*, 441 F.3d at 135 (finding period of 20 minutes was sufficient).

29.     Third, the intervening events show that the defendant voluntarily agreed to go to the police station where he signed the form.  As he states, the request to go to the police station was phrased as a request, not an order.  He was not in handcuffs and he was calm and cooperative.  And the consent to search form made clear that he had the right to require the detectives to obtain a search warrant first.  The defendant also initialed the statements that he was giving consent freely and voluntarily without coercion.

30.     Finally, the detectives conduct was not flagrant or purposeful.  Although the detectives did not get a warrant before going to the apartment, Detective Morgan did not believe he had enough probable cause at the time.  He thought using a "knock and talk" strategy would be more fruitful.  Courts have repeatedly recognized that this "knock and talk" strategy is a legitimate law enforcement option. *See United States v. Chambers*, 395 F.3d 563, 568 n. 2 (6th Cir. 2005) ("Courts generally have upheld [the 'knock and talk'] investigative procedure as a legitimate effort to obtain a suspect's consent to search."); *United States v. Jones*, 239 F.3d 716, 720 (5th Cir. 2001) ("Federal courts have recognized the 'knock and talk' strategy as a reasonable investigative tool when officers seek to gain an occupant's consent to search or when officers reasonably suspect criminal activity."); *United States v. Hardeman*, 36 F. Supp. 2d 770, 777 (E.D. Mich. 1999) (noting that the "knock and talk" is "generally upheld as a legitimate method of investigation, designed to obtain a suspect's consent to search").  In addition, when

they entered the apartment, they believed the defendant had the authority to let them in.  They

also believed the defendant had the authority to let them take the computer.

31.     In sum, the four factors weigh in favor of a finding that the taint from any illegal

entry into the apartment and taking of the computer was sufficiently dissipated by the time the

defendant signed the consent to search form.  Even if the Court finds the fourth factor weighs in

favor of the defendant, the other three weigh in favor of the Government.

32.     Accordingly, suppression of the computer evidence is not warranted.

**D.     Law enforcement would have inevitably obtained the computer evidence, and
therefore, suppression is not warranted.**

33.     The inevitable discovery exception to the exclusionary rule also applies in this

case, and therefore suppression is not warranted.  If the defendant had not consented to let the

detectives take and later forensically examine the computer from his bedroom, Detective Morgan

stated he would have sought a search warrant, and there would have been sufficient probable

cause for him to obtain such a warrant.

34.     Evidence obtained by law enforcement during an otherwise unreasonable search

and seizure is nonetheless admissible "[i]f the prosecution can establish by a preponderance of

the evidence that the information ultimately or inevitably would have been discovered by lawful

means." *Nix v. Williams*, 467 U.S. 431, 444 (1984). "[I]llegally–obtained evidence will be

admissible under the inevitable discovery exception to the exclusionary rule only where a court

can find, with a high level of confidence, that each of the contingencies necessary to the legal

discovery of the contested evidence would be resolved in the government's favor." *United States

v. Heath*, 455 F.3d 52, 60 (2d Cir. 2006).  This analysis "requires the district court to determine,

viewing affairs as they existed at the instant before the unlawful search, what would have

36

A-530

happened had the unlawful search never occurred." *United States v. Eng*, 997 F.2d 987, 990 (2d Cir. 1993).

35.     Under this standard, in order for the computer evidence to be admissible under the inevitable discovery doctrine, the Court must be able to conclude "with sufficient confidence" that Detective Morgan would, in fact, have obtained a warrant to search and seize these tapes and DVDs if they had applied for one.  *See Heath,* 455 F.3d at 60–61.  That standard is satisfied in this case.

36.     When Detective Morgan went to the defendant's residence on the evening of November 10, 2012, he was aware, based on information provided by the Vermont State Police, that someone was using a computer to communicate with minors in a sexually explicit manner over Skype.  He also had information that the Skype communications were associated with a Skype username that was created from an internet protocol address assigned to the defendant's address.  However, Detective Morgan felt he needed additional probable cause and believed, based on his experience, that a judge might question the probable cause since Detective Morgan did not conduct any of his own independent investigation.  For example, Detective Morgan stated there could have been other people outside the residence who were using that internet protocol address, if, for instance, there was an unsecured wireless router in the home.

37.     After the detectives went to the apartment, and after the defendant invited them inside and began talking to the detectives, Detective Morgan obtained the additional information he needed to establish probable cause to seize the computer.   The defendant was not in custody and he admitted that he had been using the Harry Styles username to speak with people over Skype, and that information was consistent with the information provided by the Vermont State Police.  Based on this information, Detective Morgan testified that if the defendant had not

consented to letting the detectives take the computer, he would have at that point secured the apartment if necessary and obtained a search warrant to seize the computer.

38.     In light of the information provided by the Vermont State Police, the information provided by the defendant about his Skype activity, and Detective Morgan's training and experience in investigating online child enticement cases, this Court should find, "with a high level of confidence" that had the detective secured the apartment while obtaining a warrant for the search and seizure of the computer, such a warrant application would have been granted.

39.     Therefore, even the detectives improperly took the computer from the home without a warrant, it properly falls under an exception to the warrant clause and should not be excluded.

**E.     Law enforcement did not violate the defendant's Fifth Amendment rights when they interviewed him.**

40.     The detectives did not violate the defendant's Fifth Amendment when they interviewed him in his home and at the police station.  Therefore, suppression of his statements is not warranted.

41.     A defendant's voluntary confessions are admissible under the Fifth Amendment. *See Dickerson v. United States*, 530 U.S. 428, 433 (2000).  The Government must demonstrate that a defendant's statements were voluntary by a preponderance of the evidence. *See Missouri v. Seibert*, 542 U.S. 600, 610, n. 1 (2004).  To protect a defendant's Fifth Amendment right against self-incrimination, police are required to administer *Miranda* warnings when a suspect is subjected to "custodial interrogation." *Newton*, 369 F.3d at 669 (quoting *Miranda v. Arizona*, 384 U.S. 444, 447 (1966)).  Thus, if a suspect is not in custody, then *Miranda* warnings are not required.  *See United States v. FNU LNU*, 653 F.3d 144, 155 (2d Cir. 2011).   The test for determining whether a person is in "custody is an objective one: whether a reasonable person in

38

defend-ant's position would have understood himself to be subjected to the restraints comparable to those associated with a formal arrest." *Newton*, 369 F.3d at 671 (internal quotation marks omitted). "[O]nce *Miranda's* requirements have been met, a defendant is hard pressed to argue that his confession has been coerced." *United States v. McFarland*, 424 F. Supp. 2d 427, 434 (N.D.N.Y. 2006) (citing *Dickerson*, 530 U.S. at 444 (citing *Berkemer v. McCarty*, 468 U.S. 420, 433, n. 20 (1984))).

42.     Under this standard, the defendant's statements were voluntary and should not be suppressed.

43.     First, any discussion that took place in the defendant's home was not the subject of a custodial interrogation.  The Second Circuit has determined that "absent an arrest, interrogation in the familiar surroundings of one's own home is generally not deemed custodial." *Newton*, 369 F.3d at 675; *see Mitchell*, 966 F.2d at 99 (noting that interrogation in one's own home is generally not deemed custodial).  The defendant invited the detectives into the home, he was not in handcuffs, and he was calm and cooperative throughout the short time period of time—15 to 20 minutes—that the detectives were in the home.  Indeed, the defendant concedes he was told he was not under arrest and the detectives' request for him to go to the station "was phrased as a request, not an order."  These circumstances weigh in favor of finding the interview at the home was voluntary and non-custodial. *See Newton*, 369 F.3d at 677 ("[A] reasonable person told . . . that he was not under arrest would likely have understood that he was not about to be removed from his home to the police station—a significant factor in assessing the degree to which one is at 'the mercy' of the authorities."); *Mitchell*, 966 F.2d at 98 ("Decisions in this circuit have emphasized that in the absence of actual arrest, an interrogation is not 'custodial' unless the authorities affirmatively convey the message that the defendant is not free to leave.");

*FNU LNU*, 653 F.3d at 153 (pertinent "circumstances include" the "interrogation's duration");

*United States v. Hughes*, 640 F.3d 428, 437 (1st Cir. 2011) ("The relatively short duration of the

interview, which lasted roughly ninety minutes" is "consistent with the finding that the interview

was not custodial.")

44.     Second, the statements the defendant made at the police station were made after

he was advised of and waived his *Miranda* rights.  Indeed, the defendant was advised of and

waived his rights two times, once when he signed the "Advisement of Rights" card and then

again when he signed the "Voluntary Statement Rights" form.  (Gov't Exs. 1 and 2.)  Also, in the

"Voluntary Statement," the defendant again acknowledged that he was advised of his rights and

agreed to waive them.  (Gov't Ex. 4.)  All three forms were signed by both the defendant in the

presence of Detectives Morgan and Terni.  In addition, a supervisor, Lieutenant Fox observed

and notarized the defendant's signature on the Voluntary Statement.  The defendant was not in

handcuffs when he was at the police, and he was not arrested afterwards.  These circumstances

weigh in favor of finding that his statements were voluntary.  *See McFarland*, 424 F. Supp. 2d at

434 ("[O]nce *Miranda's* requirements have been met, a defendant is hard pressed to argue that

his confession has been coerced" (citations omitted)).

45.     Even if the Court were to determine that the detective's entry into the home was

illegal, the statements he made at the police station in the "Voluntary Statement" were

sufficiently attenuated from the unlawful entry, and therefore suppression is unwarranted.  *See*

*United States v. Guzman*, 724 F.Supp.2d at 444 (government bears burden of demonstrating "the

statements were sufficiently attenuated to remove the taint from the unlawful search"). The

factors to be considered are identical to the factors outlined above with respect to consent: "(1)

the administration of the *Miranda* warnings, (2) the temporal proximity between the Fourth

Amendment violation and the statements, (3) the presence of intervening circumstances, and (4) the purpose and flagrancy of the official misconduct." *Id.* at 444 (citing *Mosby v. Senkowski*, 470 F.3d 515, 521 (2d Cir. 2006). As discussed above, these factors weigh in favor of a finding that the taint from any illegal entry into the apartment was sufficiently dissipated by the time the defendant made his statements at the police station and signed the Voluntary Statement. *See* discussion of the four factors, *supra* ¶¶ 27-31.

46.    Accordingly, suppression of the defendant's statements is not warranted.

## CONCLUSION

For the foregoing reasons, the Government respectfully requests that the Court deny the defendant's motion to suppress.

Respectfully submitted,

DEIRDRE M. DALY
UNITED STATES ATTORNEY

*/s/  Neeraj N. Patel*
NEERAJ N. PATEL
ASSISTANT UNITED STATES ATTORNEY
Federal Bar No. phv04499
157 Church Street, 25th Floor
New Haven, CT  06510
Tel.:   (203) 821-3700
Fax:    (203) 773-5376
Email: neeraj.patel@usdoj.gov

A-535

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA | No. 3:16-CR-00006 (MPS) |
| v. | |
| JOHN EASTMAN | |

## RULING ON MOTION TO SUPPRESS

### I.   Introduction

The Government accuses John Eastman of posing online as a teenage pop star to induce young girls to expose themselves to him in violation 18 U.S.C. § 2422(b). He is also accused of possessing child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B). In 2012, a young girl told her mother that a person online posing as the pop star Harry Styles told her and other girls at a sleep-over to pose sexually for him. The mother reported the incident to the police. Later, the police traced the report to an internet protocol address assigned to John Eastman. The police went to Mr. Eastman's home. Mr. Eastman spoke with the police and gave his desktop computer to them. The police did not obtain a warrant before entering Mr. Eastman's home and seizing his computer. Mr. Eastman allegedly gave a detailed confession the same day.

Mr. Eastman now moves to suppress the physical evidence and incriminating statements. The defendant seeks to suppress "all physical evidence seized from [his apartment] as well as certain statements he allegedly made that day to law enforcement officers." (ECF No. 30 at 1.) He argues that the search and seizure is constitutionally infirm because it was conducted without a warrant and without consent. He also argues that his confession must be suppressed because he did not receive *Miranda* warnings. More specifically, he argues that the police forged his signatures on documents purporting to show his consent to the seizure of his computer, his acknowledgment of having received and understood *Miranda* warnings, and his confession.

I held an evidentiary hearing on the motion to suppress on May 31, 2016. The Government presented three witnesses, including Peter Morgan, David Terni, and William Fox. The defense presented a single witness: the defendant's mother, Linda Eastman. The Court also considered the exhibits and affidavits submitted by the parties as well as the parties' pre-hearing submissions and post-hearing briefing. For the reasons discussed below, I deny the motion to suppress because I find that Mr. Eastman consented to the search and seizure and received adequate *Miranda* warnings when they were required.

**II.    Legal Standard**

Before trial, a criminal defendant may move to suppress evidence that was obtained illegally. *See* Fed. R. Crim. P. 12(b). "On a motion to suppress, the defendant bears the initial burden of establishing that a government official acting without a warrant subjected him to a search or seizure. Once the defendant has met this burden, the burden then shifts to the government to demonstrate by a preponderance of the evidence, that the search or seizure did not violate the Fourth Amendment." *U.S. v. Herron*, 18 F. Supp. 3d 214, 221 (E.D.N.Y. 2014) (citations omitted). *See also United States v. Arboleda*, 633 F.2d 985, 989 (2d Cir. 1980). The government also bears the burden of proving by a preponderance of the evidence that the defendant waived his *Miranda* rights. *United States v. Jaswal*, 47 F.3d 539, 542 (2d Cir. 1995).

**A.    Fourth Amendment**

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "The touchstone of the Fourth Amendment is reasonableness." *Florida v. Jimeno*, 500 U.S. 248, 250 (1991) (citing *Katz v. United States*, 389 U.S. 347, 360 (1967)). The police do not violate the Fourth Amendment if a defendant consents to a search or seizure. *See id.* at 250–51 ("Thus, we

have long approved consensual searches because it is no doubt reasonable for the police to conduct a search once they have been permitted to do so." (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973))). The question "is whether 'the officer had a reasonable basis for believing that there had been consent to the search.'" *United States v. Garcia*, 56 F.3d 418, 423 (2d Cir.1995) (quoting *United States v. Sanchez*, 32 F.3d 1330, 1334 (8th Cir.1994)).

"So long as the police do not coerce consent, a search conducted on the basis of consent is not an unreasonable search." *Id.* at 422 (citing *Schneckloth*, 412 U.S. at 228). "The test of voluntariness is whether[, under the totality of the circumstances,] the consent was the product of an essentially free and unconstrained choice by its maker, as opposed to mere acquiescence in a show of authority." *United States v. Moreno*, 701 F.3d 64 (2d Cir. 2012) (internal citations and quotations omitted); *United States v. Perez*, 72 Fed. App'x 857, 859 (2d Cir. 2003); *see also Schneckloth*, 412 U.S. at 227. "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Jimeno*, 500 U.S. at 251. "The scope of the suspect's consent is a question of fact, and '[t]he government has the burden of proving, by a preponderance of the evidence, that a consent to search was voluntary.'" *United States v. Gandia*, 424 F.3d 255, 265 (2d Cir. 2005) (quoting *United States v. Isiofia*, 370 F.3d 226, 230–31 (2d Cir. 2004)).

"Factors the court should consider in assessing the voluntariness of a consent include the defendant's age, intelligence and educational background, the length and nature of his or her interaction with the police, and whether the officers engaged in coercive behavior." *United States v. Zaleski,* 559 F. Supp. 2d 178, 185 (D. Conn. 2008); *see Schneckloth,* 412 U.S. at 226–27. The Court should also consider "whether the alleged consenting person was advised of his

3

A-538

constitutional rights . . . ." *United States v. Puglisi*, 790 F.2d 240, 243 (2d Cir.1986).  *See also Garcia*, 56 F.3d at 422–23.

### B.      Fifth Amendment

"The Fifth Amendment protects against compelled self-incrimination. It is well settled that before a suspect may properly be subjected to custodial interrogation, he must be informed that he has the right to remain silent, that any statement he makes may be used in evidence against him, and that he has the right to have counsel present." *United States v. Mathurin*, 148 F.3d 68, 69 (2d Cir. 1998) (citing *Miranda v. Arizona*, 384 U.S. 436, 467–71 (1966)). "'Failure to administer *Miranda* warnings creates a presumption of compulsion,' and that 'presumption . . . [is] irrebuttable for purposes of the prosecution's case in chief.'" *Mathurin*, 148 F.3d at 69 (quoting *Oregon v. Elstad*, 470 U.S. 298, 307 (1985)). "Thus, 'unwarned statements that are otherwise voluntary within the meaning of the Fifth Amendment must nevertheless be excluded from evidence under *Miranda*.'" *Id.* (quoting *Elstad*, 470 U.S. at 307.)

"The test for determining custody is an objective inquiry that asks (1) 'whether a reasonable person would have thought he was free to leave the police encounter at issue' and (2) whether 'a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest.'" *United States v. Faux*, —F.3d—, No. 15-1282-CR, 2016 WL 3648331, at *4 (2d Cir. July 8, 2016) (quoting *United States v. Newton*, 369 F.3d 659, 672 (2d Cir. 2004)). A seizure is necessary, but not sufficient, for finding that a person is in custody. *Id.* "An individual's subjective belief about his or her status generally does not bear on the custody analysis." *Id.* An officer's subjective belief about the status of an individual, "if conveyed . . . to the individual being questioned," "'may bear upon the custody issue . . .' but 'only to the extent [it] would affect how a reasonable person in the position of the individual being questioned would

A-539

gauge the breadth of his or freedom of action.'" *See id.* (quoting *Stansbury v. California*, 511 U.S. 318, 322 (1994)).

"Relevant considerations include: (1) 'the interrogation's duration'; (2) 'its location (*e.g.*, at the suspect's home, in public, in a police station, or at the border)'; (3) 'whether the suspect volunteered for the interview'; (4) 'whether the officers used restraints'; (5) 'whether weapons were present and especially whether they were drawn'; and (6) 'whether officers told the suspect he was free to leave or under suspicion.'" *Id.* (quoting *United States v. FNU LNU*, 653 F.3d 144, 153 (2d Cir. 2011)).

### III.    Findings of Fact

The defendant contends that the officers lacked a warrant to enter his apartment and that he did not consent to the entry of his apartment or the seizure of his computer. He also contends that his mother revoked any consent that may have been given. Finally, he asserts that his signatures on the consent-to-search and acknowledgment-of-rights forms were forged. (ECF No. 31 at 1.) After considering all of the evidence presented at the evidentiary hearing and the evidence the parties included in their written submissions, I make the following findings of fact, rejecting the defendant's contentions (other than that the police lacked a warrant) and concluding that the Government satisfied its burden of proving by a preponderance of the evidence that the defendant voluntarily consented to the searches, was not in custody when he made statements in his house, and voluntarily waived his *Miranda* rights before signing a confession at the police station.[1]

---

[1] To the extent that any finding of fact reflects a legal conclusion, it shall to that extent be deemed a conclusion of law, and vice-versa.

5

A-540

### A.    The Alleged Crime

Prior to 2012, John Eastman moved in with his mother, Linda Eastman. Tr. 209. His mother leased the apartment where they lived and bought a computer that Mr. Eastman kept in his bedroom. *Id.* at 209, 217. His mother would go into his bedroom once a week "to see what was on there," *i.e.*, the computer. *Id.* at 225–26.

In 2012, a group of eleven and twelve year-old girls in Vermont were playing with Skype, an online video chat program, during a sleep-over. *See id.* at 12–13. Mr. Eastman was allegedly also using Skype that night and began chatting with the girls. *Id.* at 13. His username, "Harry.Styles888," resembled the name of a member of a popular boy band. *Id.* To trick children into thinking that he was Harry Styles, he would allegedly project video images of Harry Styles via his webcam. Def.'s Ex. 5. The night of the sleep-over, he allegedly asked the eleven and twelve year-old girls to pose sexually in front of their webcam. Tr. 13. One of the girls told her mother, who reported the incident to the Vermont State Police. *Id.* at 12–13.

### B.    The Preliminary Investigation

The Vermont State Police interviewed the child, who confirmed what her mother had reported. (Decl. of Peter Morgan, ECF No. 46-1 at ¶ 3.) The police then obtained a court order to obtain the Skype account information and the IP address associated with the username "Harry.Styles888," which allowed the police to trace the account to Waterbury, Connecticut. Tr. 14, 58. The Vermont State Police contacted the Waterbury Police Department, who assigned the investigation to Detective Peter Morgan. *Id.* at 12, 57. Detective Morgan specializes in digital forensic examination and focuses on the investigation of child pornography and similar crimes. *Id.* at 12.

6

A-541

Detective Morgan obtained a court order to acquire from Comcast Cable ("Comcast") the account information on the IP address associated with Harry.Styles888. *Id.* at 15, 58–59. Comcast reported that the IP address was assigned to John Eastman, 157 Congress Avenue, Third Floor, Waterbury, CT. *Id.* at 15, 59. Armed with that information, Detective Morgan went to that address with Detective David Terni, hoping that Mr. Eastman would cooperate with the investigation and that obtaining a warrant would not be necessary. *Id.* at 66–69.

**C.    The Defendant Consents to the Police Entering His Home, Allows the Police to Take His Computer, and Admits to Sex Chatting as Harry Styles**

The detectives arrived in the dark around 6:00 p.m. on November 10, 2012. *Id.* at 70–71, 92. The two were in plain clothes but visibly wearing police badges and firearms. *Id.* at 73–74. The detectives identified themselves when Mr. Eastman answered the door to the apartment on the third floor of 157 Congress Avenue. *Id.* at 74. Detective Morgan asked Mr. Eastman if the detectives could "come in and talk to him." *Id.* at 75. Mr. Eastman said "yes, okay." *Id.* at 21, 75.

Once inside, the detectives asked Mr. Eastman about his computer and the investigation. *Id.* at 78. The detectives told Mr. Eastman that he was not under arrest and Mr. Eastman was calm and cooperative throughout the discussion. *Id.* at 22. Detective Morgan told Mr. Eastman about the information that he had received from the Vermont police, which included that the incident under investigation had occurred on Skype with a Harry Styles username. *Id.* at 22–23.

At some point, Mr. Eastman's mother came out of her room, but as soon as Detective Morgan identified himself and told her that he was investigating a case, Mr. Eastman told his mother to return to her room and she walked away. *Id.* at 23–24. The detectives asked about a laptop computer that was in the living room. *Id.* at 25. Mr. Eastman explained that he did not use the laptop, but that he did use a desktop computer in his bedroom. *Id.* at 25–26. Mr. Eastman led

7

A-542

the detectives to his bedroom where the desktop computer was located and told the detectives that he had used the Harry Styles username for video sex chatting. *Id.* at 25–26, 30, 81–82.

At the hearing and in the briefs, the defendant contested that he was a lessee of the apartment and that he owned the computer. Although the lease of the apartment was in Mr. Eastman's mother's name, Mr. Eastman had resided at the apartment for a few years. *Id.* at 210, 221–22. According to Mr. Eastman's mother, the defendant had authority to set up services such as Comcast internet for the apartment. *Id.* at 222–23. At the apartment, he had his own room where he kept a desktop computer. *Id.* at 29 ("He identified the bedroom as his and identified the computer as one that he had purchased.").

I find that at the time of the seizure the computer belonged to Mr. Eastman, either because his mother gave it to him as a gift or because he purchased it. The computer was located in his bedroom and Ms. Eastman used two other computers, one in her bedroom and one in the living room. *See id.* at 29, 139, 187, 217, 225–26. Although Ms. Eastman testified that she purchased the computer, there is no testimony that Ms. Eastman told the detectives that she owned the computer, or that she expressly objected to the presence of the police in the apartment. *See id.* at 217. Further, Mr. Eastman suggests in his affidavit that he was the computer's owner, Def.'s Ex. 7 at ¶¶ 13, 17 ("I . . . demanded the return of my computer.").

Mr. Eastman agreed to go to the police station and to let the detectives take the computer, but asked to use the restroom before leaving, which he did. Tr. at 24–29. The officers repeated that the defendant was not under arrest. *Id.* at 140. Mr. Eastman, Detective Morgan, and Detective Terni then left for the police station with the computer. *Id.* at 30–32. Although Mr. Eastman was not placed in handcuffs, Detective Terni performed a pat-down of Mr. Eastman before he entered

8

A-543

the unmarked police vehicle to ensure that Mr. Eastman did not possess any weapons. *Id.* at 19, 31. On the way to the station, they did not discuss the investigation. *Id.* at 31.

**D.      The Police Mirandize the Defendant, Who Gives a Full Confession**

Once they reached the police station, they sat at one of the many desks in a large room. *Id.* 32. Detective Morgan gave *Miranda* warnings to the defendant around 6:55 p.m. *See id.* at 34–35. Mr. Eastman signed a card acknowledging that he had been advised of his rights. *Id.* at 35–38; Gov't Ex. 1. Detective Morgan then interrogated the defendant, who gave an oral confession. Tr. at 37.

Next, Mr. Eastman agreed to give a written statement. *Id.* at 37–38. The computer program that Detective Morgan used to type the statement gives the option of printing out an advisement of rights form. *Id.* at 38. Detective Morgan chose to print the form that explained the defendant's constitutional rights. *Id.* Mr. Eastman signed the form around 7:32 p.m. *Id.* at 39; *see* Gov't Ex. 2. As Detective Morgan began to type Mr. Eastman's statement at 7:34 p.m., he asked whether Mr. Eastman would be willing to sign a consent form to search Mr. Eastman's computer. Tr. at 41–42. Mr. Eastman agreed and at 7:40 p.m. signed the form, which listed the location of the computer as having been at Mr. Eastman's apartment, although by that time it had already been brought to the police station with Mr. Eastman's permission. *Id.* at 25–26, 41, 43–44; Gov't Ex. 3. Detective Morgan completed typing the statement at 8:43 p.m. Tr. at 42–43. Mr. Eastman reviewed the document and requested that Detective Morgan change certain portions of the statement, which Detective Morgan did. *Id.* at 48. The statement describes in graphic detail Mr. Eastman's use of his computer to lure underage girls into performing sexually explicit activity. *See* Gov't Ex. 4 (Waterbury Police Department Voluntary Statement). The statement also acknowledges that Mr. Eastman was repeatedly advised of his constitutional rights and consented to the search of his

A-544

computer. *Id.*; Tr. 49–50. Mr. Eastman swore an oath before William Fox, then a lieutenant and supervisor, affirming that the statement was true and accurate.[2] Gov't Ex. 4; Tr. 49–52. Mr. Eastman then signed and initialed the document. Gov't Ex. 4; Tr. 52–53. Captain Fox and Detective Terni signed the statement as well. Gov't Ex. 4; Tr. 53. Finally, the detectives drove Mr. Eastman home. Tr. 54–55.

### E.     The Defendant's Version of Events Is Not Credible

The defendant asks me to accept a contrary version of these events. According to him, the police shoved their way into his apartment and physically restrained him with handcuffs; his mother strenuously objected to the police presence; the police never gave him any *Miranda* warnings and he was interrogated despite his request for an attorney; and the police repeatedly forged his signature on documents that purport to show that his confession was lawful. For the reasons that follow, I do not credit the defendant's version of events.

Captain William Fox was a highly credible witness with little incentive to fabricate: He was not assigned to the case, did not work frequently with Detectives Morgan and Terni, and was considerably more senior in rank. Further, his testimony closely matched the documents—even before he was shown those documents on the stand. Although Captain Fox did not specifically remember actually notarizing the defendant's signature on the voluntary statement, his testimony that he has only performed one such notarization for Detectives Morgan and Terni was credible, and he identified his signature on the notarization spaces on Mr. Eastman's confession. Tr. at 195–96; *see* Gov't Ex. 4. At the hearing, before the exhibit was shown to him, he described his practice of obtaining initials on the left and right of each page, which closely reflects what is on the

---

[2] Fox, who had been promoted to captain by the time of the hearing, testified that he was a lieutenant when he notarized Mr. Eastman's signature on the statement in 2012. Tr. at 191.

document. *See* Tr. at 193–98; Gov't Ex. 4. Further, because he testified that his practice is to ask each person signing such a statement whether or not the statement is his, whether or not it is accurate, and whether or not it was voluntary, his notarization of the signature not only provides me with confidence that Mr. Eastman did, in fact sign it, but that it was, in fact, his voluntary statement and one he believed to be accurate at the time. Tr. 193–98. I further credit Captain Fox's testimony that he has never, in notarizing voluntary statements such as the one signed by Mr. Eastman, notarized a blank form or a form that had been previously signed in his absence. *Id.* at 194. Captain Fox's testimony was corroborated by the detailed testimony of Detectives Morgan and Terni.

Against this evidence showing that Mr. Eastman did in fact sign the forms in question, the defendant presented no credible evidence. The defendant's only witness at the hearing—his mother—testified only as to what she observed after Mr. Eastman gave his consent for the officers to enter the apartment, and had no personal knowledge of what took place during the initial entry or later at the police station. The only other evidence on whether the signatures were forged was two-fold: (1) the defendant's own affidavit, in which he swore that the signatures on the forms at issue were not his, and (2) the report of the defendant's handwriting expert, which concluded that the defendant did not sign the consent forms.

With regard to the defendant's affidavit, I find that it is not credible. First, the defendant's definitive statements that he did not sign the police forms are directly contradicted by the substantial evidence that he did, which is discussed above. Second, the defendant himself did not testify, and while I draw no adverse inference from his decision not do so, the fact remains that his statements have not been subjected to cross-examination and therefore carry less weight compared to the credible testimony of the government witnesses, which was subject to cross-examination at

11

A-546

the hearing. *E.g.*, *United States v. Medina*, 19 F. Supp. 3d 518, 535 n.13 (S.D.N.Y. 2014) ("As a general matter, credible testimony at a hearing is entitled to more weight than an affidavit, because testimony has been subjected to cross-examination."). Third, portions of the defendant's versions of events—as set forth in his affidavit—make little sense. For example, he avers that Officer Terni drove him home alone, *i.e.*, without the accompaniment of another officer. (ECF No. 31-2 at ¶ 17.) This is neither consistent with the credible testimony of the officers, nor plausible as an account of police practice in this context. Tr. 55 ("Q: Who took him home? A: Myself and Detective Terni.") While it is true that he was not formally under arrest at the time, it is simply implausible that Detective Morgan—the lead detective—would have allowed Detective Terni, who was assisting him, to drive someone who was then definitely a suspect home alone. The car involved was an unmarked vehicle with no security screen between the front and back seats and with no other particular security features. *Id.* at 85, 140.

Mr. Eastman's affidavit also states that "[w]hen Officer Terni dropped me at my home, he gave back to me four cell phones" the officers had taken from his house. (ECF No. 31-2 at ¶ 18.) This was not covered at all at the hearing, but it is implausible that the officers would have seized the phones and then returned them without examining them forensically, especially in light of their plans to examine the computer forensically. In short, I find that the defendant's affidavit is not credible in several respects—and especially on the crucial point about whether he signed the police forms—and do not credit any of it. *See Hinton v. Patnaude*, No. 92–CV–405, 1997 WL 727529, at *2 & n.3 (N.D.N.Y. Oct. 21, 1997) (noting that "*[f]alsus in uno, falsus in omnibus* has particular applicability to an assessment of plaintiff's credibility" (citation and internal quotation marks omitted)).

A-547

F.    **Conflicting Testimony Surrounding Handcuffs**

The defendant urges me not to credit the Government's witnesses because of inconsistent testimony surrounding handcuffs. Admittedly, the evidence about handcuffing was muddled. The defendant's affidavit states that he was cuffed while in the apartment and that the officers removed the cuffs when he asked to go to the bathroom. Def.'s Ex. 7 at ¶¶ 7, 10. The defendant's mother testified that she observed him in cuffs while he sat on a couch in the apartment. Tr. 214. On direct examination, she testified in a way that suggested that she could not see whether or not he had cuffs on when he went to the bathroom, although this testimony is ambiguous, *id.* at 216 ("Q: And did they remove the handcuffs so he could use the restroom? A: I didn't see that because I moved back."); in response to the Court's questions, however, she testified that he did have cuffs on when he went to the bathroom, contradicting her son's affidavit, *id.* at 235 ("The Court: He did have cuffs on at that time? The Witness: Yes, he did, correct."). She also testified, in response to the Court's questions, that she was standing at a location from which she could—according to the diagram of the apartment introduced by the defendant—have clearly seen whether or not he was cuffed when he went to the bathroom. *Id.* at 235; Def.'s Ex. 21.

For their part, the officers both testified—definitively and repeatedly—that the defendant at no time was cuffed, either in the apartment, at the police station, or in the vehicle. *E.g.*, Tr. at 22. Both detectives—and Captain Fox—testified that cuffing someone who is not under arrest was not standard practice and was not always necessary. *E.g.*, *id.* at 167. The two detectives contradicted each other, however, on whether they had cuffs in their possession that day—with Detective Morgan saying that he did not and that detectives did not ordinarily carry cuffs and Detective Terni saying the opposite. *Id.* at 73, 161–62, 166.

13

A-548

Overall, while it is not clear to me why the two detectives contradicted each other on whether they were carrying handcuffs on November 10, 2012, I found that the detectives were more credible than the defendant's mother and, as noted, I do not credit anything in Mr. Eastman's affidavit. The detectives were on the stand for considerably longer than the mother, their testimony was substantially more detailed, and her testimony, which was closer to the version in her son's affidavit, is suspect because that affidavit is not credible.[3]

Further, the mother's version of at least some of the events was implausible and may have been colored by her affection for her son or by the fact that, as she testified, she was not feeling well that day, was sleeping when the officers came into the apartment, and was roused suddenly while they were there—or both. *Id.* at 212–13. For example, she testified that she was awakened when there was a banging on her bedroom door and that a detective, who she later learned was Detective Morgan, entered her room without her permission, "stood there for a few minutes," and then exited her room and began rifling through drawers and cabinets. *Id.* at 213–14. According to her testimony, she protested and demanded that he identify himself and explain why he was in her home but he said not a word in response, not even identifying himself or telling her to get out of his way. *Id.* at 213–14. It is unclear what motive the detectives would have had to refuse to speak

---

[3] The defendant argues that I should discredit the officers' account because of a "lack of candor or sloppiness." (ECF No. 59 at 11–14.) The defendant points out what he considers to be material omissions in Detective Morgan's police report, that Detective Morgan did not make or keep notes of the investigation, that Detective Morgan argued with defense counsel on cross-examination, that Detective Morgan did not provide a property receipt when he took the computer, and other instances of alleged "dishonesty" or "sloppiness." (*Id.*) As discussed above, I find Detective Morgan's testimony to be credible because it is corroborated by the other credible evidence in this case. Even if I were to conclude that Detective Morgan conducted a sloppy investigation and did not follow certain best practices, for example, giving Mr. Eastman a receipt for his computer, it would not follow that Detective Morgan lied in his testimony or that Mr. Eastman did not consent to the search of the apartment and the seizure of the computer.

14

to or even identify themselves to a complaining resident whose room they had just entered. I do not find her account to be credible.

In addition, at points Ms. Eastman's memory was faulty or she was not forthright, or both. In addition to the potentially contradictory testimony about whether she could see whether the defendant was handcuffed when he entered the bathroom, the defendant's mother offered conflicting facts about her location within the apartment during the police visit. At the hearing, she testified that she was standing in two locations during the police visit (other than when she was in her room): (1) in the doorway between the kitchen and the living room, from which she observed her son on a couch with cuffs on, and (2) in the doorway between her bedroom and the bathroom, from which she could look into her son's bedroom (the door of which faced her bedroom door) and see Detective Morgan. *See id.* at 226–33. In her affidavit, however, she stated that at one point, she sat down at the kitchen table (from which, according to the diagram, she could not have observed either of these events) in response to a directive from Detective Morgan; there was no mention of sitting at the kitchen table during her hearing testimony. *See* Def.'s Ex. 8 at ¶ 4; Def.'s Ex. 21. For all these reasons, I credit the officers' version that Mr. Eastman was not cuffed at any time on November 10, 2012.

G.    **Handwriting Analysis**

The parties submitted reports from two handwriting experts. Neither expert was called as a witness at the hearing. Because the defendant's handwriting expert learned of a conflict of interest a few days before the evidentiary hearing but after he drafted his report, the parties agreed to submit the expert reports as evidence without subjecting either expert to cross-examination. Tr. at 2–5. The experts disagree about whether Mr. Eastman is the person who signed the Government's exhibits purporting to show that Mr. Eastman was informed of his rights and

15

voluntarily gave a full confession. Before considering the experts' reports, I first consider the role of handwriting experts.

## 1.    *Applicability of Rules of Evidence*

The admissibility of expert testimony in general is controlled by Federal Rule of Evidence 702.[4] "[T]he rules of evidence normally applicable in criminal trials do not operate with full force at hearings before the judge to determine the admissibility of evidence." *U.S. v. Matlock*, 415 U.S. 164, 172–73 (1974) (discussing hearsay); *United States v. Raddatz*, 447 U.S. 667, 679 (1980) ("At a suppression hearing, the court may rely on hearsay and other evidence, even though that evidence would not be admissible at trial."). *See also* Fed. R. Evid. 1101(d)(1) ("These rules—except for those on privilege do not apply to . . . the court's determination, under Rule 104(a), on a preliminary question of fact governing admissibility."). Thus, at least arguably, I may consider the handwriting experts' opinions even if they do not satisfy Rule 702. Nonetheless, because the purpose of any expert opinion offered in court is to "help the trier of fact to understand the evidence or to determine a fact in issue," Fed. R. Evid. 702(a), it will be helpful to consider how the Second Circuit and other courts have treated the field of handwriting analysis.

---

[4] Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

        2.      *The Second Circuit's Treatment of Handwriting Experts*

"Handwriting analysis, or 'forensic document examination' as its practitioners prefer to call it, involves the 'asserted ability to determine the authorship vel non of a piece of handwriting by examining the way in which the letters are inscribed, shaped and joined, and comparing it to exemplars of a putative author's concededly authentic handwriting.'" *Almeciga v. Ctr. for Investigative Reporting, Inc.*, No. 15-CV-4319 (JSR), 2016 WL 2621131, at *8 (S.D.N.Y. May 6, 2016) (citation omitted).

The Second Circuit "has not authoritatively decided whether a handwriting expert may offer his opinion as to the authorship of a handwriting sample, based on a comparison with a known sample." *United States v. Adeyi*, 165 F. App'x 944, 945 (2d Cir. 2006). Nonetheless, expert testimony on handwriting analysis has been admitted in this Circuit, and the court in *Adeyi* concluded: "Because expert opinion as to handwriting authorship is not clearly inadmissible in this circuit, we cannot say the district court committed plain error" in allowing the expert's opinion. *Id.* at 946 & n.1. *Accord United States v. Tin Yat Chin*, 371 F.3d 31, 38 (2d Cir. 2004) ("The combined proffered testimony of: (1) Tin Yat Chin's wife (that she had not made the purchases), (2) the store managers (regarding their transaction practices), and (3) a handwriting expert (identifying Tin Yat Chin's signature) was sufficient to satisfy Rule 901's authentication requirements."); *United States v. Green*, 523 F.2d 229, 236–37 (2d Cir. 1975) (handwriting expert may testify as an expert witness in criminal trial); *United States v. Wilson*, 441 F.2d 655, 656 (2d Cir. 1971) (handwriting expert's uncertainty about his ability conclusively to identify a specific writer goes to weight, not admissibility).

17

A-552

       3.      *A Recent District Court Decision Criticized Handwriting Experts*

A district court in this Circuit recently excluded the opinions of a handwriting expert after "finding that handwriting analysis in general is unlikely to meet the admissibility requirements of Federal Rule of Evidence 702 . . . ." *Almeciga*, 2016 WL 2621131, at *1. Judge Rakoff concluded that the expert's testimony in that case "[bore] none of the indicia of science and suggest[ed], at best, a form of subjective expertise." *Id.* at *10. He found that "to the extent the field has been subject to any 'peer' review and publication, the review has not been sufficiently robust or objective to lend credence to the proposition that handwriting comparison is a scientific discipline." *Id.* at *11. He noted a "2001 study in which forensic document examiners were asked to compare (among other things) the 'known' signature of an individual in his natural hand to the 'questioned' signature of the same individual in a disguised hand, examiners were only able to identify the association 30% of the time. Twenty-four percent of the time they were wrong, and 46% of the time they were unable to reach a result." *Id.* at *12. He said: "For decades, the forensic document examiner community has essentially said to courts, 'Trust us.' And many courts have. But that does not make what the examiners do science." *Id.* at *14.

While Judge Rakoff's opinion does not address the use of handwriting experts at a suppression hearing, which is not governed by Fed. R. Evid. 702, it does raise doubt about the extent to which a court should rely on the conclusions of handwriting experts.

       4.      *The Handwriting Experts in This Case Did Not Testify*

Further, in this case, the handwriting experts have not testified, as the parties decided by agreement not to call their experts as witnesses at the suppression hearing. Tr. at 2–5. I thus have not been able to observe these witnesses or evaluate their demeanor—which is a significant part of any credibility assessment. The reports of the experts do not adequately answer questions I

18

A-553

would have posed had they appeared and testified, such as (1) how the experts verified that the "known" handwriting exemplars are accurate representations of the defendant's handwriting; (2) how differences among the signatures examined show a difference in authorship, as opposed to the mere passage of time or different conditions under which the signatures were made; and (3) whether the experts were told that the signatures were forged or authentic prior to beginning their analysis. *See Almeciga*, 2016 WL 2621131, at *15 ("All of this is contrary to the well-established principle that experts must, to the maximum extent possible, proceed 'blindly,' that is, without knowledge of the result sought by the party seeking to retain them."). Further, neither expert submitted a sworn affidavit. Accordingly, I do not give significant weight to either report. All that I can conclude is that some of the signatures are written with varying qualities of penmanship. Because there is other strong evidence that the defendant did sign the crucial documents, I attribute the differences in handwriting either to the conditions under which the signatures were made or to the defendant's decision to change his signature. I base my finding that the defendant did in fact sign the documents in question primarily on the credible testimony of Captain Fox, which was corroborated by other officers and the documents themselves.

## IV.    Legal Analysis

### A.    The Defendant Consented to the Search and Seizure

As to the issue of entry, the only evidence introduced at the hearing was that of the detectives, who said that Mr. Eastman agreed to let them enter the apartment and take his computer. The mother had no personal knowledge of the entry because she was sleeping at the time. And, as noted, Mr. Eastman did not testify at the hearing. Although his affidavit suggests that the officers "stepped inside, forcing [him] to stumble backwards," I do not credit that statement for the reasons set forth above. (ECF No. 31-2 at ¶ 4.) Therefore, I find that Mr. Eastman consented to the entry.

A-554

I likewise find that he consented to the search and seizure of his computer because the preponderance of the evidence shows that Mr. Eastman gave the officers permission to seize his computer. Tr. 25; (ECF No. 46-1 at ¶ 13 (declaration of Detective Morgan stating "I asked Eastman if we could take the desktop to the police station to be examined for further investigation. Eastman verbally consented for us to take the computer.")). Also the fact that Mr. Eastman signed the consent to search form at the police station suggests that he consented to the earlier seizure of his computer.

Additional factors weigh in favor of finding that Mr. Eastman's consent to the search and seizure was voluntary. *Zaleski,* 559 F.Supp.2d at 185 (listing factors including age, length and nature of interactions with the police, and whether the officers engaged in coercive behavior). During the time in question, Mr. Eastman was an adult. (*See* ECF No. 59 at 2.) As Mr. Eastman points out, he is no stranger to police interactions. Indeed, his rap sheet is thirty-seven pages long. (*See id.* at 2–3.) Given Mr. Eastman's extensive interactions with the police from 1998 until 2012, Mr. Eastman likely would have been exposed to police questioning multiple times and would almost certainly have had his rights explained to him either by the officers involved or by his attorneys.[5] Finally, Captain Fox specifically questioned Mr. Eastman about whether his signature on the voluntary statement—which includes a statement that he consented to the seizure of the

---

[5] Mr. Eastman argues that "it does not make sense that Mr. Eastman would consent to a search" because "Mr. Eastman has a history of past interactions with law enforcement and is an inherently distrustful man," including an assault charge and a charge of refusing to provide fingerprints. (ECF No. 31 at 9.) Much of Mr. Eastman's extensive criminal history, however, dates from when he was a younger man, and thus does not necessarily suggest that his apparent actions of cooperation with the police in this case were out of character. It is equally plausible that when two officers arrived at his door asking about his Internet conversations with a twelve-year-old, he believed that he had been apprehended and that it would be in his interest to cooperate.

20

computer—was voluntary. Tr. at 193–94. I thus find that Mr. Eastman voluntarily gave the officers permission to enter the apartment and seize his computer.

The defendant suggests that the seizure of the computer was not reasonable because Mr. Eastman was not the lessee of the apartment, because it was not Mr. Eastman's computer, and because Ms. Eastman did not provide her consent. (*See* ECF No. 31 at 11.) The defendant points out that Ms. Eastman testified that she purchased the computer. Tr. at 217; Def.'s Ex. 38. When asked "Did either officer ever ask you for permission to take the computer that was located in the apartment?" Ms. Eastman replied "No, he did not. He just took it." Tr. at 215.

"It is well established that the consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that common authority is shared." *United States v. Gonzalez Athehorta*, 729 F. Supp. 248, 256 (E.D.N.Y. 1990) (citing *United States v. Matlock*, 415 U.S. 164, 170 (1974)). "The consenting party need not have actual authority; apparent authority to consent is sufficient." *Id.* (citations omitted). "[A] person (described as a 'third party') validates a search by giving the authorities consent to search 'if two prongs are present: first, the third party had access to the area searched, and, second, either: (a) common authority over the area; or (b) a substantial interest in the area; or (c) permission to gain access." *United States v. McGee*, 564 F.3d 136, 139–40 (2d Cir. 2009) (citing *United States v. Davis*, 967 F.2d 84, 87 (2d Cir. 1992)). Whether a person had apparent authority "must 'be judged against an objective standard: would the facts available to the officer at the moment . . . warrant a man of reasonable caution in the belief" that the consenting party had authority over the premises?" *See Illinois v. Rodriguez*, 497 U.S. 177, 188 (1990) (quoting *Terry v. Ohio*, 392 U.S. 1, 21–22 (1968)).

21

A-556

Even assuming that Mr. Eastman did not have actual authority to consent to the entry of the apartment or the seizure of the computer, the facts available to the officers would warrant a person of reasonable caution in the belief that Mr. Eastman could consent to the search and seizure at issue. *Id.* A utility company, Comcast, reported to the police that the IP address for Harry.Styles888 was assigned to John Eastman at the address of the apartment. When the police arrived at the apartment, Mr. Eastman, who ordered internet service for the apartment, answered the door. When Mr. Eastman allowed the officers to enter, there was no indication that Ms. Eastman was also present. Mr. Eastman told the officers that he had a bedroom at the apartment and that he had purchased the computer in the bedroom. Tr. at 29 ("He identified the bedroom as his and identified the computer as one that he had purchased.").

Although the police learned after the entry that there was another occupant in the apartment, she had a separate bedroom, there were other computers in the apartment that she likely used, and she did not protest the officers' presence in the apartment. *Id.* at 22–26. The police certainly could have asked Ms. Eastman whether she owned the computer that was in her adult son's separate bedroom, but even a person of reasonable caution would not think that doing so was necessary to confirm that Mr. Eastman had authority to allow the police to take the computer that was in his bedroom at the apartment where he arranged for internet service and that he claimed to have purchased.

**B.     There Was No Custodial Interrogation in the Defendant's Home, and the Defendant Was Mirandized Before He Voluntarily Confessed**

Mr. Eastman contends that his statements to the police must be suppressed because the police did not give him *Miranda* warnings before subjecting him to custodial interrogation. He does not contend that the police otherwise violated his Fifth Amendment rights.

22

There is credible evidence that Mr. Eastman received *Miranda* warnings before making his full confession at the police station. There is, therefore, no basis to suppress those statements. The best evidence that Mr. Eastman received *Miranda* warnings are the multiple signed statements affirming that he was advised of his constitutional rights, that he understood those rights, and that he wished to forego his rights and answer the detectives' questions. Def.'s Exs. 3–5; (ECF No. 46-1 at 11, 13, 15). As discussed above, there is also credible testimony that the officers gave these warnings. There is no credible evidence that Mr. Eastman did not understand the warning and did not waive his constitutional rights. Accordingly, as the detectives did not fail to administer *Miranda* warnings, there is no presumption of compulsion that would merit suppressing the statements made at the police station. *See Mathurin*, 148 F.3d at 69. Because the detectives gave *Miranda* warnings, I do not decide the issue of whether Mr. Eastman was in custody while he was at the police station.

As for the statements made at Mr. Eastman's apartment, I find that Mr. Eastman did not receive *Miranda* warnings before he admitted that he used the Harry Styles username for video sex chatting. Tr. 81. However, I also determine that *Miranda* warnings were not needed because Mr. Eastman was not subjected to custodial interrogation at that time.

"The test for determining custody is an objective inquiry that asks (1) 'whether a reasonable person would have thought he was free to leave the police encounter at issue' and (2) whether 'a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest.'" *United States v. Faux*, —F.3d—, No. 15-1282-CR, 2016 WL 3648331, at *4 (2d Cir. July 8, 2016) (quoting *United States v. Newton*, 369 F.3d 659, 672 (2d Cir. 2004)). "Relevant considerations include: (1) 'the interrogation's duration'; (2) 'its location (*e.g.*, at the suspect's home, in public, in a police station, or at the border)'; (3) 'whether the suspect

23

A-558

volunteered for the interview'; (4) 'whether the officers used restraints'; (5) 'whether weapons were present and especially whether they were drawn'; and (6) 'whether officers told the suspect he was free to leave or under suspicion.'" *Id.* (quoting *United States v. FNU LNU*, 653 F.3d 144, 153 (2d Cir. 2011)).

Here, the questioning was relatively brief. The detectives arrived around 6:00 p.m. and had been questioning the defendant for less than an hour when he admitted to using the Harry Styles username. *See* Tr. 32–35, 71, 81–82 (showing that officers arrived around 6:00 p.m., that the defendant made incriminating admission at his apartment, and that the defendant was later Mirandized at the police station around 6:55 p.m.). This factor weighs in favor of finding that Mr. Eastman was not in custody.

The location of the interview was Mr. Eastman's home. "The home is 'the most constitutionally protected place on earth'; thus, the right to terminate the interrogation and be 'free to leave' is 'hollow' if the one place that the individual cannot retreat to, or exclude law enforcement from, is her home." *Faux*, 2016 WL 3648331, at *4. However, "courts rarely conclude, absent a formal arrest, that a suspect questioned in her own home is 'in custody.'" *Id.* (collecting cases). Although there was some evidence that Mr. Eastman was not the lessee of his apartment, and thus may have felt less able to exclude the officers from the apartment, he had been living there for some time. A reasonable person who lived in an apartment, even though not a leaseholder, would think that he was able to to terminate the police encounter in this context by telling the officers to leave. *See United States v. Mitchell*, 966 F.2d 92, 98–99 (2d Cir. 1992) (suspect who "welcomed" government agents into his home, who "was cooperative," and who "willingly divulged information" was not in custody when agent "engaged in no speech or actions

24

A-559

which reasonably could be taken as intimidating, coercive, or restricting" of the suspect's freedom").

The next factor, whether the suspect volunteered for the interview, weighs in favor of finding that Mr. Eastman was not in custody. Although he did not approach the police, Mr. Eastman responded affirmatively when asked whether the police could enter his apartment to speak with him. His voluntary statement also confirms that he "wanted to fully cooperate" with the investigation. (ECF No. 46-1 at 16.)

The fourth factor also weighs in favor of finding that Mr. Eastman was not in custody because, as discussed above, I find that the officers did not use any restraints or otherwise restrict Mr. Eastman's movement while at Mr. Eastman's home.

The fifth factor, by contrast, weighs in favor of finding that Mr. Eastman was in custody because the officers were visibly armed. However, this factor is only slightly in Mr. Eastman's favor and does not outweigh the other factors because there is no evidence that the weapons were ever drawn or that the detectives otherwise made a show of force. *See Faux*, 2016 WL 3648331, at *4 ("whether weapons were present and *especially whether they were drawn*") (emphasis added) (quoting *FNU LNU*, 653 F.3d at 153).

Finally, the sixth factor is neutral as to whether Mr. Eastman was in custody. It would have been clear to a reasonable person in Mr. Eastman's position, based on the nature and subject of the detectives' questioning, that he was "under suspicion" and Mr. Eastman was not explicitly told that he was free to leave. *Id.* However, Mr. Eastman was also informed that he was not under arrest and was not told that he had to continue to cooperate with the investigation, which a reasonable person would understand to mean that he was "free to leave the police encounter at issue." *Id.*; Tr. 130.

25

A-560

As discussed above, given the circumstances concerning the questioning in Mr. Eastman's apartment, I find that a reasonable person would have understood that he or she was not in custody. Accordingly, the failure to give *Miranda* warnings at the apartment does not merit the suppression of evidence.

Finally, as discussed above, the evidence at the hearing showed that the defendant knowingly and voluntarily signed two waivers of his *Miranda* rights at the police station before voluntarily signing the written confession.

**V.      Conclusion**

For the reasons discussed above, the Motion to Suppress (ECF No. 30) is DENIED.

IT IS SO ORDERED.

_____/s/_____
Michael P. Shea, U.S.D.J.


Dated:          Hartford, Connecticut
                August 15, 2016

26

A-561



**U.S. Department of Justice**

*United States Attorney*
*District of Connecticut*

*Connecticut Financial Center*        *(203)821-3700*
*157 Church Street, 25th Floor*        *Fax (203) 773-5376*
*New Haven, Connecticut 06510*        *www.justice.gov/usao/ct*

March 2, 2017

Moira L. Buckley, Esq.
The Law Office of Moira Buckley, LLC
879 Main Street, 2nd Floor
Glastonbury, Connecticut 06073

> Re:   **United States v. John Eastman**
>        **Criminal No. 3:16-cr-006 (MPS)**

Dear Attorney Buckley:

This letter confirms the plea agreement between your client, John Eastman (the "defendant"), and the United States Attorney's Office for the District of Connecticut (the "Government" or "this Office") concerning the referenced criminal matter.

**THE PLEA AND OFFENSE**

The defendant agrees to plead guilty to Count One of the Indictment charging him with use of an interstate facility to persuade a minor to engage in unlawful sexual activity, in violation of 18 U.S.C. § 2422(b). However, pursuant to Fed. R. Crim. P. 11(a)(2), the defendant expressly reserves his right to appeal the district court's August 15, 2016 Ruling (Docket No. 72), which denied his motion to suppress all physical evidence seized from his apartment as well as certain statements he allegedly made to law enforcement officers. Should the defendant prevail on his appeal of the district court's Ruling, the Government will not object to the defendant's motion to withdraw his guilty plea on remand.

The defendant understands that to be guilty of this offense, the following essential elements of the offense must be satisfied:

1. The defendant knowingly used a facility or means of interstate or foreign commerce to persuade, induce, entice or coerce an individual under the age of eighteen (18) to engage in sexual activity;

2. The defendant believed that such individual was less than eighteen (18) years of age; and

Moira L. Buckley, Esq.
Page 2 of 13

3. The defendant could have been charged with a criminal offense based on such sexual activity.

**THE PENALTIES**

This offense carries a maximum penalty of life imprisonment and a $250,000 fine, and a mandatory minimum penalty of ten (10) years imprisonment. Moreover, any sentence of incarceration under this provision must also include a term of supervised release of at least five (5) years and as much as life. 18 U.S.C. § 3583(k). Further, the defendant understands that by pleading guilty, he will be required to register as a sex offender upon his release from prison as a condition of supervised release pursuant to 18 U.S.C. § 3583(d). The defendant understands that should he violate any condition of supervised release during its term, he may be required to serve a further term of imprisonment of up to five (5) years with no credit for the time already spent on supervised release. However, if the defendant is required to register under the Sex Offender Registration and Notification Act, and violates a condition of supervised release by committing any felony offense in chapters 109A, 110, 117, or sections 1201 or 1591 of Title 18, United States Code, then the defendant shall be required to serve a term of not less than five (5) years of imprisonment. 18 U.S.C. § 3583(k).

The defendant also is subject to the alternative fine provision of 18 U.S.C. § 3571. Under this section, the maximum fine that may be imposed on the defendant is the greatest of the following amounts: (1) twice the gross gain to the defendant resulting from the offense; (2) twice the gross loss resulting from the offense; or (3) $250,000.

In addition, the defendant is obligated by 18 U.S.C. § 3013 to pay a special assessment of $100 on the count of conviction. The defendant agrees to pay the special assessment on or before the date of sentencing unless he establishes an inability to pay on or before the date of sentencing through the financial disclosure to the Probation Office as part of the presentence investigation and report, in which case the defendant agrees to pay it as soon as practicable.

The defendant is also subject to restitution, as discussed below. Unless otherwise ordered, should the Court impose a fine or restitution of more than $2,500 as part of the sentence, interest will be charged on the unpaid balance of the fine or restitution not paid within 15 days after the judgment date. 18 U.S.C. § 3612(f). Other penalties and fines may be assessed on the unpaid balance of a fine or restitution pursuant to 18 U.S.C. § 3572 (h), (i) and § 3612(g).

Finally, in addition to the standard conditions of any supervised release, the defendant does not object to certain additional conditions, as set forth in the attached Rider: Additional Conditions of Supervised Release.

*Moira L. Buckley, Esq.*
*Page 3 of 13*

<u>Restitution</u>

In addition to the other penalties provided by law, the Court must also order that the defendant make restitution under 18 U.S.C. § 3663A, and the Government reserves its right to seek restitution on behalf of victims consistent with the provisions of § 3663A. The scope and effect of the order of restitution are set forth in the attached Rider Concerning Restitution. The parties reserve their respective rights to address the Court on the amount of restitution that should be ordered. Restitution is payable immediately unless otherwise ordered by the Court.

<u>Forfeiture</u>

Pursuant to 18 U.S.C. § 2428(a), the defendant agrees to forfeit any interest he may have in the following property:

an HP Pavilion desktop computer, bearing serial number 3CR22116SQ, containing a 500 gigabyte Hitachi computer hard drive, bearing serial number JP1572FL0375ZK (hereinafter, the "HP Computer").

The defendant acknowledges that the HP Computer is subject to forfeiture as property used to commit or to promote the commission of illegal conduct giving rise to forfeiture.

The defendant agrees to waive all of his interests in the HP Computer in any administrative or judicial forfeiture proceeding, whether criminal or civil, state or federal. The defendant agrees to consent to the entry of an order of forfeiture for the HP Computer and waives the requirements of Federal Rules of Criminal Procedure 32.2 and 43(a) regarding notice of the forfeiture in the charging instrument, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment. The defendant acknowledges that he understands that the forfeiture of assets is part of the sentence that may be imposed in these cases and waives any failure by the Court to advise him of this, pursuant to Federal Rule of Criminal Procedure 11(b)(1)(J), at the time his guilty plea is accepted.

The defendant agrees to hold the United States, its agents and employees harmless from any claim whatsoever in connection with the forfeiture of the HP Computer covered by this agreement. The defendant further agrees to waive all constitutional and statutory challenges in any manner (including direct appeal, habeas corpus, or any other means) to any forfeiture carried out in accordance with this plea agreement on any grounds, including that the forfeiture constitutes an excessive fine or punishment.

The defendant understands and agrees that by virtue of his plea of guilty he waives any rights or cause of action to claim that he is a "substantially prevailing party" for the purpose of recovery of attorney fees and other litigation costs in any related forfeiture proceeding pursuant to 28 U.S.C. § 2465(b)(1).

*Moira L. Buckley, Esq.*
*Page 4 of 13*

## THE SENTENCING GUIDELINES

Applicability

The defendant understands that the Court is required to consider any applicable Sentencing Guidelines as well as other factors enumerated in 18 U.S.C. § 3553(a) to tailor an appropriate sentence in this case and is not bound by this plea agreement. The defendant agrees that the Sentencing Guideline determinations will be made by the Court, by a preponderance of the evidence, based upon input from the defendant, the Government, and the United States Probation Office. The defendant further understands that he has no right to withdraw his guilty plea if his sentence or the Guideline application is other than he anticipated, including if the sentence is outside any of the ranges set forth in this agreement.

Acceptance of Responsibility

At this time, the Government agrees to recommend that the Court reduce by two levels the defendant's adjusted offense level under § 3E1.1(a) of the Sentencing Guidelines, based on the defendant's prompt recognition and affirmative acceptance of personal responsibility for the offense. Moreover, should the defendant qualify for a decrease under § 3E1.1(a) and his offense level determined prior to the operation of subsection (a) is level 16 or greater, the Government will file a motion with the Court pursuant to § 3E1.1(b) which recommends that the Court reduce the defendant's Adjusted Offense Level by one additional level based on his prompt notification of his intention to enter a plea of guilty. The defendant understands that the Court is not obligated to accept the Government's recommendations on the reductions.

The above-listed recommendations are conditioned upon the defendant's affirmative demonstration of acceptance of responsibility, by (1) truthfully admitting the conduct comprising the offense(s) of conviction and truthfully admitting or not falsely denying any additional relevant conduct for which the defendant is accountable under § 1B1.3 of the Sentencing Guidelines, and (2) truthfully disclosing to the United States Attorney's Office and the United States Probation Office personal information requested, including the submission of a complete and truthful financial statement detailing the defendant's financial condition.

In addition, the Government expressly reserves the right to seek denial of the adjustment for acceptance of responsibility if the defendant engages in any acts, unknown to the Government at the time of the signing of this agreement, which (1) indicate that the defendant has not terminated or withdrawn from criminal conduct or associations (§ 3E1.1 of the Sentencing Guidelines); (2) could provide a basis for an adjustment for obstructing or impeding the administration of justice (§ 3C1.1 of the Sentencing Guidelines); or (3) constitute a violation of any condition of release. Moreover, the Government reserves the right to seek denial of the adjustment for acceptance of responsibility if the defendant seeks to withdraw his guilty plea or takes a position at sentencing, or otherwise, which, in the Government's assessment, is inconsistent with affirmative acceptance of personal responsibility. The defendant understands that he may not withdraw his plea of guilty if, for the reasons explained above, the Government does not make one or both of the recommendations or seeks denial of the adjustment for acceptance of responsibility.

Moira L. Buckley, Esq.
Page 5 of 13

### Stipulation of Offense Conduct

Pursuant to § 6B1.4 of the Sentencing Guidelines, the defendant and the Government have entered into the attached stipulation on page 10, which is a part of this plea agreement. The defendant understands that this stipulation does not set forth all of the relevant conduct and characteristics that may be considered by the Court for purposes of sentencing. The defendant understands that this stipulation is not binding on the Court. The defendant also understands that the Government and the United States Probation Office are obligated to advise the Court of any additional relevant facts that subsequently come to their attention.

### Guidelines Stipulation

The parties agree that the Guidelines Manual in effect on the date of sentencing is used to determine the applicable Guidelines range.

The parties disagree about the Guidelines calculation and the Guidelines range. The parties also disagree about the defendant's Criminal History Category.

The Government and the defendant reserve their rights to seek a departure or a non-Guidelines sentence, and both sides reserve their right to object to a departure or a non-Guidelines sentence. However, the Government agrees not to seek a sentence above 240 months. The defendant agrees that he is subject to a mandatory minimum term of imprisonment of 120 months, and therefore, he may not argue for a sentence below 120 months of imprisonment.

The defendant expressly understands that the Court is not bound by this agreement on the ranges specified above. The defendant further understands that he will not be permitted to withdraw the plea of guilty if the Court imposes a sentence outside any of the ranges set forth in this agreement.

In the event the United States Probation Office or the Court contemplates any sentencing calculations different from those stipulated by the parties, the parties reserve the right to respond to any inquiries and make appropriate legal arguments regarding the proposed alternate calculations. Moreover, the parties reserve the right to defend any sentencing determination, even if it differs from that stipulated by the parties, in any post-sentencing proceeding.

### Appeal Rights Regarding Sentencing

The parties reserve their respective rights to appeal and to oppose each other's appeal of the sentence imposed as permitted by 18 U.S.C. § 3742.

*Moira L. Buckley, Esq.*
*Page 6 of 13*

### Information to the Court

The Government reserves its right to address the Court with respect to an appropriate sentence to be imposed in this case. Moreover, the Government will discuss the facts of this case, including information regarding the defendant's background and character, 18 U.S.C. § 3661, with the United States Probation Office and will provide the Probation Officer with access to material in its file, with the exception of grand jury material.

## WAIVER OF RIGHTS

### Waiver of Trial Rights and Consequences of Guilty Plea

The defendant understands that he has the right to be represented by an attorney at every stage of the proceeding and, if necessary, one will be appointed to represent him.

The defendant understands that he has the right to plead not guilty or to persist in that plea if it has already been made, the right to a public trial, the right to be tried by a jury with the assistance of counsel, the right to confront and cross-examine the witnesses against him, the right not to be compelled to incriminate himself, the right to testify and present evidence, and the right to compel the attendance of witnesses to testify in his defense. The defendant understands that by pleading guilty he waives those rights and that, if the plea of guilty is accepted by the Court, there will not be a further trial of any kind.

The defendant understands that, if he pleads guilty, the Court may ask him questions about each offense to which he pleads guilty, and if he answers those questions falsely under oath, on the record, and in the presence of counsel, his answers may later be used against him in a prosecution for perjury or making false statements.

### Waiver of Statute of Limitations

The defendant agrees that, should the conviction following defendant's guilty plea be vacated for any reason, then any prosecution that is not time-barred by the applicable statute of limitations on the date of the signing of this plea agreement (including any indictment or counts the Government has agreed to dismiss at sentencing pursuant to this plea agreement) may be commenced or reinstated against the defendant, notwithstanding the expiration of the statute of limitations between the signing of this plea agreement and the commencement or reinstatement of such prosecution. The defendant agrees to waive all defenses based on the statute of limitations with respect to any prosecution that is not time-barred on the date the plea agreement is signed.

*Moira L. Buckley, Esq.*
*Page 7 of 13*

## ACKNOWLEDGMENT OF GUILT AND VOLUNTARINESS OF PLEA

The defendant acknowledges that he is entering into this agreement and is pleading guilty freely and voluntarily because he is guilty. The defendant further acknowledges that he is entering into this agreement without reliance upon any discussions between the Government and him (other than those described in the plea agreement letter), without promise of benefit of any kind (other than the concessions contained in the plea agreement letter), and without threats, force, intimidation, or coercion of any kind. The defendant further acknowledges his understanding of the nature of the offense to which he is pleading guilty, including the penalties provided by law. The defendant also acknowledges his complete satisfaction with the representation and advice received from his undersigned attorney. The defendant and his undersigned counsel are unaware of any conflict of interest concerning counsel's representation of the defendant in the case.

The defendant acknowledges that he is not a "prevailing party" within the meaning of Public Law 105-119, section 617 ("the Hyde Amendment") with respect to the count of conviction or any other count or charge that may be dismissed pursuant to this agreement. The defendant voluntarily, knowingly, and intelligently waives any rights he may have to seek attorney's fees and other litigation expenses under the Hyde Amendment.

## SCOPE OF THE AGREEMENT

The defendant acknowledges that this agreement is limited to the undersigned parties and cannot bind any other federal authority, or any state or local authority. The defendant acknowledges that no representations have been made to him with respect to any civil or administrative consequences that may result from this plea of guilty because such matters are solely within the province and discretion of the specific administrative or governmental entity involved. Finally, the defendant acknowledges that this agreement has been reached without regard to any civil tax matters that may be pending or which may arise involving him.

## COLLATERAL CONSEQUENCES

The defendant understands that he will be adjudicated guilty of each offense to which he has pleaded guilty and will be deprived of certain rights, such as the right to hold public office, to serve on a jury, to possess firearms and ammunition, and in some states, the right to vote. Further, the defendant understands that if he is not a citizen of the United States, a plea of guilty may result in removal from the United States, denial of citizenship, and denial of admission to the United States in the future. The defendant understands that pursuant to section 203(b) of the Justice For All Act, the Federal Bureau of Prisons or the United States Probation Office will collect a DNA sample from the defendant for analysis and indexing. Finally, the defendant understands that the Government reserves the right to notify any state or federal agency by which he is licensed, or with which he does business, as well as any current or future employer of the fact of his conviction.

*Moira L. Buckley, Esq.*
*Page 8 of 13*

## SEX OFFENDER REGISTRATION

The defendant acknowledges that he has been advised and understands that he will be subject to federal and state sex offender registration requirements, and that those requirements may apply throughout his life. The defendant understands that pursuant to these requirements, he must register and keep the registration current in each of the following jurisdictions: where he resides; where he is an employee; and where he is a student.  He understands that the requirements for registration include providing his name, his residence address, and the names and addresses of any places where he is or will be an employee or a student, among other information.  He further understands that the requirement to keep the registration current includes informing at least one jurisdiction in which he resides, is an employee, or is a student not later than three business days after any change of his name, residence, employment, or student status.  The defendant has been advised, and understands, that he will be subject to possible federal and state penalties for failure to comply with such sex offender notification requirements, including prosecution for failure to register under federal law, 18 U.S.C. § 2250, which is punishable by a fine or imprisonment, or both.  If he resides in Connecticut following release from prison, he will be subject to the registration requirements of Conn. Gen. Stat. § 54-251. The defendant further understands that, under 18 U.S.C. § 4042(c), notice will be provided to certain law enforcement agencies upon his release from confinement following conviction.

As a condition of supervised release, the defendant shall initially register with the state sex offender registration in Connecticut, and shall also register with the state sex offender registration agency in any state where the defendant resides, is employed, works, or is a student, as directed by the Probation Officer. The defendant shall comply with all requirements of federal and state sex offender registration laws, including the requirement to update his registration information. The defendant shall provide proof of registration to the Probation Officer within 72 hours of release from imprisonment.

## SATISFACTION OF FEDERAL CRIMINAL LIABILITY; BREACH

The defendant's guilty plea, if accepted by the Court, will satisfy the federal criminal liability of the defendant in the District of Connecticut as a result of his participation in the criminal conduct which forms the basis of the Indictment in this case.  After sentencing, the Government will move to dismiss Count Two of the Indictment because the conduct underlying the dismissed count will have been taken into account in determining the appropriate sentence.

The defendant understands that if, before sentencing, he violates any term or condition of this agreement, engages in any criminal activity, or fails to appear for sentencing, the Government may void all or part of this agreement.  If the agreement is voided in whole or in part, defendant will not be permitted to withdraw his plea of guilty.

*Moira L. Buckley, Esq.*
*Page 9 of 13*

**NO OTHER PROMISES**

The defendant acknowledges that no other promises, agreements, or conditions have been entered into other than those set forth in this plea agreement, and none will be entered into unless set forth in writing, signed by all the parties.

This letter shall be presented to the Court, in open court, and filed in this case.

Very truly yours,

DEIRDRE M. DALY
UNITED STATES ATTORNEY

NEERAJ N. PATEL
ASSISTANT UNITED STATES ATTORNEY

The defendant certifies that he has read this plea agreement letter and its attachment(s) or has had it read or translated to him, that he has had ample time to discuss this agreement and its attachment(s) with counsel and that he fully understands and accepts its terms.

JOHN EASTMAN                          3/2/17
The Defendant                         Date

I have thoroughly read, reviewed and explained this plea agreement and its attachment(s) to my client who advises me that he understands and accepts its terms.

MOIRA L. BUCKLEY, ESQ.                3/2/17
Attorney for the Defendant           Date

*Moira L. Buckley, Esq.*
*Page 10 of 13*

### STIPULATION OF OFFENSE CONDUCT

The defendant, John Eastman ("Mr. Eastman"), and the Government stipulate and agree to the following offense conduct that gives rise to the defendant's agreement to plead guilty to Count One of the Indictment:

On approximately November 6, 2012, Mr. Eastman used Skype, which was installed on the HP Computer (as defined on page 3) in his bedroom, to communicate with a 16-year old female in Washington.  Mr. Eastman was in Connecticut at the time.  Mr. Eastman communicated with her using the Skype screenname justin.bieber727.  The female's webcam was turned on and Mr. Eastman could see her.  During the conversation, Mr. Eastman asked the female to pull her underwear down and pose in a lascivious manner so that Mr. Eastman could see her exposed genitals.  The female complied, and Mr. Eastman used a function on Skype to save on the computer a still image of the female lasciviously displaying her exposed genitals.

Based on this conduct, Mr. Eastman could have been charged with other criminal offenses, including the offense of using, persuading, inducing, enticing, or coercing a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct, in violation of 18 U.S.C. § 2251(a).

The written stipulation above is incorporated into the preceding plea agreement.  The defendant and the Government reserve their right to present additional relevant offense conduct to the attention of the Court in connection with sentencing.


JOHN EASTMAN
The Defendant

NEERAJ N. PATEL
ASSISTANT UNITED STATES ATTORNEY


MOIRA L. BUCKLEY, ESQ.
Attorney for the Defendant

Moira L. Buckley, Esq.
Page 12 of 13

## RIDER: ADDITIONAL CONDITIONS OF SUPERVISED RELEASE

1.   The defendant shall comply with the requirements of the Sex Offender Registration and Notification Act (42 U.S.C. § 16901, et seq.) as directed by the Probation Office, the Bureau of Prisons, or any state sex offender registration agency, in which he resides, works, is a student, or was convicted of a qualifying offense.

2.   The defendant shall participate in mental health treatment, with an emphasis on sexual offender treatment, as approved by the United States Probation Office, and shall abide by the policies and procedures of the program, which may include polygraph testing. The defendant shall pay all or a portion of the costs associated with treatment based upon the defendant's ability to pay as determined by the Probation Office and as approved by the Court.

3.   The defendant shall be required to submit to periodic polygraph testing at the discretion of the Probation Office as a means to ensure that the defendant is in compliance with the requirements of their supervision following the completion of a sex offender treatment program. The defendant shall pay all or a portion of the costs associated with testing based upon the defendant's ability to pay as determined by the Probation Office and as approved by the Court.

4.   As directed by the Probation Office, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics, and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirements.

5.   The defendant shall not possess any materials including pictures, photographs, books, writings, drawings, videos or video games depicting what are described as child pornography as defined in 18 U.S.C. § 2256(A), or otherwise contrary to the anti-pornography laws of the United States.

6.   The defendant shall not associate with children under the age of 18 except in the presence of a responsible adult who is aware of the nature of the defendant's background and current offense and who has been approved by the Probation Office.

7.   The defendant shall provide the Probation Office with access to any requested financial records, including but not limited to, telephone/cellular phone bills and credit card statements.

8.   The defendant shall not loiter around playgrounds, schools, youth oriented organizations/clubs or other any place where children under the age of 18 are known to congregate. The defendant shall not associate with or have contact with convicted sex offenders or those considered inappropriate by the Probation Office because of a connection to sexual abuse of minors or sexually explicit materials involving minors, unless as part of an approved counseling program.

9.   The defendant shall not be employed in any position or participate as a volunteer in any activity that involves contact with children under the age of 18, except as approved by the probation officer.

A-572

*Moira L. Buckley, Esq.*
*Page 13 of 13*

10. The defendant shall submit all photographic equipment, personal computers, media storage devices, or other Internet capable devices and related equipment, owned, controlled or used by them to a compliance review conducted by the U.S. Probation Office or its designee at a reasonable time and reasonable manner without prior notice or search warrant. The defendant will also permit the Probation Office to install and use monitoring programs on all such equipment, and will allow the U.S. Probation Office to use such equipment as is necessary to determine the presence of an internet/Wi-Fi connection. The defendant shall pay all or a portion of the costs associated with such equipment based upon the defendant's ability to pay, as determined by the Probation Office.

11. The defendant shall submit their person, residence, office, vehicle, all photographic equipment, personal computers, media storage devices, or other Internet capable devices and related equipment, owned, controlled or used by the defendant, to a search, conducted by a United States Probation Officer, at a reasonable time and in a reasonable manner, based upon reasonable suspicion of contraband or evidence of a violation of a condition of release; failure to submit to a search may be grounds for revocation; the defendant shall warn any other residents that the premises may be subject to searches pursuant to this condition.

12. The defendant shall not download, install, or utilize any application, software, or hardware that will prevent the U.S. Probation Office from monitoring the defendant's computer activity. This includes, but is not limited to, encryption, anonymity, or invisible mode software or devices, or dark web Internet browsers.

1

```
1    UNITED STATES DISTRICT COURT

2    DISTRICT OF CONNECTICUT

3
     UNITED STATES OF AMERICA,  )
4                   Plaintiff,  )          NO: 3:16CR6(MPS)
                                )
5    vs.                        )
                                )          March 2, 2017
6    JOHN EASTMAN,              )
                   Defendant.   )          Plea
7    _____

8
                           450 Main Street
9                       Hartford, Connecticut

10   B E F O R E:
             THE HONORABLE MICHAEL P. SHEA, U.S.D.J.
11

12   A P P E A R A N C E S:

13   For the Plaintiff :        NEERAJ N. PATEL, AUSA
                                United States Attorney's Office
14                              157 Church Street, 25th Floor
                                New Haven, CT 06510
15
     For the Defendant:         MOIRA LYNN BUCKLEY, ESQUIRE
16                              Law Offices of Moira Buckley, LLC
                                P.O. Box 424
17                              Marlborough, CT 06447

18

19

20

21

22

23
     Court Reporter:            Martha C. Marshall, RMR, CRR
24

25   Proceedings recorded by mechanical stenography, transcript
     produced by computer.
```

2

1          THE COURT:  Good afternoon.  Please be seated.

2          We're here in United States versus John Eastman.

3  The case is 16CR6.  Let's have appearances, starting with the

4  Government, please.

5          MR. PATEL:  Thank you, Your Honor.

6          Your Honor, Neeraj Patel on behalf of the United

7  States.  And with me at counsel table is Special Agent

8  Allison Himalelle (ph) with the Homeland Security

9  Investigation.

10          MS. BUCKLEY:  Good afternoon, Your Honor.  Moira

11  Buckley representing John Eastman who is with me at counsel

12  table.

13          THE COURT:  Good afternoon.

14          I understand we're here, Attorney Buckley, because

15  Mr. Eastman has decided to change his plea and to plead

16  guilty to Count One of the Indictment which charges him with

17  use of an interstate facility to entice a minor to engage in

18  sexual activity, in violation of Title 18, United States

19  Code, Section 2422(b), is that right?

20          MS. BUCKLEY:  It is, Your Honor.

21          THE COURT:  Mr. Eastman, the first thing I want to

22  tell you today -- that's all right.  You can be seated, sir.

23  I'll let you know when you need to stand.

24          The first thing I want to tell you is to take your

25  time.  The decisions you have to make today are important and

3

1    it's important that you completely understand what's going on

2    in the courtroom and what you're doing before you make those

3    decisions.  If you have any problems or questions during this

4    proceeding at any time, please let me know or, if you need

5    time to speak privately with your lawyer, Attorney Buckley,

6    please let me know that and I will give you all the time that

7    you need.

8              Do you understand?

9              THE DEFENDANT:  Yes, sir.

10             THE COURT:  Now, before I can accept your guilty

11   plea, there are questions that I have to ask you while you

12   are under oath to make sure the plea is valid.  If you don't

13   understand one of my questions, please let me know that and I

14   will rephrase it.

15             At this I am going to ask you to stand and raise

16   your right hand so that the Clerk can place you under oath.

17                  J O H N   E A S T M A N,

18   the Defendant, having been duly sworn by the Clerk, was

19   examined and testified on his oath as follows:

20             THE COURT:  You can be seated.

21             Mr. Eastman, do you understand that now that you've

22   been sworn, if you do not answer truthfully your answers to

23   my questions can be used against you in a prosecution for

24   perjury or for making a false statement?

25             THE DEFENDANT:  Yes, sir.  Yes, Your Honor.

A-576

4

1          THE COURT:  To begin with, Mr. Eastman, I'm going to

2     get some background information about you.  What is your full

3     name?

4          THE DEFENDANT:  John Timothy Eastman.

5          THE COURT:  Have you ever used any other names, any

6     nicknames, any street names, any alias, anything like that?

7          THE DEFENDANT:  No.

8          THE COURT:  Are you a citizen of the United States?

9          THE DEFENDANT:  Yes, Your Honor.

10          THE COURT:  How old are you?

11          THE DEFENDANT:  I'm 49.

12          THE COURT:  And how far did you go in school?

13          THE DEFENDANT:  10th grade.

14          THE COURT:  And have you had any trouble

15     communicating with your lawyer for any reason?

16          THE DEFENDANT:  No.

17          THE COURT:  Are you now or have you recently been

18     under the care of a doctor?

19          THE DEFENDANT:  No.

20          THE COURT:  And are you now or have you recently

21     been under the care of a psychiatrist, a psychologist, or

22     mental health worker?

23          THE DEFENDANT:  No, Your Honor.

24          THE COURT:  During the past 48 hours, have you taken

25     any narcotic drugs, any medicine or any pills?

5

 1          THE DEFENDANT:  No.

 2          THE COURT:  And during that period, have you drunk

 3     any alcoholic beverages?

 4          THE DEFENDANT:  No.

 5          THE COURT:  Have you ever been hospitalized or

 6     treated on an out-patient basis for narcotics addiction or

 7     other substance abuse, including alcohol?

 8          THE DEFENDANT:  Yes, I've been in treatment.

 9          THE COURT:  When?

10          THE DEFENDANT:  A few times.

11          THE COURT:  When was the most recent time, how many

12     years ago?

13          THE DEFENDANT:  The most recent was 1999.

14          THE COURT:  Okay.  As you sit here today, is your

15     mind clear?

16          THE DEFENDANT:  Yes.

17          THE COURT:  And do you understand what's going on so

18     far?

19          THE DEFENDANT:  Yes.

20          THE COURT:  And will you let me know if at some

21     point you don't know what's going on?

22          THE DEFENDANT:  Yes, Your Honor.

23          THE COURT:  Attorney Buckley, have you had any

24     difficulty communicating with your client?

25          MS. BUCKLEY:  Not at all, your Honor.

6

1          THE COURT:  Do you believe he understands the rights

2     he'll be give up by pleading guilty today?

3          MS. BUCKLEY:  Yes, Your Honor.

4          THE COURT:  Do you have any doubt as to his

5     competence to plead guilty today?

6          MS. BUCKLEY:  No, your Honor.

7          THE COURT:  We spoke on the phone the other day just

8     to schedule this hearing.  I don't know whether you were able

9     to meet with your client ahead of time.

10          MS. BUCKLEY:  I was able to meet with him yesterday,

11     and then I saw him again briefly this morning -- not this

12     morning, this afternoon.  But I was able to meet with him

13     down in Bridgeport yesterday.

14          THE COURT:  Very well.  Thank you.

15          Mr. Eastman, from your perspective, have you had

16     enough opportunity and enough information to discuss the case

17     with your lawyer?

18          THE DEFENDANT:  Yes.

19          THE COURT:  And are you satisfied to have her

20     represent you in this proceeding?

21          THE DEFENDANT:  Yes, I'm satisfied.

22          THE COURT:   Is there any way in which you're not

23     fully satisfied with her advice and representation?

24          THE DEFENDANT:  No.

25          THE COURT:   Attorney Buckley, from your

1   perspective, have you had enough time and information to

2   allow for meaningful discussion with the Defendant about the

3   case?

4           MS. BUCKLEY:  Yes, Your Honor.

5           THE COURT:  Mr. Eastman, did you receive a copy of

6   the Indictment in this case?

7           THE DEFENDANT:  Yes.

8           THE COURT:  And you've read it?

9           THE DEFENDANT:  Yes.

10          THE COURT:  And you've had -- have you had a chance

11  to consult with your lawyer about the charges?

12          THE DEFENDANT:  Yes, sir.

13          THE COURT:  I'm sorry?

14          THE DEFENDANT:  Yes, Your Honor.

15          THE COURT:  Do you understand the charges against

16  you?

17          THE DEFENDANT:  Yes.

18          THE COURT:  I now want to talk to you about the

19  rights you'll be giving up if you plead guilty.  The most

20  important thing I want you to understand is that in our

21  system of justice, you don't have to plead guilty even if you

22  are guilty.  By law, the Government has the burden of proving

23  the guilt of a defendant beyond a reasonable doubt.  If the

24  Government's not able to meet that burden, the jury has the

25  duty to find the Defendant not guilty even if he is guilty.

A-580

8

1    Do you understand that?

2            THE DEFENDANT:   Yes, Your Honor.

3            THE COURT:   Sometimes a jury will find a defendant

4    not guilty, even though the people sitting watching the trial

5    thought the Defendant was probably guilty.   What the jury was

6    saying in that type of a case is not necessarily that it

7    found that the Defendant was innocent but, instead, that it

8    found that the Government failed to meet its burden of

9    proving the guilt of the Defendant beyond a reasonable doubt.

10   Do you understand?

11           THE DEFENDANT:   Yes, Your Honor.

12           THE COURT:   So that's why I say that even if you're

13   guilty, you still have the right to continue in your case to

14   plead not guilty, which means you have a choice even today.

15   You can plead guilty, as you've indicated you wish to do, or

16   you can say to the Government prove it.   Meet your burden of

17   proving my guilt beyond a reasonable doubt.   And the way you

18   do that and make the Government go to trial on the

19   Government's case is you say "not guilty" when Ms. Johnson,

20   the Clerk of the Court, asks you how you plead in about 25

21   minutes from now.   Do you understand?

22           THE DEFENDANT:   Yes.

23           THE COURT:   Now, if you were to maintain your plea

24   of not guilty, under our Constitution and under federal law

25   you'd be entitled to a speedy public trial by jury with the

**A-581**

9

1    assistance of counsel both at the trial and at every stage of

2    the proceedings on the charge contained in the indictment.

3    Do you understand?

4            THE DEFENDANT:  Yes.

5            THE COURT:  Now, you're currently represented by

6    Attorney Buckley.  If in the future you were not and you

7    could not afford to hire counsel, I would appoint counsel to

8    represent you at no cost to you.  Do you understand?

9            THE DEFENDANT:  Yes.

10           THE COURT:  At trial, I would instruct the jury to

11   presume that you were innocent, and the Government would have

12   to overcome that presumption and prove you guilty by

13   competent evidence and beyond a reasonable doubt.  You would

14   not have to prove that you were innocent.  In fact, you would

15   not have to introduce any evidence at the trial.  If the

16   Government failed to meet its burden, the jury would have the

17   duty to find you not guilty.  Do you understand?

18           THE DEFENDANT:  Yes.

19           THE COURT:  During the trial, the witnesses for the

20   Government would have to come to court and testify in your

21   presence.  You would have the right to confront those

22   witnesses and your lawyer would have the right to

23   cross-examine them, to object to evidence offered by the

24   Government, to offer evidence on your behalf, and to use a

25   subpoena to compel the attendance of witnesses to testify at

A-582

10

1    the trial on your behalf.  Do you understand those rights?

2              THE DEFENDANT:  Yes, sir.

3              THE COURT:  At trial, while you would have the right

4    to testify if you wanted to testify, you could not be

5    required to testify.  Under our constitution, no one can

6    force you to take the witness stand at your trial and say

7    anything that could be used to show that you're guilty of the

8    crime with which you're charged.  If you decided not to

9    testify, I would instruct the jurors that you were exercising

10   your constitutional right and that they could not hold that

11   against you.  Do you understand?

12             THE DEFENDANT:  Yes.

13             THE COURT:  On the other hand, if you decide to

14   plead guilty, as you've indicated you wish to do, I'm going

15   to have to ask you questions about what it is that you did in

16   order to satisfy myself that you are, in fact, guilty, that

17   the facts support your guilt, because I'm not allowed to

18   accept your guilty plea unless I make that finding.  You'll

19   have to answer my questions and admit your guilt.  So you'll

20   be giving up the right that I described, that is, the right

21   not to say anything that will show you're guilty of the crime

22   with which you're charged.

23             If you plead guilty and I accept your plea as valid,

24   you'll be giving up your constitutional right to a trial and

25   the other rights that I discussed.  There will be no trial.

**A-583**

11

1          Do you understand?

2          THE DEFENDANT:    Yes.

3          THE COURT:  The offense to which you intend to plead

4     guilty is a felony.  If your plea's accepted, you'll be found

5     guilty of a felony.  That could deprive you of important

6     civil rights, such as the right to vote, the right to hold

7     public office, the right to serve on a jury, and the right to

8     possess firearms.  A felony conviction could also prevent you

9     from obtaining certain jobs and professional licenses.   In

10    this case, a felony conviction could also require you to

11    register as a sex offender and may also carry other

12    consequences as a result of the nature of this conviction.

13          You've told me you're a citizen and I believe you.

14    I'll still required to tell you that if you were not a

15    citizen you could be deported, denied citizenship, and denied

16    admission to this country in the future as a result of your

17    guilty plea.

18          Finally, your guilty plea today could work to your

19    disadvantage if in the future you were found guilty of

20    another crime because there's a possibility you could receive

21    a more severe penalty at that time as a result of this guilty

22    plea and conviction.  I'm not expecting that you're going to

23    commit a crime in the future, but I am required to tell every

24    defendant that.

25          All right.  Attorney Buckley, have you discussed

12

1    with Mr. Eastman the collateral consequences of pleading

2    guilty to this charge?

3            MS. BUCKLEY:  I have, Your Honor.

4            THE COURT:  Mr. Eastman, do you understand all of

5    the rights and all of the possible consequences of a guilty

6    plea that I have reviewed with you?

7            THE DEFENDANT:  Yes, Your Honor.

8            THE COURT:  Do you have any questions for me or

9    Attorney Buckley at this time?

10            THE DEFENDANT:  No, Your Honor.

11            THE COURT:  Are you willing to give up your right to

12    the trial and the other rights that I discussed?

13            THE DEFENDANT:  Yes, Your Honor.

14            THE COURT:  And you have the Plea Agreement there,

15    Attorney Buckley?

16            MS. BUCKLEY:  Yes, Your Honor.

17            THE COURT:  Mr. Eastman, have you had a chance to

18    read the Plea Agreement?

19            THE DEFENDANT:  Yes, Your Honor.

20            THE COURT:  Have you had a chance and enough

21    opportunity to discuss it with your lawyer?

22            THE DEFENDANT:  Yes.

23            THE COURT:  Do you understand the Plea Agreement?

24            THE DEFENDANT:  Yes.

25            THE COURT:  Attorney Buckley, are you confident that

A-585

13

1    to Mr. Eastman understands the terms of the Plea Agreement?

2             MS. BUCKLEY:  I am, Your Honor.

3             THE COURT:  And you've had a chance -- enough time

4    to review it with him?

5             MS. BUCKLEY:  I have, Your Honor.

6             THE COURT:  Mr. Eastman, if you're still ready and

7    willing to sign the Plea Agreement, you should do that now.

8             MR. PATEL:  Your Honor, the Plea Agreement has been

9    signed by both parties.

10            THE COURT:  All right.  If you could bring it

11   forward, please.

12            So, Mr. Eastman, in a moment I'm going to ask

13   Attorney Patel to summarize the terms of the Plea Agreement

14   and when he's done, I'm going to turn to you and ask you if

15   what he said accurately reflects your understanding of the

16   agreement.

17            Before we do that, I do just need to ask counsel.  I

18   did notice that the Plea Agreement amounts to an agreement to

19   have the Defendant make what's known as a conditional plea

20   under Rule 11(a)(2) of the Rules of Criminal Procedure,

21   something that both the Government and I have to agree to.

22   Obviously, the Government appears to have agreed because it's

23   in the Plea Agreement.  I take it that the rationale is that

24   the Defendant wants to reserve his right to appeal my ruling

25   on the Motion to Suppress that the Defendant filed and that,

14

1   in effect, the reason for doing it this way is the case

2   hinges on that ruling.  Is that a fair statement?

3           MR. PATEL:  Yes, Your Honor.

4           MS. BUCKLEY:  It is, Your Honor.

5           THE COURT:  So then I'm going to make a finding that

6   I will approve that, a plea under Rule 11(a)(2), because in

7   light of the fact that it would promote judicial economy to

8   do that.  If the ruling is upheld, well, then, the case and

9   the sentence will be final and, if it's not upheld, in

10  effect, as I understand it, there would be no case.  Is that

11  right, Mr. Patel?

12          MR. PATEL:  That is the Government's position.

13          THE COURT:  That's fine.  In that circumstance it

14  does make sense to save the Court and jurors the need for a

15  trial if it all hinges on that ruling.  So that's perfectly

16  fine.

17          In light of that, I'm going to ask Mr. Patel to

18  summarize the terms of the Plea Agreement and then we'll

19  proceed as I indicated.

20          MR. PATEL:  Thank you, Your Honor.

21          The plea is in the form of a 13 page letter

22  agreement dated today from the U.S. Attorney's Office

23  addressed to Attorney Buckley in which the Defendant agrees

24  to plead guilty to Count One of the Indictment, charging him

25  with using an interstate facility to persuade a minor to

1    engage in unlawful sexual activity, in violation of 18,

2    United States Code, Section 2422(b).

3           As Your Honor noted, it is a conditional plea in

4    which the Defendant reserves his right to appeal this Court's

5    August 15th, 2016 ruling denying his motion to suppress.  If

6    he appeals and prevails, the Government will not object to

7    the Defendant's motion to withdraw his guilty plea on a

8    remand.

9           The bottom of page one and the top of page two

10   contain the elements that must be satisfied to be found

11   guilty.

12          THE COURT:  We'll go over those later.

13          MR. PATEL:  Thank you.

14          Turning to page two, sets forth the maximum

15   penalties for the offense.  In this case, the Defendant faces

16   a maximum penalty of life in prison, a $250,000 fine, and a

17   mandatory minimum penalty of 10 years of imprisonment.  The

18   Court must also impose a term of supervised release of at

19   least five years and as much as life.

20          By pleading guilty, he'll be required to register as

21   a sex offender as a condition of supervised release.  If he

22   violates any condition of supervised release, he could be

23   required to serve a further term of imprisonment of up to

24   five years with no credit for time already spent on

25   supervised release.  If he violates a condition of supervised

1   release by committing certain enumerated offenses which are

2   basically other child exploitation or sex offenses, then he

3   will be required to serve a term of imprisonment of not less

4   than five years of imprisonment.

5        Under the alternative fine provisions of the United

6   States Code, the maximum fine that could be imposed is the

7   greatest of twice the gross gain or loss from the offense or

8   $250,000.  He's also obligated to pay a special assessment of

9   $100.  And he's also subject to restitution.

10       Finally, in addition to the standard conditions of

11  supervised release, the Defendant does not object to certain

12  additional conditions which are set forth on a rider that's

13  attached on pages 12 and 13.

14       Turning to page three, at the top.  The Defendant

15  understands that the Court must also order that the Defendant

16  make restitution, and the Government reserves its right to

17  seek restitution on behalf of the victims.  The scope and

18  effect of an order of restitution are set forth in a rider

19  that's attached on page 11.

20       Starting at the middle of page three, in the section

21  entitled Forfeiture.  The Defendant agrees to forfeit any

22  interest he has in a Hewlett Packard computer.  That's

23  further described on page three.

24       Turning to page four, at the top.  The Defendant

25  understands that in tailoring an appropriate sentence, the

A-589

17

```
1    Court is required to consider any applicable Sentencing

2    Guidelines as well as the factors in United States Code

3    3553(a), and that the Court is not bound by the Plea

4    Agreement.  The Defendant understands that any sentencing

5    determinations will be made by the Court based on the

6    preponderance of the evidence, based on input from the

7    Defendant, the Government, and the Probation Office.  And

8    that he has no right to withdraw his guilty plea if his

9    sentence or Guidelines application is other than he

10   anticipated.

11         In the middle of page four.  The Government agrees,

12   through a combination of recommendation and motion, to ask

13   the Court to reduce the Defendant's total offense level under

14   the Sentencing Guidelines by three levels based on his

15   acceptance of responsibility and his prompt notification of

16   intention to plead guilty.  Those recommendations are

17   conditioned upon the Defendant's demonstration of acceptance

18   of responsibility by truthfully admitting his offense conduct

19   and truthfully disclosing to the U.S. Attorney's Office and

20   the Probation Office any personal information that's

21   requested.

22         The Government reserves the right to seek denial of

23   the adjustment for acceptance of responsibility if he engages

24   in any acts unknown as of today which indicate that he has

25   not terminated or withdrawn from criminal conduct or which
```

18

1    could constitute obstructing or impeding the administration

2    of justice or constitute a violation of any release

3    condition.

4           The Government reserves the right to seek denial of

5    the adjustment if he seeks to withdraw his guilty plea or

6    takes a position at sentencing which, in the Government's

7    view, is inconsistent with acceptance of responsibility.  And

8    he understands that he may not withdraw his guilty plea if

9    for those reasons the Government does not make the

10   recommendations.

11          Turning to page five, at the top.  The

12   Government -- the parties have entered into a Stipulation of

13   Offense Conduct that's attached on page 10.  The Defendant

14   understands that this Stipulation does not set forth all of

15   the relevant conduct that the Court may consider and that the

16   Government and Probation Office are obligated to advise the

17   Court of any additional relevant facts.

18          In the middle of page five, there's a Guideline

19   Stipulation.  And in this case the parties disagree about the

20   Guidelines calculation and the Guidelines range and, also,

21   disagree about the Defendant's Criminal History Category.

22   The parties reserve their rights to seek a departure or

23   non-guidelines sentence, and both sides reserve their right

24   to object to a departure or a non-guidelines sentence.

25          The Government agrees not to seek a sentence above

1    240 months, and the Defendant agrees that he may not argue

2    for a sentence below 120 months of imprisonment, which is the

3    mandatory minimum.

4         The Defendant understands that the Court is not

5    bound by this agreement on the ranges, on the Guidelines

6    ranges or the ranges that were just discussed, and that he

7    will not be permitted to withdraw his guilty plea if the

8    Court imposes a sentence outside those any of those ranges.

9         At the bottom of page five.  The parties reserve

10   their rights to appeal the sentence.

11        Turning to page six.  In the middle there is a

12   section called Waiver of Trial Rights and Consequences of a

13   Guilty Plea which Your Honor has already discussed with the

14   Defendant which he indicated he understood.  The bottom of

15   page six, there's a section titled Waiver of Statute of

16   Limitations in which the Defendant understands that should

17   the conviction, following his guilty plea, be vacated for any

18   reason, then any prosecution that's not time-barred as of

19   today could be reinstated against the Defendant.

20        The top of page seven.  The Defendant acknowledges

21   that he is entering into this agreement and pleading guilty

22   freely and voluntarily because he's guilty, without promises

23   of any kind other than what's contained in Plea Agreement,

24   and without threats, force, intimidation or coercion of any

25   kind.

**A-592**

20

1          In the middle of page seven, the Defendant

2     acknowledges that this Plea Agreement is limited just to the

3     U.S. Attorney's Office for the District of Connecticut and

4     himself and does not bind any other federal, state, or local

5     authority.

6          The bottom of page seven describes the collateral

7     consequences that the Defendant will face as a result of his

8     conviction which Your Honor has already discussed with him.

9          Page eight.  The Defendant acknowledges that he will

10    be subject to federal and state sex offender registration

11    requirements and, that as a condition of his supervised

12    release, he will have to initially register with the State

13    Sex Offender Registration in Connecticut.

14         Bottom of page eight.  The parties agree that his

15    guilty plea, if accepted by the Court, will satisfy his

16    federal criminal liability in the District of Connecticut as

17    a result of his participation in the conduct which forms the

18    basis of the indictment, and that after sentencing the

19    Government will move to dismiss Count Two of the Indictment

20    because the conduct will have been taken into account in

21    determining an appropriate sentence.

22         Page nine contains spaces for the parties to sign

23    the agreement.

24         Page 10 contains a Stipulation of Offense Conduct

25    that was referred to earlier.

**A-593**

21

1          Page 11 contains the rider concerning restitution

2    that was referenced earlier.

3          And pages 12 and 13 contain the additional

4    conditions of supervised release that was mentioned earlier

5    which the Defendant does not object to.

6          THE COURT:  All right.  Thank you, Attorney Patel.

7          So, Mr. Eastman, does the summary provided by

8    Mr. Patel of the Plea Agreement reflect fully and accurately

9    your understanding of the agreement you've entered into with

10   the Government?

11         THE DEFENDANT:  Yes, sir.

12         THE COURT:  And other than the promises contained in

13   the written agreement, has anyone made any other promises or

14   statements to you that have caused you to plead guilty?

15         THE DEFENDANT:  No, sir.

16         THE COURT:  Has anyone made any threats against you

17   to get you to plead guilty?

18         THE DEFENDANT:  No.

19         THE COURT:  Is anyone forcing you or intimidating

20   you into pleading guilty?

21         THE DEFENDANT:  No.

22         THE COURT:  Are you pleading guilty today of your

23   own free will and because you are, in fact, guilty?

24         THE DEFENDANT:  Yes, Your Honor.

25         THE COURT:  Has anyone made any promises to you as

1    to what your sentence will be?

2            THE DEFENDANT:  No.

3            THE COURT:  It's important for you to understand

4    that no one, including me, who has the responsibility to

5    sentence you, knows today what your sentence will be.  In my

6    case, the reason that I don't know today will become apparent

7    in a moment when I describe the sentencing process.

8            I will hand the agreement to the Clerk for filing.

9            So, Mr. Eastman, now I'm going to talk to you about

10   the maximum and minimum penalties that apply to Count One to

11   which you propose to plead guilty, and then I'm going to talk

12   to you about the sentencing process.

13           Mr. Patel has already summarized the penalties and

14   they are set forth in details on page two of the Plea

15   Agreement but just briefly.

16           If you plead guilty to Count One, I could sentence

17   you to imprisonment for as much as life, that would be the

18   maximum, and I'm required to sentence you to a minimum of 10

19   years, which means that even if I think that you don't

20   deserve 10 years, my hands would be tied.  I would have to

21   impose at least 10 years imprisonment.

22           In addition and similarly, the term of supervised

23   release that's applicable here is -- allows me to sentence

24   you to a term of supervised release of as much as life.  And

25   there's also a minimum term of supervised release of 5 years.

A-595

23

1     If you were to violate any condition of supervised release, I

2     could sentence you to additional time in prison for as much

3     as 5 years.  If the violation involved another sex related

4     offense, in particular, the provisions that are listed in the

5     Plea Agreement, then I would be required to sentence you to a

6     term of imprisonment on a finding of a violation of no less

7     than 5 years of imprisonment.

8           With respect to Count One, I could impose a fine of

9     as much as $250,000 or, if the offense involved a gain or a

10    loss that was substantial, I could impose twice the gross

11    gain or twice the gross loss, whichever amount results in the

12    highest dollar figure.

13          Some other features of the sentence that you are

14    facing that I need to go over with you is I'm required to

15    impose what's called a special assessment which is $100 here.

16          Restitution in this case is mandatory.  And so

17    whatever -- the Government has the burden of proving the

18    amount of restitution, but apart from that, I am required to

19    impose restitution in this case.

20          Because of the type of offense involved here, you

21    would not be eligible for probation.

22          As I said, I'm required to order restitution.

23          I also may order you to forfeit any property that

24    was involved in the offense that was derived from the

25    offense.  Here I note that there is an agreement concerning

A-596

24

1    forfeiture of a computer, and that forfeiture would be part

2    of the judgment in this case.

3          There's no parole in the federal prison system.  So

4    if you're sentenced to prison, which you would be for this

5    offense, you will not be released on parole.

6          Finally, your sentence could be -- not finally, but

7    your sentence could be increased up to the statutory maximum

8    for a variety of reasons.  For example, if it's determined

9    that you have a more serious criminal history than the

10   parties currently understand to be the case or that you

11   committed this offense while you were on parole or probation

12   or under some other Court sentence or, that you engaged in

13   other offenses or other criminal conduct during or related to

14   the commission of this offense, and any of those things was

15   brought to my attention, I could decide to increase your

16   sentence because of them.  And if I did that, you would not

17   be allowed to withdraw your guilty plea.

18         In addition, as we discussed, this type of offense

19   would require you to register under the Sex Offender

20   Registration Notification Act.

21         I now want to talk to you about the sentencing

22   process.  Before sentencing, you, your lawyer, and the

23   prosecutor will receive what's called the Presentence

24   Investigation Report.  That report is prepared by the United

25   States Probation Office and it helps me to determine the

25

1    appropriate sentence for you.  The report will recommend a

2    sentencing range based on the United States Sentencing

3    Guidelines and the Policy Statements in the Guidelines.  You,

4    your lawyer, and the prosecutor will all have an opportunity

5    to object to the Presentence Report.  The report will also

6    consider whether any downward or upward departures from the

7    suggested sentencing range are warranted and your lawyer, as

8    well as the prosecutor, will be able to argue for or against

9    departures whether or not they're mentioned in the report.

10          It's important with regard to the Sentencing

11   Guidelines, it's important for you to understand that I have

12   to consider the Sentencing Guidelines and the Policy

13   Statements in the Guidelines in deciding on your sentence.

14   But I'm not bound by the guidelines.  Also, if there are

15   factual disputes about matters related to your sentence,

16   including objections to particular applications of the

17   Guidelines, it's important for you to understand how those

18   disputes will be resolved.  Once you plead guilty, there's no

19   more jury.  I become the finder of fact.  And with regard to

20   factual disputes concerning the sentence, I will resolve

21   those disputes based on an evidentiary standard which is

22   called preponderance of the evidence.  And that is a lower

23   standard than the beyond a reasonable doubt standard that

24   would apply if the case went to trial.

25          After I've considered the factual matters concerning

1    your sentence and decided whether any departures from the

2    Guidelines range are appropriate, I'll indicate what I think

3    is the appropriate sentencing range for you under the

4    Sentencing Guidelines.  I will consider that range but, as I

5    said, I'm not bound by it and I'll impose a sentence based on

6    consideration not only of the Guidelines, but also of the

7    factors that are listed in the federal law that governs

8    sentencing for these purposes which is Title 18, United

9    States Code, Section 3553(a).  At the end of the day, I could

10   give you a sentence that falls within the Guidelines range or

11   outside the Guidelines range.  Either way, you will have no

12   right to withdraw your guilty plea.

13          A few additional points about the sentencing

14   process.  First, until the Presentence Report is prepared and

15   you, your lawyer, and the prosecutor all have had an

16   opportunity to comment on it, and I have ruled on any

17   disputed issues, you cannot know with certainly what the

18   Guidelines range will be, whether there will be grounds for

19   departure and, most importantly, what your sentence will be.

20   Second, even if your lawyer and the Government -- and the

21   prosecutor were to agree on any issue concerning your

22   sentence or the Guidelines range, and it doesn't appear that

23   there's much of an agreement right now, but if they were to

24   agree, for example, at the sentencing proceeding, I would not

25   be bound by that agreement.  If I do not accept any

A-599

27

1  agreements between you and the Government, you will still be

2  bound by your guilty plea.  You will have no right to

3  withdraw that plea and I could impose a sentence that's more

4  severe than the one that you might expect.

5          So I've been talking for a while now.  Do you

6  understand what I said about the maximum and minimum

7  penalties that apply in this case?

8          THE DEFENDANT:  Yes, Your Honor.

9          THE COURT:  You understand what I said about the

10 terms of supervised release to which you could be exposed

11 here?

12         THE DEFENDANT:  Yes, Your Honor.

13         THE COURT:  And the terms of imprisonment that the

14 Court would be required to in certain cases or could impose

15 if you were to violate a condition of supervised release?

16         THE DEFENDANT:  Yes, Your Honor.

17         THE COURT:  And do you understand what I've said

18 about the mandatory minimums here?

19         THE DEFENDANT:  Yes.

20         THE COURT:  And you understand what I've said about

21 the sentencing process?

22         THE DEFENDANT:  Yes.

23         THE COURT:  Do you understand what I said about the

24 Sentencing Guidelines, my obligation to consider the

25 Guidelines range and possible departures from the range?

A-600

28

1          THE DEFENDANT:  Yes, Your Honor.

2          THE COURT:  And do you understand also what I said

3   about my obligation to consider the other sentencing factors

4   listed in Section 3553(a)?

5          THE DEFENDANT:  Yes.  Yes, Your Honor.

6          THE COURT:  Do you have any questions for me or for

7   your lawyer at this time?

8          THE DEFENDANT:  No.  No questions.

9          THE COURT:  Let me ask Attorney Buckley.  Have you

10  gone over with your client the maximum penalties, the

11  operation of the Guidelines, and the statutory factors the

12  Court has to take into account at sentencing?

13         MS. BUCKLEY:  I have, Your Honor.

14         THE COURT:  All right.  And from your perspective,

15  does he understand that if he's not successful in appealing

16  the denial of the Motion to Suppress that that's going to be

17  it, there's not going to be any further proceedings in the

18  case, the sentence, unless you're able to successfully appeal

19  the sentence, the sentence will stand?  Have you discussed

20  that with him?

21         MS. BUCKLEY:  I have, Your Honor.  And he does

22  understand that.

23         THE COURT:  Have you told him that he will not be

24  able to withdraw his guilty plea if I do not follow any

25  recommendation you might make to me or any estimate you might

A-601

29

1   have given to him concerning the sentence?

2           MS. BUCKLEY:  Yes, Your Honor.

3           THE COURT:  And you've discussed with him the

4   statutory factors the Court has to take into account at

5   sentencing?

6           MS. BUCKLEY:  Yes, Your Honor.

7           THE COURT:  Thank you.

8           Mr. Eastman, we've now reached the part of the

9   proceeding where we're going to be talking about the crime.

10  We're going to do this as follows:

11          I'm going to ask Mr. Patel to identify the elements

12  of Count One, and the elements are the critical facts the

13  Government would have to prove to a jury if the case were to

14  go to trial.

15          And then I'm going to ask him to describe how the

16  Government would prove that at a trial, what evidence the

17  Government would introduce.  And, in particular, what are the

18  facts that make you, in the Government's estimation, guilty

19  of this offense.

20          When he's done, I'm going to turn to you.  I'm going

21  to ask you some questions about what it is that you did or

22  did not do to determine whether, in my view, the facts

23  support your guilt.

24          Now, before we proceed to this stage, do you have

25  any questions for me or do you need to speak privately with

1   your lawyer?

2                   THE DEFENDANT:  No.  No, Your Honor.

3                   THE COURT:  Attorney Patel.

4                   MR. PATEL:  Thank you, Your Honor.

5           Your Honor, at trial the Government would have to

6   prove the following elements to find the Defendant guilty.

7           First -- and they're listed on the bottom of page

8   one, top of page two, of the Plea Agreement.

9                   (1)  The Defendant knowingly used a facility or

10  means of interstate or foreign commerce to persuade, induce,

11  entice or coerce an individual under the age of 18 to engage

12  in sexual activity.

13                  (2)  The Defendant believed that such individual

14  was less than 18 years of age.

15                  (3)  The Defendant could have been charged with a

16  criminal offense based on such sexual activity.

17          If this case were to go to trial, the Government

18  would call witnesses, including federal and state law

19  enforcement officers, as well as other witnesses,

20  including --

21                  THE COURT:  I'm sorry to interrupt, Mr. Patel.  I

22  just want to check on the elements.

23          So you heard what Mr. Patel said about the elements

24  of this crime?

25                  THE DEFENDANT:  Yeah.

A-603

31

1          THE COURT:  Do you think that you understand those

2    elements?

3          THE DEFENDANT:  Yes.

4          THE COURT:  Do you have any questions for me or for

5    your lawyer about the elements of the offense?

6          THE DEFENDANT:  No.  No, sir.

7          THE COURT:  Go ahead, Mr. Patel.

8          MR. PATEL:  Thank you, Your Honor.

9          Again, the Government would introduce witnesses,

10   including federal and state law enforcement witnesses, as

11   well as other civilian witnesses, including some of the

12   minors with whom the Defendant is alleged to have

13   communicated with via Skype.

14         The Government would also introduce statements that

15   the Defendant allegedly made to law enforcement officers.  In

16   addition, the Government would introduce evidence recovered

17   from the computer that the Defendant was using, including

18   Skype chats, pictures of minors, his internet browsing

19   history, as well as records provided by third parties, such

20   as Comcast cable, FaceBook, Google, MicroSoft, Skype, Yahoo.

21   The Government would also introduce evidence recovered from

22   the computers used by some of the minors with whom the

23   Defendant was allegedly communicating with.  And together,

24   the evidence would show, among other things, that on

25   approximately November 6, 2012, while the Defendant was in

A-604

32

1    Connecticut, he used Skype to communicate with a girl in the

2    State of Washington who he believed to be 16 years old, and

3    the Defendant used the screen name Justin.Bieber727 at the

4    time.  During the conversation, the female's webcam was

5    turned on and the Defendant could see her.  The Defendant

6    asked the female to pull her underwear down and pose in a

7    lascivious maner so that he could see her exposed genitalia,

8    and the female complied.  And the Defendant used a function

9    on his computer to save a still image of the minor female

10   displaying her exposed genitals in a lascivious manner.

11          And the Government would also show that this offense

12   conduct could have been charged as a violation of another

13   federal statute, specifically, 18 United States Code, Section

14   2251.

15          THE COURT:  Which is what?

16          MR. PATEL:  It's abusing, persuading, inducing,

17   enticing, or coercing a minor to engage in sexually explicit

18   conduct for the purpose of producing a visual depiction of

19   that conduct.

20          THE COURT:  And that satisfies 2422(b) because what

21   that statute says is sexual activity for which any person,

22   which would include the Defendant, or the person depicted,

23   any person, can be charged with a criminal offense.

24          MR. PATEL:  Right.  It doesn't have to be the person

25   you're persuading or the Defendant, it could be either of

A-605

33

1    them.

2            THE COURT:  Attorney Buckley, you agree that the

3    statement of the elements in the Plea Agreement is accurate?

4            MS. BUCKLEY:  I do, Your Honor.

5            THE COURT:  Mr. Eastman, I have a couple of

6    questions for you.

7            In November 2012, you were living in Waterbury, am I

8    right?

9            THE DEFENDANT:  Yes.  Yes, sir.

10           THE COURT:  And at the time you were living in a

11   apartment with your mother, if I'm not mistaken?

12           THE DEFENDANT:  Yes, Your Honor.

13           THE COURT:  And around that time you had a computer

14   in your bedroom, an HP computer?

15           THE DEFENDANT:  Yes, sir.

16           THE COURT:  And Skype was installed on the computer?

17           THE DEFENDANT:  Yes, Your Honor.

18           THE COURT:  All right.  And is it true that on

19   November 6, 2012, or thereabouts, you used Skype on that

20   computer to communicate with a 16 year old female?

21           THE DEFENDANT:  Yes, Your Honor.

22           THE COURT:  It says in Washington.  Was that in

23   Washington state or in Washington, D.C., if you know?

24           THE DEFENDANT:  I didn't know until this all

25   happened.  I didn't know where the person was from.

A-606

34

1          THE COURT:  Do you know now?

2          THE DEFENDANT:  Yeah, now I know.

3          THE COURT:  Which one was it, Washington state or

4    Washington, D.C.?

5          THE DEFENDANT:  It's Seattle, Washington.

6          THE COURT:  Seattle, Washington?

7          THE DEFENDANT:  Yes.

8          THE COURT:  And so this person was, you've come to

9    learn, was in Seattle, Washington, while you were in

10   Connecticut, is that true?

11         THE DEFENDANT:  While I've been incarcerated I found

12   out.

13         THE COURT:  I understand that.  Let me ask the

14   question again.

15         Based on what you know now --

16         THE DEFENDANT:  Yes.

17         THE COURT:  -- at the time that you were

18   communicating with this person on Skype, you were physically

19   in Connecticut and she was physically in Seattle, Washington?

20         THE DEFENDANT:  Yes, Your Honor.

21         THE COURT:  And you were using a screen name that

22   used -- that was Justin Bieber or something like that, is

23   that right?

24         THE DEFENDANT:  Yes, Your Honor.

25         THE COURT:  And at the time this was a situation

A-607

35

1    where this female's camera associated with her computer,

2    which is called a webcam, was activated, is that true?

3            THE DEFENDANT:  Yes, Your Honor.

4            THE COURT:  And you had some conversation with her

5    over Skype at the time, is that true?

6            THE DEFENDANT:  Yes, Your Honor.

7            THE COURT:  And, in particular, you asked her to

8    pull down here underwear and pose so that you could see her

9    genitals, is that true?

10           THE DEFENDANT:  Yes.

11           THE COURT:  And she did that?

12           THE DEFENDANT:  Yes, Your Honor.

13           THE COURT:  And you used a function on Skype to

14   essentially take a picture of her while she was doing that,

15   is that true?

16           THE DEFENDANT:  Yes, Your Honor.

17           THE COURT:  And you saved that on your computer?

18           THE DEFENDANT:  Yes, Your Honor.

19           THE COURT:  You understood at the time that she was

20   less than 18 years old?

21           THE DEFENDANT:  Yes, Your Honor.

22           THE COURT:  No one forced you to do this, is that

23   true?

24           THE DEFENDANT:  No, Your Honor.

25           THE COURT:  Let me try it again.  Is it true that

A-608

36

1    you did this voluntarily?

2              THE DEFENDANT:  Yes, Your Honor.

3              THE COURT:  And no one forced you to do it, is that

4    correct?

5              THE DEFENDANT:  Correct.

6              THE COURT:  Would counsel have me inquire further?

7              MR. PATEL:  No, Your Honor.

8              THE COURT:  Mr. Eastman, if you're still willing and

9    ready to plead guilty now is the time.  You should stand for

10   that purpose.

11             You have a right to have the charge, which is Count

12   One of the Indictment, read to you.  You can also choose to

13   waive a reading of the charge.  Do you wish to waive a

14   reading of the charge?

15             THE DEFENDANT:  Yes.

16             THE COURT:  I'm going to ask the Clerk to put you to

17   plea as to Count One of the Indictment, charging a violation

18   of Title 18, United States Code, Section 2422(b).

19             THE CLERK:  In the case of United States of America

20   versus John Eastman, criminal number 3:16CR6(MPS), as to

21   Count One of the Indictment charging you with violation of

22   Title 18, United States Code, Section --

23             THE COURT:  I apologize.  Start again.  I guess I'm

24   no longer in a position to fine lawyers when that happens.

25   So let me ask the Clerk of the Court to put you to plea.

A-609

37

1          THE CLERK:  In the case of United States of America

2     versus John Eastman, criminal number 3:16CR6(MPS), as to

3     Count One of the Indictment charging you with violation of

4     the Title 18, United States Code, Section 2422(b), how do you

5     plea?

6          THE DEFENDANT:  Guilty.

7          THE CLERK:  Your Honor, the Defendant has pled

8     guilty to Count One of the Indictment.

9          THE COURT:  Does any either counsel know of any

10    reason I should not accept Mr. Eastman's guilty plea?

11         MR. PATEL:  No, Your Honor.

12         MS. BUCKLEY:  No, Your Honor.

13         THE COURT:  On the basis of the answers to the

14    questions of the Court given by the Defendant while under

15    oath, while on the record, while in open court, and while in

16    the presence of his counsel, on the basis of the remarks of

17    defense counsel and the remarks of the Assistant United

18    States Attorney, I find as follows:

19         (1)  That the Defendant is fully competent and

20    capable of entering an informed plea.

21         (2)  That he understands the nature the charge to

22    which he's pled guilty.

23         (3)  That he understands his rights.

24         (4)  That he understands the possible consequences

25    of his guilty plea.

**A-610**

38

1          (5)   That he's chosen to plead guilty because he is,

2    in fact, guilty of the offense charged.

3          (6)   That the plea of guilty is a knowing and

4    voluntary plea supported by an independent basis in fact

5    containing each of the essential elements of the offense.

6          The Defendant's plea is accepted and he is adjudged

7    guilty of the offense to which he's pleaded guilty.   A

8    finding of guilt will enter and the case is referred to the

9    Probation Office for a Presentence Investigation.

10          You could be seated.

11          Mr. Eastman, the next thing of significance that

12    will happen in the case is that the United States Probation

13    Officer will sit down with you to interview you.   And that's

14    for the purpose of preparing that Presentence Investigation

15    Report that I discussed earlier.   As I said, the report will

16    be submitted to me to assist in determining an appropriate

17    sentence.   When you meet with the probation officer, keep in

18    mind that the probation officer works for the Court and not

19    for the prosecutor.   So, generally speaking, your cooperation

20    with the probation officer will benefit you.   However, it's

21    very important that you discuss carefully with Attorney

22    Buckley what you say to the probation officer, because the

23    Presentence Report is very important in the calculation of

24    your Guidelines and in consideration of your sentence.

25          Please read the Presentence Report when it becomes

39

1    available and review it with your lawyer.  I'm going to ask

2    you at sentencing if you've read it, if you've understood it,

3    and if you've given any response you have to it to the

4    probation officer or to your lawyer.

5              Sentencing is set for May 25, 2017, at 10:00.

6              The draft Presentence Report must be disclosed to

7    the Defendant, counsel for the Defendant, and the Government

8    by April 27th.  Objections from counsel are due by May 7th.

9    The final Presentence Report is required to be disclosed by

10   May -- you know what, we're going to set the sentencing

11   schedule.  I'm going to go back in Chambers and take a look

12   and we'll issue an order later today.  I may have -- scratch

13   what I said about the sentencing schedule.  We'll issue an

14   order later today.  If there's a problem with it counsel

15   should file a motion.

16             Is there anything else we should take up today?

17             MR. PATEL:  I don't believe so, Your Honor.

18             MS. BUCKLEY:  Nothing, Your Honor.

19             THE COURT:  Very well.  We'll be in recess.

20             Thank you.

21             (Concluded.)

22

23

24

25

40

1                    C E R T I F I C A T E

2

3          I, Martha C. Marshall, RMR, CRR, hereby certify that

4    the foregoing pages are a complete and accurate transcription

5    of my original stenotype notes taken in the matter of UNITED

6    STATES V. JOHN EASTMAN, which was held before the Honorable

7    Michael P. Shea, U.S.D.J, at 450 Main Street, Hartford,

8    Connecticut, on March 2, 2017.

9

10

11

12                                    _/s/Martha C. Marshall_____
                                      Martha C. Marshall, RMR,CRR
13                                    Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25

1

```
1    UNITED STATES DISTRICT COURT

2    DISTRICT OF CONNECTICUT

3
     UNITED STATES OF AMERICA,  )
4                   Plaintiff,  )         NO: 3:16CR6(MPS)
                                )
5    vs.                        )
                                )         March 2, 2017
6    JOHN EASTMAN,              )
                    Defendant.  )         Plea
7    _____)

8
                            450 Main Street
9                       Hartford, Connecticut

10   B E F O R E:
             THE HONORABLE MICHAEL P. SHEA, U.S.D.J.
11

12   A P P E A R A N C E S:

13   For the Plaintiff :        NEERAJ N. PATEL, AUSA
                                United States Attorney's Office
14                              157 Church Street, 25th Floor
                                New Haven, CT 06510
15
     For the Defendant:         MOIRA LYNN BUCKLEY, ESQUIRE
16                              Law Offices of Moira Buckley, LLC
                                P.O. Box 424
17                              Marlborough, CT 06447

18

19

20

21

22

23
     Court Reporter:            Martha C. Marshall, RMR, CRR
24

25   Proceedings recorded by mechanical stenography, transcript
     produced by computer.
```

A-614

2

```
 1            THE COURT:  Good afternoon.  Please be seated.

 2            We're here in United States versus John Eastman.

 3   The case is 16CR6.  Let's have appearances, starting with the

 4   Government, please.

 5            MR. PATEL:  Thank you, Your Honor.

 6            Your Honor, Neeraj Patel on behalf of the United

 7   States.  And with me at counsel table is Special Agent

 8   Allison Himalelle (ph) with the Homeland Security

 9   Investigation.

10            MS. BUCKLEY:  Good afternoon, Your Honor.  Moira

11   Buckley representing John Eastman who is with me at counsel

12   table.

13            THE COURT:  Good afternoon.

14            I understand we're here, Attorney Buckley, because

15   Mr. Eastman has decided to change his plea and to plead

16   guilty to Count One of the Indictment which charges him with

17   use of an interstate facility to entice a minor to engage in

18   sexual activity, in violation of Title 18, United States

19   Code, Section 2422(b), is that right?

20            MS. BUCKLEY:  It is, Your Honor.

21            THE COURT:  Mr. Eastman, the first thing I want to

22   tell you today -- that's all right.  You can be seated, sir.

23   I'll let you know when you need to stand.

24            The first thing I want to tell you is to take your

25   time.  The decisions you have to make today are important and
```

A-615

3

1   it's important that you completely understand what's going on

2   in the courtroom and what you're doing before you make those

3   decisions.  If you have any problems or questions during this

4   proceeding at any time, please let me know or, if you need

5   time to speak privately with your lawyer, Attorney Buckley,

6   please let me know that and I will give you all the time that

7   you need.

8            Do you understand?

9            THE DEFENDANT:  Yes, sir.

10           THE COURT:  Now, before I can accept your guilty

11   plea, there are questions that I have to ask you while you

12   are under oath to make sure the plea is valid.  If you don't

13   understand one of my questions, please let me know that and I

14   will rephrase it.

15           At this I am going to ask you to stand and raise

16   your right hand so that the Clerk can place you under oath.

17                   J O H N   E A S T M A N,

18   the Defendant, having been duly sworn by the Clerk, was

19   examined and testified on his oath as follows:

20           THE COURT:  You can be seated.

21           Mr. Eastman, do you understand that now that you've

22   been sworn, if you do not answer truthfully your answers to

23   my questions can be used against you in a prosecution for

24   perjury or for making a false statement?

25           THE DEFENDANT:  Yes, sir.  Yes, Your Honor.

4

1          THE COURT:  To begin with, Mr. Eastman, I'm going to

2   get some background information about you.  What is your full

3   name?

4          THE DEFENDANT:  John Timothy Eastman.

5          THE COURT:  Have you ever used any other names, any

6   nicknames, any street names, any alias, anything like that?

7          THE DEFENDANT:  No.

8          THE COURT:  Are you a citizen of the United States?

9          THE DEFENDANT:  Yes, Your Honor.

10          THE COURT:  How old are you?

11          THE DEFENDANT:  I'm 49.

12          THE COURT:  And how far did you go in school?

13          THE DEFENDANT:  10th grade.

14          THE COURT:  And have you had any trouble

15   communicating with your lawyer for any reason?

16          THE DEFENDANT:  No.

17          THE COURT:  Are you now or have you recently been

18   under the care of a doctor?

19          THE DEFENDANT:  No.

20          THE COURT:  And are you now or have you recently

21   been under the care of a psychiatrist, a psychologist, or

22   mental health worker?

23          THE DEFENDANT:  No, Your Honor.

24          THE COURT:  During the past 48 hours, have you taken

25   any narcotic drugs, any medicine or any pills?

A-617

5

1          THE DEFENDANT:  No.

2          THE COURT:  And during that period, have you drunk

3     any alcoholic beverages?

4          THE DEFENDANT:  No.

5          THE COURT:  Have you ever been hospitalized or

6     treated on an out-patient basis for narcotics addiction or

7     other substance abuse, including alcohol?

8          THE DEFENDANT:  Yes, I've been in treatment.

9          THE COURT:  When?

10         THE DEFENDANT:  A few times.

11         THE COURT:  When was the most recent time, how many

12    years ago?

13         THE DEFENDANT:  The most recent was 1999.

14         THE COURT:  Okay.  As you sit here today, is your

15    mind clear?

16         THE DEFENDANT:  Yes.

17         THE COURT:  And do you understand what's going on so

18    far?

19         THE DEFENDANT:  Yes.

20         THE COURT:  And will you let me know if at some

21    point you don't know what's going on?

22         THE DEFENDANT:  Yes, Your Honor.

23         THE COURT:  Attorney Buckley, have you had any

24    difficulty communicating with your client?

25         MS. BUCKLEY:  Not at all, your Honor.

**A-618**

6

1          THE COURT:  Do you believe he understands the rights

2    he'll be give up by pleading guilty today?

3          MS. BUCKLEY:  Yes, Your Honor.

4          THE COURT:  Do you have any doubt as to his

5    competence to plead guilty today?

6          MS. BUCKLEY:  No, your Honor.

7          THE COURT:  We spoke on the phone the other day just

8    to schedule this hearing.  I don't know whether you were able

9    to meet with your client ahead of time.

10          MS. BUCKLEY:  I was able to meet with him yesterday,

11    and then I saw him again briefly this morning -- not this

12    morning, this afternoon.  But I was able to meet with him

13    down in Bridgeport yesterday.

14          THE COURT:  Very well.  Thank you.

15          Mr. Eastman, from your perspective, have you had

16    enough opportunity and enough information to discuss the case

17    with your lawyer?

18          THE DEFENDANT:  Yes.

19          THE COURT:  And are you satisfied to have her

20    represent you in this proceeding?

21          THE DEFENDANT:  Yes, I'm satisfied.

22          THE COURT:   Is there any way in which you're not

23    fully satisfied with her advice and representation?

24          THE DEFENDANT:   No.

25          THE COURT:   Attorney Buckley, from your

A-619

7

1    perspective, have you had enough time and information to

2    allow for meaningful discussion with the Defendant about the

3    case?

4            MS. BUCKLEY:  Yes, Your Honor.

5            THE COURT:  Mr. Eastman, did you receive a copy of

6    the Indictment in this case?

7            THE DEFENDANT:  Yes.

8            THE COURT:  And you've read it?

9            THE DEFENDANT:  Yes.

10           THE COURT:  And you've had -- have you had a chance

11   to consult with your lawyer about the charges?

12           THE DEFENDANT:  Yes, sir.

13           THE COURT:  I'm sorry?

14           THE DEFENDANT:  Yes, Your Honor.

15           THE COURT:  Do you understand the charges against

16   you?

17           THE DEFENDANT:  Yes.

18           THE COURT:  I now want to talk to you about the

19   rights you'll be giving up if you plead guilty.  The most

20   important thing I want you to understand is that in our

21   system of justice, you don't have to plead guilty even if you

22   are guilty.  By law, the Government has the burden of proving

23   the guilt of a defendant beyond a reasonable doubt.  If the

24   Government's not able to meet that burden, the jury has the

25   duty to find the Defendant not guilty even if he is guilty.

A-620

8

1    Do you understand that?

2              THE DEFENDANT:   Yes, Your Honor.

3              THE COURT:   Sometimes a jury will find a defendant

4    not guilty, even though the people sitting watching the trial

5    thought the Defendant was probably guilty.  What the jury was

6    saying in that type of a case is not necessarily that it

7    found that the Defendant was innocent but, instead, that it

8    found that the Government failed to meet its burden of

9    proving the guilt of the Defendant beyond a reasonable doubt.

10   Do you understand?

11             THE DEFENDANT:   Yes, Your Honor.

12             THE COURT:   So that's why I say that even if you're

13   guilty, you still have the right to continue in your case to

14   plead not guilty, which means you have a choice even today.

15   You can plead guilty, as you've indicated you wish to do, or

16   you can say to the Government prove it.  Meet your burden of

17   proving my guilt beyond a reasonable doubt.  And the way you

18   do that and make the Government go to trial on the

19   Government's case is you say "not guilty" when Ms. Johnson,

20   the Clerk of the Court, asks you how you plead in about 25

21   minutes from now.  Do you understand?

22             THE DEFENDANT:   Yes.

23             THE COURT:   Now, if you were to maintain your plea

24   of not guilty, under our Constitution and under federal law

25   you'd be entitled to a speedy public trial by jury with the

**A-621**

9

1    assistance of counsel both at the trial and at every stage of

2    the proceedings on the charge contained in the indictment.

3    Do you understand?

4         THE DEFENDANT:  Yes.

5         THE COURT:  Now, you're currently represented by

6    Attorney Buckley.  If in the future you were not and you

7    could not afford to hire counsel, I would appoint counsel to

8    represent you at no cost to you.  Do you understand?

9         THE DEFENDANT:  Yes.

10        THE COURT:  At trial, I would instruct the jury to

11   presume that you were innocent, and the Government would have

12   to overcome that presumption and prove you guilty by

13   competent evidence and beyond a reasonable doubt.  You would

14   not have to prove that you were innocent.  In fact, you would

15   not have to introduce any evidence at the trial.  If the

16   Government failed to meet its burden, the jury would have the

17   duty to find you not guilty.  Do you understand?

18        THE DEFENDANT:  Yes.

19        THE COURT:  During the trial, the witnesses for the

20   Government would have to come to court and testify in your

21   presence.  You would have the right to confront those

22   witnesses and your lawyer would have the right to

23   cross-examine them, to object to evidence offered by the

24   Government, to offer evidence on your behalf, and to use a

25   subpoena to compel the attendance of witnesses to testify at

A-622

10

1    the trial on your behalf.  Do you understand those rights?

2              THE DEFENDANT:  Yes, sir.

3              THE COURT:  At trial, while you would have the right

4    to testify if you wanted to testify, you could not be

5    required to testify.  Under our constitution, no one can

6    force you to take the witness stand at your trial and say

7    anything that could be used to show that you're guilty of the

8    crime with which you're charged.  If you decided not to

9    testify, I would instruct the jurors that you were exercising

10   your constitutional right and that they could not hold that

11   against you.  Do you understand?

12             THE DEFENDANT:  Yes.

13             THE COURT:  On the other hand, if you decide to

14   plead guilty, as you've indicated you wish to do, I'm going

15   to have to ask you questions about what it is that you did in

16   order to satisfy myself that you are, in fact, guilty, that

17   the facts support your guilt, because I'm not allowed to

18   accept your guilty plea unless I make that finding.  You'll

19   have to answer my questions and admit your guilt.  So you'll

20   be giving up the right that I described, that is, the right

21   not to say anything that will show you're guilty of the crime

22   with which you're charged.

23             If you plead guilty and I accept your plea as valid,

24   you'll be giving up your constitutional right to a trial and

25   the other rights that I discussed.  There will be no trial.

A-623

11

1          Do you understand?

2          THE DEFENDANT:   Yes.

3          THE COURT:  The offense to which you intend to plead

4    guilty is a felony.  If your plea's accepted, you'll be found

5    guilty of a felony.  That could deprive you of important

6    civil rights, such as the right to vote, the right to hold

7    public office, the right to serve on a jury, and the right to

8    possess firearms.  A felony conviction could also prevent you

9    from obtaining certain jobs and professional licenses.  In

10   this case, a felony conviction could also require you to

11   register as a sex offender and may also carry other

12   consequences as a result of the nature of this conviction.

13          You've told me you're a citizen and I believe you.

14   I'll still required to tell you that if you were not a

15   citizen you could be deported, denied citizenship, and denied

16   admission to this country in the future as a result of your

17   guilty plea.

18          Finally, your guilty plea today could work to your

19   disadvantage if in the future you were found guilty of

20   another crime because there's a possibility you could receive

21   a more severe penalty at that time as a result of this guilty

22   plea and conviction.  I'm not expecting that you're going to

23   commit a crime in the future, but I am required to tell every

24   defendant that.

25          All right.  Attorney Buckley, have you discussed

1  with Mr. Eastman the collateral consequences of pleading

2  guilty to this charge?

3            MS. BUCKLEY:  I have, Your Honor.

4            THE COURT:  Mr. Eastman, do you understand all of

5  the rights and all of the possible consequences of a guilty

6  plea that I have reviewed with you?

7            THE DEFENDANT:  Yes, Your Honor.

8            THE COURT:  Do you have any questions for me or

9  Attorney Buckley at this time?

10           THE DEFENDANT:  No, Your Honor.

11           THE COURT:  Are you willing to give up your right to

12 the trial and the other rights that I discussed?

13           THE DEFENDANT:  Yes, Your Honor.

14           THE COURT:  And you have the Plea Agreement there,

15 Attorney Buckley?

16           MS. BUCKLEY:  Yes, Your Honor.

17           THE COURT:  Mr. Eastman, have you had a chance to

18 read the Plea Agreement?

19           THE DEFENDANT:  Yes, Your Honor.

20           THE COURT:  Have you had a chance and enough

21 opportunity to discuss it with your lawyer?

22           THE DEFENDANT:  Yes.

23           THE COURT:  Do you understand the Plea Agreement?

24           THE DEFENDANT:  Yes.

25           THE COURT:  Attorney Buckley, are you confident that

A-625

13

1    to Mr. Eastman understands the terms of the Plea Agreement?

2              MS. BUCKLEY:  I am, Your Honor.

3              THE COURT:  And you've had a chance -- enough time

4    to review it with him?

5              MS. BUCKLEY:  I have, Your Honor.

6              THE COURT:  Mr. Eastman, if you're still ready and

7    willing to sign the Plea Agreement, you should do that now.

8              MR. PATEL:  Your Honor, the Plea Agreement has been

9    signed by both parties.

10             THE COURT:  All right.  If you could bring it

11   forward, please.

12             So, Mr. Eastman, in a moment I'm going to ask

13   Attorney Patel to summarize the terms of the Plea Agreement

14   and when he's done, I'm going to turn to you and ask you if

15   what he said accurately reflects your understanding of the

16   agreement.

17             Before we do that, I do just need to ask counsel.  I

18   did notice that the Plea Agreement amounts to an agreement to

19   have the Defendant make what's known as a conditional plea

20   under Rule 11(a)(2) of the Rules of Criminal Procedure,

21   something that both the Government and I have to agree to.

22   Obviously, the Government appears to have agreed because it's

23   in the Plea Agreement.  I take it that the rationale is that

24   the Defendant wants to reserve his right to appeal my ruling

25   on the Motion to Suppress that the Defendant filed and that,

A-626

14

1    in effect, the reason for doing it this way is the case

2    hinges on that ruling.  Is that a fair statement?

3            MR. PATEL:  Yes, Your Honor.

4            MS. BUCKLEY:  It is, Your Honor.

5            THE COURT:  So then I'm going to make a finding that

6    I will approve that, a plea under Rule 11(a)(2), because in

7    light of the fact that it would promote judicial economy to

8    do that.  If the ruling is upheld, well, then, the case and

9    the sentence will be final and, if it's not upheld, in

10   effect, as I understand it, there would be no case.  Is that

11   right, Mr. Patel?

12           MR. PATEL:  That is the Government's position.

13           THE COURT:  That's fine.  In that circumstance it

14   does make sense to save the Court and jurors the need for a

15   trial if it all hinges on that ruling.  So that's perfectly

16   fine.

17           In light of that, I'm going to ask Mr. Patel to

18   summarize the terms of the Plea Agreement and then we'll

19   proceed as I indicated.

20           MR. PATEL:  Thank you, Your Honor.

21           The plea is in the form of a 13 page letter

22   agreement dated today from the U.S. Attorney's Office

23   addressed to Attorney Buckley in which the Defendant agrees

24   to plead guilty to Count One of the Indictment, charging him

25   with using an interstate facility to persuade a minor to

A-627

15

1    engage in unlawful sexual activity, in violation of 18,

2    United States Code, Section 2422(b).

3            As Your Honor noted, it is a conditional plea in

4    which the Defendant reserves his right to appeal this Court's

5    August 15th, 2016 ruling denying his motion to suppress.  If

6    he appeals and prevails, the Government will not object to

7    the Defendant's motion to withdraw his guilty plea on a

8    remand.

9            The bottom of page one and the top of page two

10   contain the elements that must be satisfied to be found

11   guilty.

12           THE COURT:  We'll go over those later.

13           MR. PATEL:  Thank you.

14           Turning to page two, sets forth the maximum

15   penalties for the offense.  In this case, the Defendant faces

16   a maximum penalty of life in prison, a $250,000 fine, and a

17   mandatory minimum penalty of 10 years of imprisonment.  The

18   Court must also impose a term of supervised release of at

19   least five years and as much as life.

20           By pleading guilty, he'll be required to register as

21   a sex offender as a condition of supervised release.  If he

22   violates any condition of supervised release, he could be

23   required to serve a further term of imprisonment of up to

24   five years with no credit for time already spent on

25   supervised release.  If he violates a condition of supervised

16

1    release by committing certain enumerated offenses which are

2    basically other child exploitation or sex offenses, then he

3    will be required to serve a term of imprisonment of not less

4    than five years of imprisonment.

5            Under the alternative fine provisions of the United

6    States Code, the maximum fine that could be imposed is the

7    greatest of twice the gross gain or loss from the offense or

8    $250,000.  He's also obligated to pay a special assessment of

9    $100.  And he's also subject to restitution.

10           Finally, in addition to the standard conditions of

11   supervised release, the Defendant does not object to certain

12   additional conditions which are set forth on a rider that's

13   attached on pages 12 and 13.

14           Turning to page three, at the top.  The Defendant

15   understands that the Court must also order that the Defendant

16   make restitution, and the Government reserves its right to

17   seek restitution on behalf of the victims.  The scope and

18   effect of an order of restitution are set forth in a rider

19   that's attached on page 11.

20           Starting at the middle of page three, in the section

21   entitled Forfeiture.  The Defendant agrees to forfeit any

22   interest he has in a Hewlett Packard computer.  That's

23   further described on page three.

24           Turning to page four, at the top.  The Defendant

25   understands that in tailoring an appropriate sentence, the

1    Court is required to consider any applicable Sentencing

2    Guidelines as well as the factors in United States Code

3    3553(a), and that the Court is not bound by the Plea

4    Agreement.  The Defendant understands that any sentencing

5    determinations will be made by the Court based on the

6    preponderance of the evidence, based on input from the

7    Defendant, the Government, and the Probation Office.  And

8    that he has no right to withdraw his guilty plea if his

9    sentence or Guidelines application is other than he

10   anticipated.

11           In the middle of page four.  The Government agrees,

12   through a combination of recommendation and motion, to ask

13   the Court to reduce the Defendant's total offense level under

14   the Sentencing Guidelines by three levels based on his

15   acceptance of responsibility and his prompt notification of

16   intention to plead guilty.  Those recommendations are

17   conditioned upon the Defendant's demonstration of acceptance

18   of responsibility by truthfully admitting his offense conduct

19   and truthfully disclosing to the U.S. Attorney's Office and

20   the Probation Office any personal information that's

21   requested.

22           The Government reserves the right to seek denial of

23   the adjustment for acceptance of responsibility if he engages

24   in any acts unknown as of today which indicate that he has

25   not terminated or withdrawn from criminal conduct or which

A-630

18

1    could constitute obstructing or impeding the administration

2    of justice or constitute a violation of any release

3    condition.

4           The Government reserves the right to seek denial of

5    the adjustment if he seeks to withdraw his guilty plea or

6    takes a position at sentencing which, in the Government's

7    view, is inconsistent with acceptance of responsibility.  And

8    he understands that he may not withdraw his guilty plea if

9    for those reasons the Government does not make the

10   recommendations.

11          Turning to page five, at the top.  The

12   Government -- the parties have entered into a Stipulation of

13   Offense Conduct that's attached on page 10.  The Defendant

14   understands that this Stipulation does not set forth all of

15   the relevant conduct that the Court may consider and that the

16   Government and Probation Office are obligated to advise the

17   Court of any additional relevant facts.

18          In the middle of page five, there's a Guideline

19   Stipulation.  And in this case the parties disagree about the

20   Guidelines calculation and the Guidelines range and, also,

21   disagree about the Defendant's Criminal History Category.

22   The parties reserve their rights to seek a departure or

23   non-guidelines sentence, and both sides reserve their right

24   to object to a departure or a non-guidelines sentence.

25          The Government agrees not to seek a sentence above

**A-631**

19

1   240 months, and the Defendant agrees that he may not argue

2   for a sentence below 120 months of imprisonment, which is the

3   mandatory minimum.

4          The Defendant understands that the Court is not

5   bound by this agreement on the ranges, on the Guidelines

6   ranges or the ranges that were just discussed, and that he

7   will not be permitted to withdraw his guilty plea if the

8   Court imposes a sentence outside those any of those ranges.

9          At the bottom of page five.  The parties reserve

10  their rights to appeal the sentence.

11         Turning to page six.  In the middle there is a

12  section called Waiver of Trial Rights and Consequences of a

13  Guilty Plea which Your Honor has already discussed with the

14  Defendant which he indicated he understood.  The bottom of

15  page six, there's a section titled Waiver of Statute of

16  Limitations in which the Defendant understands that should

17  the conviction, following his guilty plea, be vacated for any

18  reason, then any prosecution that's not time-barred as of

19  today could be reinstated against the Defendant.

20         The top of page seven.  The Defendant acknowledges

21  that he is entering into this agreement and pleading guilty

22  freely and voluntarily because he's guilty, without promises

23  of any kind other than what's contained in Plea Agreement,

24  and without threats, force, intimidation or coercion of any

25  kind.

20

```
1              In the middle of page seven, the Defendant

2    acknowledges that this Plea Agreement is limited just to the

3    U.S. Attorney's Office for the District of Connecticut and

4    himself and does not bind any other federal, state, or local

5    authority.

6              The bottom of page seven describes the collateral

7    consequences that the Defendant will face as a result of his

8    conviction which Your Honor has already discussed with him.

9              Page eight.  The Defendant acknowledges that he will

10   be subject to federal and state sex offender registration

11   requirements and, that as a condition of his supervised

12   release, he will have to initially register with the State

13   Sex Offender Registration in Connecticut.

14             Bottom of page eight.  The parties agree that his

15   guilty plea, if accepted by the Court, will satisfy his

16   federal criminal liability in the District of Connecticut as

17   a result of his participation in the conduct which forms the

18   basis of the indictment, and that after sentencing the

19   Government will move to dismiss Count Two of the Indictment

20   because the conduct will have been taken into account in

21   determining an appropriate sentence.

22             Page nine contains spaces for the parties to sign

23   the agreement.

24             Page 10 contains a Stipulation of Offense Conduct

25   that was referred to earlier.
```

A-633

21

1          Page 11 contains the rider concerning restitution

2     that was referenced earlier.

3          And pages 12 and 13 contain the additional

4     conditions of supervised release that was mentioned earlier

5     which the Defendant does not object to.

6          THE COURT:  All right.  Thank you, Attorney Patel.

7          So, Mr. Eastman, does the summary provided by

8     Mr. Patel of the Plea Agreement reflect fully and accurately

9     your understanding of the agreement you've entered into with

10    the Government?

11         THE DEFENDANT:  Yes, sir.

12         THE COURT:  And other than the promises contained in

13    the written agreement, has anyone made any other promises or

14    statements to you that have caused you to plead guilty?

15         THE DEFENDANT:  No, sir.

16         THE COURT:  Has anyone made any threats against you

17    to get you to plead guilty?

18         THE DEFENDANT:  No.

19         THE COURT:  Is anyone forcing you or intimidating

20    you into pleading guilty?

21         THE DEFENDANT:  No.

22         THE COURT:  Are you pleading guilty today of your

23    own free will and because you are, in fact, guilty?

24         THE DEFENDANT:  Yes, Your Honor.

25         THE COURT:  Has anyone made any promises to you as

22

1    to what your sentence will be?

2              THE DEFENDANT:  No.

3              THE COURT:  It's important for you to understand

4    that no one, including me, who has the responsibility to

5    sentence you, knows today what your sentence will be.  In my

6    case, the reason that I don't know today will become apparent

7    in a moment when I describe the sentencing process.

8              I will hand the agreement to the Clerk for filing.

9              So, Mr. Eastman, now I'm going to talk to you about

10   the maximum and minimum penalties that apply to Count One to

11   which you propose to plead guilty, and then I'm going to talk

12   to you about the sentencing process.

13             Mr. Patel has already summarized the penalties and

14   they are set forth in details on page two of the Plea

15   Agreement but just briefly.

16             If you plead guilty to Count One, I could sentence

17   you to imprisonment for as much as life, that would be the

18   maximum, and I'm required to sentence you to a minimum of 10

19   years, which means that even if I think that you don't

20   deserve 10 years, my hands would be tied.  I would have to

21   impose at least 10 years imprisonment.

22             In addition and similarly, the term of supervised

23   release that's applicable here is -- allows me to sentence

24   you to a term of supervised release of as much as life.  And

25   there's also a minimum term of supervised release of 5 years.

A-635

23

1    If you were to violate any condition of supervised release, I

2    could sentence you to additional time in prison for as much

3    as 5 years.  If the violation involved another sex related

4    offense, in particular, the provisions that are listed in the

5    Plea Agreement, then I would be required to sentence you to a

6    term of imprisonment on a finding of a violation of no less

7    than 5 years of imprisonment.

8              With respect to Count One, I could impose a fine of

9    as much as $250,000 or, if the offense involved a gain or a

10   loss that was substantial, I could impose twice the gross

11   gain or twice the gross loss, whichever amount results in the

12   highest dollar figure.

13             Some other features of the sentence that you are

14   facing that I need to go over with you is I'm required to

15   impose what's called a special assessment which is $100 here.

16             Restitution in this case is mandatory.  And so

17   whatever -- the Government has the burden of proving the

18   amount of restitution, but apart from that, I am required to

19   impose restitution in this case.

20             Because of the type of offense involved here, you

21   would not be eligible for probation.

22             As I said, I'm required to order restitution.

23             I also may order you to forfeit any property that

24   was involved in the offense that was derived from the

25   offense.  Here I note that there is an agreement concerning

A-636

24

1    forfeiture of a computer, and that forfeiture would be part

2    of the judgment in this case.

3         There's no parole in the federal prison system.  So

4    if you're sentenced to prison, which you would be for this

5    offense, you will not be released on parole.

6         Finally, your sentence could be -- not finally, but

7    your sentence could be increased up to the statutory maximum

8    for a variety of reasons.  For example, if it's determined

9    that you have a more serious criminal history than the

10   parties currently understand to be the case or that you

11   committed this offense while you were on parole or probation

12   or under some other Court sentence or, that you engaged in

13   other offenses or other criminal conduct during or related to

14   the commission of this offense, and any of those things was

15   brought to my attention, I could decide to increase your

16   sentence because of them.  And if I did that, you would not

17   be allowed to withdraw your guilty plea.

18        In addition, as we discussed, this type of offense

19   would require you to register under the Sex Offender

20   Registration Notification Act.

21        I now want to talk to you about the sentencing

22   process.  Before sentencing, you, your lawyer, and the

23   prosecutor will receive what's called the Presentence

24   Investigation Report.  That report is prepared by the United

25   States Probation Office and it helps me to determine the

25

1    appropriate sentence for you.  The report will recommend a

2    sentencing range based on the United States Sentencing

3    Guidelines and the Policy Statements in the Guidelines.  You,

4    your lawyer, and the prosecutor will all have an opportunity

5    to object to the Presentence Report.  The report will also

6    consider whether any downward or upward departures from the

7    suggested sentencing range are warranted and your lawyer, as

8    well as the prosecutor, will be able to argue for or against

9    departures whether or not they're mentioned in the report.

10           It's important with regard to the Sentencing

11   Guidelines, it's important for you to understand that I have

12   to consider the Sentencing Guidelines and the Policy

13   Statements in the Guidelines in deciding on your sentence.

14   But I'm not bound by the guidelines.  Also, if there are

15   factual disputes about matters related to your sentence,

16   including objections to particular applications of the

17   Guidelines, it's important for you to understand how those

18   disputes will be resolved.  Once you plead guilty, there's no

19   more jury.  I become the finder of fact.  And with regard to

20   factual disputes concerning the sentence, I will resolve

21   those disputes based on an evidentiary standard which is

22   called preponderance of the evidence.  And that is a lower

23   standard than the beyond a reasonable doubt standard that

24   would apply if the case went to trial.

25           After I've considered the factual matters concerning

1     your sentence and decided whether any departures from the

2     Guidelines range are appropriate, I'll indicate what I think

3     is the appropriate sentencing range for you under the

4     Sentencing Guidelines.  I will consider that range but, as I

5     said, I'm not bound by it and I'll impose a sentence based on

6     consideration not only of the Guidelines, but also of the

7     factors that are listed in the federal law that governs

8     sentencing for these purposes which is Title 18, United

9     States Code, Section 3553(a).  At the end of the day, I could

10    give you a sentence that falls within the Guidelines range or

11    outside the Guidelines range.  Either way, you will have no

12    right to withdraw your guilty plea.

13          A few additional points about the sentencing

14    process.  First, until the Presentence Report is prepared and

15    you, your lawyer, and the prosecutor all have had an

16    opportunity to comment on it, and I have ruled on any

17    disputed issues, you cannot know with certainly what the

18    Guidelines range will be, whether there will be grounds for

19    departure and, most importantly, what your sentence will be.

20    Second, even if your lawyer and the Government -- and the

21    prosecutor were to agree on any issue concerning your

22    sentence or the Guidelines range, and it doesn't appear that

23    there's much of an agreement right now, but if they were to

24    agree, for example, at the sentencing proceeding, I would not

25    be bound by that agreement.  If I do not accept any

A-639

27

1    agreements between you and the Government, you will still be

2    bound by your guilty plea.  You will have no right to

3    withdraw that plea and I could impose a sentence that's more

4    severe than the one that you might expect.

5              So I've been talking for a while now.  Do you

6    understand what I said about the maximum and minimum

7    penalties that apply in this case?

8              THE DEFENDANT:  Yes, Your Honor.

9              THE COURT:  You understand what I said about the

10   terms of supervised release to which you could be exposed

11   here?

12             THE DEFENDANT:  Yes, Your Honor.

13             THE COURT:  And the terms of imprisonment that the

14   Court would be required to in certain cases or could impose

15   if you were to violate a condition of supervised release?

16             THE DEFENDANT:  Yes, Your Honor.

17             THE COURT:  And do you understand what I've said

18   about the mandatory minimums here?

19             THE DEFENDANT:  Yes.

20             THE COURT:  And you understand what I've said about

21   the sentencing process?

22             THE DEFENDANT:  Yes.

23             THE COURT:  Do you understand what I said about the

24   Sentencing Guidelines, my obligation to consider the

25   Guidelines range and possible departures from the range?

A-640

28

1          THE DEFENDANT:  Yes, Your Honor.

2          THE COURT:  And do you understand also what I said

3    about my obligation to consider the other sentencing factors

4    listed in Section 3553(a)?

5          THE DEFENDANT:  Yes.  Yes, Your Honor.

6          THE COURT:  Do you have any questions for me or for

7    your lawyer at this time?

8          THE DEFENDANT:  No.  No questions.

9          THE COURT:  Let me ask Attorney Buckley.  Have you

10   gone over with your client the maximum penalties, the

11   operation of the Guidelines, and the statutory factors the

12   Court has to take into account at sentencing?

13         MS. BUCKLEY:  I have, Your Honor.

14         THE COURT:  All right.  And from your perspective,

15   does he understand that if he's not successful in appealing

16   the denial of the Motion to Suppress that that's going to be

17   it, there's not going to be any further proceedings in the

18   case, the sentence, unless you're able to successfully appeal

19   the sentence, the sentence will stand?  Have you discussed

20   that with him?

21         MS. BUCKLEY:  I have, Your Honor.  And he does

22   understand that.

23         THE COURT:  Have you told him that he will not be

24   able to withdraw his guilty plea if I do not follow any

25   recommendation you might make to me or any estimate you might

**A-641**

29

1    have given to him concerning the sentence?

2              MS. BUCKLEY:  Yes, Your Honor.

3              THE COURT:  And you've discussed with him the

4    statutory factors the Court has to take into account at

5    sentencing?

6              MS. BUCKLEY:  Yes, Your Honor.

7              THE COURT:  Thank you.

8              Mr. Eastman, we've now reached the part of the

9    proceeding where we're going to be talking about the crime.

10   We're going to do this as follows:

11             I'm going to ask Mr. Patel to identify the elements

12   of Count One, and the elements are the critical facts the

13   Government would have to prove to a jury if the case were to

14   go to trial.

15             And then I'm going to ask him to describe how the

16   Government would prove that at a trial, what evidence the

17   Government would introduce.  And, in particular, what are the

18   facts that make you, in the Government's estimation, guilty

19   of this offense.

20             When he's done, I'm going to turn to you.  I'm going

21   to ask you some questions about what it is that you did or

22   did not do to determine whether, in my view, the facts

23   support your guilt.

24             Now, before we proceed to this stage, do you have

25   any questions for me or do you need to speak privately with

A-642

30

1   your lawyer?

2          THE DEFENDANT:  No.  No, Your Honor.

3          THE COURT:  Attorney Patel.

4          MR. PATEL:  Thank you, Your Honor.

5          Your Honor, at trial the Government would have to

6   prove the following elements to find the Defendant guilty.

7          First -- and they're listed on the bottom of page

8   one, top of page two, of the Plea Agreement.

9          (1)  The Defendant knowingly used a facility or

10  means of interstate or foreign commerce to persuade, induce,

11  entice or coerce an individual under the age of 18 to engage

12  in sexual activity.

13         (2)  The Defendant believed that such individual

14  was less than 18 years of age.

15         (3)  The Defendant could have been charged with a

16  criminal offense based on such sexual activity.

17         If this case were to go to trial, the Government

18  would call witnesses, including federal and state law

19  enforcement officers, as well as other witnesses,

20  including --

21         THE COURT:  I'm sorry to interrupt, Mr. Patel.  I

22  just want to check on the elements.

23         So you heard what Mr. Patel said about the elements

24  of this crime?

25         THE DEFENDANT:  Yeah.

A-643

31

1          THE COURT:  Do you think that you understand those

2     elements?

3          THE DEFENDANT:  Yes.

4          THE COURT:  Do you have any questions for me or for

5     your lawyer about the elements of the offense?

6          THE DEFENDANT:  No.  No, sir.

7          THE COURT:  Go ahead, Mr. Patel.

8          MR. PATEL:  Thank you, Your Honor.

9          Again, the Government would introduce witnesses,

10    including federal and state law enforcement witnesses, as

11    well as other civilian witnesses, including some of the

12    minors with whom the Defendant is alleged to have

13    communicated with via Skype.

14          The Government would also introduce statements that

15    the Defendant allegedly made to law enforcement officers.  In

16    addition, the Government would introduce evidence recovered

17    from the computer that the Defendant was using, including

18    Skype chats, pictures of minors, his internet browsing

19    history, as well as records provided by third parties, such

20    as Comcast cable, FaceBook, Google, MicroSoft, Skype, Yahoo.

21    The Government would also introduce evidence recovered from

22    the computers used by some of the minors with whom the

23    Defendant was allegedly communicating with.  And together,

24    the evidence would show, among other things, that on

25    approximately November 6, 2012, while the Defendant was in

A-644

32

1    Connecticut, he used Skype to communicate with a girl in the

2    State of Washington who he believed to be 16 years old, and

3    the Defendant used the screen name Justin.Bieber727 at the

4    time.  During the conversation, the female's webcam was

5    turned on and the Defendant could see her.  The Defendant

6    asked the female to pull her underwear down and pose in a

7    lascivious maner so that he could see her exposed genitalia,

8    and the female complied.  And the Defendant used a function

9    on his computer to save a still image of the minor female

10   displaying her exposed genitals in a lascivious manner.

11           And the Government would also show that this offense

12   conduct could have been charged as a violation of another

13   federal statute, specifically, 18 United States Code, Section

14   2251.

15           THE COURT:  Which is what?

16           MR. PATEL:  It's abusing, persuading, inducing,

17   enticing, or coercing a minor to engage in sexually explicit

18   conduct for the purpose of producing a visual depiction of

19   that conduct.

20           THE COURT:  And that satisfies 2422(b) because what

21   that statute says is sexual activity for which any person,

22   which would include the Defendant, or the person depicted,

23   any person, can be charged with a criminal offense.

24           MR. PATEL:  Right.  It doesn't have to be the person

25   you're persuading or the Defendant, it could be either of

A-645

33

1    them.

2           THE COURT:  Attorney Buckley, you agree that the

3    statement of the elements in the Plea Agreement is accurate?

4           MS. BUCKLEY:  I do, Your Honor.

5           THE COURT:  Mr. Eastman, I have a couple of

6    questions for you.

7           In November 2012, you were living in Waterbury, am I

8    right?

9           THE DEFENDANT:  Yes.  Yes, sir.

10          THE COURT:  And at the time you were living in a

11   apartment with your mother, if I'm not mistaken?

12          THE DEFENDANT:  Yes, Your Honor.

13          THE COURT:  And around that time you had a computer

14   in your bedroom, an HP computer?

15          THE DEFENDANT:  Yes, sir.

16          THE COURT:  And Skype was installed on the computer?

17          THE DEFENDANT:  Yes, Your Honor.

18          THE COURT:  All right.  And is it true that on

19   November 6, 2012, or thereabouts, you used Skype on that

20   computer to communicate with a 16 year old female?

21          THE DEFENDANT:  Yes, Your Honor.

22          THE COURT:  It says in Washington.  Was that in

23   Washington state or in Washington, D.C., if you know?

24          THE DEFENDANT:  I didn't know until this all

25   happened.  I didn't know where the person was from.

**A-646**

34

1          THE COURT:  Do you know now?

2          THE DEFENDANT:  Yeah, now I know.

3          THE COURT:  Which one was it, Washington state or

4    Washington, D.C.?

5          THE DEFENDANT:  It's Seattle, Washington.

6          THE COURT:  Seattle, Washington?

7          THE DEFENDANT:  Yes.

8          THE COURT:  And so this person was, you've come to

9    learn, was in Seattle, Washington, while you were in

10   Connecticut, is that true?

11         THE DEFENDANT:  While I've been incarcerated I found

12   out.

13         THE COURT:  I understand that.  Let me ask the

14   question again.

15         Based on what you know now --

16         THE DEFENDANT:  Yes.

17         THE COURT:  -- at the time that you were

18   communicating with this person on Skype, you were physically

19   in Connecticut and she was physically in Seattle, Washington?

20         THE DEFENDANT:  Yes, Your Honor.

21         THE COURT:  And you were using a screen name that

22   used -- that was Justin Bieber or something like that, is

23   that right?

24         THE DEFENDANT:  Yes, Your Honor.

25         THE COURT:  And at the time this was a situation

35

1    where this female's camera associated with her computer,

2    which is called a webcam, was activated, is that true?

3              THE DEFENDANT:  Yes, Your Honor.

4              THE COURT:  And you had some conversation with her

5    over Skype at the time, is that true?

6              THE DEFENDANT:  Yes, Your Honor.

7              THE COURT:  And, in particular, you asked her to

8    pull down here underwear and pose so that you could see her

9    genitals, is that true?

10             THE DEFENDANT:  Yes.

11             THE COURT:  And she did that?

12             THE DEFENDANT:  Yes, Your Honor.

13             THE COURT:  And you used a function on Skype to

14   essentially take a picture of her while she was doing that,

15   is that true?

16             THE DEFENDANT:  Yes, Your Honor.

17             THE COURT:  And you saved that on your computer?

18             THE DEFENDANT:  Yes, Your Honor.

19             THE COURT:  You understood at the time that she was

20   less than 18 years old?

21             THE DEFENDANT:  Yes, Your Honor.

22             THE COURT:  No one forced you to do this, is that

23   true?

24             THE DEFENDANT:  No, Your Honor.

25             THE COURT:  Let me try it again.  Is it true that

A-648

36

1   you did this voluntarily?

2           THE DEFENDANT:  Yes, Your Honor.

3           THE COURT:  And no one forced you to do it, is that

4   correct?

5           THE DEFENDANT:  Correct.

6           THE COURT:  Would counsel have me inquire further?

7           MR. PATEL:  No, Your Honor.

8           THE COURT:  Mr. Eastman, if you're still willing and

9   ready to plead guilty now is the time.  You should stand for

10  that purpose.

11          You have a right to have the charge, which is Count

12  One of the Indictment, read to you.  You can also choose to

13  waive a reading of the charge.  Do you wish to waive a

14  reading of the charge?

15          THE DEFENDANT:  Yes.

16          THE COURT:  I'm going to ask the Clerk to put you to

17  plea as to Count One of the Indictment, charging a violation

18  of Title 18, United States Code, Section 2422(b).

19          THE CLERK:  In the case of United States of America

20  versus John Eastman, criminal number 3:16CR6(MPS), as to

21  Count One of the Indictment charging you with violation of

22  Title 18, United States Code, Section --

23          THE COURT:  I apologize.  Start again.  I guess I'm

24  no longer in a position to fine lawyers when that happens.

25  So let me ask the Clerk of the Court to put you to plea.

**A-649**

37

1          THE CLERK:  In the case of United States of America

2     versus John Eastman, criminal number 3:16CR6(MPS), as to

3     Count One of the Indictment charging you with violation of

4     the Title 18, United States Code, Section 2422(b), how do you

5     plea?

6          THE DEFENDANT:  Guilty.

7          THE CLERK:  Your Honor, the Defendant has pled

8     guilty to Count One of the Indictment.

9          THE COURT:  Does any either counsel know of any

10    reason I should not accept Mr. Eastman's guilty plea?

11         MR. PATEL:  No, Your Honor.

12         MS. BUCKLEY:  No, Your Honor.

13         THE COURT:  On the basis of the answers to the

14    questions of the Court given by the Defendant while under

15    oath, while on the record, while in open court, and while in

16    the presence of his counsel, on the basis of the remarks of

17    defense counsel and the remarks of the Assistant United

18    States Attorney, I find as follows:

19         (1)  That the Defendant is fully competent and

20    capable of entering an informed plea.

21         (2)  That he understands the nature the charge to

22    which he's pled guilty.

23         (3)  That he understands his rights.

24         (4)  That he understands the possible consequences

25    of his guilty plea.

A-650

38

1          (5)  That he's chosen to plead guilty because he is,

2     in fact, guilty of the offense charged.

3          (6)  That the plea of guilty is a knowing and

4     voluntary plea supported by an independent basis in fact

5     containing each of the essential elements of the offense.

6          The Defendant's plea is accepted and he is adjudged

7     guilty of the offense to which he's pleaded guilty.  A

8     finding of guilt will enter and the case is referred to the

9     Probation Office for a Presentence Investigation.

10          You could be seated.

11          Mr. Eastman, the next thing of significance that

12     will happen in the case is that the United States Probation

13     Officer will sit down with you to interview you.  And that's

14     for the purpose of preparing that Presentence Investigation

15     Report that I discussed earlier.  As I said, the report will

16     be submitted to me to assist in determining an appropriate

17     sentence.  When you meet with the probation officer, keep in

18     mind that the probation officer works for the Court and not

19     for the prosecutor.  So, generally speaking, your cooperation

20     with the probation officer will benefit you.  However, it's

21     very important that you discuss carefully with Attorney

22     Buckley what you say to the probation officer, because the

23     Presentence Report is very important in the calculation of

24     your Guidelines and in consideration of your sentence.

25          Please read the Presentence Report when it becomes

A-651

39

1    available and review it with your lawyer.  I'm going to ask

2    you at sentencing if you've read it, if you've understood it,

3    and if you've given any response you have to it to the

4    probation officer or to your lawyer.

5            Sentencing is set for May 25, 2017, at 10:00.

6            The draft Presentence Report must be disclosed to

7    the Defendant, counsel for the Defendant, and the Government

8    by April 27th.  Objections from counsel are due by May 7th.

9    The final Presentence Report is required to be disclosed by

10   May -- you know what, we're going to set the sentencing

11   schedule.  I'm going to go back in Chambers and take a look

12   and we'll issue an order later today.  I may have -- scratch

13   what I said about the sentencing schedule.  We'll issue an

14   order later today.  If there's a problem with it counsel

15   should file a motion.

16           Is there anything else we should take up today?

17           MR. PATEL:  I don't believe so, Your Honor.

18           MS. BUCKLEY:  Nothing, Your Honor.

19           THE COURT:  Very well.  We'll be in recess.

20           Thank you.

21           (Concluded.)

22

23

24

25

```
1                    C E R T I F I C A T E

2

3          I, Martha C. Marshall, RMR, CRR, hereby certify that

4     the foregoing pages are a complete and accurate transcription

5     of my original stenotype notes taken in the matter of UNITED

6     STATES V. JOHN EASTMAN, which was held before the Honorable

7     Michael P. Shea, U.S.D.J, at 450 Main Street, Hartford,

8     Connecticut, on March 2, 2017.

9

10

11

12                                    _/s/Martha C. Marshall_____
                                      Martha C. Marshall, RMR,CRR
13                                    Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25
```

A-653

1

1   UNITED STATES DISTRICT COURT

2   DISTRICT OF CONNECTICUT

3

    UNITED STATES OF AMERICA,  )
4                 Plaintiff,  )          NO: 3:16CR6(MPS)
                               )
5   vs.                       )
                               )          November 28, 2017
6   JOHN EASTMAN,             )
                  Defendant.  )          Sentencing
7   _____

8
                           450 Main Street
9                      Hartford, Connecticut

10  B E F O R E:
            THE HONORABLE MICHAEL P. SHEA, U.S.D.J.
11

12  A P P E A R A N C E S:

13  For the Plaintiff :       NEERAJ N. PATEL, AUSA
                              United States Attorney's Office
14                            157 Church Street, 25th Floor
                              New Haven, CT 06510
15
    For the Defendant:        WILLIAM M. BLOSS, ESQUIRE
16                            Koskoff, Koskoff & Bieder, P.C.
                              350 Fairfield Avenue
17                            Bridgeport, CT 06604

18

19

20

21

22

23
    Court Reporter:           Martha C. Marshall, RMR, CRR
24

25  Proceedings recorded by mechanical stenography, transcript
    produced by computer.

1          THE COURT:  Good afternoon, everyone.  Please be

2     seated.  We're here for sentencing in United States versus

3     John Eastman.  The case is 16CR6.

4          Let's have counsel identify themselves for the

5     record, please.

6          MR. PATEL:  Thank you, Your Honor.  Neeraj Patel on

7     behalf of the United States.  And with me at counsel table is

8     Special Agents Allison Haimila (ph) and Ryan Mahar (ph) from

9     the Department of Homeland Security.

10          THE COURT:  Good afternoon.

11          MR. BLOSS:  William Bloss, Your Honor, by

12     appointment of the Court.  With me is Mr. Eastman.

13          THE COURT:  Attorney Bloss, Mr. Eastman.

14          Just by way of -- first, for the record, January

15     Welks, the Probation Officer, who prepared the Presentence

16     Investigation Report, is also with us today in the courtroom.

17          By way of procedural background, Mr. Eastman

18     appeared before me on March 2nd of this year and entered a

19     plea of guilty to Count One of the Indictment which charges

20     him with use of an interstate facility to persuade a minor to

21     engage in unlawful sexual activity, in violation of Title 18,

22     United States Code, Section 2422(b).  Mr. Eastman later

23     sought to withdraw his plea.  I denied his motion to withdraw

24     his plea.

25          Thereafter, a Presentence Report was prepared for

3

1    the Court by the U.S. Probation Office.  The initial report

2    was filed on January 28th, 2017; the final report on October

3    17th, 2017.

4          I have reviewed these materials.  I have consulted

5    with Officer Welks who prepared the report.  I have reviewed

6    her sentencing recommendation dated October 17, 2017.  I've

7    reviewed the sentencing memoranda prepared and filed by the

8    parties, including a brief the Government filed yesterday.

9    I've also reviewed a report by a psychiatrist retained by

10   Attorney Bloss which itself includes the results of

11   psychological testing as well as other information.  I have

12   reviewed law enforcement affidavits concerning the forensic

13   analysis of Mr. Eastman's computer.  I've also reviewed

14   documents underlying Mr. Eastman's criminal record.

15         Before we get into the Presentence Report, let me

16   just verify the Government -- whether the Government has

17   given notice to any victims under Section 3771.

18         MR. PATEL:  We have, Your Honor.

19         THE COURT:  And I take it there are no victims here?

20         MR. PATEL:  No victims chose to appear today.

21         THE COURT:  None have expressed a desire to speak or

22   anything like that?

23         MR. PATEL:  No, Your Honor.

24         THE COURT:  Thank you.

25         Turning now to the Presentence Report.  Attorney

A-656

4

```
1   Bloss, have you had a chance to read the Presentence Report,

2   sir?

3           MR. BLOSS:  I have, Your Honor.

4           THE COURT:  Did you have a chance to discuss it with

5   your client?

6           MR. BLOSS:  I did.

7           THE COURT:  Mr. Eastman, have you had a chance to

8   read the Presentence Report, sir?

9           THE DEFENDANT:  Yes, Your Honor.

10          THE COURT:  And have you had a chance to discuss it

11  with your lawyer?

12          THE DEFENDANT:  Yes, Your Honor.

13          THE COURT:  And did you understand the Presentence

14  Report?

15          THE DEFENDANT:  Yes, I understood it.

16          THE COURT:  Attorney Bloss, do you have any

17  objections to any of the factual statements in the

18  Presentence Report?

19          MR. BLOSS:  Factual statements, no, your Honor.

20          THE COURT:  Very well.  And then, Attorney Patel, do

21  you have any objections to any of the factual statements in

22  the Presentence Report?

23          MR. PATEL:  No, Your Honor.

24          THE COURT:  There being no objections to the factual

25  statements in the Presentence Report, I adopt those factual
```

5

1    statements as my findings of fact in this case.

2          I do have one item that I wanted to bring to the

3    parties attention and I think may need correction.  I did

4    bring this to Officer Welks' attention earlier today.

5          I'm referring, in particular, to paragraph 135.

6    There's a sentence that appears on page 34, and it's towards

7    the bottom of the paragraph, which says Mr. Eastman detailed

8    that his 13 year old cousin was residing at his aunt's house

9    as well and one night he came home drunk and his cousin's

10   step-daughter who was nine years old at the time, et cetera.

11   I believe that should be his aunt's step-daughter.  Do

12   counsel have thoughts on that?

13         MR. BLOSS:  Just give me a moment?

14         THE COURT:  Sure.

15         MR. BLOSS:  It's a different cousin, Your Honor.

16   There's a 13 year old cousin and there's a different cousin.

17         THE DEFENDANT:  He's a boy, a male.  That was his

18   bedroom.

19         THE COURT:  I got it.  Thank you, Mr. Eastman.  So

20   what we'll do is we'll say instead of his, we'll say another

21   cousin's step-daughter.  I'll order that change to paragraph

22   135.  Thank you, Mr. Easton.

23         THE DEFENDANT:  His older sister's step-daughter.

24         THE COURT:  Understood, sir.  Thank you.

25         I accept the Plea Agreement that was signed and

6

1    filed on March 2nd of this year.  I'm satisfied that the

2    agreement adequately reflects the seriousness of the actual

3    offense behavior and that accepting the agreement will not

4    undermine the purposes of sentencing.

5            Mr. Eastman, when you appeared before me for your

6    guilty plea, I explained to you the maximum and minimum

7    penalties you face.  They are as follows:

8            You face a term of imprisonment of up to life.

9            You face a minimum term of 10 years.

10           You face a minimum term of supervised release of

11   five years and a maximum of life.

12           You are not eligible for probation.

13           You face a fine of up to $250,000.

14           I'm required to impose a special assessment of $100.

15           You will be required to register as a sex offender

16   upon release.

17           I'm required to order the forfeiture of any property

18   that was used to commit the offense or that constitutes any

19   proceeds from the offense.

20           In your Plea Agreement you agreed to forfeit the

21   interest or your interest in a computer that's described in

22   the Plea Agreement.  The Government filed a motion for

23   preliminary order of forfeiture yesterday with respect to

24   that computer, which I granted, and that forfeiture of that

25   property will become part of the judgment in this case.

1       I'm required to order restitution under Section

2   3663(a), the mandatory Victims Restitution Act.  I

3   understand, however, from the Government's filings that the

4   Government has not received information that it believed

5   would provide a basis for restitution in this case.  Is that

6   right, Mr. Patel?

7       MR. PATEL:  That's correct, Your Honor.  I believe I

8   attached to my memo this one letter we received from an

9   attorney of a victim in Norway.  I do not believe -- the

10  Government's position is that is not a basis for restitution

11  in this case because there's no bodily injury which is a

12  prerequisite under 3663(a).

13      THE COURT:  I agree with that, although for a

14  different reason, which I'll explain in a moment.  I was

15  curious.  This has nothing to do with your case, Mr. Eastman.

16  But just because I imagine you and I will have other cases

17  together.  So if the only basis in say a child pornography

18  case for restitution is either bodily injury or damage to

19  property, what is the basis for restitution in all those

20  cases?

21      MR. PATEL:  Most of those cases are charged under a

22  different chapter of the United States Code which has its own

23  restitution provision that does not require bodily injury.

24  The enticement statute, 2422, is in a different chapter that

25  does not have its own restitution provision.

8

```
 1           THE COURT:  I should have known that.  Thank you.

 2           I do agree that there's no basis for restitution

 3    that at least I've been provided with in this case.  I think

 4    my reasoning on that is a little bit different, though.  And

 5    I'll get into more detail on this later.

 6           First, as Mr. Patel points out, the relevant statute

 7    offers restitution only for bodily injury or for damage to

 8    property.  There's been no evidence of either submitted to

 9    me.  I also note, however, that the statute does provide for

10    expenses for participating in an investigation or

11    prosecution.  So, in theory, someone who hires a lawyer might

12    have such expenses.  However, the Second Circuit has held

13    that under the mandatory Victim Restitution Act, the relevant

14    question is whether the loss is caused by the specific

15    conduct that is the basis of the offense of conviction.  As I

16    will discuss later in our discussions of the Guidelines, the

17    conduct directed against the victim on whose behalf the

18    lawyer's letter was submitted, in my view, was not part of

19    the offense of conviction in this case.  So I do concur that

20    there's not a basis for restitution.

21           In any event, does either counsel object to my

22    statement of the maximum and minimum penalties?

23           MR. PATEL:  No, Your Honor.

24           MR. BLOSS:  No, your Honor.

25           THE COURT:  Turning now to the Sentencing
```

1    Guidelines, Mr. Eastman.  I mentioned the Sentencing

2    Guidelines when you were here for the guilty plea.  The

3    Guidelines are a body of advice -- this is the current

4    version of the Guidelines manual that I'm holding up now.

5    They are issued by the United States Sentencing Commission.

6    They provide me, as the sentencing judge, with guidance or

7    recommendations on what would be a fair and just sentence in

8    your case.  The way they do that is to examine the type of

9    offense involved, here, use of an interstate to persuade a

10   minor to engage in unlawful sexual activity.  They direct the

11   Court to consider certain characteristics that sometimes

12   accompany that type of an offense in a case like this, for

13   example, the number of victims, things likes that.  They also

14   direct the Court to consider whether and to what extent the

15   defendant has a criminal record.

16         The end result of the process of applying the

17   Sentencing Guidelines in a particular case results in

18   pointing the Court to a range of months of imprisonment that

19   the Sentencing Commission has decided would be appropriate in

20   a case like your case.  I am not bound to sentence you within

21   that range, but I do have to calculate the range accurately

22   and I have to consider it, along with other advice that the

23   Commission gives me, as well as other factors which I will

24   discuss later in sentencing you.

25         So here the parties disagree with each other and the

1   Defendant disagrees with the Probation Office concerning the

2   calculation of the Guidelines range.  And that calculation is

3   not straightforward in this case.

4          I have reviewed the Presentence Report.  I've

5   reviewed the parties submissions, including the submission

6   the Government filed yesterday in response to the notice that

7   I posted concerning a Guidelines issue not mentioned in the

8   parties' briefs.  I'm happy to have the parties speak

9   further.

10          I will start with the issue, just in case it will

11  save you time, with the issue at which I posted the notice as

12  to which the Government responded.  I concur with the

13  Government.  The question was whether the enhancement under

14  Section 4B1.5(a) should apply.  I concur with the Government

15  that it should not, for the reasons pretty much set forth in

16  the Government's brief.  So I'm not going to discuss that

17  issue further unless anybody wants to.  And I'm not going to

18  apply that enhancement.

19          There were two other issues the parties were

20  debating in their briefs.  One was whether conduct described

21  in the Presentence Report at paragraphs 26 through 33

22  directed at persons identified in the Presentence Report as

23  minor victims 2 through 5 constituted relevant conduct within

24  the meaning of the Guidelines and, thus, was conduct the

25  Court should use to calculate the Guidelines range.

A-663

11

```
 1          The second issue is whether the Court should deny

 2    Mr. Eastman a 2 point reduction for acceptance of

 3    responsibility under Section 3E1.1(a) in light of the fact

 4    that he sought to withdraw his guilty plea.

 5          I have considered the parties briefs on that issue.

 6    I'm happy to hear further argument if the parties wish to

 7    present it.  I'm also happy to give you my ruling.

 8          MR. PATEL:  The Government has nothing further to

 9    add aside what's in our brief.

10          THE COURT:  Okay.  Attorney Bloss.

11          MR. BLOSS:  I think it has been adequately briefed,

12    Your Honor.  I think the only issue on the acceptance point,

13    today Mr. Eastman advised me that he wanted to express to the

14    Court his regrets at filing the motion to withdraw his guilty

15    plea.

16          THE COURT:  All right.  Thank you.

17          So I'm now going to turn to my own calculation of

18    the offense level under the Sentencing Guidelines.  I'm going

19    to start with what I take to be common ground between the

20    parties, the probation officer and myself.  I find that the

21    applicable base offense level for this matter is set forth in

22    Section 2G2.1 of the Guidelines manual effective November 1,

23    2016, which is the manual in effect on the date of

24    Mr. Eastman's sentencing and the one that the Court will use.

25    Section 2G2.1(a) determines that the base offense level is
```

12

1    32.  I note that Section 2G2.1 applies instead of Section

2    2G1.3 which would otherwise apply to this offense because the

3    offense in this case involved causing a minor to engage in

4    sexually explicit conduct for the purpose of producing a

5    visual depiction of that conduct.

6         Under Section 2G2.1 the base offense level will be

7    adjusted as follows:

8         An adjustment of plus 2 points applies under Section

9    2G2.1(b((6)(B) due to the Defendant's use of a computer in

10   the commission of the offense and, also, separately due to

11   his misrepresentation of his identity, that is, using the

12   screen name Justin Bieber to induce the minor to engage in

13   sexually explicit conduct for the purpose of producing a

14   visually depiction of that conduct.  This leads to an offense

15   level of 34.

16        As I said, the parties appear to agree with the

17   analysis thus far.  But as I said, they do disagree with

18   respect to two issues.  First, is Mr. Eastman's conduct

19   described in paragraphs 26 through 33 of the Presentence

20   Report with respect to minor victims 2 through 5.  Relevant

21   conduct, within the meaning of the Guidelines and, thus,

22   conduct the Court should use to calculate the Guidelines

23   range.  And second, should the Court deny Mr. Eastman a 2

24   point reduction for acceptance of responsibility under

25   Section 3E1.1(a) of the Guidelines in light of the fact that

1   he sought to withdraw his guilty plea.

2           I conclude after considering the parties' arguments

3   and reviewing the case law, that the answer to the first

4   question, the relevant conduct question is, no, that the

5   conduct described in paragraphs 26 through 33 is not relevant

6   conduct and should not be used to determine the Guidelines

7   range.  And that the answer to the second question whether

8   the Court should deny Mr. Eastman credit for acceptance of

9   responsibility is yes, and I will explain now.

10          With regard to the relevant conduct issue, the

11  parties first disagree over what Mr. Eastman admitted by

12  virtue of his guilty plea.  Strictly speaking, this part of a

13  dispute is not about whether his conduct with regard to the

14  four other victims is relevant conduct but, instead, about

15  whether it comprises part of the offense to which he pled

16  guilty.  By virtue of his guilty plea, Mr. Eastman admitted

17  only the elements of the offense to which he pled guilty,

18  that is, the elements of Title 18, United States Code,

19  Section 2422(b).  He did not, by pleading guilty to that

20  offense, admit every allegation set forth in the indictment,

21  nor did he admit anything other than facts that support the

22  elements of that offense with respect to a single victim,

23  minor victim 1, by signing the Stipulation of Offense Conduct

24  or by answering my questions about the factual basis for his

25  plea during the Change of Plea proceeding.  Those questions,

14

1   as Mr. Bloss points out in his brief, focused on the facts in

2   the Stipulation of Offense Conduct.  That stipulation

3   describes Mr. Eastman's conduct only with respect to minor

4   victim 1.  Mr. Eastman's conduct with respect to minor

5   victims 2 through 5 is not part of his offense of conviction.

6   It is also not part of the relevant conduct under Section

7   1B1.3(a)(1)(A) of the Guidelines in my view.  The reason for

8   that is that Mr. Eastman's conduct with respect to the other

9   four victims mentioned in the Presentence Report did not

10  occur during the commission of the offense of conviction,

11  that is, during his conduct on November 6, 2012 towards minor

12  victim 1 in preparation for that offense or in the course of

13  attempting to avoid detection or responsibility for that

14  offense.

15          My conclusion in this regard is based largely on the

16  2nd Circuit's decisions in the *Wernick* and *Ahders* cases --

17  ahders is A H D E R S, *Wernick is* W E R N I C K. -- on those

18  cases cited in the parties' briefs.  Those cases and similar

19  cases make clear that relevant conduct under Section

20  1B1.3(a)(1)(A) requires more than temporal overlap which we

21  don't really even have here, and more than similarity between

22  the other conduct and the offense of conviction.

23          First, it is plain, and no one here suggests

24  otherwise, that Mr. Eastman's conduct with respect to the

25  other four victims did not occur in the course of attempting

15

1    to avoid detection or responsibility for his conduct with

2    respect to minor victim 1.

3         Second, his other conduct, with respect to the other

4    four victims, did not occur during his offense conduct

5    either.  The conduct directed at minor victims 2 through 5

6    occurred on different dates and, in particular, before the

7    conduct directed at minor victim 1.  Further, the fact that

8    Mr. Eastman may have possessed on his computer child

9    pornography, even child pornography that he may have produced

10   during interactions with the five different victims, at the

11   time he committed the offense against minor victim 1 does not

12   suffice to make the other conduct relevant conduct.  *Wernick*

13   and *Ahders* both make clear that mere temporal overlap is

14   insufficient.  And in the *Ahders* case, the Second Circuit

15   rejected the Government's argument that mere possession of

16   sadomasochistic images of children involving a different

17   victim was enough to render it relevant conduct.

18        Third, there is no evidence in the Presentence

19   Report suggesting that Mr. Eastman's conduct with respect to

20   the four others was "in preparation for" his conduct with

21   respect to minor victim 1.  The mere fact that he may have

22   used the same computer equipment, the same screen name and

23   Skype account, and the same general modus operandi does not

24   mean the earlier conduct was in preparation for the offense

25   conduct.  Again, *Wernick* and *Ahders* both support this

1    interpretation of "in preparation for."  *Wernick's* example of
2    an elaborate bank robbery being planned and an opportunistic
3    bank robbery being committed, and *Ahders* discussion of the
4    possibility that the Defendant used sadomasochistic images to
5    induce the minor to engage in sexual activity both show that
6    "in preparation for" means that there has to be some link
7    beyond similarity of conduct tying the two crimes together.
8    There is no evidence in the PSR in this case that
9    Mr. Eastman's conduct with respect to minor victims 2 through
10   5 was, for example, practice for his conduct with respect to
11   minor victim 1.
12          Finally, the text of the relevant conduct section of
13   the Guidelines makes clear that Section 1B1.3(a)(2), which
14   sweeps into the notion of relevant conduct all acts that are
15   part of the "same course of conduct or common scheme or plan"
16   as the offense of conviction does not apply here.  By its
17   term, that provision applies "solely with respect to offenses
18   of a character for which Section 3D1.2(d) would require
19   grouping of multiple counts."  Section 3D1.2(d) does not
20   apply to this case and it is clear from the Guidelines that
21   because different victims were involved on different
22   occasions, grouping under chapter 3 would not be appropriate
23   here.
24          Therefore, I conclude that Mr. Eastman's conduct
25   with respect to minor victims 2 through 5 is not relevant

1    conduct.

2           As the Defendant concedes in his brief, however, I

3    still may consider that conduct under the Section 3553(a)

4    factors, for example, as part of the Defendant's history and

5    characteristics.  I may consider the conduct as long as it is

6    supported by reliable evidence and has been established by a

7    preponderance of that evidence.  I find that it is and that

8    it has been.  Specifically, I have reviewed the sworn

9    incident report and sworn arrest warrant relating to the

10   Waterbury police's investigation of Mr. Eastman and, in

11   particular, relating to the forensic analysis of his

12   computer.  I posted those documents on the docket yesterday

13   under seal because they contain details about minor victims.

14   Those documents support the facts set forth in paragraphs 26

15   through 33 in the Presentence Report.  And as noted earlier,

16   I have adopted those paragraphs as part of my factual

17   findings in this case.  Therefore, I may consider those facts

18   as part of the Section 3553(a) factors, but not as part of

19   the Guidelines calculation.

20          With respect to the second issue I find, after

21   considering all of the actions of Mr. Eastman, including his

22   statement today, that he has not clearly demonstrated

23   acceptance of responsibility for his offense.  Although he

24   did plead guilty and admit to the facts in the Stipulation of

25   Offense Conduct, he moved to withdraw his plea only four

A-670

18

1   weeks later and shortly after meeting with the probation
2   officer for purposes of preparing a Presentence Report.
3   Under the Guidelines, a defendant is not entitled as a matter
4   of right to credit for acceptance of responsibility merely
5   because he has pled guilty.  That's application note 3 to
6   Section 3E1.1.
7           Mr. Eastman's motion to withdraw his plea did not
8   challenge the constitutionality of the statute or contend
9   that the statute did not apply to his conduct.  Circumstances
10  that the Second Circuit has suggested might want credit for
11  acceptance of responsibility even in the event of a motion to
12  withdraw a plea.  Instead, Mr. Eastman in his motion
13  complained about his lawyer, saying she had pressured him
14  into pleading guilty.  That she was acting improperly by not
15  serving as an extension of himself in the courtroom, and had
16  failed to challenge, among other things, alleged chain of
17  custody failures by the Waterbury police.  The motion added
18  that Mr. Eastman would not "tacitly accept debasing of his
19  character especially when rendered by his own defense counsel
20  in the form of a plea arrangement."
21          I denied his motion to withdraw his plea in a
22  separate ruling, but the point for present purposes is that
23  his arguments in that motion and the filing of the motion
24  itself are not consistent with acceptance of responsibility.
25  To the contrary, Mr. Eastman in that motion clearly blamed

1  everyone but himself, including his lawyer, the Waterbury

2  police, and me for the situation in which he finds himself.

3  Therefore, I deny him credit for acceptance of

4  responsibility.

5          As noted, although I had raised another issue about

6  Section 4B1.5, I concur with the Government for the reasons

7  set forth in its response to my notice yesterday that no

8  enhancement should be applied under that provision.

9  Therefore, the offense level is 34.

10          Turning to criminal history, there did not appear to

11  be a dispute about this issue.  But, in any event, I concur

12  with the probation officer that Mr. Eastman falls into

13  Criminal History Category VI.

14          Mr. Eastman, a defendant's criminal history category

15  is determined largely by the nature and extent of his prior

16  criminal record.  In your case, the available information

17  places you in Criminal History Category VI.  That makes the

18  Guidelines range as follows:

19          262 to 327 months imprisonment;

20          A term of supervised release of five years to life;

21          A fine of $250,000, or twice the gross gain or loss

22  resulting from the offense, whichever is the highest; and

23          A special assessment of $100.

24          Apart from objections that have already been

25  preserved in the papers, are there further objections to my

A-672

20

1    calculation of the Guidelines range?

2         MR. PATEL:  Just for the record, to the extent it's

3    not reflected in our papers, we do object to the Court's view

4    not to include the other victims as relevant conduct or as

5    part of the offense of conviction, just in the event that

6    Mr. Eastman appeals, to preserve our right to cross appeal on

7    that issue.

8         THE COURT:  That's fine.

9         Mr. Bloss.

10         MR. BLOSS:  No, I don't have any other comments on

11    that, Your Honor.

12         THE COURT:  All right.  Thank you.

13         All right.  So we've now reached what I consider to

14    be the heart of the sentencing proceeding.  I'm going to ask

15    Attorney Bloss to speak on behalf of Mr. Eastman.  And I'm

16    also going to, after when Attorney Bloss is done, ask if

17    Mr. Eastman would like to speak.  He certainly can and I'd be

18    interested in anything he might wish to say, but he's not

19    required to speak.  After the defense has finished with their

20    presentation, I'll hear from the Government.  After that, I

21    will take a short recess to reflect on everything that's been

22    said.  And after that I will return to impose sentence.

23         Attorney Bloss.

24         MR. BLOSS:  Thank you, your Honor.

25         Your Honor, I think I cited an article in my

```
 1    memorandum written by Judge Chen that I think makes some very
 2    interesting points and very valid points about how there's no
 3    such thing as an easy sentencing.  And you're the only person
 4    in the courtroom, Your Honor, whose ever done it and ordered
 5    somebody committed to the custody of the Attorney General.  I
 6    don't think anybody here imagines that it's an easy activity
 7    or that it is not an activity that should be done without a
 8    great deal of thought and without a great deal of
 9    understanding about both the conduct that causes us to be
10    here.  Not surprisingly, I'm not going to spend a lot of time
11    on the conduct that leads us here because we've stipulated to
12    what's in the Presentence Report.  There is not going to be
13    any attempt to minimize the conduct.  There's not going to be
14    any attempt to justify the conduct.  What I would like to try
15    to do, though, a little bit today is to try to maybe explain
16    why we're here, why Mr. Eastman has made the decisions that
17    cause us to be here and maybe, as importantly, or perhaps
18    more importantly, what are the implications of that for the
19    future.  I am sure there are a couple of different currents
20    crossing here in this case in this courtroom, right?
21          One is Mr. Eastman has a long record.  And while
22    it's not a particularly violent record compared to some
23    defendants, there's no use of force or weapons or things like
24    that.  On the other hand, it's pretty long.  And it is
25    pretty -- it is indicative of somebody who has had a hard
```

22

```
1    time meeting societal norms, if I can phrase it that way.

2            I think when I read the, very ably put, discussed in

3    the Presentence Report, but it's also I think fleshed out a

4    little bit more in Dr. Heil's report which I'm sure Your

5    Honor has read.  If you think about what happened to

6    Mr. Eastman in the years between his fifth or sixth birthday

7    and his, say, 18th birthday, just to cut it off, when I think

8    much of the misbehavior that forms the foundation of what

9    leads us to be here started to take place, the phone calls,

10   things like that, if you just take off or catalog what

11   happened to Mr. Eastman from the time he was in kindergarden

12   until the time he was 18 years old it's, frankly,

13   unimaginable.

14           His mother and father break up.  Mr. Eastman catches

15   his mother with another man.  She reacts angrily, winds up

16   breaking his leg.  He's in a body cast for a period of

17   months.  That leads to DCF taking him out of the home.  Which

18   was probably a good thing.  The problem is then he was put

19   into a foster home where he was sexually abused.  And the DCF

20   records, the contemporaneous DCF records establish that.

21   That's not something that Dr. Heil discussed for the first

22   time.  The DCF records establish that.  The records show that

23   Mrs. Eastman was told by Mr. Eastman about that abuse and she

24   didn't do anything about it, which I'm going to touch on a

25   little bit later, Your Honor, in terms of some abandonment
```

23

1    issues.

2         In any event, he then goes and eventually winds up

3    going back into the mother's home and the mother has a new

4    boyfriend.  The father and the mother are separated by this

5    time or divorced.  And the boyfriend fractures his nose.

6    Hits him in the face because of some disagreement and

7    fractures his nose.

8         He is then -- I think the Dr. Heil's report talks

9    about how the family is really living day-to-day.  There's

10   food shortages.  There is, nonetheless, plenty of alcohol and

11   marijuana in the house.  By the time he's 12, he's basically

12   living in an apartment where the only thing to eat is rice

13   and the activity is alcohol and drugs.  This is by 12 years

14   old, Your Honor.

15        So he's been physically assaulted with a broken leg,

16   sexually assaulted, physically assaulted with a broken nose,

17   effectively abandoned, and living basically day-to-day.  This

18   is 12 years old.  Then when he's 15, his mother just leaves.

19   Goes to the store.  Doesn't come back.  Now, what she told

20   Dr. Heil, I think what she told DCF, was that she thought

21   that John, Mr. Eastman, was capable, mature enough to take

22   care of raising, helping to raise his sisters.  That's

23   madness.  That's just absolute madness.

24        He then goes to live with the father.  The father

25   had been in and out of alcohol treatment and been in and out

24

1   of Rushford Hall in Middletown for many years.  And part of I

2   guess his activities in terms of helping his father, taking

3   care of his father, was to drive his father back and forth to

4   Waterbury for sexual liaisons.

5           Now this is about when the misconduct starts.  I

6   think really based on both the Presentence Report records and

7   also the records that Dr. Heil reviewed and are summarized in

8   his report.  But then there's something that I know Dr. Heil

9   talked about and --

10          THE COURT:  You said his report.  Dr. Heil's report?

11          MR. BLOSS:  Yes, Dr. Heil's report.

12          THE COURT:  Dr. Heil's a woman.

13          MR. BLOSS:  No, Your Honor.

14          THE COURT:  Wasn't the name Katherine.

15          MR. BLOSS:  Karsten.  He's German, Your Honor.

16          THE COURT:  I'm glad you pointed that out to me.

17  You kept saying his report and I'm glad you pointed that out.

18  Thank you.

19          MR. BLOSS:  Karston Heil, Your Honor, he's German

20  and works at Yale obviously.

21          Now there's an event that takes place.

22  Mr. Eastman's in high school.  This has been a bad childhood

23  up to now, but it's about to get worse.  Because he starts to

24  lose his hearing.  And I know Dr. Heil talked about that in

25  some depth, and I've talked about it with Mr. Eastman myself,

```
 1    Your Honor.  I think -- I'm not the psychiatrist, Dr. Heil is
 2    the psychiatrist and he's done a good job putting this
 3    together I think and trying to explain what series of events
 4    and what series of circumstances bring us here.  But what
 5    happened when Mr. Eastman was in high school, Your Honor, is
 6    that his hearing wound up alienating him, separating him from
 7    friends.  People made fun of him.  People teased him pretty
 8    mercilessly.  And so by the time he's 16, he's in 10th grade,
 9    he drops out of school.  That's it.  And largely because of
10    the hearing issues.  Now why didn't -- his father had
11    insurance.  John thinks his father had insurance.  Why didn't
12    John's father bring him to get help?  The best explanation,
13    as Mr. Eastman has it, is that his father was too focused on
14    himself and too focused -- too worried that he was going to
15    hit maximums on his own medical insurance.  If Mr. Eastman
16    had surgery, then the father wouldn't be able to check into
17    facilities as he needed to.  Apparently he checked into
18    either mental health or alcohol related facilities regularly
19    during this time period.  So I don't think it's a good
20    explanation, but that's at least the explanation that the
21    father gave the son.  And that never really got taken care
22    of, Your Honor.  So if you think about, what is that, half a
23    dozen, eight decisions, conscious decisions that adults in
24    Mr. Eastman's life made that wound up alienating him from
25    friends, not giving him medical care, not giving him food,
```

A-678

1    having him physically abused, having him physically abused

2    again, having him sexually abused, and dropping out of school

3    with basically no prospects.

4         Now, that's a long time ago.  That's a long time ago

5    and I accept that.  That's 32 years before today.  But,

6    nonetheless, the pattern of behavior that I think is a

7    straight line from the time he was 16 until the time he was

8    46 or 45, at the time of his offense, runs straight through

9    all of those events.

10        Now, the next question may be so what?  Because that

11   still is the foundation that his life has been built on.  And

12   how -- I would expect, Your Honor, that one of the major

13   concerns you have would be if I let him out after a period,

14   how do I know that it's not going to happen again, right?  Of

15   course that's a significant concern.  Safety of the community

16   is one of the factors you have to take into account under

17   3553(a).

18        The best I can say -- I think I can say two things.

19   One is I rely on what Dr. Heil and Dr. Brown, for that

20   matter, the psychologists did the testing have written in

21   their report.  And I know that Your Honor has read it but I

22   do want to refer to a couple of parts of it.

23        Specifically, Dr. Brown, the psychologists at page

24   16 of the report.  Mr. Eastman is a -- Mr. Eastman has a

25   history of a chaotic childhood, including exposure to sex at

1    an early age, physical and sexual abuse as a child and

2    emotional neglect.  As an adult he struggled to make

3    meaningful connections with others and often spent time out

4    on the street using drugs, drinking alcohol excessively, and

5    getting into legal trouble.  Although he exhibits poor

6    insight on the severity of his childhood events and its

7    influence on his current functioning, is is my opinion that

8    Mr. Eastman's chaotic development did impede his social and

9    emotional maturation, he has not successfully achieved adult

10   independence, nor normal and intimate adult social

11   connections.  His sexual social deviant behavior has

12   demonstrated a desire for closeness and intimacy, but he is

13   ill-equipped emotionally to engage in a mature responsible

14   give and take of an adult relationship.  Then a little later.

15   Mr. Eastman will benefit from supervision as well as

16   treatment that can help him gain insight on his personality

17   structures, specifically how he understands himself and it

18   relates to others, and behaviors that have contributed to his

19   current legal issues.

20        Dr. Heil, your Honor, has the same conclusion at

21   page 17.  Mr. Eastman would benefit from psychosocial

22   treatment that focuses on improving his insight into his

23   social immaturity as well as building a set of skills that

24   would help him to navigate in personal and social

25   relationships in a more appropriate way.  He would most

28

1    benefit from sex offenders specific treatment.  There are

2    many such treatment programs throughout the country.  I'm

3    going to actually have a request as it relates to designation

4    on that in a moment, Your Honor.  Here Mr. Eastman could

5    learn strategies and skills to better control his maladaptive

6    behaviors.  Research has shown that participation in such

7    specialized programs significantly reduces the risk of

8    recidivism in sex offenders.

9            THE COURT:  Let me ask you a question about that.

10   If you look at the Presentence Report, Officer Welks was

11   apparently able to obtain records from a previous sex

12   offender program set forth in her report, in which he didn't

13   follow the rules on two different occasions separated by

14   years.

15           I note that in the final paragraph Dr. Heil talks

16   about his defensiveness and says it's unlikely he would

17   adhere to such treatments without being mandated to do so.  I

18   assumed that the earlier treatment was also a court ordered

19   condition and twice it didn't work out.  To be more blunt, he

20   was ejected for failing to follow the rules, at least

21   according to the information in the Presentence Report.  So

22   why should I, addressing the very question that you raised,

23   have confidence that this time will be different with regard

24   to sex offender treatment?

25           MR. BLOSS:  I think for two reasons, Your Honor.

1    One is the sex offender treatment has come a long way since

2    then.  This was a long time ago.  I think we provided those

3    records actually to Probation.  The records are from The

4    Connection, as I recall it, the program.  It was a program in

5    Middletown.  I don't know whether those were court mandated.

6    I think it would not be unreasonable to speculate that they

7    were court mandated and that they were conditions of

8    probation.  I have a little bit of experience with The

9    Connection.  It is not a higher level sex offender treatment

10   for whatever reason.  I think, as I look back on it, I think

11   that that treatment program was probably as a result of the

12   sexual assault on the fourth degree and risk of injury charge

13   that Mr. Eastman was convicted of in 1999 approximately, and

14   that was at the very, very, very beginning of when the

15   Connecticut Probation Department started to really get into a

16   much more energetic, robust interventional sex offender

17   program.  It was actually a little bit later when they

18   started to get into something, the Connecticut -- CATSO,

19   Connecticut Association for the Treatment of Sex Offenders.

20   That program, I think, was in its very early days at the

21   time.

22           What we don't have, Your Honor, is we don't

23   have -- I provided I think the Probation Office with all the

24   records we were able to obtain and the records are terribly

25   incomplete.  But I agree that it is not hard to imagine that

30

1   Mr. Eastman would not do this voluntarily, would not do a

2   program voluntarily.  He would need to do it first during his

3   incarceration.  So there's going to be a program that he

4   -- and he's going to want to take advantage of it, Your

5   Honor.  I will tell you that this has been a little bit of a

6   struggle, because it is a hard thing to say I need help.  It

7   is.  And today actually, for the first time, Mr. Eastman said

8   to me I'd like to do it.  I'd like to make a go of it.  I

9   think you said I'm going to try my best.  That's progress,

10  Your Honor.  Is it a guarantee of success?  No.  But that's

11  more than I've heard.  I don't know when I was appointed in

12  this case, over the summer, I think.  I heard that today.  I

13  think that's a positive step.

14        The other thing, though, I can say about that, Your

15  Honor -- no matter what you do, Your Honor, he's going to get

16  some kind of treatment on the inside, assuming he takes

17  advantage of it.  Second, assuming that he's released and he

18  gets out on supervised release, I have a much higher degree

19  of confidence in the ability of the Federal Probation Office

20  to supervise sex offender treatment than I do the Connecticut

21  Probation Department.  I'm sorry to say that, but that's just

22  a fact.

23        Third, I would note, Your Honor, he's 50 years old.

24  So let's say he gets out whenever he gets out.  He has some

25  treatment on the inside and my guess is his records of that

1    treatment will follow him to Probation and Probation will

2    look at that and say, hum, this guy really doesn't get it and

3    so we're going to have him on an extraordinarily short leash.

4    The next time he's here, Your Honor, is the end.  I think.

5    He's 50 years old.  The next time it's -- no matter what you

6    do or somebody else, it's effectively a life sentence.

7           So that's the best -- I think that's the best

8    assurance I can give you under the present record, your

9    Honor.  I understand what Your Honor's concern is.  It is

10   completely valid.  All I can tell you is that Mr. Eastman

11   tells me, in addition to the systemic issues, the kind of

12   structural issues I talked about, he tells me he's willing to

13   do it.  I hope that happens.  I hope Your Honor gives him an

14   opportunity to make it happen and I hope he takes advantage

15   of it if Your Honor gives him that opportunity.  If he

16   doesn't, there's not much anybody can do.  Right?

17          So, Your Honor, I do -- let me maybe just talk about

18   that for just a second, I think on the designation issue.  I

19   don't think Danbury has the program.  I know Devens does.

20   His mother, Mr. Eastman's mother, lives in Waterbury.  I

21   think Devens would be relatively convenient.  Mr. Patel said

22   that maybe Fort Dix does, although I could only find Devens

23   in the Northeast.

24          THE COURT:  They're well-known programs outside the

25   northeast, Butner, there's a place in Ohio, there's a place

32

```
 1    in Colorado but, obviously, that's no where near where his

 2    mother is.  I don't know.  Devens has a medical -- well-known

 3    medical facility.  I don't know about their sex offender

 4    treatment program.  But you've done some research on this?

 5              MR. BLOSS:  I have, Your Honor, to the extent that I

 6    could.  Just looking at BOP, some BOP guidelines.  And the

 7    fact is, the PSR is obviously going to be available to

 8    whoever does the designation, as is Dr. Heil's report I

 9    assume.  They have a very structured program.

10              THE COURT:  I'm happy to recommend Devens if that's

11    what you're asking.

12              MR. BLOSS;  That is what I'm asking, Your Honor.

13              THE COURT:  And that's in terms of classification,

14    that's either low or medium?

15              MR. BLOSS:  I think their medical unit is

16    technically an administrative, because it's a medical unit.

17    And so I think would he qualify for Devens.

18              THE COURT:  That's fine.  I'm going to include it.

19              MR. BLOSS:  And, obviously, it's up to the BOP.

20              THE COURT:  That's right.  And I'll explain that

21    later.

22              MR. BLOSS:  So, anyway, I'm not going to keep going

23    through Dr. Heil's report.  You read it.  Again, I don't

24    offer it as an excuse.  I don't offer it as a justification.

25    Maybe of an explanation and with some hope, or maybe more
```

1    than a hope that there is something positive that can come

2    out of this in terms of avoiding any kind of future

3    misconduct.

4            There's just a couple of other issues I want to talk

5    about, Your Honor, briefly.  One is -- and I think Government

6    and I actually agree on this, although our scale of agreement

7    may not completely overlap.  I think we agreed that there is

8    a rather broad spectrum of cases of this nature.  None of

9    them are -- they're all bad.  They're all bad period.  There

10   are some, though, that are worse.  And I think the 2nd

11   Circuit has made this point, the 7th Circuit has made this

12   point, where there is conduct such as the images are

13   distributed, where there is -- where the perpetrator -- where

14   the defendant is present with the victims.  Where the

15   defendant actually physically touches or molests or assaults

16   the victims.  Where the victims are photographed in some of

17   the more graphic circumstances where there is contact with

18   others during the photography, threats of violence, threats

19   of weapons involved, and so forth.  All of those factors are

20   aggregating, I guess, in the type of conduct.  There are none

21   of those factors here.  I understand there is deception that

22   was involved.  That was already taken into account in the

23   Guidelines.  And, again, I'm not trying to minimize what

24   Mr. Eastman did, but I do want to put it in the greater

25   context of the types of cases that bring us here, that I

34

1    think we've cited some of the cases and the Government cited

2    some of the cases too.  And I appreciate the Government's

3    candor, frankly, with trying to put this case into a context

4    of similar cases to avoid disparity.

5         THE COURT:  There is one issue with regard to that,

6    one issue you have a chance to address.  Of course there's

7    the conduct in the offense but, as you know, I can consider

8    the conduct in paragraphs 26 through 33, and I will, in

9    connection with his history and characteristics.  Surely some

10   of that conduct could have been charged as the production of

11   child pornography.  I don't think there's really any basis to

12   dispute that.  And the production of child pornography

13   carries a 15 year minimum.  Now, I'm not sure why the

14   Government chose to charge the case the way it did.  I'm not

15   criticizing the Government for that.  But there are other

16   cases, including cases where I sentenced, where the defendant

17   did something that was not all that different, but faced the

18   15 year minimum.  So that I think also plays into the

19   disparity analysis here.  Just because one person faces a

20   different charge isn't really a reason not to treat them

21   alike with another if the conduct is pretty similar.

22        MR. BLOSS:  I guess I can't comment on those cases,

23   Your Honor, without knowing, again, were the images

24   distributed in those cases, were there other factual -- I

25   think that's a big issue.

```
 1          THE COURT:  You're right that that is a
 2     significant -- it's distribution, as you say, physical
 3     contact.  And I think I also agree that physical presence
 4     makes a difference.  I agree that those are to some extent
 5     differentiators in this case.  But, anyway, if you wanted to
 6     comment on that further you can.
 7          MR. BLOSS:  I think I've said what I can say, Your
 8     Honor.  I don't know what the charging decision was and why
 9     it was charged the way it was.  My guess is that the
10     Government takes into account some of these aggravating
11     factors and mitigating factors, I guess the absence of
12     aggravating factors, if you will, even if it's technically
13     within.  But I don't know the answer to that, Your Honor.
14          I think this is a sad and difficult case all around.
15     All around.  For the victims certainly, I think it's sad
16     because what I think led us to be here.  And it's just I
17     think a frustrating, difficult and sad situation.
18          The only other issue that I want to mention, Your
19     Honor, is the issue of jail credit for Mr. Eastman's
20     detention for four and a half years.  I'm not suggesting
21     anybody did wrong here by the way.  I just want that to be
22     very, very clear.  Mr. Eastman was arrested on state charges.
23     He was held for two years on bond in the Bridgeport jail
24     before he was indicted in this case.  Then, of course, Your
25     Honor is familiar with what happened here.  The bottom line
```

1    is that he has been held on bond on the state charges for

2    four and a half years.  That is under any analysis a long

3    time.

4            THE COURT:  I agree with you.

5            MR. BLOSS:  Again, I'm not suggesting the Government

6    did something wrong.

7            THE COURT:  I understand.

8            MR. BLOSS:  But I'm just making a point.  It

9    happened the way it happened.  And it happens sometimes that

10   way.  That's fine.  But he has been held in protective

11   custody for four and a half years.  And what protective

12   custody means, Your Honor, is that he's out of his cell for

13   seven and a half hours a day, three and a half hours part of

14   the day and four hours during the day.  However, he can only

15   go into the day room.  He takes meals in the day room.  The

16   day room is a room maybe about half the size of the jury box,

17   something along those lines.  The people that are there are

18   all there for not this specifically, but they're there

19   because they're either witnesses in a case or they're

20   something else.  They're not in general population.  He can't

21   see me when there's anybody else around.  I tried to go see

22   him on Friday, Your Honor, and as long as there were general

23   population inmates in the room, in the visiting area, he

24   couldn't go in there.  So it has not only been an

25   extraordinarily long period of time, but it's an

1    extraordinarily difficult period of time.  As a pretrial

2    detainer, which he's been for four and a half years, he gets

3    no programming at all.  There's no schooling, there's no

4    rehabilitative function because he's not convicted.  There's

5    nothing to rehabilitate.  They don't spend any time on

6    programming.  So do I think that's the controlling factor?

7    No.  But I think it's an important fact and something that I

8    think Your Honor can take into account.

9            So I think, Your Honor, between the papers and my

10   comments here today, I don't really have any other comments.

11   I think Mr. Eastman does want to address the Court briefly.

12           THE COURT:  Sure.

13           THE DEFENDANT:  I'd just like to say I'm sorry for

14   what I've done and I wish I could take it back.  I look

15   forward to doing programs, if I can.  If you let me do this

16   so I can function, you know, in society again, you know, one

17   day.  But I really, you know, the bottom line is I'm really

18   sorry.  I wish this never happened.  I've embarrassed my

19   family.  I've embarrassed the victims.  That's all I want to

20   say.

21           THE COURT:  Thank you, Mr. Eastman.

22           Mr. Patel.

23           MR. PATEL:  Thank you, Your Honor.  Before I begin

24   my remarks on what's an appropriate sentence, I just want to

25   go back a little bit and talk about -- I should have raised

38

```
 1   it a little while ago.  The Court noted that it reviewed the

 2   Waterbury police affidavit and police report and posted it on

 3   the docket.  I just want to be clear that was not the only

 4   source of evidence in this case.  After the Waterbury police

 5   did their forensics, Agent Mahar here did his own forensic

 6   analysis in the computer and recovered additional

 7   information.  For example, in the PSR there is a paragraph on

 8   some of the chats between Mr. Eastman and the minor victim

 9   number 1.  That was all recovered in the subsequent forensic

10   analysis that Agent Mahar did.  The pictures and the videos,

11   that was all recovered.  And the Skype user names and what

12   they were when they were created, that was all done in the

13   Waterbury police forensic analysis.  But then we did our own

14   forensic analysis.  We also obtained records from various

15   email providers and Facebook.  When someone creates a Skype

16   user name they have to register an email address with that.

17   And so for each one of those Skype users names that's in the

18   PSR there was an email address, a Gmail account, a Yahoo

19   account, a Microsoft account in the name of those celebrities

20   as well, and we obtained records and saw the IP addresses

21   that were used to create those email addresses, and that all

22   corroborated the forensic report from the Waterbury Police

23   that tied this all back to Mr. Eastman.  I just want to make

24   sure the record is clear it's more than just the evidence on

25   his computer.  We also searched the minor victim 1 and minor
```

39

1    victim 3's computers and did a forensic analysis which also

2    showed some chats with these specific user names.

3          THE COURT:  Thank you for pointing that out.  I

4    think I asked you this the very first appearance but I don't

5    remember what you told me.  Is that why it took a long time

6    for the government to adopt -- the federal government to

7    adopt the case?

8          MR. PATEL:  Partly the reason.  I will say that

9    we -- this case was brought to our attention by the State

10   Attorney's Office and that didn't happy I think until more

11   than a year after he was extradited back from Virginia.  And

12   then after that we did our own investigation and that took

13   almost a year.  And then he was charged by complaint and with

14   his previous counsel we were working with them on discovery

15   and that took continuing the case for a year, hoping that it

16   could be resolved.  And then at a point it came we were told

17   it was not going to be resolved and so we had to indict the

18   case.

19         THE COURT:  Okay.

20         MR. PATEL:  I also believe -- my understanding from

21   the State's Attorney is there was a couple of instances of a

22   change of counsel in the state case before it was adopted

23   federally.  So that added to the delay in the state case

24   before it was brought to our attention.

25         So turning to the appropriate sentence.  The parties

1    agree that in this particular case a non-guideline sentence

2    is appropriate.  We're not seeking a Guideline sentence.  The

3    question is what is the right sentence.  I don't think

4    counsel explicitly stated it a few minutes ago, but in his

5    Plea Agreement -- in his sentencing memorandum he argues for

6    10 years which is mandatory minimum.  And the Government's

7    arguing for something in the middle of the range, between 10

8    and 20 years.

9           We agree with certain things that counsel raised his

10   remarks.  There's no evidence Mr. Eastman distributed these

11   pictures or videos that he created.

12         THE COURT:  I did want to ask about that.  I'm not

13   suggesting there is such evidence just to be clear.  But

14   there was a line in the Presentence Report that concerned me

15   along those lines.  I'm expecting you're going to tell me,

16   Judge, we checked and nothing happened.  But let me just tell

17   you what I'm referring to.

18         Yes, it's paragraph 34.  There's a discussion of a

19   chat on Skype between justin.bieber727 and someone called

20   other user.  And then the -- there's a line there that says

21   from the other user to justin.bieber, you should record some

22   more to me.  And I didn't know what, if anything, the

23   Government made of that.

24         MR. PATEL:  We saw that, too, and we just don't have

25   any evidence that that was ever done.  We did go through the

41

1   Facebook records.  We did see that message.  That showed up

2   in the emails because his Facebook profile was set to that,

3   any time someone posted a message it was went to his email

4   account.  But we didn't see any evidence of distribution.

5           THE COURT:  Okay.

6           MR. PATEL:  So there's no evidence he distributed

7   and we agree that he did not have any physical contact with

8   any of the people he enticed via Skype.  And there's no

9   evidence he did this for commercial gain or benefited

10  financially.  Ten years is a long time but, even still, the

11  Government does not believe that the mandatory minimum of 10

12  years is appropriate in this case.  So I'd like to start by

13  putting that mandatory minimum into context.

14          If we take, for example, a defendant who enticed one

15  or two minors who are 16 or 17 years old over a short period

16  of time, a few weeks, or maybe a month, the defendant did not

17  misrepresent himself or use trickery or deceit, where the

18  victim knew exactly who they were communicating with and the

19  defendant asked that victim to take pictures of herself and

20  send them to him and the defendant and the victim complied,

21  and a defendant with no criminal history and no prior

22  offenses involving a minor, that person is a person whose

23  request for a mandatory minimum sentence of 10 years in the

24  Government's view would be credible.  But that person is not

25  Mr. Eastman.  He did not entice just one or two minors who

42

1    were in their mid to late teens.  And taking the Court's

2    ruling that the victims 2 through 5 are not part of the

3    Guidelines calculation, they did agree -- the defense did

4    agree that those facts were accurate in the PSR.

5              THE COURT:  And I've adopted them.

6              MR. PATEL:  Right.  And that the Court acknowledged

7    that it could consider that as part of the characteristics.

8              THE COURT:  Absolutely.

9              MR. PATEL:  And so by our account he enticed at

10   least five young girls, some as young as 12 years old.  He

11   didn't do this over a short period of time.  He did this over

12   the course of several months.  He also deceived these minors.

13   He went to great length to impersonate celebrities that he

14   knew and hoped that would cause these young girls to contact

15   him.  He used screen names and videos of these celebrities as

16   bait to lure these young girls into Skype conversations with

17   him.  And then once he lured them into these Skype calls he

18   preyed on them.  He preyed on the admiration these girls had

19   for these singers, these celebrities.  And he also preyed on

20   their emotions and their self-esteem.  For example, I noted

21   this in this my memo.  The chats with minor victim number 1

22   are in the Presentence Report, where she's talking about how

23   she's lonely at school and no one likes her.  There's also

24   another girl, minor victim number 2.  This is not in the

25   Presentence Report, but she was interviewed by law

1    enforcement and during that interview she talked about this

2    period of time in her life when this conduct occurred.  She

3    talked about how right around this time there was stuff going

4    on at school and she felt like her friends had turned on her

5    and they didn't like her anymore and so she started chatting

6    on Skype.  And that's when she encountered a screen name of

7    someone with -- a screen name with Harry Styles in it.  And

8    Harry Styles was the singer in her favorite music group at

9    the time, One Direction.

10            And so, like I said, Mr. Eastman was counting on

11   these young girls falling for his deception and he took

12   advantage of these naive girls and enticed them and

13   instructed them to get naked and pose in a sexual manner for

14   him.  And as he watched them he masturbated and secretly

15   recorded them.

16            Now, this isn't Mr. Eastman's first brush with the

17   law.  We've talked about this, that he has 31 prior

18   convictions, including a prior conviction involving a minor.

19   He was on the sex offender registry for 10 years.  And he did

20   participate in sex offender treatment before.  That was court

21   mandated.  If we look at the order of probation that was part

22   of his prior conviction.

23            THE COURT:  If I'm not mistaken, there are two prior

24   convictions involving a minor.  There's one involving the

25   paragraph that I read earlier about the step-daughter of the

A-696

44

1   cousin, and then there's another -- I believe it was a risk

2   of injury conviction or grabbing the arm.

3           MR. PATEL:  Yes, that's right.  After that

4   conviction where he did grab the arm of somebody.  There's no

5   indication that this was sexual in nature.  But from the

6   first one involving the step-daughter of the cousin, I think

7   the order of probation lists sex offender treatment as part

8   of the order at the bottom of that page.  So I do believe it

9   was court ordered.  And he was ejected from that program.

10          Now, we heard today from his counsel that, for the

11  first time, that he wants to obtain treatment and it's a goal

12  of his.  I will note that we just heard that for the first

13  time today just moments before Your Honor's about to sentence

14  him.  I also note we've heard him say things before only to

15  change his mind.  For example, on March 2nd he pled guilty,

16  and then a few weeks later he had a change of heart and

17  decided to withdraw his guilty plea.  So I don't know how

18  much credit we can give his statement today that he really

19  wants to participate in this program and get better.  And

20  those prior convictions, the sex offender treatment, being on

21  the sex offender registry, none of that deterred him from

22  victimizing these young girls in this case.

23          So the Government believes that the defendant is a

24  very real danger to the community, especially minors.  And

25  just because he hid behind the internet and did not

45

```
1   physically touch any of these young girls does not make him
2   any less of a danger.  He had direct contact with and
3   communicated with these girls in a sexually explicit manner.
4   He directed and instructed them in how to engage in sexually
5   explicit conduct, how to pose in front of the camera.  And he
6   recorded their sexual acts for his own or their sexually
7   explicit conduct for his own sexual pleasure.  And the
8   Government believes this conduct would have continued if he
9   wasn't arrested.  Minor victim number 1, the date of that
10  offense was November 6, 2012, and Waterbury police visited
11  him only four days later.
12          THE COURT:  That's the report from Vermont?
13          MR. PATEL:  The report from Vermont actually was in
14  September 2012, before the incident with minor victim
15  number 1.  The incident from Vermont happened and after --
16          THE COURT:  It took a while to --
17          MR. PATEL:  It took a while to get the IP address,
18  to figure out which residence that resolved to.  And by the
19  time they got that information and Detective Morgan and
20  Detective Terni went to the house, it wasn't until November
21  10th, 2012.
22          THE COURT:  Okay.
23          MR. PATEL:  So in the Government's view,
24  Mr. Eastman's conduct makes him a real danger to the
25  community, not only this conduct but his past conduct.  And
```

1   his conduct and history, as the Government set forth in its

2   memo, are a far cry from the type of conduct that might merit

3   the mandatory minimum sentence.

4        Your Honor noted about the production charge versus

5   the enticement charge.  You know, in other districts, being

6   the coordinator in our office for these types of cases I'm on

7   a list serve where we discuss these type of cases with other

8   AUSAs in other districts.  I have no doubt in some other

9   districts that this would definitely have been charged as a

10  production of child pornography.

11       THE COURT:  I had a case in this district, United

12  States versus Michael Crawford, 13CR6, where there were

13  differences, there was contact, it was a person in his care.

14  The case agent is here.  On the other hand, there were many

15  more extenuating circumstances as well and one could have

16  argued about the wisdom of charging it that way, but it was

17  charged that way.  So I think -- I mean, there's no question,

18  at least in that case that was, one could say, a reasonably

19  aggressive use of a production charge.  I'm not being

20  critical, to be clear.  I'm just saying I don't think it's

21  correct to say that in this district no one ever gets charged

22  for production unless they're the Charles Manson of sex abuse

23  crimes.  It's just not true.

24       MR. PATEL:  I just had a sentencing earlier this

25  year which I handled and I did not put it in my memo because

1   it was a production charge, but it was a defendant who

2   enticed three young girls under the age of 16 over Skype and

3   Kik, but he had physical contact with one of them.  And in

4   that instance we decided to charge that one with production.

5   This one there was no physical contact or not in person with

6   these victims, and those cases our office tends to review

7   those more on a case by case basis.  If it was an in person

8   contact we more likely would have charged that as a

9   production case.

10          The last thing I want to mention, Your Honor, is the

11  harm of this conduct on the victims.  And while we've not

12  received any impact statements from victims directly, there

13  is a statement from the attorney, what's listed in the PSR as

14  minor victim number 4.  But we know from past experience the

15  harmful effects these cases have on minors.  And while the

16  effects might not manifest themselves right away so that

17  there could be a victim impact statement, they sometimes

18  occur years down the road.

19          I don't think there is a doubt that whatever

20  sentence this Court imposes, the victims will be dealing with

21  this conduct for some time to go, if not for the rest of

22  their lives.  And so while the Government is not seeking a

23  Guideline sentence in this case, the Government does not

24  believe that the mandatory minimum is appropriate.  And so we

25  would ask the Court to impose somewhere in the middle of the

A-700

48

1    range between 10 and 20 years, followed by a lengthy term, if

2    not a life term, of supervised release.

3            THE COURT:  Thank you, Attorney Patel.

4            Mr. Bloss, did you want to say anything before we

5    recess?

6            MR. BLOSS:  Very briefly, your Honor, just as to the

7    last point.  I think the supervised release should be a long

8    time.  I don't think there's any question about that.  I

9    would expect that to be the case.  I think any marginal

10   credibility I might have might disappear if I suggested that

11   anything different should take place.

12           On the harm to the victims, I don't want to minimize

13   that, but in those Second Circuit cases that I cited there

14   was evidence of specific -- now, a lot of those were contact

15   cases, to be fair, and there was much more detailed evidence

16   of harm to the victims.  Having said that, I don't dispute

17   generally the circumstances here.  Other than that, no, Your

18   Honor, I don't have any comments.

19           THE COURT:  Thank you.  All right.  We're going to

20   take a short recess.  I'll be back to impose sentence at

21   about 3:30.

22           (Recess.)

23           THE COURT:  Please be seated.

24           First, just as a preliminary matter, I'm going to

25   order that the psychiatric evaluation be attached to the

1    Presence Report in this case for purposes of the Bureau of

2    Prisons.

3            Let me now turn to sentencing.

4            So, Mr. Eastman, the law requires me to consider a

5    series of factors in deciding on a sentence in your case.

6    The factors are listed in Section 3553(a) of Title 18 of the

7    United States Code.  They include the following things:

8            Your background and characteristics.

9            The nature and circumstances of this crime.

10           The purposes of a criminal sentence.  And the

11   purposes of a criminal sentence recognized in the law are

12   punishment.  Punishment itself includes the need to reflect

13   the seriousness of the offense behavior and the need to

14   promote respect for the law, among other things.

15           Another purpose of a criminal sentence is

16   deterrence.  Deterrence includes deterring you from

17   committing crimes in the future and deterring other people

18   from committing this type of a crime.

19           Rehabilitation, which means addressing treatment and

20   vocational needs you might have.

21           And protecting the public from further crimes by

22   you.

23           Those are the purposes of a criminal sentence.

24           Another factor I'm required to consider is the

25   Sentencing Guidelines and the advice that the Guidelines give

1    me about how to sentence you.  As I've said before, I've

2    calculated the Guidelines range as 262 to 327 months of

3    imprisonment.

4          I also have to consider the need to avoid

5    unwarranted sentence disparities among defendants with

6    similar records who have been found guilty of similar

7    conduct.  There are other factors as well, such as

8    restitution which doesn't ultimately apply here.  But in

9    short, these factors require me to consider everything that I

10   have learned today, everything that's good and everything

11   that's not good, and to weigh all that information and

12   determine a sentence that is fair, just, and reasonable in

13   your case, and also a sentence that is sufficient but no

14   greater than necessary to serve the purposes of sentencing.

15   Now, I've considered all of these factors, but every case is

16   different and there are some factors here that weigh more

17   heavily than others.  I now want to talk to you more

18   specifically about how I reached a decision as to the

19   sentence by walking through these factors.

20         First, as a preliminary matter, I note that the law

21   gives me discretion to depart from the Guidelines range.  I'm

22   not going to exercise that discretion in this case because I

23   don't believe there's a basis to do so.  However, second, the

24   law also gives me discretion to impose what's called a

25   non-guidelines sentence, which is a sentence outside the

51

1    Guidelines regime.  I am going to exercise my discretion to

2    do that for reasons that will become apparent as I walk

3    through the factors and how they apply in this case in my

4    assessment.

5           I'm going to begin with your background and

6    characteristics.  Your lawyer did a very good job laying out

7    the information that's in the Presentence Report and in the

8    psychiatric report that I've received in a cogent way.  It's

9    clear you had a very challenging childhood.  And I see a lot

10   of defendants who have -- I would say actually most

11   defendants have challenging childhoods.  Yours was worst than

12   most that I see.  Alcoholic parents, a father who served

13   time, really abandonment by parents, in and out of foster

14   case, physical and sexual abuse, hearing loss, early on

15   dropping out of school, beginning to abuse alcohol.

16          So let me just begin by saying that Mr. Bloss is

17   right, this is sad for any child.  It's sad for you and it's

18   sad for any child.  Nobody deserves to begin life like that.

19   That said, after a time or actually quite early on, you began

20   following the pattern of your father and to some extent your

21   mother by engaging in alcohol abuse.  You began committing

22   crimes, including sex related crimes.  You've compiled a very

23   long criminal record, well over three decades, much of which

24   is too old to even count under the Sentencing Guidelines.

25   And unfortunately, that record, though not involving what

1   some people would consider to be violence, guns, knives,

2   beatings, things like that, the record does document

3   increasingly serious conduct.

4          While this offense, which I'm going to talk about in

5   a minute, did not involve physical conduct, two of the

6   earlier offenses did.  The two that I discussed with

7   Mr. Patel.  One of which was a risk of injury conviction from

8   just 10 years ago.  We're not talking about ancient history

9   here.

10         Perhaps even more disturbingly, your criminal record

11  also further documents that you committed several of these

12  offenses while you were on probation and while you were not

13  supposed to possess or use a computer.

14         As I discussed earlier, the Presentence Report

15  documents reliable evidence of uncharged criminal conduct in

16  this case, conduct that I found not to be a basis for

17  calculating the Guidelines.  And I''m talking now about the

18  conduct described in paragraphs 26 through 33 of the

19  Presentence Report against minor victims 2 through 5.  That

20  conduct was very similar to the conduct involved in the

21  offense of conviction except that some of the victims were

22  even younger, as young as 12.  Some of the conduct involved,

23  clearly involved the production of child pornography,

24  including encouraging minors to perform sex acts.

25         Other reliable evidence in the Presentence Report

A-705

53

1    shows that you independently possessed child pornography

2    downloaded from the internet.  That's a crime that causes its

3    own unique harm by inflicting pain on victims repeatedly

4    through the years each time an image is accessed.

5            Taken together, I find that your background shows

6    whatever the explanation for it and whatever the causes for

7    it, that you are a habitual and, I'm sorry to say, dangerous

8    sex offender, regardless of whether you qualify for

9    particular labels in that regard under the Sentencing

10   Guidelines.

11           First, you have not aged out of criminal conduct.

12   Even in your mid 40's, your crimes continue to occur and, if

13   anything, became more serious.  Worse, I would say, you

14   apparently failed to recognize this, at least before anything

15   that you said today.  And I'll be frank with you, I always

16   take what's said on the day of sentencing with a grain of

17   salt.  It's normal for a judge to do that.  Because I know

18   that you are aware that you're facing sentencing.

19           I read the motion that you filed to withdraw your

20   plea, and in that motion you described your crime against

21   minor victim 1 as a crime of technicality.  You made the

22   point earlier that you didn't want to be portrayed as a

23   monster or a sexual predator, and that somehow you seemed to

24   suggest that the world saw you in a much worst light than you

25   really were or that you really presented.

54

1        The problem with all that from my perspective is

2    that it doesn't fit with the actual conduct.  In spite of

3    repeatedly deceiving young girls into displaying themselves

4    in sexual positions and into performing sex acts, in spite of

5    grabbing one and spanking another, in spite of refusing to

6    comply with the rules of an earlier sex offender program, in

7    spite of repeatedly violating strict conditions of probation,

8    you think that you're not a sexual predator.  Your failure to

9    take responsibility for your actions and to recognize your

10   flaws by itself poses a danger, because it suggests that you

11   will be resistant to efforts to curb your behavior.  And I

12   think that, frankly, the psychiatric report to some extent

13   concurs with that.

14        Turning now to the nature and circumstances of this

15   crime.  Causing a child, even one as old as 16, to display

16   herself over the internet for your sexual gratification and

17   taking a picture of it is a serious crime.  The law has long

18   recognized that children suffer serious harm when they're

19   made the sexual play things of adults.  And there are many,

20   many studies that show that children who are sexually abused

21   are much more likely to abuse substances, suffer from

22   depression, and engage in other antisocial behaviors as

23   compared to those who are not sexually abused.  Your own life

24   is evidence of that.  I'm aware of that.

25        This crime was exacerbated by the deception used and

**A-707**

55

1   by your creating a visual image.  Conduct that, as I

2   mentioned, could have been charged as production of child

3   pornography which would have subjected you to a 15 year

4   minimum.  With regard to the seriousness of the offense, make

5   no mistake, apart from violent crime, sex crimes against

6   children are probably the most serious crimes that are

7   prosecuted in this court, at least in my assessment.

8           Turning now to the purposes of a criminal sentence.

9   One purpose here, of course, is the need to reflect the

10  seriousness of the crime which I just described.  There's

11  also a need to promote respect for the law.  In light of the

12  attitude you expressed in your motion to withdraw your plea

13  about a crime of technicality, and in light of your pattern

14  of reoffending while under court supervision such as

15  probation.  But far and away from my perspective the purpose

16  of a criminal sentence that is most salient, most urgent here

17  is the need to protect the public.  Previous sentences,

18  including a term of as long as 40 months, and previously

19  lengthy terms of probation with strict conditions, including

20  computer monitoring and sex offender treatment were not

21  adequate to protect the public.  Nor, as I mentioned, has

22  your age slowed down your criminal conduct which is, frankly,

23  unusual.

24          Further, I'm taking comfort in the fact that this

25  particular offense did not involve contact.  As I said,

1    earlier offenses did, including one you committed in your

2    late 30's.  In light of all this, it would not be

3    unreasonable to make an argument, which the Government has

4    not made, that the protection of the public alone calls for a

5    sentence so lengthy that you would be decrepit and physically

6    incapable of committing further crimes when you were

7    released.  I'm not going to impose a sentence that that's

8    long, but I do think I reasonably could.  And the sentence is

9    going to be long in this case.

10          Specific deterrence is also a salient purpose here

11   for pretty much the same reasons I've already said.  A longer

12   prison sentence -- a substantially longer prison sentence is

13   necessary here than any one you previously served, because

14   previous sentences were unsuccessful in deterring from

15   criminal conduct.

16          I agree with Mr. Bloss about the need to take into

17   account where you've been for the past four and a half years.

18   That is unusual, too, in my experience.  And though I haven't

19   been to Bridgeport, I have been to other holding facilities

20   like Whalley Avenue in the state, I've certainly been to

21   Wyatt, but I can imagine that Bridgeport not only doesn't

22   have programming but, frankly, is a place where you had to do

23   much harder time than most federal prisoners would have to

24   serve.  And you're going to get a year's worth of credit for

25   that for me.  And I would say that, just so you understand

A-709

57

1    why it's only a year, it's not unusual in this court for

2    someone to be at Wyatt for two, two and a half years.  There

3    are circumstances, some of which occurred in this case,

4    changing counsel and the like, that sometimes delay things.

5    But in this case most of the delay or at least a substantial

6    part of it was not due to anything that you did.  And I'm not

7    faulting the Government.  As Mr. Bloss said, this happened.

8    But you are going to receive some credit for it.

9          Lastly, in terms of -- and the reason I mention that

10    in connection with the purposes of sentencing is that the

11    fact that you did harder time does go part of the way towards

12    the need to address the seriousness of the offense and to

13    provide for just punishment.

14          Turning to the Sentencing Guidelines and how I see

15    them fitting into the picture here.  As I said, the range is

16    262 to 327 months.  I note that that is over six times more

17    than any amount of time that Mr. Eastman has previously

18    served.  That fact, combined with the fact that I expect to

19    impose very restrictive conditions of supervised release,

20    leads me to conclude that a sentence within the Guidelines

21    range would be greater than what is please to protect the

22    public and even to reflect the seriousness of the offense.

23    Although, I'll be honest, it's a close call in my

24    assessment.  And I think one could reasonably argue otherwise

25    with regard to the need to protect the public.

58

```
 1          The sentence I impose will be substantially below
 2     the Guidelines range.  Indeed, after taking account of the
 3     one year reduction, I will be imposing as a result of the
 4     fact that you were at Bridgeport for four and a half years,
 5     the sentence will be below the range that would apply even if
 6     I had granted acceptance of responsibility.  The sentence I
 7     will impose is the minimum that I find to be necessary to
 8     protect the public and fulfill the other purposes of
 9     sentencing that are most salient in the case as I have
10     described them.  I note that I would impose that same
11     sentence, the sentence I'm going to impose, regardless of
12     whether Mr. Eastman had qualified for acceptance of
13     responsibility
14          Lastly, I want to touch on the issue of disparities
15     which is another issue that I've thought about and the
16     parties have discussed.  I do appreciate the Government's
17     bringing some of those cases to my attention.  I wasn't aware
18     of all of them.  I was aware of some of them.  I've
19     considered those cases.  I've also, as I said, considered the
20     fact that Mr. Eastman easily could have been charged here
21     with the production of child pornography which would have
22     carried a 15 year minimum.  There's no evidence here that
23     Mr. Eastman traded images.  There's no evidence that he had
24     contact with either minor victim 1 or minor victims 2 through
25     5.  And I agree that those are -- those factors make this
```

A-711

59

```
 1   less serious than some cases.  That said, the harm he

 2   perpetrated on these victims is still serious.  And I

 3   mentioned the Crawford case.  In that case there were some

 4   different circumstances, starting with the fact that the

 5   victim was the defendant's relative, and that the defendant

 6   traded images and was physically present with the victim.  By

 7   the same token, the defendant in that case, who I sentenced

 8   to 210 months in prison, posed much less of a danger of

 9   recidivism.  He had zero criminal history points.  He was in

10   his 30's at the time of the offense, and he did not have

11   nearly as troubling history and characteristics as

12   Mr. Eastman does.  Were it not for the fact that I'm going to

13   give Mr. Eastman a year's credit for serving his time in

14   Bridgeport, I would impose a sentence on him that was

15   slightly higher than the one that Mr. Crawford received.  In

16   the end it will be slightly lower, and it will be three years

17   lower than what I understand Mr. Hazley received.  Mr. Hazley

18   was discussed in the Government's brief.  He was sentenced,

19   as I understand it, by Judge Bolden.  His offense was

20   considerably more serious than Mr. Eastman's.  It involved

21   not only trading, but a great deal more victims.  On the

22   other hand, he had a substantially lower criminal history.

23           So those are the comparisons that I've run in my

24   mind.  The Government also mentioned the Smith case.  And in

25   my view that case bears zero resemblance to this case.  There
```

1  were very different circumstance in that case, including the

2  fact that the defendant suffered from a rare disease which

3  affected his mind.

4  Finally, with regard to restitution, as I said, I

5  don't believe I have a basis to impose restitution in this

6  case.

7  All right. Mr. Eastman, for the reasons I've

8  explained, I find that the following sentence is the minimum

9  that is necessary to serve the purposes of sentencing that

10 I've described, including the need to protect the public.

11 And, again, I note that I would impose this sentence

12 regardless of my Guidelines determinations.

13 Please stand.

14 I sentence you to 204 months, which is 17 years, of

15 imprisonment with credit for time served.

16 I impose a lifetime term of supervised release.  In

17 addition to the standard conditions of supervised release,

18 the following mandatory conditions are imposed:

19 First, the Defendant shall not commit another

20 federal, state, or local offense.

21 Second, he shall not unlawfully possess a controlled

22 substance.

23 Next, the Defendant shall refrain from any unlawful

24 use of a controlled substance and submit to one drug test

25 within 15 days of release on supervised release and at least

1    two periodic drug tests thereafter for use of a controlled

2    substance.

3            The Defendant is required to pay the assessment

4    imposed in accordance with Title 18, United States code,

5    Section 3013.

6            The Defendant shall report the address where he will

7    reside and any subsequent change of residence to the

8    Probation Officer responsible for supervision and shall

9    register as a sex offender in any state where he may reside,

10   where he may be employed, or where he carries on location or

11   is a student.

12           The Defendant shall cooperate in the collection of a

13   DNA sample.

14           In addition, the following special conditions are

15   imposed.  Before I specify these conditions, I note that they

16   are based on my findings that I've detailed today, including

17   the findings about Mr. Eastman's history and characteristics,

18   his performance on probation, his performance in sex offender

19   treatment, and his performance under a condition requiring

20   checking his computer.  I find that these conditions are the

21   minimum necessary to protect the public when Mr. Eastman is

22   released from prison based on his history and characteristics

23   and the nature and circumstances of the offense.

24           First, you must not associate with children under

25   the age of 18 except in the presence of a responsible adult

62

1   who is aware of the nature of your background and the current

2   offense and who has been approved by the Probation Office.

3       Second, you must not loiter around playgrounds,

4   schools, youth oriented organizations, clubs, or any other

5   place where children under the age of 18 are known to

6   congregate.  You must not associated with or have contact

7   with convicted sex offenders or those considered

8   inappropriate by the Probation Office because of a connection

9   to sexual abuse of minors or sexually explicit material

10  involving minors unless as part of an approved counseling

11  program.

12      Next, you must submit to periodic polygraph testing

13  at the discretion of the Probation Office as a means to

14  ensure that you are in compliance with the requirements of

15  your supervision following the completion of a sex offender

16  treatment program. You must pay all or a portion of the costs

17  associated with testing based on your ability to pay as

18  determined by the Probation Office.

19      Next, you must not possess any materials including

20  pictures, photographs, books, writings, drawings, videos, or

21  video games depicting what is described as child pornography

22  as described in Title 18, United States Code, Section 2256.

23      Next, you must submit your person, residence, office

24  or vehicle to a search conducted by a U.S. Probation Officer

25  at a reasonable time and in a reasonable manner based upon

1    reasonable suspicion of contraband or evidence of a violation

2    of a condition of release.  Failure to submit to a search may

3    be grounds for revocation.  You must inform any other

4    residents that the premises may be subject to searches under

5    this condition.

6            Next, you must submit all photographic equipment,

7    personal computers, or other internet capable devices and

8    related equipment owned, controlled, or used by you, to a

9    review conducted by the U.S. Probation Office or its designee

10   at a reasonable time and in a reasonable manner without prior

11   notice or a search warrant.  You must also permit the

12   Probation Office to install and use monitoring programs on

13   all such equipment.  You must bear the cost of said

14   monitoring programs depending, however, on your ability to do

15   so.  Refusal to submit to a search will be a violation of

16   conditions of supervision.  This condition may be modified on

17   motion by the parties or the recommendation of the Probation

18   Office communicated to the parties based on changes in

19   technology.

20           Next, you must comply with the requirements of the

21   Sex Offender Registration Identification Act as directed by

22   the Probation Office, the Bureau of Prisons, or any state sex

23   offender registration agency in which you reside, work, are a

24   student, or were convicted of a qualified offense.

25           Next, you must not be employed in any position or

64

1    participate as a volunteer in any activity that involves

2    contact with children under the age of 18 except as approved

3    by the Probation Officer.

4         Next, you must participate in mental health

5    treatment with an emphasis on sex offender treatment as

6    recommended by the Probation Office and approved by the

7    Court, and must abide by the policies and procedures of the

8    program which may include polygraph testing.  You must pay

9    all or a portion of the costs associated with treatment based

10   on your ability to pay as determined by the Probation Office.

11        Next, you must participate in substance abuse,

12   evaluation and treatment in a program recommended by

13   Probation and approved by the Court.  You must comply with

14   the rules of the program.  You must pay all or a portion of

15   the costs associated with such treatment based on your

16   ability to pay as determined by the Probation Office.

17        Finally, you must provide the Probation Office with

18   access to any requested financial records including, but not

19   limited to telephone and cellular phone bills and credit card

20   statements.  That condition is based on your computer

21   purchases documented in the record.

22        I impose no fine.

23        I impose no restitution.

24        You're required to pay a special assessment of $100.

25        As I said, the forfeiture of your computer will be

**A-717**

65

```
1    part of the judgment.

2            Does either counsel know of any reason that the

3    sentence I have described cannot legally be imposed as the

4    sentence of the Court?

5            MR. PATEL:  No, Your Honor.

6            MR. BLOSS:  No, Your Honor.

7            THE COURT:  Mr. Eastman, the sentence I've described

8    is imposed as the sentence in your case.  The judgment will

9    be prepared for my signature by the Clerk's Office in

10   consultation with the Probation Office.  It will include a

11   recommendation for the Devens facility.

12           If you wish to appeal the judgment, you must file a

13   written Notice of Appeal within 14 days of the entry of

14   judgment.  Do you understand that time limit?

15           THE DEFENDANT:  Yeah.

16           THE COURT:  If you wish to appeal but you cannot

17   afford to, then you may apply for leave to appeal in forma

18   pauperis.  If the motion is granted, the Court will waive the

19   filing fee for your appeal and will appoint a lawyer to

20   represent you at no cost to you.  Do you understand, sir?

21           THE DEFENDANT:  Yeah.

22           THE COURT:  Mr. Bloss, I did grant your motion with

23   regard to withdrawing your appearance after the sentencing.

24   Mr. Eastman not only has a right to appeal the judgment, but

25   this was a conditional guilty plea.  Unless he directs you
```

1  otherwise, would it be all right if you actually filed the

2  Notice of Appeal for him?

3         MR. BLOSS:  I think there are two alternatives, Your

4  Honor.  The other time that I've been involved with this I

5  think what the Court did actually was to appoint a new

6  lawyer --

7         THE COURT:  It's just you've got 14 days.

8         MR. BLOSS:  I understand.  I can certainly do it.  I

9  don't mind doing it.  I think the problem is --

10        THE COURT:  Will the Circuit consider that an

11  appearance?

12        MR. BLOSS:  Exactly.  So if it is possible to have

13  somebody appointed who is on the panel.

14        THE COURT:  The only problem is I think -- you mean

15  the Circuit panel, right?

16        MR. BLOSS:  Correct.

17        THE COURT:  I don't believe I'm -- I may be

18  wrong -- to appoint people who are the Circuit panel to

19  represent him at the Circuit.

20        MR. BLOSS:  There are going to be people that are on

21  the District Court panel that are also on the Circuit panel.

22  I think that would be the cleanest way to do it is if

23  somebody from the District panel was on the Circuit panel.

24        THE COURT:  I mean, it might be better, though, if

25  he got somebody from New York just kind of a fresh eye as

67

1    your motion indicated.  Look, I hear you which is -- but

2    wouldn't you be able to say to the Circuit Judge Shea let me

3    out?

4              MR. BLOSS:  I would trust that somebody would

5    -- obviously I don't want to have Mr. Eastman prejudiced.

6              THE COURT:  Let's have you file the Notice of Appeal

7    for him.  I will put something on the docket with the

8    judgment noting, again, that I granted your order and you are

9    relieved from representing him on appeal.  I'll put that

10   somewhere.

11             MR. BLOSS:  That's fine.  It will work out, your

12   Honor.

13             THE COURT:  Thank you, Mr. Bloss.

14             Does the Government have a motion with respect to

15   the remaining count of the indictment?

16             MR. PATEL:  Yes, Your Honor.  In accordance with the

17   Plea Agreement, now that he's been sentenced we move to

18   dismiss Count Two of the indictment.

19             THE COURT:  And that motion is granted.

20             Officer Welks?

21             PROBATION OFFICER WELKS:  Your Honor, just to

22   clarify for the record, when the amended Presentence Report

23   comes out should it include the Court's finding with regard

24   to the Guidelines that were determined today?

25             THE COURT:  Yes.  Unless either counsel thinks this

A-720

68

1 doesn't work, what I'm going to do is direct the Probation

2 Office to change the reference in the discussion in

3 paragraphs 26 through 33 where the heading to I think

4 Mr. Bloss suggested other evidence. And that would at least

5 correspond with my findings. I understand the Government

6 disagrees. But it would correspond with my findings that

7 it's not part of the relevant conduct in this case. Is there

8 any reason not to do that?

9          MR. PATEL: I don't think so, Your Honor.

10          MR. BLOSS: No, Your Honor. And on that issue,

11 though, Your Honor indicated that regardless of how the

12 Guidelines were calculated on the acceptance issue that the

13 Court would impose the same sentence. And given that Your

14 Honor has taken into account the paragraph 26 through 33

15 conduct, albeit not under the Guidelines but as other

16 conduct, again, forgive me for asking this, would it also be

17 the case that Your Honor's sentence would be the same as what

18 Your Honor imposed?

19          THE COURT: Absolutely, yes. I should have said

20 that. I did sort of encompass it, but my sentence would be

21 the same -- it's a good question -- even if I had included

22 the conduct described in paragraphs 26 through 33 as relevant

23 conduct. In other words, even if I had gone the opposite way

24 on that Guidelines issue. It's prudent of you to raise that.

25 So thank you. Because I find for the reasons I've indicated.

A-721

69

```
1          Why don't we do that then.

2          PROBATION OFFICER WELKS:  Yes, your Honor.

3          THE COURT:  Anything else?

4          MR. PATEL:  No, Your Honor.

5          MR. BLOSS:  Not that I can think of, Your Honor.

6   Thank you.

7          THE COURT:  Thank you.  We'll be in recess.

8          (Concluded.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

A-722

70

1                    C E R T I F I C A T E

2

3          I, Martha C. Marshall, RMR, CRR, hereby certify that

4    the foregoing pages are a complete and accurate transcription

5    of my original stenotype notes taken in the matter of UNITED

6    STATES V. JOHN EASTMAN, which was held before the Honorable

7    Michael P. Shea, U.S.D.J, at 450 Main Street, Hartford,

8    Connecticut, on November 28, 2017.

9

10

11

12                              /s/Martha C. Marshall
                                Martha C. Marshall, RMR,CRR
13                              Official Court Reporter

14              .

15

16

17

18

19

20

21

22

23

24

25

A-723

Criminal Notice of Appeal - Form A

## NOTICE OF APPEAL

### United States District Court

District of Connecticut

Caption:

United States _____ v.

John Eastman

Docket No.: 3:16cr006(MPS)

Michael P. Shea

(District Court Judge)

Notice is hereby given that John Eastman appeals to the United States Court of Appeals for the Second Circuit from the judgment ✔, other | ✔ Denial of Motion to Suppress
(specify)

entered in this action on August 15, 2016.
(date)

This appeal concerns: Conviction only |___ Sentence only |___| Conviction & Sentence | ✔ Other | ✔

Defendant found guilty by plea | ✔ | trial | | N/A | .

Offense occurred after November 1, 1987? Yes | ✔ | No |___ N/A [___

Date of sentence: November 30, 2017 N/A |___|

Bail/Jail Disposition: Committed | ✔ | Not committed | | N/A |

Appellant is represented by counsel? Yes ✔ | No | If yes, provide the following information:

Defendant's Counsel: David A. Moraghan

Counsel's Address: 257 Main St., 2-2 Floor

Torrington, Connecticut 06790

Counsel's Phone: 860-482-7651

Assistant U.S. Attorney: Neeraj Patel

AUSA's Address: 157 Church St., 25th Floor

New Haven, Connecticut 06519

AUSA's Phone: 203-821-3720

Signature