# 17-3893

*To Be Argued By:*
NEERAJ N. PATEL

## United States Court of Appeals

### FOR THE SECOND CIRCUIT

### Docket No. 17-3893

———

UNITED STATES OF AMERICA,

*Appellee,*

-vs-

JOHN EASTMAN,

*Defendant-Appellant.*

———

ON APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF CONNECTICUT

### BRIEF FOR THE UNITED STATES OF AMERICA

JOHN H. DURHAM
*United States Attorney*
*District of Connecticut*
157 Church Street, 25th Floor
New Haven, Connecticut 06510
(203) 821-3700

NEERAJ N. PATEL
MARC H. SILVERMAN (*of counsel*)
*Assistant United States Attorneys*

## Table of Contents

Table of Authorities ............................................ iii

Statement of Jurisdiction .................................. vi

Statement of Issue Presented for Review......... vii

Preliminary Statement........................................1

Statement of the Case ........................................3

    A. The underlying investigation ....................4

    B. The suppression ruling .............................9

        1. The signatures....................................11

        2. The handcuffs ....................................14

Summary of Argument .....................................17

Argument............................................................17

I. The district court committed no error—
   and certainly no clear error—in crediting law
   enforcement's account and therefore denying
   Eastman's suppression motion......................17

    A. Governing law and standard of
       review........................................................17

    B. Discussion ................................................19

        1. Consent ................................................24

2. Statements at the apartment ............... 32

3. Statements at the police station .......... 36

Conclusion ........................................................ 39

Federal Rule of Appellate Procedure 32(g)
Certification

Addendum

# Table of Authorities

Pursuant to "Blue Book" rule 10.7, the Government's citation of cases does not include "certiorari denied" dispositions that are more than two years old.

## Cases

*Anderson v. Bessemer City,*
   470 U.S. 564 (1985) .................................. 18, 23

*DiMattina v. United States,*
   949 F. Supp. 2d 387 (E.D.N.Y. 2013)............. 12

*Georgia v. Randolph,*
   547 U.S. 103 (2006) ........................................ 31

*Kentucky v. King,*
   563 U.S. 452 (2011) ........................................ 21

*Miranda v. Arizona,*
   384 U.S. 436 (1966) ................................*passim*

*Schneckloth v. Bustamonte,*
   412 U.S. 218 (1973) ........................................ 24

*Stansbury v. California,*
   511 U.S. 318 (1994) (per curiam)................... 32

*United States v. Buettner-Janusch,*
   646 F.2d 759 (2d Cir. 1981)............................ 26

*United States v. Davis,*
   967 F.2d 84 (2d Cir. 1992).............................. 27

iii

*United States v. Deutsch*,
  987 F.2d 878 (2d Cir. 1993) ............................ 26

*United States v. Faux*,
  828 F.3d 130 (2d Cir. 2016) .......... 12, 32, 33, 34

*United States v. Garcia*,
  56 F.3d 418 (2d Cir. 1995) .............................. 24

*United States v. Iodice*,
  525 F.3d 179 (2d Cir. 2008) ..................... 18, 23

*United States v. Isiofia*,
  370 F.3d 226 (2d Cir. 2004) ..................... 18, 24

*United States v. Jones*,
  239 F.3d 716 (5th Cir. 2001) .......................... 21

*United States v. Lopez*,
  547 F.3d 397 (2d Cir. 2008) ..................... 29, 31

*United States v. Lucas*,
  640 F.3d 168 (6th Cir. 2011) .......................... 21

*United States v. Maldonado-Rivera*,
  922 F.2d 934 (2d Cir. 1990) ..................... 18, 23

*United States v. McGee*,
  564 F.3d 136 (2d Cir. 2009) ........................... 27

*United States v. Medina*,
  19 F. Supp. 3d 518 (S.D.N.Y. 2014) ............... 12

iv

*United States v. Medunjanin*,
  752 F.3d 576 (2d Cir. 2014)...................... 18, 23

*United States v. Newton*,
  369 F.3d 659 (2d Cir. 2004)........................... 32

*United States v. Pabon*,
  871 F.3d 164 (2d Cir. 2017), *cert. denied*,
  No. 17-8331, 2018 WL 1610239
  (U.S. Oct. 1, 2018).......................................... 17

## Statutes

18 U.S.C. § 2252A ................................................ 3

18 U.S.C. § 2422................................................ 2, 3

18 U.S.C. § 3231.................................................. vi

28 U.S.C. § 1291.................................................. vi

U.S. CONST. amend. IV...................................... 24

## Rules

Fed. R. App. P. 4 ................................................. vi

Fed. R. Crim. P. 11............................................... 4

## Statement of Jurisdiction

The United States District Court for the District of Connecticut (Shea, J.) had subject matter jurisdiction over this federal criminal prosecution under 18 U.S.C. § 3231. Judgment entered on November 30, 2017. *See* A20; SPA1-SPA5.[1] On December 1, 2017, the defendant filed a timely notice of appeal pursuant to Fed. R. App. P. 4(b). *See* A21, A723. This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291.

---

[1] The Joint Appendix, filed by the defendant, is cited herein as "A__." The Special Appendix, attached to the defendant's brief, is cited herein as "SPA__." The Pre-Sentence Report, filed by the defendant under seal, is cited herein as "PSR ¶ __."

## Statement of Issue
## Presented for Review

I. The defendant moved to suppress evidence recovered from his computer and inculpatory statements he made at his apartment and at the police station. The district court denied the suppression motion after determining that (1) the defendant consented to law enforcement's entry in his apartment and the search and seizure of his computer, (2) the defendant was not in custody when he made statements at his apartment, and (3) the defendant waived his *Miranda* rights before making additional statements at the police station. This Court reviews for clear error the factual findings underlying these determinations. Did the district court—in crediting the account of law enforcement and rejecting the account of the defendant—commit clear error?

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

## Docket No. 17-3893

———

UNITED STATES OF AMERICA,

*Appellee,*

-vs-

JOHN EASTMAN,

*Defendant-Appellant.*

———

ON APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF CONNECTICUT

## BRIEF FOR THE UNITED STATES OF AMERICA

## Preliminary Statement

In 2012, defendant-appellant John Eastman used the internet to engage girls aged 12 to 16 in video chats. Eastman posed as musicians popular among this demographic and enticed the girls to engage in sexually explicit conduct, which Eastman recorded or photographed.

On November 10, 2012, two Waterbury Police Department detectives visited Eastman's apartment. Eastman let the detectives into the apartment and consented to their seizure of his desktop computer. Eastman also made inculpatory statements to the detectives. He then agreed to accompany the detectives to the police station where he waived his *Miranda* rights and made additional inculpatory statements.

Following his indictment on federal charges, Eastman moved to suppress the evidence recovered from his computer and his inculpatory statements. The district court held an evidentiary hearing, reviewed the briefing submitted by the parties, and issued a 26-page ruling denying Eastman's motion. The district court credited law enforcement's account of the events of November 10, 2012 and rejected Eastman's contrary version.

 Eastman subsequently pleaded guilty to one count of using an interstate facility to persuade a minor to engage in unlawful sexual activity, in violation of 18 U.S.C. § 2422(b). However, Eastman expressly reserved his right to appeal the district court's suppression ruling.

Eastman now exercises that right. He challenges the district court's credibility determinations. But the district court committed no error—and certainly no clear error—in crediting law enforcement's account. Accordingly, this Court should affirm the suppression ruling and the judgment entered by the district court.

2

## Statement of the Case

On February 12, 2015, the government obtained a criminal complaint charging Eastman with two federal offenses. *See* A3, A23. First, it charged Eastman with using an interstate facility to persuade a minor to engage in unlawful sexual activity, in violation of 18 U.S.C. § 2422(b). *See* A23. Second, it charged Eastman with possession of child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B). *See* A23.

On January 7, 2016, a federal grand jury returned an indictment charging Eastman with the same two offenses. *See* A6, A38-A41. Count One charged Eastman with using an interstate facility to persuade a minor to engage in unlawful sexual activity, in violation of 18 U.S.C. § 2422(b). *See* A39. Count Two charged Eastman with possession of child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B). *See* A39-A40.

On January 22, 2016, Eastman moved to suppress the evidence recovered from his computer and the inculpatory statements he made at his apartment and at the police station. *See* A6, A42-A106. The government opposed this motion. *See* A8, A107-A192. On May 31, 2016, the district court (Shea, J.) held an evidentiary hearing. *See* A8, A216-A453. The parties then submitted proposed findings of fact and conclusions of law. *See* A9-A10, A459-A534. On August 15, 2016, the district issued a written ruling denying Eastman's suppression motion. *See* A10, A535-A560.

3

On March 2, 2017, Eastman pleaded guilty to Count One of the indictment. *See* A14, A561-A572 (plea agreement), A573-A612 (plea transcript). Under Fed. R. Crim. P. 11(a)(2), Eastman expressly reserved the right to appeal the district court's suppression ruling. *See* A561, A585-A586, A587.[2]

On November 28, 2017, the district court principally sentenced Eastman to 204 months of imprisonment, followed by a life term of supervised release. *See* A20, A653-A722. Judgment entered on November 30, 2017. *See* A20; SPA1-SPA5. On December 1, 2017, Eastman filed a timely notice of appeal. *See* A21, A723.

Eastman currently is serving his 204-month term of imprisonment.

## A. The underlying investigation[3]

In September 2012, a group of girls aged 11 and 12 were using Skype—an internet video chatting service—at a sleepover in Vermont. *See*

---

[2] On April 18, 2017, Eastman filed a *pro se* motion to withdraw his guilty plea. *See* A16. On May 8, 2017, the district court issued a ruling denying Eastman's withdrawal motion. *See* A16-A17. On appeal, Eastman raises no claims regarding this ruling.

[3] The information recounted herein is drawn from the factual findings set forth in the district court's suppression ruling and the factual statements set forth

4

A540. Another Skype user—with the moniker "Harry.Styles888"—began chatting with the girls. A540. Harry Styles is "a member of a popular boy band." A540. To trick the girls into thinking they were communicating with the real Harry Styles, the Skype user projected video images of Harry Styles. *See* A540. The Skype user asked the girls to pose sexually in front of their webcam. *See* A540. One of the girls later told her mother, who reported the incident to the Vermont State Police. *See* A540.

The Vermont State Police traced the "Harry.Styles888" Skype username to an address in Waterbury, Connecticut. *See* A540. The Vermont State Police then contacted the Waterbury Police Department, which assigned the investigation to Waterbury Police Detective Peter Morgan. *See* A540. Using a state court order, Detective Morgan determined that the internet protocol address associated with the "Harry.Styles888" Skype account was assigned to John Eastman at a specific apartment in Waterbury, Connecticut. *See* A541.

On November 10, 2012, at approximately 6:00 p.m., Detective Morgan and Waterbury Police Detective David Terni went to the apartment to conduct a "knock and talk." *See* A451. "The detectives were in plain clothes but visibly wearing police

_____

in the PSR (which the district court adopted as its findings of fact, *see* A656-A657).

5

badges and firearms." A541. After Eastman answered the door, the detectives identified themselves and asked if they could "'come in and talk to him.'" A541. Eastman responded "'yes, okay.'" A541.

In the apartment, the detectives asked Eastman "about his computer and the investigation." A541. Detective Morgan told Eastman "about the information that he had received from the Vermont police, which included that the incident under investigation had occurred on Skype with a Harry Styles username." A451. The detectives informed Eastman that "he was not under arrest" and Eastman "was calm and cooperative throughout the discussion." A541.

"At some point, Mr. Eastman's mother"—with whom Eastman shared the apartment—"came out of her room, but as soon as Detective Morgan identified himself and told her that he was investigating a case, Mr. Eastman told his mother to return to her room and she walked away." A541. In response to questioning, Eastman explained that he "use[d] a desktop computer in his bedroom." A541. Eastman "led the detectives to his bedroom where the desktop computer was located and told the detectives that he had used the Harry Styles username for video sex chatting." A541-A542.

6

Eastman then "agreed to go to the police station and to let the detectives take the computer." A542. After Eastman requested to use the bathroom and the detectives permitted him to do so, the detectives "repeated" that Eastman "was not under arrest." A542. Eastman, Detective Morgan, and Detective Terni "then left for the police station with the computer." A542. The detectives did not handcuff Eastman, but Detective Terni patted down Eastman before he entered the police vehicle. *See* A542-A543.

At around 6:55 p.m., seated "at one of the many desks in a large room" at the police station, "Detective Morgan gave *Miranda* warnings" to Eastman. A543. Eastman "signed a card acknowledging that he had been advised of his rights." A543; *see also* A147. Detective Morgan then conducted an interview, which resulted in Eastman's "oral confession." A543.

Eastman thereafter "agreed to give a written statement." A543. At "around 7:32 p.m.," he signed "an advisement of rights form." A543; *see also* A149. At 7:40 p.m., Eastman signed "a consent form to search" the desktop computer seized from his bedroom. A543; *see also* A154. Detective Morgan finished typing a written statement at approximately 8:43 p.m., at which point Eastman reviewed the document and requested certain changes. *See* A543. Detective Morgan incorporated those changes. *See* A543. "The statement describes in graphic detail Mr. Eastman's use of

7

his computer to lure underage girls into performing sexually explicit activity." A543; *see also* A151-A152. Eastman "swore an oath" before Waterbury Police Lieutenant William Fox—who had been promoted to Captain by the time of the suppression hearing—"affirming that the statement was true and accurate." A544. Eastman "then signed and initialed the document." A544. The detectives did not arrest Eastman at that time; instead, they drove him home. *See* A544.

The Waterbury Police conducted an initial forensic examination of Eastman's computer. *See* PSR ¶ 12. Homeland Security Investigations subsequently conducted its own forensic examination of the computer and took additional investigative steps. *See* PSR ¶ 12.

The forensic examinations and Eastman's statements reveal that, from approximately June 2012 through November 2012, Eastman engaged in video chats with several young girls on Skype, using different Skype accounts he created that resembled the names of popular musicians (such as Justin Bieber, Harry Styles, and others) and video footage of those musicians. *See* PSR ¶¶ 10, 12-34, 39-40. During these Skype chats, Eastman asked the girls to pose in a sexual manner or to perform sexual acts. *See* PSR ¶¶ 10, 23-24, 26-29.

Moreover, Eastman used his computer to take photographs or video recordings of the girls during these Skype chats. *See* PSR ¶¶ 19-21, 23-24,

8

26, 28, 31-33. In total, the forensic review of East-
man's computer revealed that he produced and
saved at least 74 photographs and two videos of
child pornography, depicting the girls he was
communicating with on Skype. *See* PSR ¶¶ 20-21.
Law enforcement identified five of the girls de-
picted in these images, whose ages ranged from
12 to 16. *See* PSR ¶¶ 22-32.

The forensic examinations and Eastman's
statements also revealed that Eastman viewed
child pornography on various internet websites.
*See* PSR ¶¶ 11, 36-38. Indeed, hundreds of deleted
images of child pornography were located on
Eastman's computer. *See* PSR ¶¶ 36-38.

In May 2013, a state warrant issued for East-
man's arrest on various charges related to this
conduct. *See* PSR ¶¶ 41, 94. On February 12,
2015, a federal criminal complaint effectively
adopted the pending state charges against East-
man. *See* A23-A37. On January 7, 2016, a federal
grand jury returned the underlying indictment.
*See* A38-A41.

## B. The suppression ruling

On January 22, 2016, Eastman moved to sup-
press the evidence recovered from his computer
and the inculpatory statements he made at his
apartment and at the police station. *See* A6, A42-
A106. Eastman primarily argued that he never
provided consent for the detectives to enter his
apartment or to seize his computer, and he never

9

received *Miranda* warnings at his apartment or at the police station.

On May 31, 2016, the district court held an evidentiary hearing. *See* A8, A216-A453. The government presented the testimony of three witnesses: Detective Morgan, Detective Terni, and Captain Fox. *See* A536. The government also presented several exhibits, including the various police forms Eastman signed on November 10, 2012. *See* A543; *see also* A147, A149, A151-A152, A154. Eastman presented the testimony of his mother, Linda Eastman. *See* A536. Eastman also presented his own affidavit, but he did not testify. *See* A545, A553; *see also* A92-A94.[4]

On August 15, 2016, the district issued a written ruling denying Eastman's suppression motion. *See* A535-A560. In denying the motion, the district court credited law enforcement's account of the events of November 10, 2012 and rejected

---

[4] The parties also submitted reports from handwriting experts regarding the examination of Eastman's signatures and initials on the police forms. *See* A549. By agreement, the parties did not call the experts to testify at the evidentiary hearing. *See* A549; *see also* A217-A220. In the suppression ruling, the district court expressed skepticism about the utility of handwriting experts. *See* A550-A552. But it ultimately declined to "give significant weight to either report" because the experts did not testify and therefore could not answer the district court's questions about their methodology. *See* A552-A553.

10

Eastman's contrary account. *See generally* A544-A553. The suppression ruling explored in depth two particular issues related to this credibility determination: whether Eastman signed the police forms and whether the detectives ever placed Eastman in handcuffs. *See* A544-A549.

### 1. The signatures

In crediting law enforcement's account, the district court started with "the crucial point about whether [Eastman] signed the police forms." A546. The district court deemed "Captain William Fox" to be "a highly credible witness with little incentive to fabricate: He was not assigned to the case, did not work frequently with Detectives Morgan and Terni, and was considerably more senior in rank." A544. Captain Fox's "testimony closely matched the documents." A544; *compare* A151-A152 *with* A408-A413. Moreover, "Captain Fox's testimony was corroborated by the detailed testimony of Detectives Morgan and Terni." A545; *see also* A265-A269, A364-A368.

"Against this evidence showing that Mr. Eastman did in fact sign the forms in question, the defendant presented no credible evidence." A545. "The defendant's only witness at the hearing—his mother—testified only as to what she observed after Mr. Eastman gave his consent for the officers to enter the apartment, and had no personal knowledge of what took place during the initial entry or later at the police station." A545. In his

11

affidavit, Eastman "swore that the signatures on the forms at issue were not his," but the district court determined that affidavit was "not credible." A545. It explained three reasons for this determination:

- "First, the defendant's definitive statements that he did not sign the police forms are directly contradicted by the substantial evidence that he did." A545.

- "Second, the defendant himself did not testify, and while I draw no adverse inference from his decision not to do so, the fact remains that his statements have not been subjected to cross-examination and therefore carry less weight compared to the credible testimony of the government witnesses, which was subject to cross-examination at the hearing." A545-A546.[5]

---

[5] *See, e.g.*, *United States v. Faux*, 828 F.3d 130, 132 n.1 (2d Cir. 2016) (suggesting that a district court is "not able to credit" a defendant's "version of the events when it conflicted with the Government's version," where the defendant "presented" her account only "in an affidavit and was not subject to cross examination"); *United States v. Medina*, 19 F. Supp. 3d 518, 535 n.13 (S.D.N.Y. 2014) ("As a general matter, credible testimony at a hearing is entitled to more weight than an affidavit, because testimony has been subjected to cross-examination."); *DiMattina v. United States*, 949 F. Supp. 2d 387, 410-11 (E.D.N.Y. 2013)

12

- "Third, portions of the defendant's version of events—as set forth in his affidavit—make little sense." A546. The district court underscored two examples. Eastman averred that Detective Terni "drove him home alone." A546; *see also* A94. Not only did Eastman's version diverge from the testimony of the detectives, *see* A270, A368, but "it is simply implausible that Detective Morgan—the lead detective— would have allowed Detective Terni, who was assisting him, to drive someone who was then definitely a suspect home alone," A546. Eastman also averred that upon dropping him off, Detective Terni returned to Eastman four cell phones taken from the apartment. *See* A94, A546. Although this topic "was not covered at all at the hearing," "it is implausible that the officers would have seized the phones and then returned them without examining them forensically, especially in light of their plans to examine the computer forensically." A546.

Accordingly, the district court found that Eastman "sign[ed] the documents in question." A553. Moreover, it declined to credit any part of Eastman's affidavit. *See* A546, A548.

------------------------

("Without the threat of cross-examination, DiMattina's affidavits are viewed as self-serving and given little weight.").

13

## 2. The handcuffs

The district court next considered that "the two detectives contradicted each other on whether they were carrying handcuffs on November 10, 2012." A548. It nevertheless credited "the officers' version that Mr. Eastman was not cuffed at any time on" that date. A549. On this point, Detectives Morgan and Terni "testified—definitively and repeatedly—that the defendant at no time was cuffed, either in the apartment, at the police station, or in the vehicle." A547; *see also* A237, A241, A245, A246, A249, A270, A300, A345, A353, A381.

In contrast, Eastman's mother provided "muddled" testimony about whether Eastman was placed in handcuffs. A547. She testified that she observed Eastman in handcuffs in the apartment. *See* A429. But diverging from Eastman's own affidavit, *see* A93, Eastman's mother testified that Eastman was cuffed when he went to the bathroom, *see* A450. Moreover, Eastman's mother offered seemingly conflicting testimony about whether she even was in a position to see if Eastman was cuffed when he went to the bathroom. *Compare* A431 *with* A450.

In any event, the district court "found that the detectives were more credible than the defendant's mother" because they "were on the stand for considerably longer than the mother, their testimony was substantially more detailed, and her testimony, which was closer to the version in her

14

son's affidavit, is suspect because that affidavit is not credible." A548. The district court highlighted other specific concerns about Eastman's mother's testimony:

- "The mother's version of at least some of the events was implausible and may have been colored by her affection for her son or by the fact that, as she testified, she was not feeling well [on November 10, 2012], was sleeping when the officers came into the apartment, and was roused suddenly while they were there—or both." A548; *see also* A427-A428. For example, Eastman's mother testified that one of the detectives entered her bedroom, "stood there for a few minutes," exited her bedroom, and began "looking through stuff." A428-429. When she asked "who are you" and inquired "what was he doing," the officer allegedly did not respond. A428-A429. As the district court explained, "[i]t is unclear what motive the detectives would have had to refuse to speak to or even identify themselves to a complaining resident whose room they had just entered. I do not find her account to be credible." A549.

- Moreover, "at points Ms. Eastman's memory was faulty or she was not forthright, or both." A549. For example, she "offered conflicting facts about her location within the apartment during the police visit." A549. Eastman's mother testified that she stood in two different locations during the police visit, *see* A441-

15

A450, but she described sitting at a kitchen table in a previously submitted affidavit, *see* A96.

Accordingly, the district court "credit[ed] the officers' version that Mr. Eastman was not cuffed at any time on November 10, 2012" and it rejected Eastman's mother's account. A549.

\* \* \*

The district court's legal conclusions flowed directly from the foregoing credibility determinations. Indeed, based on law enforcement's account, the district court concluded that Eastman "voluntarily consented to the searches, was not in custody when he made statements in his house, and voluntarily waived his *Miranda* rights before signing a confession at the police station." A539; *see also* A553-A560. The district court therefore denied Eastman's suppression motion in its entirety. *See* A560.

Following that denial, on March 2, 2017, Eastman entered a conditional guilty plea, reserving his right to appeal the district court's suppression ruling. *See* A14, A561-A572, A573-A612. Eastman filed a timely notice of appeal and now exercises that right. *See* A723.

16

## Summary of Argument

At the heart of his appeal, Eastman challenges the district court's credibility determinations. He primarily attacks Detective Morgan's decision not to seek a search warrant. Highlighting this decision and other purported missteps in the investigation, Eastman argues the district court should have accepted his version of events and rejected law enforcement's contrary account. But the suppression ruling makes clear that the district court carefully considered the testimony, affidavits, reports, and exhibits before crediting law enforcement's account. The record provides ample support for the district court's credibility determinations. Put differently, the district court committed no error—and certainly no clear error—in crediting law enforcement's account. Accordingly, the suppression ruling and the judgment entered by the district court should be affirmed.

## Argument

## I. The district court committed no error— and certainly no clear error—in crediting law enforcement's account and therefore denying Eastman's suppression motion.

### A. Governing law and standard of review

On appeal from the denial of a suppression motion, this Court "review[s] the district court's factual findings for clear error, and its application of law to fact *de novo*." *United States v. Pabon*, 871

17

F.3d 164, 173 (2d Cir. 2017), *cert. denied*, No. 17-8331, 2018 WL 1610239 (U.S. Oct. 1, 2018). But where a district court's factual "findings are based on credibility determinations, even greater deference is required, 'for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what was said.'" *United States v. Isiofia*, 370 F.3d 226, 232 (2d Cir. 2004) (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 575 (1985)); *see also United States v. Iodice*, 525 F.3d 179, 185 (2d Cir. 2008) ("When, as here, credibility determinations are at issue, we give particularly strong deference to a district court finding.").

Indeed, this Court is "not allowed to second-guess the factfinder's credibility assessments, and '[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.'" *United States v. Medunjanin*, 752 F.3d 576, 584-85 (2d Cir. 2014) (quoting *Bessemer City*, 470 U.S. at 573-74). As this Court put it nearly thirty years ago, "[a]ssessments of the credibility of witnesses are the province of the district court and we are not entitled to overturn those assessments." *United States v. Maldonado-Rivera*, 922 F.2d 934, 972 (2d Cir. 1990).

18

## B. Discussion

The district court committed no error—and certainly no clear error—in crediting law enforcement's account of the events of November 10, 2012. Eastman presented a contrary version of events, in which:

> the police shoved their way into his apartment and physically restrained him with handcuffs; his mother strenuously objected to the police presence; the police never gave him any *Miranda* warnings and he was interrogated despite his request for an attorney; and the police repeatedly forged his signature on documents that purport to show that his confession was lawful.

A544. But the suppression ruling makes clear that the district court carefully considered the testimony, affidavits, reports, and exhibits before crediting law enforcement's version and rejecting Eastman's contrary account. *See* A544-A553.

As recounted above, the district court methodically evaluated the evidence before finding that Eastman signed the police forms and that the detectives never cuffed Eastman. The credibility determinations underlying these factual findings find ample support in the record. On appeal, Eastman therefore shifts the focus away from these credibility determinations. He instead renews his attack on Detective Morgan's credibility on the ground that Detective Morgan decided not to seek

19

a search warrant for Eastman's apartment, conduct other investigative work, or take field notes. *See* Def.'s Br. at 5-7, 9-11, 13-14, 21-22, 24-25. This attack is misplaced.

*First*, Detective Morgan's decision not to seek a search warrant was entirely appropriate. Detective Morgan testified that he felt he needed more information to establish probable cause before applying for such a warrant. *See* A232, A283, A340. But he also testified that "I found in my years of doing these investigations that just showing up with a search warrant and going in and taking things doesn't yield as much cooperation as just going and talking to people and having an honest and a direct conversation about the investigation. And I feel that that garners much more cooperation with people." A233. Indeed, Detective Morgan testified that the "practice of trying to have a person . . . talk to you voluntarily or consent to a search" is "a widely used tactic, and it's referred to as a knock and talk throughout the community." A341; *see also* A280-A285. The district court therefore explained that Detectives Morgan and Terni went to Eastman's apartment on November 10, 2012 "hoping that Mr. Eastman would cooperate with the investigation and that obtaining a warrant would not be necessary." A541.

This approach is both lawful and appropriate. "There are many entirely proper reasons why police may not want to seek a search warrant as soon as the bare minimum of evidence needed to

20

establish probable cause is acquired" and instead may "knock on the door and seek either to speak with an occupant or to obtain consent to search." *Kentucky v. King*, 563 U.S. 452, 466 (2011). These reasons include that "officers may wish to obtain more evidence before submitting what might otherwise be considered a marginal warrant application" and that a "knock and talk" approach "is simpler, faster, and less burdensome than applying for a warrant." *Id.* at 467; *see also United States v. Lucas*, 640 F.3d 168, 174 (6th Cir. 2011) ("[T]he 'knock and talk' procedure used by the police is a legitimate investigative technique aimed at achieving a suspect's consent to search."); *United States v. Jones*, 239 F.3d 716, 720 (5th Cir. 2001) ("Federal courts have recognized the 'knock and talk' strategy as a reasonable investigative tool when officers seek to gain an occupant's consent to search[.]").

*Second*, to the extent Eastman attacks Detective Morgan's investigative work as incomplete or sloppy, such an attack simply does not go to Detective Morgan's credibility. The district court expressly considered Eastman's claims of "material omissions in Detective Morgan's police report," "that Detective Morgan did not make or keep notes of the investigation," and "that Detective Morgan did not provide a property receipt when he took the computer." A548 n.3. But it concluded that even if "Detective Morgan conducted a sloppy

21

investigation and did not follow certain best practices," "it would not follow that Detective Morgan lied in his testimony or that Mr. Eastman did not consent to the search of the apartment and the seizure of the computer." A548 n.3. Moreover, the district court found "Detective Morgan's testimony to be credible because it is corroborated by other credible evidence in this case." A548 n.3.

*Third*, Eastman argues that Detective Morgan's testimony that the officers did not conduct a protective sweep is incredible because Detective Morgan claimed to bring along Detective Terni for the purpose of ensuring officer safety. *See* Def.'s Br. at 16. Relying on his mother's testimony, Eastman asserts that Detective Morgan did perform a protective sweep. *See* Def.'s Br. at 16 (citing A428-A429). But the district court declined to credit Eastman's mother's testimony. *See* A548-A549. Moreover, the detectives consistently testified that they neither entered Eastman's mother's room nor conducted a protective sweep. *See* A243, A293-A294, A369. Detective Morgan further testified that once he was inside the apartment, he did not sense any danger and therefore did not feel any need to conduct a protective sweep. *See* A293-A294, A342 ("I didn't feel a protective sweep was necessary in any way."), A383. Indeed, the testimony established—and the district court found—that Eastman was calm and cooperative throughout the police interaction. *See, e.g.*, A237, A242, A245, A270, A342, A541.

22

In short, Eastman's renewed attack on Detective Morgan's investigation does very little—if anything—to undermine the district court's credibility determinations. The district court already considered and rejected this attack. Moreover, the district court identified specific reasons why Eastman's affidavit and his mother's testimony were not credible, especially when compared to the consistent and corroborated account that emerged from the law enforcement testimony.

Accordingly, there is no basis for this Court to overturn the district court's factual findings. *See, e.g.*, *Medunjanin*, 752 F.3d at 584-85 ("We are not allowed to second-guess the factfinder's credibility assessments."); *Iodice*, 525 F.3d at 185 ("When, as here, credibility determinations are at issue, we give particularly strong deference to a district court finding."); *Maldonado-Rivera*, 922 F.2d at 972 ("Assessments of the credibility of witnesses are the province of the district court and we are not entitled to overturn those assessments."). No error—and certainly no clear error—taints the district court's credibility determinations. *See Bessemer City*, 470 U.S. at 573-74 ("If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible

23

views of the evidence, the factfinder's choice between them cannot be clearly erroneous.").

But for the sake of completeness, the government now turns to the credibility determinations underlying the district court's legal conclusions that Eastman "voluntarily consented to the searches, was not in custody when he made statements in his house, and voluntarily waived his *Miranda* rights before signing a confession at the police station." A539.

## 1. Consent

The Fourth Amendment generally prohibits warrantless searches and seizures. *See* U.S. CONST. amend. IV. But law enforcement officers may search a residence without a warrant (and without probable cause) if the search is conducted with consent. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973).

"The government has the burden of proving, by a preponderance of the evidence, that a consent to search was voluntary." *Isiofia*, 370 F.3d at 230. "Voluntariness is a question of fact determined by a 'totality of all the circumstances.'" *Id.* at 231 (quoting *Schneckloth*, 412 U.S. at 227). "[T]he ultimate question presented is whether the officer had a reasonable basis for believing there had been consent to the search." *United States v. Garcia*, 56 F.3d 418, 423 (2d Cir. 1995) (internal quotation marks omitted).

24

Against this legal backdrop, the district court concluded that Eastman provided consent for the detectives to enter his apartment, seize his computer, and search his computer. *See* A553-A554. In finding that "Eastman consented to the entry," A553, the district court credited the testimony of Detectives Morgan and Terni, *see* A236, A290, A352. The district court did not credit Eastman's affidavit on this point and Eastman's mother "had no personal knowledge of the entry because she was sleeping at the time." A553.

In finding that Eastman "consented to the search and seizure of his computer," A554, the district court again credited the testimony of the detectives, *see* A240-A241, A243-A245, A319, A333, A354-A355, A362, A379, A402. The district court further explained "the fact that Mr. Eastman signed the consent to search form at the police station suggests that he consented to the earlier seizure of his computer." A554; *see also* A154. It also highlighted that "Captain Fox specifically questioned Mr. Eastman about whether his signature on the voluntary statement—which includes a statement that he consented to the seizure of the computer—was voluntary." A554-A555; *see also* A152.

In making these findings, the district court considered the totality of the circumstances to evaluate the voluntariness of Eastman's consent. *See* A554. It highlighted that Eastman "was an

25

adult" and that he was "no stranger to police interactions." A554. In view of Eastman's "extensive interactions with the police from 1998 until 2012," he "likely would have been exposed to police questioning multiple times and would almost certainly have had his rights explained to him either by the officers involved or by his attorneys." A554; *see also* PSR ¶¶ 59-90, 151.

The record therefore provides ample support for the district court's credibility determinations regarding consent and, in turn, those credibility determinations provide ample support for the district court's legal conclusions regarding consent. On appeal, Eastman pursues three arguments to the contrary. All three arguments lack merit.

*First*, Eastman underscores that he "did not provide written consent for the Detectives to enter his home" and "it is undisputed, that neither Detective nor Mr. Eastman ever uttered the word 'consent.'" Def.'s Br. at 12, 13; *see also* Def.'s Br. at 24-25. But the law is clear that consent "need not be expressed in any particular form[.]" *United States v. Deutsch*, 987 F.2d 878, 883 (2d Cir. 1993). Indeed, "it is well settled that consent may be inferred from an individual's words, gestures, or conduct." *United States v. Buettner-Janusch*, 646 F.2d 759, 764 (2d Cir. 1981).

In this case, the district court found that "Detective Morgan asked Mr. Eastman if the detectives could 'come in and talk to him.' Mr. Eastman

26

said 'yes, okay.'" A541 (citations omitted). Moreover, the district court found that Eastman "agreed . . . to let the detectives take the computer." A542; *see also* A240-A241, A243-A245, A319, A333, A354-A355, A362, A379, A402.

Based on these factual findings, the district court committed no error—and certainly no clear error—in determining that Eastman consented to law enforcement's entry into his apartment and to the seizure of his computer.

*Second*, Eastman argues that even if he provided consent, law enforcement's entry into the home and search and seizure of the computer still violated the Fourth Amendment because Eastman's mother held the lease for the apartment and she purchased the computer. *See* Def.'s Br. at 21. But there is "nothing new in the notion that a third party may validly consent to the search of an area in which another has a reasonable expectation of privacy where the third party shares common authority over the area." *United States v. Davis*, 967 F.2d 84, 86-87 (2d Cir. 1992). "Even if the person giving consent in fact lacked authority to do so, the consent may nonetheless validate the search if the person reasonably appeared to the police to possess authority to consent to the search." *United States v. McGee*, 564 F.3d 136, 139 (2d Cir. 2009).

In this case, the district court found that the lease for the apartment was in Eastman's mother's name, but Eastman "had resided at the

27

apartment for a few years," "had authority to set up services such as Comcast internet for the apartment," and "had his own room where he kept a desktop computer." A542. Moreover, when the detectives arrived at the apartment on November 10, 2012, Eastman "answered the door" and, at that point, "there was no indication that Ms. Eastman was also present." A556.

The district court further found that Eastman "told the officers that he had a bedroom at the apartment and that he had purchased the computer in the bedroom." A556; *see also* A93-A94 (Eastman's affidavit repeatedly refers to this computer as "my computer"), A151 (in his voluntary statement, Eastman stated he "bought the [computer] I have now"), A244 (Detective Morgan testified that Eastman "identified the bedroom as his and identified the computer as one that he had purchased"). It also found that Eastman's mother "had a separate bedroom" and "there were other computers in the apartment that she likely used." A556; *see also* A542 (finding the desktop "computer belonged to Mr. Eastman, either because his mother gave it to him as a gift or because he had purchased it" and "Ms. Eastman used two other computers, one in her bedroom and one in the living room"). Indeed, there was "no testimony that Ms. Eastman told the detectives that she owned the computer." A542.

28

Based on these factual findings, the district court committed no error—and certainly no clear error—in determining that even if Eastman "did not have actual authority to consent to the entry of the apartment or the seizure of the computer," he had apparent authority to do so. A556. "[T]he facts available to the officers would warrant a person of reasonable caution in the belief that Mr. Eastman could consent to the search and seizure at issue." A556.

"The police certainly could have asked Ms. Eastman whether she owned the computer that was in her adult son's separate bedroom, but even a person of reasonable caution would not think that doing so was necessary to confirm that Mr. Eastman had authority to allow the police to take the computer that was in his bedroom at the apartment where he arranged for internet service and that he claimed to have purchased." A556; *see also United States v. Lopez*, 547 F.3d 397, 400 (2d Cir. 2008) ("[H]aving obtained the consent of one co-occupant, the officers are under no obligation to inquire of the other occupant whether he consents, even when the other occupant is present at the premises when the consent is given."). The detectives simply "had no duty to ask" Eastman's mother whether she "consented to the search, no matter how easy or convenient it might have been to do so." *Id.*

29

*Third*, Eastman argues that his mother negated any "purported consent when she questioned the Detectives['] presence in her home." Def.'s Br. at 21. This argument fails on the facts and the law.

Contrary to Eastman's argument, the district court found that Eastman's mother "did not protest the officers' presence in the apartment." A556. In making this factual finding, the district court rejected Eastman's mother's testimony:

> According to her testimony, she protested and demanded that [Detective Morgan] identify himself and explain why he was in her home but he said not a word in response, not even identifying himself or telling her to get out of his way. It is unclear what motive the detectives would have had to refuse to speak to or even identify themselves to a complaining resident whose room they had just entered. I do not find her account to be credible.

A548-A549 (citation omitted). The district court instead credited law enforcement's account that "[a]t some point, Mr. Eastman's mother came out of her room, but as soon as Detective Morgan identified himself and told her that he was investigating a case, Mr. Eastman told his mother to return to her room and she walked away." A541; *see also* A238-A239. The district court's factual

30

findings thus undermine the premise of East-man's argument (*i.e.*, that his mother questioned law enforcement's presence in the apartment).

But even if Eastman's mother had "questioned the Detectives['] presence in her home," such questioning falls short. Def.'s Br. at 21. The law places "the onus" on a co-occupant to affirmatively object to a search or seizure for which another occupant has provided consent. *Lopez*, 547 F.3d at 400. Indeed, to overcome one occupant's consent, another occupant must lodge an "express objection," *id.* at 399, or provide an "express refusal of consent," *Georgia v. Randolph*, 547 U.S. 103, 120 (2006). Not even Eastman's mother's testimony reveals such an express objection. *See* A427-A432. The district court therefore observed "there is no testimony that Ms. Eastman . . . expressly objected to the presence of the police in her apartment." A542.

Accordingly, the district court committed no error—and certainly no clear error—in determining that Eastman's mother "did not protest the officers' presence in the apartment" at all, much less in a manner that would have overcome Eastman's consent. A556.

For the foregoing reasons, the district court properly determined that Eastman provided valid consent to law enforcement's entry in his apartment and to the search and seizure of his computer.

31

## 2. Statements at the apartment

"To protect the Fifth Amendment right against self-incrimination, the Supreme Court in *Miranda v. Arizona* ruled that police may not interrogate a suspect who has been taken into custody without first warning the person 'that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.'" *United States v. Newton*, 369 F.3d 659, 668 (2d Cir. 2004) (quoting *Miranda*, 384 U.S. 436, 479 (1966)). "Statements made during a custodial interrogation are generally inadmissible unless a suspect has first been advised of [these *Miranda*] rights." *United States v. Faux*, 828 F.3d 130, 134 (2d Cir. 2016).

"The test for determining custody is an objective inquiry that asks (1) whether a reasonable person would have thought he was free to leave the police encounter at issue and (2) whether a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with formal arrest." *Id.* at 135 (internal quotation marks omitted); *see also Stansbury v. California*, 511 U.S. 318, 323 (1994) (per curiam) ("Our decisions make clear that the initial determination of custody depends on the objective circumstances of the interrogation, not on

32

the subjective views harbored by either the interrogating officers or the person being questioned."). In applying this test, "a court looks at all the surrounding circumstances." *Faux*, 828 F.3d at 135. "Relevant considerations include: (1) the interrogation's duration; (2) its location (*e.g.*, at the suspect's home, in public, in a police station, or at the border); (3) whether the suspect volunteered for the interview; (4) whether the officers used restraints; (5) whether weapons were present and especially whether they were drawn; and (6) whether officers told the suspect he was free to leave or under suspicion." *Id.* (internal quotation marks omitted).

The district court found that "Mr. Eastman did not receive *Miranda* warnings before he admitted that he used the Harry Styles username for video sex chatting" while in the apartment. A557. But it determined that "*Miranda* warnings were not needed because Mr. Eastman was not subjected to custodial interrogation at that time." A557. The district court carefully reviewed the surrounding circumstances before concluding that Eastman was not in custody at the apartment. *See* A558-A559. Indeed, the district court's analysis tracked the six factors enumerated in *Faux*:

- First, the district court found that "the questioning was relatively brief," lasting "less than an hour." A558.

33

- Second, the district court found that Eastman was interviewed in his "home," where "he had been living for some time." A558. "[C]ourts rarely conclude, absent a formal arrest, that a suspect questioned in her own home is 'in custody.'" *Faux*, 828 F.3d at 135-36. For Eastman, the district court explained that "[a] reasonable person who lived in an apartment, even though not a leaseholder, would think that he was able to [] terminate the police encounter in this context by telling the officers to leave." A558.

- Third, although Eastman "did not approach the police," he "responded affirmatively when asked whether the police could enter his apartment to speak with him." A559. Moreover, the district court found that Eastman "was calm and cooperative throughout the discussion." A541; *see also* A152 (in the voluntary statement, Eastman stated that he "wanted to fully cooperate").

- Fourth, the district court found "that the officers did not use any restraints or otherwise restrict Mr. Eastman's movement while at Mr. Eastman's home." A559; *see also* A542 (at his request, the detectives permitted Eastman to "use the restroom before leaving" for the police station), A549 ("I credit the officers' version that Mr. Eastman was not cuffed at any time on November 10, 2012.").

34

- Fifth, the district court found that "the officers were visibly armed," but determined "this factor is only slightly in Mr. Eastman's favor and does not outweigh the other factors because there is no evidence that the weapons were ever drawn or that the detectives otherwise made a show of force." A559.

- Sixth, the district court found that although Eastman "was not explicitly told that he was free to leave" and "[i]t would have been clear to a reasonable person in Mr. Eastman's position . . . that he was 'under suspicion,'" the detectives informed Eastman "that he was not under arrest." A559; *see also* A541 (after entering the apartment, the "detectives told Mr. Eastman that he was not under arrest"), A542 (before leaving for the police station, the "officers repeated that the defendant was not under arrest"). Indeed, in his affidavit, Eastman averred that before leaving his apartment for the police station, he "was told at that time that [he] was not under arrest, and the request to go to the station was phrased as a request, not an order." A92. The district court therefore determined this "factor is neutral as to whether Mr. Eastman was in custody." A559.

In view of all "the circumstances concerning the questioning in Mr. Eastman's apartment," the district court found "that a reasonable person would have understood that he or she was not in custody." A560. The district court committed no

35

error—and certainly no clear error—in the credibility determinations or factual findings underlying this legal conclusion.

On appeal, Eastman makes no claim to the contrary. Nor does Eastman challenge the district court's legal conclusion that he was not in custody at the apartment. Instead, the only argument Eastman raises regarding the inculpatory statements he made at his apartment is that they should "be suppressed as fruit of the poisonous tree" based on law enforcement's initial entry. Def.'s Br. at 20. But as set forth above, Eastman provided valid consent for that entry.

For the foregoing reasons, the district court properly determined that Eastman was not in custody when he provided inculpatory statements at his apartment. "[T]he failure to give *Miranda* warnings at the apartment" therefore did "not merit the suppression of" those statements. A560.

### 3. Statements at the police station

Without deciding whether Eastman was in custody at the police station, the district court found that he received *Miranda* warnings before providing inculpatory statements in that setting. *See* A557. Relying on the law enforcement testimony and the police forms themselves, the district court found that "Detective Morgan gave *Miranda* warnings to the defendant around 6:55 p.m." and again "around 7:32 p.m." on November 10, 2012. A543; *see also* A147, A149, A151-A152,

36

A249-A255, A264, A266-A269, A359-A362, A364-A368, A410-A413. The voluntary statement "acknowledges that Mr. Eastman was repeatedly advised of his constitutional rights" and Eastman "swore an oath . . . affirming that the statement was true and accurate." A543-A544. The district court rejected Eastman's affidavit—"in which he swore that the signatures on the forms at issue were not his"—as "not credible." A545.

Relying on these credibility determinations and factual findings, the district court found "no basis to suppress th[e] statements" Eastman provided at the police station. A557. It explained "[t]he best evidence that Mr. Eastman received *Miranda* warnings are the multiple signed statements affirming that he was advised of his constitutional rights, that he understood those rights, and that he wished to forego his rights and answer the detectives' questions." A557. "[T]here is also credible testimony that the officers gave these warnings." A557. Put simply, "the evidence at the hearing showed that the defendant knowingly and voluntarily signed two waivers of his *Miranda* rights at the police station before voluntarily signing the written confession." A560.

Accordingly, the district court committed no error—and certainly no clear error—in the credibility determinations underlying its factual finding that Eastman received *Miranda* warnings before making inculpatory statements at the police station.

37

On appeal, Eastman makes no claim to the contrary. Instead, the only argument Eastman raises regarding the inculpatory statements he made at the police station is that they should "be suppressed as fruit of the poisonous tree" based on law enforcement's initial entry in the apartment. Def.'s Br. at 20. But as set forth above, Eastman provided valid consent for that entry.

For the foregoing reasons, the district court properly determined that Eastman "voluntarily waived his *Miranda* rights before signing a confession at the police station." A539.

\* \* \*

The district court carefully considered the testimony, affidavits, reports, and exhibits provided in connection with Eastman's suppression motion. It ultimately credited law enforcement's account of the events of November 10, 2012 and rejected Eastman's contrary account. The district court's credibility determinations are free from error, and certainly free from clear error. And those credibility determinations led directly to the district court's legal conclusions that Eastman "voluntarily consented to the searches, was not in custody when he made statements in his house, and voluntarily waived his *Miranda* rights before signing a confession at the police station." A539. The district court therefore appropriately denied Eastman's suppression motion.

38

## Conclusion

For the foregoing reasons, the suppression ruling and the judgment entered by the district court should be affirmed.

Dated: October 23, 2018

Respectfully submitted,

JOHN H. DURHAM
UNITED STATES ATTORNEY
DISTRICT OF CONNECTICUT

NEERAJ N. PATEL
ASSISTANT U.S. ATTORNEY

Marc H. Silverman
Assistant United States Attorney (of counsel)

39

## Federal Rule of Appellate Procedure 32(g) Certification

This is to certify that the foregoing brief complies with the 14,000-word limitation of Second Circuit Local Rule 32.1(a)(4), in that the brief is calculated by the word processing program to contain approximately 8,226 words, exclusive of the Table of Contents, Table of Authorities, Addendum, and this Certification.

NEERAJ N. PATEL
ASSISTANT U.S. ATTORNEY

**Addendum**

**U.S. CONST. amend. IV.**

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

**U.S. CONST. amend. V.**

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.